G. BARON COLEMAN
**BARON COLEMAN LAW FIRM**
PO Box 789
Montgomery AL 36101-0789
baroncoleman@gmail.com
(334) 625-9097

RONALD D. COLEMAN (*phv* admission pending)
LAUREN X. TOPELSOHN (*phv* admission pending)
**MANDELBAUM SALSBURG, PC**
1270 Avenue of the Americas – Suite 1808
New York, NY  10020
rcoleman@lawfirm.ms
ltopelsohn@lawfirm.ms
(212) 776-1834

RECEIVED

2019 FEB -4  A 8: 06

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| GAVIN McINNES,<br><br>  *Plaintiff*,<br><br>  - *vs.* -<br><br>THE SOUTHERN POVERTY LAW<br>CENTER, INC.,<br><br>  *Defendant*. | CIVIL ACTION NO.<br>2:19-cv-98<br><br>**COMPLAINT<br>AND JURY DEMAND** |

Plaintiff Gavin McInnes, by and through the undersigned counsel, as and for his

Complaint against defendant The Southern Poverty Law Center, Inc. ("**SPLC**" or "Defendant"),

hereby alleges as follows:

### INTRODUCTION

1.  Gavin McInnes is a humorist,
businessman, political commentator and social critic
whose work as an Internet "television" personality is,
as shown at right, billed and understood widely as



satirical, meant for grownups and the "rebellious."

2.     Mr. McInnes, an immigrant, is an avowed and vocal opponent of discrimination based on race, religion or sexual preference, and of ideologies and movements espousing extremism, nationalism and white supremacy.

3.     In an era, however, where dominant institutions demand and enforce cultural and political orthodoxy, however disguised as non-conformity, Mr. McInnes, his associates and his family have been successfully targeted for personal and professional destruction by a self-appointed enforcer of such orthodoxy, defendant SPLC, to achieve SPLC's own ideological, political and financial (i.e., fundraising) ends, as alleged further below.

4.     As also detailed below, the primary method SPLC uses to achieve its goals and those of its donors is by identifying activists, political figures and groups as targets or enemies of society and designating its enemies "extremists," "white supremacists," "hate groups" and the like (the "SPLC Hate Designations").

5.     Although the SPLC Hate Designations are not empirical statements of fact, and are frequently entirely counter-factual, the SPLC Hate Designations are nonetheless intended by SPLC and treated by the mainstream press, law enforcement, courts and social media organizations not as SPLC's opinion but rather as objective, empirical factual determinations.

6.     One way SPLC uses the SPLC Hate Designations is to cause its victims to be "deplatformed," or deprived of access to online and in-person venues in which they were, prior to being deplatformed, able to express their views to those who choose to listen, or "defunded," meaning blocked from access from both social-media-based crowdfunding sources and payment processors such as both online and traditional banks and credit card companies.

7.      By leveraging its remarkable power and influence to deplatform and defund targeted groups and individuals such as Mr. McInnes, SPLC deprives those with which it disagrees of venues in which their points of view may be expressed, of income and ultimately of their most priceless possession, their reputations.

8.      SPLC's campaign against Mr. McInnes is arguably the most successful employment of its system to personally destroy those it disagrees with, but who in fact is not an extremist, on ideological grounds, but not its first.

9.      In August 2018, at the Summit on Religious Liberty conference of the Alliance Defending Freedom ("ADF"), a Christian legal group, then–United States Attorney General Jeff Sessions observed as follows:

> You know I'm from Alabama – the home of the Southern Poverty Law Center, an organization that did important work in the South, vital work at a pivotal time. As you know well, the law is only words on paper until there are people brave enough to stand up for their rights.
>
> There were hate groups in the South I grew up in. They attacked the life, liberty, and the very worth of minority citizens. You may not know this, but I helped prosecute and secure the death penalty for a Klansman who murdered a black teenager in my state. The resulting wrongful death suit led to a \$7 million verdict and the bankruptcy of the Ku Klux Klan in the South. That case was brought by the Southern Poverty Law Center.
>
> But when I spoke to ADF last year, I learned that the Southern Poverty Law Center had classified ADF as a "hate group." Many in the media simply parroted it as fact. Amazon relied solely on the SPLC designation and removed ADF from its Smile program, which allows customers to donate to charities.
>
> They have used this designation as a weapon and they have wielded it against conservative organizations that refuse to accept their orthodoxy and choose instead to speak their conscience. They use it to bully and intimidate groups like yours which fight for the religious freedom, the civil rights, and the constitutional rights of others.

10.     As alleged in detail below, Mr. McInnes has brought this lawsuit because SPLC has wielded this weapon against him, to devastating effect.

11.     Because of SPLC's storied history of fortitude and success against actual bigotry and hatred during the Civil Rights Era, its reputation has survived a rising and non-partisan tide of criticism directed at SPLC itself, shocking revelations concerning the personal and professional conduct of its management and controversy concerning its financial practices. These are not the subject matter of this Complaint, however.

12.     What is relevant is that despite the considerable and substantive and justified assaults on its reputation, the SPLC Hate Designations are still so widely credited and so vigorously promoted by SPLC that they are commonly accepted, treated and understood as "official" and "factual" determinations in significant and influential ways, as intended by SPLC.

13.     Mr. McInnes brings this action against SPLC for defaming him by use of the SPLC Hate Designations, and publishing other false, damaging and defamatory statements about him, as alleged in detail below; for its concerted, obsessive and malicious actions taken to "deplatform" Mr. McInnes; for its tortious interference with his economic opportunities; and for intentionally interfering with his contractual relationships by causing, *inter alia*, the termination of Mr. McInnes's employment, an almost complete deplatforming and defunding and subjecting him to employment discrimination based on his lawful non-employment recreational activities.

14.     SPLC's defamatory, false, and misleading designation of Mr. McInnes as a "hate" figure is purposefully deceitful and intended to tarnish Mr. McInnes's reputation, disparage Mr. McInnes's good name and work, inflict harm and financial damage, reduce Mr. McInnes's goodwill and standing in the community, expose Mr. McInnes, his family and anyone else associated with him to public scorn, harassment, intimidation, and potential violence, and to denigrate, malign, and ridicule Mr. McInnes to countless individuals and potential employers and partners around the world.

4

15.     This action seeks damages and injunctive relief to remedy the damages done to Mr. McInnes by SPLC and to prevent further irreparable damage.

## PARTIES

16.     Plaintiff, Mr. McInnes, is and was at all times relevant herein resident of the State of New York with a residence in Westchester County, New York.

17.     Defendant SPLC is a corporation formed under the laws of the State of Alabama with its headquarters in Montgomery, Alabama.

18.     SPLC is federally tax-exempt political fundraising and activism project that markets itself as a civil rights organization.

## JURISDICTION AND VENUE

19.     This Court has diversity jurisdiction over Mr. McInnes's claims pursuant to 28 U.S.C. § 1332(a)(1), because Mr. McInnes and SPLC are citizens of different states and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over SPLC because it is incorporated in and its headquarters are located in the State of Alabama.

21.     This Court has pendent jurisdiction over Mr. McInnes's state law claims pursuant to 28 U.S.C. § 1367.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because defendant's principal place of business is in this judicial district and a substantial part of the events or omissions giving rise to Mr. McInnes's claims occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    Gavin McInnes

11.    In an October 16, 2018 article by Alan Feuer, the *New York Times* described Mr. McInnes as "a former Brooklyn hipster turned far-right provocateur," notable for "his egghead glasses, pocket-protector and heavy-drinking, angry-nerd aesthetic" whose "obsessions seem to be more cultural than political. Mr. McInnes, a fiscal conservative and libertarian, calls himself a champion of Western values and reserves a burning ire for the political correctness of people on the left whom he describes as busybodies who have lost their sense of humor."

23.    As set forth in the *Times* article, "Born in England and raised in Canada, Mr. McInnes has been a controversial figure in the news media for nearly 20 years. In 1994, after emerging from the punk-rock music scene, he co-founded *Vice*, the Montreal-based hipster magazine that later moved to Brooklyn and delighted audiences from the start with its graphic articles on subjects such as drug-abusing models and decomposing pigeons."

24.    In fact, Mr. McInnes is a comedian and political commentator who has been working in media for a quarter century. After creating Vice Media, he ran most of the editorial or content side of the operation until his departure in 2008. After that, he made several movies, wrote books and founded an advertising agency called Rooster Worldwide in 2010, which he sold in March of 2014.  He then focused entirely on talk show hosting and had a successful career up until December, 2018, when SPLC's relentless campaign to silence him finally achieved success.

25.    The *Times* article accurately describes the iconoclastic and often "offensive" nature of Mr. McInnes's style, "offending liberals, women, 'beta male culture' and transgender

people, writing in a voice inflected with a crass, contrarian bigotry that left him just enough room to declare it all a joke."

## B. The Proud Boys – Cereal "Killers"

26. "In 2016," the *Times* article continues, "Mr. McInnes founded the first official chapter of the Proud Boys in New York after, he said, he realized that fans of his former television program, 'The Gavin McInnes Show,' liked to spend time in his studio, drinking beer with him and telling private [*sic*] jokes. He has described the group, which has since spread to dozens of cities and to countries, like Australia and Japan, as an ordinary men's club, like the Shriners or the Elks. It serves as a sort of safe space for him and what he calls his fellow 'Western chauvinists.'"

27. According to the *Times*, "In its guise as a fraternal organization, the Proud Boys get together in New York and other cities once a month at beery meet-ups that can draw as many as a hundred participants. Women are not allowed at the group's formal gatherings (though they are permitted at the 'warm up' sessions, Mr. McInnes has written). As a character-building exercise, the Proud Boys forbid both masturbation and the watching of pornography. The group's initiation rituals include reciting the names of five breakfast cereals while being slugged by other members."

28. The article in the *Times* goes on to explain, "The monthly meet-ups are largely "social events where people have fun and laugh and drink and share stories about their kids and businesses and stuff like that," said Pawl Bazile, the editor of Proud Boy magazine. 'It's a celebration of the West, of America and of freedom and liberty.'"

29. Though the *Times* article states that "Mr. McInnes has in recent years set himself apart from the current crop of professionally outraged right-wing pundits, not only for being able

to spout aggressive rhetoric, but also for being willing to get physical at times," it does not actually give an example of Gavin McInnes "getting physical," instead stating, "like the president, he tends to publicly disavow all violence while winkingly insisting that he – and the Proud Boys – will never back down during a scrape."

30.     Mr. McInnes did not, in fact, wink while making that statement to the *Times* reporter.

31.     In fact, until the conduct by SPLC complained of here, the Proud Boys had virtually no involvement in "scrapes," physical or otherwise, and were properly perceived as a social group for young men of all races and ethnic backgrounds looking for companionship, the opportunity to develop character and ways to reinforce each other's self-respect as young men. "The Proud Boys are a politically incorrect men's social club," the group's leadership was quoted in one press report; "We are a social club, a fraternity," in another.

32.     Documented Proud Boys activities include collection and distribution of Christmas presents for toy drives in Oklahoma and Michigan, raising funds for military charities in Central Texas, assisting with emergency fire relief arising from the California "Camp Fire," distributing food and essentials to homeless veterans in Boston on Veterans Day, rounding up food for a food bank in South Florida and collating and shipping care packages to overseas troops from Michigan.

33.     Emblematic of Proud Boy's philosophy, its bylaws state:

> A person that believes in the inherent supremacy of any one race over another, or who is a member of any organization promoting the supremacy of any one race over another, may not become or remain a member of this Fraternity. This includes, but is not limited to, any person who currently identifies as white nationalist, white supremacist, or alt-right (or any person who is a member of an organization identifying as such). Similarly, members of terrorist organizations or cells, including but not limited to Antifa, are prohibited from membership in the fraternity.

8

34. The *Times* however, uninterested in such mundane matters, instead goes on to describe two recent incidents, in Charlottesville and Virginia, in which the Proud Boys or members of the Proud Boys – though not Mr. McInnes himself – were accused of violence.

35. For their part, the Proud Boys maintain that any use of force by them came was only in self-defense to a violent attack by so-called "Anti-Fascist" or "antifa" groups.

36. Indeed, the *Times* article does note that "Mr. McInnes did not go to Charlottesville" and that he " explicitly forbade the Proud Boys from attending."

37. The *Times* article continued, "[t]o be clear, all white nationalists/anti-Semites are banned from Proud Boys even if they never bring up said topics,' he wrote in an article shortly after the violence in Virginia."

38. As a result of these incidents, however, and of the pressure applied by SPLC and others on both him and the Proud Boys, in late November of 2018, Mr. McInnes severed his connections with the Proud Boys.

## C.   Unaccountable Arbiter of "Hate"

39. SPLC declares itself to be the "premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists, including the Ku Klux Klan, the neo-Nazi movement, neo-Confederates, racist skinheads, black separatists, anti-government militias, Christian identity adherents, and others."

40. The Federal Bureau of Investigation ("FBI") defines hate crime or bias crime as "a criminal offense committed against a person, property, or society that is motivated, in whole or in part, by the offender's bias against a race, religion, disability, sexual orientation, or ethnicity/national origin."

41.    The FBI defines a "hate group" as an "organization whose primary purpose is to promote animosity, hostility, and malice against persons of or with a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity which differs from that of the members or the organization, e.g., the Ku Klux Klan, American Nazi Party."

42.    More generally, the term "hate group" typically refers to an association or group acting in a criminal or violent fashion or threatening to do so, based on an expressed enmity toward and menace of one or more identified target of hate.

43.    That said, according to the United States Department of Justice ("DOJ"), "most hate/bias crimes do not involve organized hate groups, whose members are dedicated to the goal of achieving racial purity." Indeed, the DOJ reports that "Hate/bias crimes are more often committed under ordinary circumstances by otherwise unremarkable types."

44.    Despite the relative unimportance of "hate groups" and high-profile individuals in the scheme of hate- or bias-based violence and crime, the cornerstone of SPLC's agenda and promotion is the identification of groups and persons as "hate groups," "extremists" and "white supremacists".

45.    To that end, SPLC acknowledges that its goal is to destroy organizations and persons it targets as "hate groups" or as members of "hate groups" as a matter of "political struggle," even if those targets do not qualify based on the broadly-understood definitions above.

46.    Among those whom SPLC has lumped together with neo-Nazis and the KKK, as "extremists" or affiliated with "hate groups," are (a) Secretary of Housing and Urban Development Dr. Ben Carson and former Vanderbilt University professor and scholar Carol Swain, who are both black; (b) Christian organizations such as the Family Research Council, Traditional Values Coalition, ADF, Freedom, American Family Association, and the Pacific

Justice Institute; (c) Islamic anti-extremism activists Ayaan Hirsi Ali, Maajid Nawaz, Pamela Geller and Robert Spencer; (d) immigration enforcement advocacy groups FAIR, the Center for Immigration Studies, The Remembrance Project, ProEnglish and, Legal Immigrants for America; (e) American Enterprise Institute scholar Charles Murray; (f) writer and commentator David Horowitz; Accuracy in Media President Cliff Kinkaid; (g) WorldNetDaily founder Joseph Farah; (h) Senator Rand Paul; and (i)  plaintiff, Gavin McInnes.

**D.**     **"Hate" is in the Eye of the Beholder**

47.     While SPLC's rhetoric routinely associates "hate groups" with actual "hate crimes," SPLC has acknowledged that what it defines as "hate group" activity includes constitutionally protected "marches, rallies, speeches, meetings, leafleting or publishing," and that the SPLC's designation of a "hate group" "does not imply a group advocates or engages in violence or other criminal activity."

48.     Indeed, in a 2018 *Washington Post* article, SPLC President Richard Cohen admitted to journalist David Montgomery that it does not matter to SPLC whether the use of SPLC Hate Designations is accurate in terms of identifying conduct motivated by actual "hate," because its use is part of SPLC's "effort to hold them accountable for their rhetoric and the ideas they are pushing."

49.     SPLC has acknowledged, in fact, that merely renting a post office box, without more, may be sufficient "activity" to get a group on SPLC's "enemies list."

50.     SPLC's fluid definitions of "hate" keep SPLC busy and flush with donations from sympathizers who are grateful that, as they understand it, SPLC is doing the hard work of obliterating "hate" so they do not have to do so.

51.     The "growth" of hate groups, as defined by SPLC, is critical to SPLC's continued existence as well as its formidable fundraising success.

52.     According to JoAnn Wypijewski, a writer for *Nation* magazine, "No one has been more assiduous in inflating the profile of [hate] groups" than SPLC, whose leadership "would have [its] donors believe" that 'militia nuts' are 'lurking around every corner.'"

53.     SPLC projects that largely imaginary looming threat to the public, the media and even law enforcement via its "Hate Map," an annual online listing of "active hate groups in the United States" featured in the "Hatewatch" section of SPLC's website, located at www.splcenter.org.

54.     The SPLC Hate Map provides no index, summary listing, details or other tools that identify which groups it has damned by inclusion have violated the law, it any.

55.     On its 2014 SPLC Hate Map, SPLC listed 784 hate groups, down almost 20 percent from the year before – but significantly higher than the 537 groups SPLC claimed to be menacing America in 1998.

56.     SPLC further inflates the "hate" threat that is its primary source of fundraising income, by placing a color-coded virtual "pin" on the Hate Map that is intended to represent every location deemed as hosting a "chapter" of a "hate group," regardless of the size of a group's or chapter's actual membership.

57.     For example, the otherwise obscure "National Socialist Movement," appears 49 times in SPLC's 2015 Hate Map – once for each of its alleged local "chapters," the membership of which may be as few as one person or, even less if a member is affiliated with more than one chapter.

58.     Moreover, SPLC counts each "local chapter" (or map pin) as a separate "hate group." On that basis, SPLC's 2012 Hate Map counted "1,007 active hate groups in the United States" including "organizations and their chapters," counting The American Third Position Party 17 times, the American Nazi Party six times and the Council of Conservative Citizens 37 times.

59.     If the 2012 Hate Map list is filtered for organizations with identical names that were counted multiple times, SPLC's 1,007 "hate groups" shrinks to 358.

60.     Unsurprisingly, based on SPLC's "math," while the FBI reported a reduction in hate crimes of 24% between 1998 and 2013, SPLC claimed the number of U.S.–based, "hate groups" shot up by 75% during this same period.

61.     SPLC's rewarded for exaggerating the threat of "hate groups" is not only enhanced prestige in the public eye because of its "heroic" efforts to "combat" them, but financial as well.

62.     According to public filings, SPLC had total assets of $477 million for the year ending October 2017, during which it had received $132 million in contributions, an increase of $140 million in its total assets from the prior year.

63.     As of the end of 2017, $92 million of SPLC's "anti-poverty" assets had been transferred to entities located in the Cayman Islands.

64.     Thus, SPLC has been handsomely rewarded by its blatant inflation of "hate groups" numbers and strategy of keeping its pot of hate boiling.

**E.      "Hate" as a Business Model**

65.     The evolution of SPLC from heroic, civil rights advocate and shield against violent and unlawful bigotry and infringements of civil rights, to its modern-day role as the enforcer for a particular

grouping of political and cultural forces – targeting ideological enemies on the Left, Right or otherwise – has been the subject of extensive analysis and commentary for years.

66.     As early as the year 2000, an article in *Harper's* magazine by Ken Silverstein entitled "The Church of Morris Dees," a reference to SPLC's once-legendary founder, described the fallacious nature of the organization's "hate group" agenda.

67.     The *Harper*'s article quoted a former SPLC staff lawyer, who admitted that admitting that the SPLC's "hate group" work consists

> mainly in spying on private citizens who belong to "hate groups," sharing
> its files with law-enforcement agencies, and suing the most prominent of
> these groups for crimes committed independently by their members – a
> practice that, however seemingly justified, should give civil libertarians
> pause, [and all of which is calculated to cash in on] black pain and white
> guilt.

68.     Echoing this criticism, Jerry Kammer, a Pulitzer prize-winning investigative journalist, and senior research fellow for the Center for Immigration Studies, demonstrated in a March 2010 research paper how SPLC acted as an "active ally" and "propaganda arm" of the National Council of La Raza – a Latino advocacy group that itself has been accused of espousing racial superiority – in a 2009 campaign to brand advocates of immigration control as "extremists" and advocates of "hate."

69.     According to Kammer, during this 2009 campaign, SPLC promulgated a definition of "hate" that encompassed simply taking stances at odds with SPLC and its client, La Raza (now known as UnidosUS), about immigration policy, widely recognized as a complex topic.

70.     As a result, in 2016 the DOJ's Disciplinary Counsel for the Executive Office for Immigration Review during the Obama administration (the "Disciplinary Counsel") sharply rebuked and reprimanded attorneys who represented SPLC and its allies for labeling a

14

conservative advocacy group whose attorneys appeared  the Executive Office for Immigration Review as a "hate group."

71.     Ultimately, the DOJ concluded that SPLC's use of the "hate group" designation to denigrate attorneys and public interest groups advocating  positions contrary to those of SPLC "overstepped the bounds of zealous advocacy and was unprofessional," and "constitute[d] frivolous behavior" that "does not aid the administration of justice."

72.     SPLC's misleading and malicious use of the SPLC Hate Designations to disparage and delegitimize political opponents was also described in 2013 by J.M. Berger, a contributor to *Foreign Policy* magazine, in which he observed that SPLC bases its "hate" claims on "a fundamentally flawed methodology."

73.     The next year, in a paper entitled "Watching the Watchers: The Neglect of Academic Analysis of Progressive Groups," George Yancey, a professor of sociology at the University of North Texas, and a researcher in the area of extremist groups of both right and left, noted the subjective nature of labeling hate groups that is at the core of SPLC's present-day activities.

74.     Based on SPLC's apparent ideological selectivity,  Yancy expressed doubt that SPLC's Hatewatch is "an objective clearinghouse for the identification of hatred" despite the widespread impression that it is" seen as embodying a gold standard.".

75.     In view of SPLC's liberal use of the Hate Group Designation – to any group or individual whose view differs from its own – Yancy's doubts were well-founded.

**F.     "Hate" is Blind**

76.     SPLC has even undermined its reputation among presumptive allies.   In a November, 2016 letter to SPLC's President Richard Cohen, Katrina Lantos Swett, the President

of the Lantos Foundation for Human Rights and Justice, condemned SPLC for "betray[ing] its own noble mission of fighting bigotry and protecting the vulnerable by attacking moderate Muslim reformers like Ayaan Hirsi Ali and Maajid Nawaz." Ms. Swett described SPLC's conduct as "unjust and unwarranted."

77.     Indeed, pursuant to a $3.375 million settlement with Mr. Nawaz, SPLC was required to issue a public written and videotaped apology from Mr. Cohen in multiple forums.

78.     Also in 2016, Lee Smith of the Hudson Institute noted the incongruity of SPLC's condemnation of Mr. Nawaz for "blasphemy" against Islam, and observed that SPLC's accusation "belongs not to the tradition of an American Civil Rights organization, but rather to the ideology of a religious fundamentalist organization, of the type that inspired the ISIS cadre that executed the staff of *Charlie Hebdo*. The fact is that more than 40 years after its founding, the Southern Poverty Law Center is now aggressively defending the kind of violent supremacists it had once sought to prosecute and attacking types like Nawaz it had once defended against violence."

79.     Laird Wilcox, a leading researcher and expert on extremist organizations as well as the phenomenon of hate crime hoaxing, has also criticized the false, misleading, and destructive nature of SPLC's "hate group" designations. According to Professor Wilcox, SPLC has gone into "ideological overdrive and has developed many of the destructive traits that characterize moral crusaders, including the demonization of critics and dissenters." SPLC's "hate group" designations, states Wilcox, reflect a "kind of selective attention and biased reporting" that "simply illustrates [SPLC's] unscrupulousness."

80.     In another recent treatment published in the *City Journal* in 2017, SPLC's tactical use of the SPLC Hate Designations was summarized as follows:

Despite numerous exposés over the years in publications spanning the political spectrum – including *Harper's*, *The Progressive*, *The Weekly Standard*, *Reason*, the *Baltimore Sun*, and even the SPLC's hometown newspaper, the *Montgomery Advertiser* – the liberal establishment continues to treat the group as credible, largely because its preoccupation with right-wing bigotry aligns with the stereotypical view of liberals who dominate newspapers like the *Washington Post* and *New York Times*.

81.    Indeed, SPLC continues to employ its business model of personally destroying those it identifies as "extremists," or political threats to its ideological agenda, as a fundraising lever, including even longstanding members of the Leftist camp.

82.    For example, in 2018 SPLC was forced to remove three (3) articles from its website when Max Blumenthal, an anti-establishment, radical iconoclastic writer, threatened legal action.

83.    The 2018 *Washington Post* article cited above notes that while SPLC's online "dossiers" for groups it deems deserving of an "accounting" present "extreme-sounding quotes by members of the group," SPLC relies on the "greatest hits" of a group no matter how stale or irrelevant those statements are in the present activism environment.

84.    According to the *Washington Post*, in the ADF's case "nearly half of the dozen quotes generally condemning the 'homosexual agenda' are more than a decade old" and, as confirmed ADF'S current leadership, reflect issues, initiatives and arguments that have long been mooted or that have essentially been retired due to shifts in the law, the organization's agenda or other developments – if they were ever representative of the group at all.

85.    Similarly, the Montgomery analyzed the SPLC's designation of the Center for Immigration Studies ("CIS") as a hate group and concluded that while immigration policy advocacy by CIS "resembles the standard think tank jousting that goes on in Washington. Nevertheless, overall SPLC had found enough data points to meet its standard of hate."

**G.**    **Scorched Earth, Broken Lives**

86.    SPLC's Hate Designations are far from abstractions.  They have resulted in consequences ranging from despicable acts of violence against groups recklessly designated as "hate groups" for nothing more than their position and viewpoint on controversial social issues, to the sort of personal and professional destruction sustained by Mr. McInnes.

87.    One of the more notorious instances of violence directly related to SPLC's "enemies' lists" occurred  in 2012, when Floyd Corkins II attempted to commit mass murder in the Washington D.C. office of the Family Research Council.

88.    During an FBI interrogation, Corkins confessed that he had been motivated by SPLC's designation of the Family Research Council as a "hate group". He also admitted that he learned of Family Research Council by reviewing at SPLC's "hate group" designations and "hate map," which  publishes the addresses of those  organizations it labels  as "hate groups."

89.    Based on SPLC's "hate" targeting, SPLC ultimately paid Family Research Council $3.4 million to settle its defamation claim.

90.    Three years later, in June of 2017, during a weekend softball game that had been publicly announced, James Hodgkinson attempted to kill  those Republican members of Congress and their staff who were present, critically injuring U.S. Representative Steve Scalise and several congressional staffers.

91.    The ensuing investigation revealed that Hodgkinson "followed" SPLC on Facebook, and by all indications knew that SPLC had associated Rep. Scalise, a conservative Republican, with SPLC-designated "hate groups."

92.    Short of incitement to murder, SPLC's designation of an organization as a "hate group" or a person as a "extremist" can and does kill careers and reputations.

93.     SPLC's "power" is the direct result of its still-semi-official status in many circles, particularly progressive, i.e., Left Wing, political and cultural, environments such as the technology and new media sectors which, in turn, continually reinforce that status as well as enhance SPLC's ability to target people and organizations hostile to these circles to stoke SPLC's fundraising.

## H.     Deplatforming and Defunding

94.     As hate-group researcher Wilcox observed that as to SPLC's "hate" designations, "When you get right down to it, all SPLC does is call people names. It's specialized a highly developed and ritualized form of defamation," specifically, SPLC "harm[s] and isolate[s] people by denying their humanity and trying to convert them into something that deserves to be hated and eliminated."  As a result, Wilcox concludes, "ordinary people expressing their values, opinions, and beliefs [are] up against a very talented and articulate defamation machine."

95.     More than merely talented and articulate, the "SPLC defamation machine" is virtually impossible to resist because it attempts to, make it literally impossible for SPLC enemies to clear their names.

96.     SPLC uses its self-proclaimed "moral authority," and indisputably, widely-adopted "hate" designations, to defame -- and thereby cow – proprietors and providers of the very forums in it uses, ensuring its defamation victims are denied the opportunity to respond to accusations in any manner approaching the way in which they were defamed.

97.     As recounted by David Montgomery in the 2018 *Washington Post* article, organizations characterized as extremists by SPLC, such as ADF, have been barred by AmazonSmile from raising money through its site.

98.    AmazonSmile is an Amazon.com program that enables customers to designate a nonprofit charity to receive a portion of the customer's purchase price.

99.    Amazon acknowledges that it relies uncritically on the SPLC Hate Designations to determine whether a charity is ineligible for the AmazonSmile program.

100.    Other SPLC-deemed "hate groups", such as ADF, which successfully represented a Christian baker before the Supreme Court in the "gay wedding cake" case, have also been barred from AmazonSmile.

101.    The heart of SPLC's attack on those unfortunate enough to be on its enemies list, is no longer the civil rights litigation and legal advocacy that made it famous, but rather deplatforming and defunding those enemies.

102.    In the past, prosecuting civil cases against actual hate groups garnered SPLC headlines and widespread support.

103.    SPLC's current "weapons" of choice, however, have none of the drawbacks of litigation and offers many comparative advantages.

104.    While extensive factual and legal research is required to comply with ethical, tactical and strategic considerations before filing a legal case against a hate group, SPLC's form of deplatforming does entail those same efforts.

105.    By favoring deplatforming and defunding over litigation, SPLC exempts itself from its obligation before the courts to engage in rigorous factual investigation and legal analysis, or to incur any expense whatsoever, before it flushes out, identifies and breaks an enemy by pinning it to SPLC's Hate Map.

106.    So liberated from the ethical obligations that govern litigants, SPLC focuses far less on accurate reporting of facts than on identifying popular or effective advocates among individuals or groups that stand for the "wrong" things and "dropping the hammer" on them.

107.    SPLC's deplatforming and defunding approach is a relatively inexpensive and simple task achieved, upon information and belief, mostly by harvesting damaging information, or claims, about its targets from the Internet.

108.    In contrast, civil litigation, before a court and jury, is governed by due process considerations that translate into "good faith", "non-harassing" pleading standards, the right to counsel, the requirement that a plaintiff meet its burden of proof, fairness and reliability provided by the rules of evidence, the right to cross-examination, presumptively "innocent" or "not liable" burdens of proof, public and open proceedings and an ultimate determination of the merits by a disinterested judicial officer chosen through the democratic process or by a jury of a defendant's peers, from which a party dissatisfied with the outcome has a right to appeal.

## I.    **The Disappeared**

109.    Examples of SPLC's success with this strategy abound and, as publicized by SPLC itself, enhance its fundraising efforts.

110.    A recent example is the David Horowitz Freedom Center, a conservative think tank. Once designated as a SPLC hate group in 2018, both Visa and MasterCard revoked the Center's ability to accept donations by credit card.

111.    Throughout 2018, SPLC's designation of a person or group as "extremist" or a "hate group," have resulted in SPLC's targets being cut off from accepting donations and processing purchases of fundraising merchandise via credit cards issued by MasterCard and Visa, and though online payment processors PayPal and Stripe, online crowd-funding

mechanisms Patreon and GoFundMe, and online content monetization systems such as Google AdSense.

112.    Thus, SPLC's deplatforming strategy extends beyond mere mailing and online campaigns and the placement of hapless targets on the Hate Map.  SPLC's  deplatforming program is depends on the cooperation of a cowed corporate sector, virtue-signaling social media managers, and a technocratic strangle-hold on virtually every organ of public and political influence in the United States.

113.    According to a June of 2018 report by Peter Hasson, four of the world's biggest social media platforms – Facebook, Amazon, Google and Twitter – have established working partnerships with SPLC, which is deems an "external expert" that "informs" the platforms' "hate speech policies."

114.    Upon information and belief, the application of an SPLC Hate Designation automatically renders a charity "ineligible" for Amazon Smile donations.

115.    Similarly, Twitter lists SPLC as a "safety partner" and acknowledges that SPLC advises Twitter, in a manner not disclosed by either Twitter or SPLC, to combat "hateful conduct and harassment."

116.    Google, which owns YouTube, uses SPLC to help police "hate speech" on YouTube as part of YouTube's "Trusted Flagger" program.

117.    As shown below in specific reference to how the SPLC's attack on Mr. McInnes affected him, SPLC exerts similar influence on numerous other online platforms and payment platforms.

On information and belief, being victimized by application of an SPLC Hate Designation renders a company or individual almost certain to be banned by Twitter, Google and their related services and platforms.

**J.      "Changing the Terms" of Free Speech**

118.    The most recent manifestation of SPLC's comprehensive deplatforming and defunding campaign is its "Change the Terms" program unveiled in October of 2018, and which SPLC refers to as "a set of policy recommendations to help social media and other internet companies reduce hateful activities on their platforms."

119.    SPLC's has dedicated a webpage on its website to "Change the Terms" <u>and</u> has set up a separate site under the domain, www.changetheterms.org (the "CTT Website").

120.    Upon information the CIT Website is another source, or anticipated source, of SPLC revenue.

121.    According to the CTT Website, Change the Terms is based on the premise that "Most tech companies are committed to providing a safe and welcoming space for all users. But when tech companies try to regulate content arbitrarily, without civil rights expertise, or without sufficient resources, they can exacerbate the problem."

122.    The clear implication is that SPLC is the "non-arbitrary" source of "civil rights expertise" and "resources" positioned to solve the supposed problem identified in the preceding paragraph.

123.    According to the SPLC's "Change the Terms" web page, "WHITE SUPREMACISTS ARE USING ONLINE PLATFORMS FOR HATE. IT'S TIME TO CHANGE THE TERMS," as shown below.



124.    SPLC's Change the Terms home page includes, as shown below, a downward-pointing arrow that suggests that the content on the page at which it points substantiates SPLC's quoted assertion regarding white supremacists.



125.    The text below the arrow, as shown above, on the Change the Terms website's home page states as follows:

**REDUCING HATE ONLINE**

As internet platforms provide more opportunities for people around the world to connect, they have also provided a forum for certain groups to spread hate, fear, and abusive behavior.

The deadly neo-Nazi march in Charlottesville, Virginia, was organized with the use of Facebook, PayPal, and Discord.

**The violent Proud Boys group** vets new applicants through Facebook, and have seen an uptick in applications since summer 2018.

Some technology companies have made steps in the right direction to reduce hateful activities online, but more work needs to be done.

Over the past year, the Change the Terms coalition has met with experts on terrorism, human rights, and technology around the world to gather insights on how hate operates online and how it can be stopped.

The result of those conversations was the creation of recommended corporate policies and terms of service to ensure that social media platforms, payment service providers, and other internet-based services are not places where hateful activities and extremism can grow.

(Emphasis added).

126.    Following the arrow and scrolling down the home page of the Change the Terms website reveals three photographs, as shown below:



127.    Two of the photographs depict what appear to be violent confrontations involving unidentified persons whose identities are unknown and whose faces are mainly obscured, as shown below.

128.    Sandwiched between those two photographs is a third photograph of an eminently recognizable Mr. McInnes, holding up a raised fist and surrounded by anxious-looking faces.



129.    On a mobile phone, from which most website content is now viewed, the photograph of Mr. McInnes is the only one shown on the homepage of the Change the Terms website, as shown at left.

130.    Although both versions of the Change the Terms home page, featuring Mr. McInnes's photograph, suggest he was part of a hate group involved in a violent confrontation with police, the photo of Mr. McInnes was actually taken in Berkeley, California at an April 2017 event at which no physical altercations occurred following the violent deplatforming of conservative provocatrice Ann Coulter.

131.    Mr. McInnes had traveled to Berkeley after Coulter canceled a planned speech at the University of California at Berkeley ("UC Berkeley") on April 27, 2017 after antifa and other left-wing protesters threatened violence.

132.    UC Berkeley subsequently settled a lawsuit by the organizers of the Coulter speech for causing Coulter to cancel the event.

133.    Pursuant to the settlement, UC Berkeley agreed to rescind its subjective "high-profile speaker policy" and viewpoint-based "security fee" policy; and to abolish its *de facto* enforcement of the on campus "heckler's veto" by which a calculated "threat of violence" was relied upon to silence speakers; and to pay  $70,000 to the event sponsors, Young America's Foundation, to cover their legal fees.

134.     Several days later, Mr. McInnes went to Berkeley and read the text of Coulter's speech on a makeshift sound system to demonstrate the importance of free speech.

135.     As he spoke and prepared to depart from the platform, however, protesters attempted to surround Mr. McInnes.

136.     While the Berkeley police force present peacefully engaged the protesters, a phalanx of Proud Boys members surrounded Mr. McInnes and safely escorted him to his next designation.

137.     The photograph shown on the Change the Terms home page – actually a screen capture from a longer video – was taken as he departed the platform, at which time, he pumped his fist and repeated the word, "Uhuru," Swahili for "freedom,"

138.     Thus far from threatening violence, as suggested by SPLC's Change the Terms website, Mr. McInnes was, when the photographed, being victimized by threats of violence and attempts at intimidation because of his non-violent, pro-free-speech activism in Berkeley.

139.     While in the context of SPLC's webpage, it may appear that Mr. McInnes was threatening imminent mayhem by his raised fist, no reasonable person present at the time the photograph was taken could be intimidated by it, juxtaposed as it was with his horn-rimmed glasses, buttoned-up white dress shirt, neatly Windsor-knotted cravat and the purpose of his presence – to present Coulter's speech.

140.     Nonetheless, Mr. McInnes's image was and still is being depicted and distorted by SPLC in a montage of words and pictures warning of imminent right-wing violence, suggesting falsely that Mr. McInnes is a militant leader of white supremacist hoodlums.

141.    Notwithstanding these facts, SPLC's Change the Terms home page uses the photo of Mr. McInnes and the Proud Boys – in particular, and spercifically – engaged in peaceful protest as a backdrop to copy that falsely characterizes the Proud Boys as "violent," and stating, "Just as the internet has created immense positive value by connecting people and creating new communities, it has also given new tools to those who want to threaten, harass, intimidate, defame, or even violently attack people different from themselves," as shown below.



142.    Besides using Mr. McInnes's image in a defamatory fashion as a "dog whistle" to inflame donors and supporters, the Change the Terms program of SPLC is also a serious attempt to institutionalize exactly the kind of deplatforming Mr. McInnes was protesting in Berkeley when the picture was taken.

143.    The "Change the Terms policies" that "organizational members" are to enforce are defined, on the SPLC Change the Terms website, simply as follows:

Users may not use these services to engage in hateful activities or use these services to facilitate hateful activities engaged in elsewhere, whether online or offline.

144.    As alleged above, however, SPLC has already established and acknowledged that its definition of "hateful activities" includes any "activity," including activity expressly protected by the First Amendment, it deems ideologically objectionable.

145.    Moreover, the policy urged by SPLC via the Change the Terms program expressly requires that the organizations who adopt it prohibit any "facilitation" of SPLC's definition of "hateful activities" – "whether online or offline."

146.    As the Change the Terms website explains, "While an online payment processor may not be the vehicle through which a group directly engages in hateful activities, the online payment processor should not knowingly allow the group to use its services to fund hateful activities. Not denying services under this example would mean that the online payment processor is financially profiting from hateful activities."

147.    Under this rubric, all activities conducted by a group or individual affiliated with that group deemed "hateful" under SPLC's ideological standards subject to control by any online service provider regardless of the relationship, or lack of relationship, between the service being provided and the conduct of the group or any of its members, at any time, anywhere in the world, without condition.

148.    According to SPLC's Change the Terms website, "These policies are intended for internet companies that provide the following types of services: Social media, video sharing, communications, marketing, event scheduling, or ticketing; Online advertising; Financial transactions or fundraising; Public chat or group communications; Domain names; Building or hosting websites, blogs, or message boards. . . . After we have given tech companies a reasonable

amount of time to digest, adopt, and implement these policies, we will initiate an evaluation process to see how companies stack up. This process will measure both tech companies' formal policies and how they implement them. Without effective and even-handed execution, a formal policy is just empty words."

149.    As of the date hereof, the Change the Terms website lists approximately 40 organizations, virtually all affiliated with left wing ideology, as having "signed on in support of the recommended policies for corporations to adopt and implement to reduce hateful activities on their platforms."

SPLC is not interested in empty words.  As shown above and detailed below with regard to Mr. McInnes, SPLC means what it says – and it has gotten results, destroying numerous careers and organizations, including those of the plaintiff.

## K.    Bringing Down the Proud Boys

150.    Gavin McInnes and the Proud Boys first appeared on SPLC's radar in June of 2017, when SPLC's website reported that he was a speaker at a New York "anti-Sharia" event and describing him as a "neo-masculine reactionary" guilty of making "blatantly misogynistic comments."

151.    The SPLC post, which is still on the SPLC website, also suggests falsely that Mr. McInnes is associated with "Vanguard America," a "white nationalist group."

152.    After this post, SPLC's mentions of Mr. McInnes and Proud Boys, who were attracting increasing attention in the national media and in social media – fundamental criteria for SPLC's fundraising purposes – ramped up concomitantly, as did the pressure brought to bear on online channels and payment processors to de-person Mr. McInnes and the Proud Boys.

153. In February 2018, the Proud Boys received the unwelcome "honor" of being "inducted" into SPLC's hall of fame – "Hall of Hate," that is, i.e., its enemies list or "Hate Map."

154. On August 1, 2018, SPLC's website attacked the entire Proud Boys organization over what it described as a "threat of violence" by the Proud Boys at an upcoming rally in the Pacific Northwest.

155. The Proud Boys did not threaten violence in connection with that rally, and no violence occurred.

156. On August 2, 2018, SPLC's website attacked the entire Proud Boys organization and plaintiff, as well as Facebook, for hosting Proud Boys' members' pages.

157. On August 10, 2018, Mr. McInnes was banned from Twitter, where he had approximately a quarter of a million followers, for "violations of the terms of service."

158. No more explanation was provided, but media reports s that the reason was Mr. McInnes's association with the Proud Boys, which – the media also reported – had been deemed a hate group by SPLC.

159. On October 19, 2018, SPLC launched another attack on Mr. McInnes by oversimplifying, taking out of context, and deliberately misconstruing his commentary on swear words, slurs, and thought police to tar him as "anti-gay."

160. Mr. McInnes is not "anti-gay."

161. On October 31st, 2018, Mr. McInnes was banned from both Facebook and its affiliated service, Instagram, "because of policies against hate groups."

162. On November 9, 2018, PayPal banned both Mr. McInnes and the Proud Boys, informing Mr. McInnes that "We do not allow PayPal services to be used to promote hate, violence or other forms of intolerance that is discriminatory."

163.    On November 19th, 2018, the British *Guardian* newspaper reported that "The FBI now classifies the far-right Proud Boys as an 'extremist group with ties to white nationalism,' according to a document produced by Washington state law enforcement." Although the FBI refused to corroborate the claim when contacted by reporters at the time, the *Guardian*'s report, which also stated, "The Southern Poverty Law Center (SPLC) lists them as a hate group," gained extensive media coverage.

164.    In response to subsequent inquiries by journalists, the FBI subsequently acknowledged that it had never characterized the Proud Boys in the manner claimed by the *Guardian*, stating, "When it comes to domestic terrorism, our investigations focus solely on criminal activity of individuals – regardless of group membership – which appears to be intended to intimidate or coerce the civilian population or influence the policy of the government by intimidation or coercion. The FBI does not and will not police ideology." The FBI's statement, however, received virtually no coverage.

165.    On November 30, 2018, Mr. McInnes was denied a visa for a paid speaking tour in Australia based on his "bad character." Credit for his exclusion from Australia was taken by a *Guardian* columnist who led a campaign to prevent Mr. McInnes's entry into the country, and who cited SPLC designation of the Proud Boys as a hate group in his *Guardian* column urging that the visa be denied.

166.    On December 8, 2018, Mr. McInnes was fired from his primary place of employment, Blaze TV, which had recently acquired CRTV, where his program was among the top three most popular.

167.    Mr. McInnes was given no reason for his termination, but upon information and belief, a proximate cause of it was SPLC's conduct as alleged above.

168.    On December 10, 2018, Mr. McInnes was banned from YouTube on spurious grounds of copyright infringement concerning certain videos on his YouTube channel.

169.    In response to his inquiry, Mr. McInnes was informed by YouTube that he could not appeal his ban, contrary to YouTube's own terms and conditions and inconsistent with its usual practice regarding copyright infringement claims.

170.    On information and belief, the copyright explanation for Mr. McInnes's ban from YouTube was a pretext for a ban based on the SPLC's conduct.

171.    Indeed, the YouTube ban was reversed only because of Mr. McInnes's diligence in establishing its falsehood and the earnestness of the copyright holder in acknowledging that it had made no complaint.

172.    When, however, Mr. McInnes's YouTube account was restored several days later, it was "demonetized" – deemed ineligible for the sale of advertisements through Google AdSense.

173.    Mr. McInnes was informed that the demonetization of his account could not be appealed.

174.    Moreover, after his account was restored, YouTube inserted a "Description" of Mr. McInnes at his YouTube channel, credited to Wikipedia, that included the claim, "He is the founder of the Proud Boys, a chauvinist men's group considered to be a 'general hate' organization by the Southern Poverty Law Center."

175.    Indeed, that statement is also found at the Wikipedia entry, "Gavin McInnes," as of the date hereof, which entry quotes SPLC seven times.

176.    Besides restoration of his account to a demonetized version of YouTube, Mr. McInnes has, since the time SPLC added him to its enemies list, been effectively deprived of the

ability to either express his view, defend himself from the false and malicious accusations against him via or to earn income through the social media platforms that have banned him.

177.    On January 10, 2019, Mr. McInnes was banned from MailChimp, an email-based marketing service, on the ground that his account was "in violations of our Terms of Use."

178.    Upon information and belief, Mr. McInnes the actions of the SPLC were a proximate cause of his being banned from MailChimp.

179.    In January of 2019, Mr. McInnes's podcasts were banned from iTunes.

180.    Upon information and belief, Mr. McInnes the actions of the SPLC were a proximate cause of his being banned from iTunes.

181.    SPLC has, through the actions alleged above, successfully deplatformed Mr. McInnes and rendered him virtually unemployable or, at best, has severely compromised his earning capacity and bargaining power with respect to future employment and the compensation therefor.

182.    The deplatforming of Mr. McInnes intended and achieved by SPLC is effective to a great extent because of the technological-economic phenomenon describes as "network effects," because of which virtually no person or institution, regardless of the financial and technical resources available, can at the present time found or establish alternative social media or communications platforms to compete with those already in place.

183.    The acts alleged herein by SPLC were, on information and belief, a proximate cause of the banning of Mr. McInnes from these platforms, payment processors and monetization channels.

184.    Beyond this, SPLC has destroyed Mr. McInnes's reputation and declared open season on him and his family.

185.    As recounted in a November, 2018 article in the only magazine *The Daily Beast*, Mr. McInnes and his family have been the subject of an escalating social boycott in the Westchester County neighborhood where they live, whose "residents' real problem, locals say, is with McInnes' role in the Proud Boys, which has been designated as a hate group by the Southern Poverty Law Center."

186.    As the article recounts,

"So the founder of the proud boys lives [around here]," read the email, which was reviewed by The Daily Beast. "I suggest we buy the 'Hate Has No Home Here' lawn signs and ask our friends and neighbors in [the neighborhood] to put one on their lawn. Imagine if everyone had one. It would send a clear message to him and his ilk. The signs are $20 each and bulk orders ship free. Spread the word." The email was quickly forwarded to other community members, a person familiar with the messages said. By the following day, the campaign had "gone way beyond me and farther than anything I can manage," the original emailer wrote neighbors, reminding them that the campaign should preach "the opposite of hate and intimidation."

187.    The irony of this last formulation being lost on "the original emailer," the dependence of all concerned in this neighborhood-wide targeting of a mixed-race family that had done them or anyone else no harm on SPLC's Hate Designation is obvious from the *Daily Caller* article.

188.    Indeed, the article ends with a quote from another neighbor of the McInnes family, who says, "Of course he's got to live somewhere. But I consider this as factual: The Proud Boys are a gang. They're listed as a hate group. When the leader of a hate group moves within driving range of you and people you care about, that's concerning. That's not petty, that's real."

189.    For Mr. McInnes and his family, such "reality" – a false "reality" created by SPLC as part of a campaign purposely intended to destroy Mr. McInnes – may very well affect

whether their father and breadwinner can even remain with them in the United States, where all of them were born and grew up.

190.    Because Mr. McInnes is a non-citizen who is a legal immigrant in the United States from Canada and holds a "Green Card," SPLC's false and malicious designation of Mr. McInnes as a member of a "hate group" could affect his immigration status and even, potentially, result in his deportation.

191.    This is not the only respect in which, because of the SPLC, Mr. McInnes has gone from being known as an edgy, sometimes vulgar and highly opinionated performer and commentator to the "leader of a hate group" and has been deemed fair game for physical and aggressive confrontations and other forms of harassment.

192.    Because of the SPLC's targeting of Mr. McInnes, the McInneses continue to experience relatively mild, but, for a young family, painful, harassment and social ostracism in their neighborhood of the kind described in the *Daily Caller* article, including vandalism of their property.

193.    Mr. McInnes has had little ability to fight back and defend the calumny directed at him and his family, however, because SPLC has so thoroughly deplatformed and defunded him.

194.    Besides losing the ability to rehabilitate his reputation by presenting his own case in the social media channels through which he is being harmed by SPLC, Mr. McInnes used and relied on these platforms to reach and expand his audience and to promote services and activities that enhanced his earning capacity both directly and indirectly, all of which he is now unable to do.

## L.  **SPLC's Golden Goose**

195.  Despite its dubious achievements in socially and professionally isolating Mr. McInnes and his family, SPLC's obsession with Mr. McInnes, and upon information and belief its commitment to promoting him and the Proud Boys as bogeymen to spur SPLC's fundraising, has not ceased to this day.

196.  As of the date hereof, a search for the term "McInnes" on the SPLC website returns 72 results, with articles or other postings almost every month since his first appearance.

197.  Besides being misleadingly featured on SPLC's Change the Terms website, Mr. McInnes's image, typically with inflammatory, misleading or defamatory text superimposed on it, is ubiquitous on the SPLC website and Twitter feed as well, as shown in the selection of recent tweets below.






198.    Besides maintaining, on its website and through its social media channels, all the content referred to above, SPLC so values Mr. McInnes as a stalking-horse for its fundraising efforts that it actually pays for Google ads to beckon Internet users to its website to when users search Google for relevant terms.

199.    An example is set forth below: a Google ad that appeared online in January of 2019 when Internet users search "Proud Boys by-laws" and directs inquirers to its "What You Need to Know" entry on the SPLC website as well as the Hate Groups Map and a web page on the SPLC site entitled, "Exposing Extremist Groups." On information and belief, this search-triggered ad is still running on Google.



200.    Because the essence of the damage caused by SPLC to Mr. McInnes consists of both rendering (i) Mr. McInnes socially despicable and "radioactive" because of his alleged "hate group" and "extremist" sympathies, and (ii) deplatforming Mr. McInnes so that he is unable either to make a living as a performer and commentator via alternative channels of distribution or to rehabilitate his reputation, Mr. McInnes is essentially an untouchable, unable to retain or be considered for gainful employment in his line of work, much less work that is commensurate with the opportunities available to him prior to SPLC's campaign of destruction against him.

201.    SPLC's actions have injured Mr. McInnes in an amount to be determined at trial.

## COUNT I.

## TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE

202.    Mr. McInnes hereby incorporates and realleges the foregoing allegations as if fully set forth herein.

203.    SPLC, as alleged above, admits that it selects, attacks and destroys targets such as Mr. McInnes as part of "an effort to hold them accountable for their rhetoric and the ideas they are pushing."

204.    SPLC's leadership has also admitted that its goal is "to destroy these groups."

205.    As alleged above, Mr. McInnes had numerous protectable business interests prior to their destruction by reason of the conduct of SPLC, including but not limited to his highly remunerative employment by CRTV / Blaze TV, the promotional opportunities arising from that position and from his preexisting reputation as a humorist and social commentator, speaking opportunities across the globe, and the opportunity to raise money through operation of a YouTube channel.

206.    SPLC was aware of Mr. McInnes's protectable business interests as set forth above.

207.    SPLC had no bona fide relationship with and was a stranger to the above-alleged protectable business interests of Mr. McInnes.

208.    SPLC intentionally interfered with Mr. McInnes's protectable business interests by the conduct set forth above, and specifically, without limitation, in its role as censor, consultant or advisor to the various social media platforms and payment processors from which he has been banned.

209.    Mr. McInnes has suffered, and unless enjoined by this Court will continue to suffer, financial and other damage as a result of SPLC's wrongful conduct.

210.    Mr. McInnes has no adequate remedy at law.

## COUNT II.

## DEFAMATION

211.    Mr. McInnes hereby incorporates and realleges the foregoing allegations as if fully set forth herein.

212.    An SPLC Hate Designation is understood and treated as essentially an "official" or empirical determination of fact by a significant and material proportion of the public as well as numerous critical social and government institutions.

213.    These institutions include law enforcement, academia, the mainstream press, the managers of social media platforms and others who dominate and substantially control access to news and information and other important civic resources.

214.    The SPLC affirmatively encourages and cultivates the treatment of the SPLC Hate Designations as factual determinations.

215.    For example, the SPLC states on its website, "Law enforcement professionals are more likely to encounter dangerous extremists than virtually any other segment of American society — and those confrontations are, tragically, sometimes fatal. . . . With that in mind, SPLC has undertaken a number of initiatives to equip officers with information and other resources that may help them carry out their duties with a minimum of danger to themselves. Our free law enforcement trainings teach officers how to recognize hate groups, symbols and activity; the threat potential of specific groups; and how to respond to hate group activity. The Extremist Files contains updated biographical profiles of leading hate groups and extremist leaders, plus background on the various extremist ideologies. And our Hate Map helps officials locate extremist groups within their communities."

216.    These SPLC resources offered to law enforcement agencies are in fact used by and relied on numerous law enforcement and other government agencies, in many cases definitively and without further inquiry or investigation regarding the SPLC Hate Designations.

217.    Thus government, police, and, as alleged above, foreign governments, press outlets and major social media platforms and others in the technology sector rely to varying degrees – in some cases, without reservation or further inquiry – on the SPLC Hate Designations for purposes of banning them or their members from entry, membership, access to resources, employment and other rights and benefits to which they otherwise would normally be entitled or permitted to use.

218.    Moreover, expert witnesses in litigation, administrative and other matters involving civil rights, discrimination and related matters routinely refer and defer to the SPLC Hate Designations by SPLC.

219.   As a result of such testimony, and based on other submissions, courts, administrative tribunals and other government bodies and organizations have cited and continue to cite the SPLC Hate Designations and related analyses and conclusions as plain fact and not opinion.

220.   Among the many courts accepting, without analysis or discussion, SPLC's Hate Designations as fact in the last five years include the United States Courts of Appeals for the Eleventh Circuit.

221.   As City Journal writer Mark Pulliam wrote in July 2017, "In our polarized culture, the epithet 'hate group' is the ultimate slander of political opponents. The SPLC's spurious imprimatur gives mere calumny gravitas, allowing liberal journalists to wield its highly charged judgments as a weapon, citing it as if it were a dispassionate authority. Many liberal (or merely lazy) journalists discredit conservative organizations by noting that they are 'listed by the SPLC as a hate group,' treating its often dubious designations as gospel truth."

222.   A reasonably prudent and typical person encountering SPLC's false and defamatory statements alleged herein, in the context in which SPLC published and continues to publish them, would understand them to be meant as statements of purported fact, not expressions of opinion, rhetoric or polemics, by the SPLC.

223.   For the foregoing reasons, each and every designation or reference by SPLC to McInnes as an "extremist," "white supremacist," "extremist," "Alt-Right figure" or similarly-described figure, or defamatory association of him by juxtaposition of his name and persona with that of the Proud Boys, which SPLC has designated a "hate group," or other such use of an SPLC Hate Designation referring to is not protected opinion, but is made and intended by SPLC to be accepted and understood as a statement of fact and it so accepted and understood.

43

224.    The above-alleged statements, insinuations and characterizations published by SPLC about Mr. McInnes are false and defamatory.

225.    The above-alleged statements, insinuations and characterizations published by SPLC about Mr. McInnes constitute claims of moral turpitude concerning him and are defamatory per se.

226.    The above-alleged statements, insinuations and characterizations published by SPLC about Mr. McInnes constitute communications to third persons of defamatory statements subjecting him plaintiff to disgrace, ridicule, odium, or contempt.

227.    SPLC has made, continues to make and, unless enjoined by this Court, will in the future make such defamatory statements and insinuations about Mr. McInnes in the expectation, moreover, that not only will such statements be understood as factual, and not opinion, but that those to whom such statements are published will rely on SPLC's statements to take action damaging to Mr. McInnes, as alleged above.

228.    Furthermore, SPLC's false and defamatory statements are not limited to its innumerable and widely-published designations of Mr. McInnes and the Proud Boys in the terms and in the materially false and misleading manner, described above, but also include scores of other false and defamatory statements of purported fact, as set forth below.

## a.  June 8, 2018 Hatewatch Staff Europe Report

229.    An article dated June 8, 2018 on the SPLC website by "Hatewatch Staff" entitled "Last Month in Europe: May 2018" bears the heading, "The following is a list of activities and events linked to American white supremacist, neo-Nazi, anti-LGBT, anti-immigrant and anti-Muslim groups and personalities in Europe." The SPLC post described a May 6, 2018 event in

44

London called Day for Freedom at which Mr. McInnes spoke, describing him as "Gavin McInnes, the founder of the Proud Boys*, which SPLC lists as a hate group."

230.    The asterisk in the sentence is, according to the article heading, an indication that the referenced organization is "listed" as a "hate group," although the sentence also explicitly says, "which SPLC lists as a hate group."

231.    The June 8, 2018 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not a hate group.

232.    The June 8, 2018 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not white supremacist, neo-Nazi, anti-LGBT, anti-immigrant or anti-Muslim.

233.    The June 8, 2018 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact Mr. McInnes, an immigrant, is not white supremacist, neo-Nazi, anti-LGBT, anti-immigrant or anti-Muslim.

**b.  August 17, 2018 Rachel Janik "Kessler falls flat" Article**

234.    An article dated August 17, 2018 on the SPLC website by Rachel Janik entitled "Kessler falls flat in D.C., but the radical right marches on" states, "The Proud Boys (an SPLC-designated hate group started by Vice co-founder, original hipster and self-described Islamophobe Gavin McInnes) and Joey Gibson's Patriot Prayer, have found great success recruiting converts to their cause in the Pacific Northwest with an approach that focuses on the same old reactionary politics and fear, just with fewer vulgar racist overtures and more

Americana. And another thing: they offer their right-wing converts a chance to duke it out in the street with people they disagree with."

235. The August 17, 2018 by Rachel Janik on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not a hate group.

236. The August 17, 2018 by Rachel Janik on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys do not recruit converts to their cause in the Pacific Northwest with an approach that focuses on the same old reactionary politics and fear.

237. The August 17, 2018 by Rachel Janik on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys do not make "right-wing converts."

238. The August 17, 2018 by Rachel Janik on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys do not offer anyone "a chance to duke it out in the street with people they disagree with."

239. The August 17, 2018 by Rachel Janik on the SPLC website is false and defamatory toward Mr. McInnes because he is not an "Islamophobe" as the word is used and understood on the website.

**c.  August 7, 2017 Bill Morlin "Unite the Right / Historic Showcase" Article**

240.  An article dated August 7, 2017 on the SPLC website by Bill Morlin entitled, "Hundreds of Alt-Right activists and white nationalist extremists are set to descend on the small community of Charlottesville, Virginia, on Saturday in what's shaping up to be the largest hate-gathering of its kind in decades in the United States," states, "The Trump-inspired 'Proud Boys,' called the 'Alt-Light' by some and always seeming to be looking for a rumble, may or may not show up in sizeable numbers, although the group's founder, Gavin McInnes, says he full-heartedly supports the rally."

241.  The August 7, 2017 article by Bill Morlin is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which is not "always looking for a rumble."

242.  The August 7, 2017 article by Hatewatch Staff is false and defamatory toward Mr. McInnes because Mr. McInnes did not "full-heartedly support the rally," but instead stated that he supported anyone's right to attend the rally.

243.  Indeed, the extent of the falsity of the August 7, 2017 article by Hatewatch Staff is demonstrated by a statement by him dated June 21, 2017 found on the Proud Boys website saying that he had "been asked a lot about this 'unite the right' thing going on in august" and that the Proud Boys leadership had decided to disavow the event.  Mr. McInnes also said, "I get that it's about free speech and we want everyone – even white nationalists – to have that right but I think it's coming at a time when we need to distance ourselves from them. I'm not punching right. I'm just not coming to your rally – no offense."

244.    The article on the Proud Boys website goes on to say, "Looking at this rally, it doesn't even look like a rally that fits in with Proud Boys. The imagery looks like something that comes from 1930 Germany. Where are your American flags? Or are you trying to appease those speaking in your group who aren't even proud Americans. Nearly every single one of your speakers do not believe in American values. Just look at this flyer [*right*] and try to tell me it doesn't look like



Nazi propaganda. The truth is, we don't need white supremacists in Proud Boys. We are western chauvinists, not racists, and welcome anyone who agrees with that. We don't give a shit what the color of your skin is, but nearly all of the speakers at this event can't seem to do anything but talk about skin color. I understand that antifa and the rest of the radical left will continue to call Proud Boys racist. That doesn't mean we should become racists, or share a stage with racists."

### d.  **August 10, 2017 Hatewatch Staff "Do you want bigots, Gavin?" Article**

245.    An article dated August 10, 2017 on the SPLC website by "Hatewatch Staff" entitled "Do You Want Bigots, Gavin? Because This Is How You Get Bigots" bears the subtitle, "Gavin McInnes, founder of the Proud Boys — what he would prefer to be described as a 'pro-western fraternal organization' — is adamant that his stable of 'western chauvinists' aren't bigots," continuing, "McInnes denies any connection between his group and the far right, dismissing the fact that they show up to the same events, take fashion cues from each other, read the same books, sympathize with each other's viewpoints including, at times, anti-Semitism . . ."

246.    The August 10, 2017 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not a hate group.

247.    The August 10, 2017 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because it suggests falsely that he is an anti-Semite.

248.    The August 10, 2017 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because it states falsely that he "perpetuates racist memes."

249.    The August 10, 2017 article by SPLC Hatewatch Staff 4:m the SPLC website false and defamatory toward Mr. McInnes because it states falsely that he "devised" what it falsely describes as the most fertile 'in-real-life' recruiting ground for white supremacists and anti-Semites within today's organized far-right."

250.    The August 10, 2017 article by SPLC Hatewatch Staff on the SPLC website is false and defamatory toward Mr. McInnes because, in addition to highlighting his name and photograph in an article containing bigoted and extremist quotes by others, it attempts to argue, and leaves readers with the impression, that numerous affirmative statements by Mr. McInnes disavowing, condemning and distancing himself from white supremacists and anti-Semites proves that the Proud Boys is actually a white supremacist and anti-Semitic organization and, hence, that Mr. McInnes himself is or promotes such views.

e.  **August 25, 2-017 Bill Merlin "Fight Club" Article**

251.    An article dated August 25, 2017 on the SPLC website by Bill Morlin entitled, "New "Fight Club" Ready for Street Violence" bears the subtitle, "A new fight club 'fraternity' of young white, pro-Trump men is being funned, its organizers claim, to defend free-speech rights

49

by 'Alt-Right' leaders and engage in street fighting" and refers to the "Free Order of Alt Knights," or FOAK, a half-serious effort — including retention of the "cereal beat-in" process — to provide a counterweight to the mainly uncontrolled phenomenon of antifa violence at conservative events.

252.    The August 25, 2017 article by SPLC states falsely that the Proud Boys are known as "the military arm of the Alt-Right," that the Proud Boys "shows up at pro-Trump rallies looking to rumble with counter[sic]-protesters," that FOAK should be compared to "a neo-Nazi 'fight club' called the 'DIY Division.'

253.    The August 25, 2017 article by Bill Morlin is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which is not "the military arm of the Alt-Right."

254.    The August 25, 2017 article by Bill Morlin is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which, while its members do not fear to defend themselves, do not "look to rumble" with anyone.

255.    The August 25, 2017 article by Bill Morlin is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of FOAK, which is not in any meaningful way comparable to a neo-Nazi organization.

256.    The August 25, 2017 -article by Bill Morlin is false and defamatory toward Mr. McInnes because it falsely states that he "he denigrated Muslims and called Asian Americans "slopes" and "riceballs" on FOX News or the VDARE website.

f.  **April 19, 2018 Hatewatch Staff "Investigating pathways to the alt-right" Article**

257.    An article dated April 19, 2018 on the SPLC website by Hatewatch Staff entitled, "McInnes, Molyneux, and 4chan: Investigating pathways to the alt-right" features the graphic shown below,, with a red arrow winding through a black maze against a white background — evoking the colors and geometry of the Nazi flag — that starts with Mr. McInnes and leads to alt-right radical Jared Taylor, as shown below.



258.    PLC's juxtaposition of Mr. McInnes and Taylor atop its April 19, 2018 article is defamatory toward Mr. McInnes because Mr. McInnes does not share the latter's extreme racist views.

259.    For example, while Taylor is involved in the extremist "White Identity" movement, advocates racial segregation and derides "race mixing," in contradistinction M McInnes is married to- an American Indian, has "mixed-race" American Indian children and has

frequently decried racism and extremism. Indeed, Mr. McInnes has debated Taylor on these very subjects.

260.    The April 19, 2018 article on the SPLC website also defames Mr. McInnes by conflating the definition and use of the term "Alt-Right," which metamorphosed from a general description of "alternative conservatives," i.e., figures and persons not included in mainstream Republican groupings and movements, to, by 2018, meaning the phenomenon of the "new" far-right that is obsessed with race, nationalism and anti-Semitism.

261.    By giving readers the impression that the "Alt-Right" label which may have been accurate to describe Mr. McInnes in 2015 could still be used to describe him in 2018, SPLC defamed and continues to defame Mr. McInnes.

262.    Moreover, the April 19, 2018 article ascribes to Mr. McInnes or associates with him the comments of unidentified speakers claiming to be extremists, white supremacists or similar adherents of far-right philosophies because of Mr. McInnes's work which does not espouse any such philosophy.

**g.  August 5, 2018 Ryan Lenz "One Year Later" Article**

263.    An article dated August 5, 2018 on the SPLC website by Ryan Lenz entitled, "One Year Later: Leaders from 'Unite the Right' Fall From Grace" states, "Since early last year, the far-right groups Patriot Prayer and the Proud Boys (an SPLC-designated hate group) have held more than a dozen rallies throughout the Pacific Northwest under the banner of "freedom." These events have always been about exhibiting machismo, but — as political divisions in the country have grown — they've developed a more targeted purpose: far-right activists taking out their aggression on political opponents. As Proud Boys founder Gavin McInnes once put it, 'Fighting solves everything.'"

264. The August 5, 2018 article by Ryan Lenz is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which is not a far-right group.

265. The August 5, 2018 article by Ryan Lenz is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which is not a hate group.

266. The August 5, 2018 article by Ryan Lenz is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which is not a far-right group.

267. The August 5, 2018 article by Ryan Lenz is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which does not take out its aggressions on political opponents.

268. The August 5, 2018 article by Ryan Lenz is false and defamatory toward Mr. McInnes because it falsely suggests, with the intention that readers understand, that the statement, "Fighting solves everything," was suggested as a literal truth, a tactic or an organizational value by Mr. McInnes.

269. The phrase is, in fact, a widely-used blue-collar slogan found on t-shirts and bumper stickers and was wrenched from the context in which Mr. McInnes said the words in order to defame him.

**h. July 25, 2018 Hatewatch Staff "Another Charlottesville" Article**

270. An article dated July 25, 2018 on the SPLC website by Hatewatch Staff entitled, "Another Charlottesville? Threats of violence loom over upcoming Portland Proud Boys, Patriot Prayer rally" states, "Since early last year, the far-right groups Patriot Prayer and the Proud Boys

have held more than a dozen rallies throughout the Pacific Northwest under the banner of "freedom" — and with talk of bringing weapons and declarations that "this is war," members are threatening to make next weekend's march the most combustible yet."

271.   The article goes on to provide an "Update," in smaller type below the headline, which admits, "The status of the August 5 rally in Berkeley is uncertain after a rash of infighting and an announcement from Gavin McInnes that the Proud Boys 'DISAVOW' the event."

272.   Notwithstanding the "Update," the July 25, 2018 article by Hatewatch Staff is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which the article falsely claims in its headline is to be "threatening violence" at an upcoming Portland "Proud Boys Rally," despite the contradictory information in the "Update."

273.   Notwithstanding the "Update," the July 25, 2018 article by Hatewatch Staff is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which the article falsely claimed in its sub-headline was "talking of bringing weapons" and "threatening to make next weekend's march the most combustible yet" despite the contradictory information in the "Update."

### i.   October 13, 2018 Rachel Janik "Proud Boys and far-right skinheads" Article

274.   An article dated October 13, 2018 on the SPLC website by Rachel Janik entitled "Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event" bears the subtitle, "Proud Boys and far-right skinheads were caught on video singling out and attacking protesters in New York City Friday night" and says, in its first paragraph, "In one video, a far-right assailant in a group of at least 15 screams, 'Faggot!' as he

kicks a person lying curled up on the pavement" without distinguishing between what SPLC claims to be the Proud Boys and "far-right assailants."

275.    The October 13, 2018 article by Rachel Janik on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not a "far-right" group.

276.    Besides omitting to report that the incident involved an attack on the Proud Boys and other by antifa militants, the October 13, 2018 article by Rachel Janik on the SPLC website is full of empirically false statements, the truth of which could readily have been ascertained by her from the information and sources used to prepare the article.

277.    For example, the passage cited above referring to "a group of at least 15" can be seen in videotaped footage to consist of nine people.

278.    The passage claims that one of the "far-right assailants" shouted "he was a fucking foreigner," a highly inflammatory statement reeking of extremism, when in fact he said, "There were four of them," referring to antifa attackers, who were upon information and belief not "foreigners."

279.    The October 13, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely claims he "brought a samurai sword to his event" when in fact Mr. McInnes owns no such or weapons and, consistent with his persona as a humorist, appeared with a toy sword made of plastic.

280.    The toy sword was also broken.

281.    The October 13, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely claims he attended "an anti-Muslim rally" in 2017, which he did not.

**j.** **October 18, 2018 Rachel Janik "Violence and hate, that's the Proud Boys" Article**

282.    An article dated October 18, 2018 on the SPLC website by "the Editors" entitled "Weekend Read: Violence and hate, that's the Proud Boys in a nutshell" bears the subtitle, "Last Friday, members of the hate group Proud Boys and at least three ultranationalist skinheads attacked protesters outside the Metropolitan Republican Club in New York City."

283.    The October 18, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not a hate group, a false claim repeated again in the article.

284.    The October 18, 2018 article repeats many of the same false and defamatory statements set forth above concerning the October 13, 2018 article by Rachel Janik on the SPLC website.

285.    The October 18, 2018 article falsely claims that the Proud Boys' "members marched in Charlottesville, Virginia alongside Richard Spencer, the most prominent alt-right leader."

286.    The October 18, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys not only did not as a group participate in the Charlottesville march and are not associated with Richard Spencer, but in fact expelled four members for attending the event after being forbidden from doing so by Mr. McInnes and the Proud Boys leadership at the time.

287.    The October 18, 2018 article falsely claims that the Proud Boys "represent a new face of the radical right," "relish street-fighting" and "embrace [the] central tenets of "white nationalism."

288.    The October 18, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys are not, as the article alleges, an "element of," much less "a new face of," the radical right.

289.    The October 18, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys do not "relish street-fighting."

290.    The October 18, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the Proud Boys do not embrace the central tenets of white nationalism.

291.    The October 18, 2018 article on the SPLC website is false and defamatory toward Mr. McInnes because it falsely describes him as an "extremist" whose utilizes "subterfuge and lies."

292.    In none of the instances of publication alleged above did SPLC ever obtain or seek information, clarification or confirmation from Mr. McInnes regarding claims about or quotes attributed to him.

293.    SPLC made the foregoing false and defamatory statements with knowledge of or in reckless disregard of their falsity, or both.

294.    Each and every one of the posts or articles referred to above as having been published on the SPLC website on a given date is, as of the date hereof, still publicly available and can be found on the SPLC website.

## COUNT III.

### FALSE LIGHT INVASION OF PRIVACY

295.    Mr. McInnes hereby incorporates and realleges the foregoing allegations as if fully set forth herein.

296.    By virtue of the foregoing alleged conduct, defendant SPLC placed Mr. McInnes in a false and defamatory light that is offensive to a reasonable person.

297.    Mr. McInnes has suffered financial and other damage as a result of SPLC's wrongful conduct.

298.    Mr. McInnes has no adequate remedy at law.

## COUNT IV.

### AIDING AND ABETTING EMPLOYMENT DISCRIMINATION PURSUANT TO N.Y. LABOR LAW § 201–d

299.    Mr. McInnes hereby incorporates and realleges the foregoing allegations as if fully set forth herein.

300.    As alleged above, SPLC targeted Mr. McInnes, and acted to cause him to be dismissed from his employment in the City of New York and to discourage or intimidate other employers from hiring Mr. McInnes because of his past involvement with the Proud Boys.

301.    Mr. McInnes's activities relating to the Proud Boys were a lawful leisure-time activity for which he as an employee of CRTV / Blaze TV received no compensation and in which he engaged for recreational purposes.

302.    Pursuant to NY Labor Law § 201–d, no employer may discriminate against an employee or prospective employee because of his legal recreational activities outside work hours, off of the employer's premises and without use of the employer's equipment or other property.

303.    The conduct of SPLC in procuring Mr. McInnes's dismissal from employment because of his involvement in a protected recreational activity was a violation of or constituted aiding and abetting of a violation of NY Labor Law § 201–d, pursuant to the general scheme provided in Chapter 5 the New York city Human Rights Law, § 8-107 *et seq.* and the construction provision of § 8-130, to which Mr. McInnes is entitled to relief under the statute and as a matter of common law.

### PRAYER FOR RELIEF

WHEREFORE, Mr. McInnes respectfully prays for judgment as follows:

A.    That this Court declare that SPLC's publication of the false and misleading representation of fact that Mr. McInnes is connected to a "hate group" and other misrepresentations about him tortiously interfered with Mr. McInnes's business expectancy in violation of law;

B.    That this Court declare that SPLC's publication of the false and misleading representation of fact that Mr. McInnes is connected to a "hate group" and other misrepresentations about him defamed Mr. McInnes and was done with actual malice in violation of law;

C.    That this Court declare that SPLC's publication of the false and misleading representation of fact that Mr. McInnes is connected to a "hate group" and other

misrepresentations about him tortiously placed Mr. McInnes in a false and harmful light in violation of applicable common law;

D.      That this Court declare that SPLC's publication of the false and misleading representation of fact concerning Mr. McInnes, including the claim that he was connected to a "hate group" because of his lawful recreational activities, wrongfully caused him to be discharged from his employment and to be prevented from obtaining future employment in the State of New York in violation of NY Labor Law § 201–d;

E.      That this Court issue a permanent injunction enjoining SPLC, its officers, agents, servants, employees, and all other persons acting in active concert or participation with SPLC from further interfering with his prospective economic opportunities by dissemination of the false, misleading, and defamatory representation of fact that Mr. McInnes is a "hate group," and requiring that SPLC issue a public retraction, apology and appropriate corrective advertising because of its actions;

E.      That this Court award Mr. McInnes all appropriate actual, compensatory, and pecuniary damages resulting from SPLC's false, misleading, and defamatory representation of fact that Mr. McInnes is connected to a "hate group";

F.      That this Court award Mr. McInnes all appropriate reputational damages resulting from SPLC's false, misleading, and defamatory representation of fact that Mr. McInnes is connected to a "hate group";

G.      That this Court award Mr. McInnes all reasonable attorney's fees and costs; and

H.      That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

**BARON COLEMAN LAW FIRM**

By:  G. BARON COLEMAN
Alabama Bar No. ASB-9562-O67C

PO Box 789
Montgomery AL 36101-0789
baroncoleman@gmail.com
334-625-9097

**MANDELBAUM SALSBURG PC**
RONALD D. COLEMAN (*phv* admission
        pending)
LAUREN X. TOPELSOHN (*phv* admission
        pending)
1270 Avenue of the Americas – Suite 1808
New York, NY  10020
rcoleman@lawfirm.ms
ltopelsohn@lawfirm.ms
212-776-1834

Dated:  February 3, 2019


Defendant:

The Southern Poverty Law Center, Inc.
400 Washington Avenue
Montgomery, AL 36104