## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **GAVIN McINNES,**<br><br>  *Plaintiff,*<br><br>  *- vs.-*<br><br>**SOUTHERN POVERTY LAW CENTER, INC.,**<br><br>  *Defendant.* | **CIVIL ACTION NO. 2:19-cv-98-MHT-GMB** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION OF SOUTHERN POVERTY LAW CENTER TO DISMISS (CORRECTED)

Plaintiff, Gavin McInnes ("**Plaintiff**" or "**Mr. McInnes**") respectfully files this response in opposition to the Motion by Southern Poverty Law Center ("**SPLC**") to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6) ("**SPLC's Motion**," ECF 17).[1]

---

[1] SPLC's Motion to Dismiss and Memorandum of Law in Support Thereof (ECF 17) is cited herein as "SPLC Br. at __."

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ............................................................................................2

    A.    Gavin McInnes .................................................................................2

    B.    SPLC: Arbiter of "Hate" ..................................................................4

    C.    Deplatforming and Defunding .........................................................6

    D.    "Changing the Terms" of Free Speech ..............................................8

    E.    Bringing Down the Proud Boys, Shutting Down Gavin McInnes......................13

    F.    The Dominoes Fall..........................................................................14

ARGUMENT ..............................................................................................................17

APPLICABLE STANDARDS .....................................................................................17

    A.  STANDARD OF REVIEW ............................................................17

    B.  ALABAMA LAW APPLIES TO PLAINTIFF'S DEFAMATION AND
        FALSE LIGHT CLAIMS, NOT NEW YORK LAW ...............................19

POINT I      PLAINTIFF'S TORTIOUS INTERFERENCE ALLEGATIONS STATE
               A CLAIM FOR WHICH RELIEF CAN BE GRANTED ...............................25

POINT II     PLAINTIFF STATES A VIABLE DEFAMATION CLAIM ...........................32

    A.    SPLC's Defamatory Statements Also Include Plain Statements of
          Purported Fact..................................................................................34

    B.    The Hate Group Designation is Of and Concerning Plaintiff..............................38

    C.    SPLC's Hate Group Designation is Not a First Amendment Protected
          Opinion ..........................................................................................44

          (1)    SPLC's Hate Group Designations are Compilations of Empirical Facts and,
                  as Applied to Plaintiff, False and Defamatory .........................................44

(2)  SPLC's Claim that the Hate Group Designation is merely an "Opinion" Contradicts SPLC's Stated Purpose for its Use..........................................48

(3)  Self-Proclaimed "Opinions" are Not Constitutionally Protected if they are Made with Knowledge of their False Implications or a Reckless Disregard of the Truth....................................................................................50

(4)  SPLC's Reliance on the "Absolute" Protection New York Affords Opinions is Unavailing................................................................51

D.  SPLC's Applied the Hate Group Designation to Plaintiff and the Proud Boys Knowing it to Be False and/or With a Reckless Disregard of the Truth.............................................................................................56

E.  Plaintiff Alleges Facts Sufficient to Support Actual Malice ...............61

POINT III   PLAINTIFF'S FALSE LIGHT INVASION OF PRIVACY ALLEGATIONS STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED ...............................................................................63

POINT IV   PLAINTIFF STATES A VIABLE CLAIM UNDER NEW YORK GRANTED .............................................................................66

CONCLUSION .......................................................................................69

<u>**TABLE OF AUTHORITIES**</u>

## Other Authorities

*Constitutional Limitations on Choice of Law: The Special Case of Multistate Defamation,* James R. Pielemeier, 133 U. Pa. L. Rev. 381 (1985)...................................................................................... 20
Restatement (First) of Conflicts § 377............................................................................................ 20
Restatement (Second) of Conflicts § 149 ...................................................................................... 21
Restatement of Torts (Second) § 564 ............................................................................................ 43
Webster's New World College Dictionary, 5th Ed. (2014).............................................................. 59

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 17, 26, 30, 40
Fed. R. Civ. P. 8.............................................................................................................................. 17
Fed. R. Civ. P. 8(a)(2).................................................................................................................... 17

## Federal Cases

*Ala. State Conference of the NAACP v. Alabama*, 264 F. Supp. 3d 1280 (M.D. Ala. 2017) ....................... 18
*Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40 (N.Y. App. Div. 2009) ....................... 26, 31
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................. 18, 23, 33
*Beck v. Deloitte & Touche*, 144 F.3d 732 (11th Cir. 1998) ........................................................... 18
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).................................................................... passim
*Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438 (M.D. Ala. 1996) ................. 55
*Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976) .......................................................................... 53
*Celle v. Filipino Reporter Enters.*, 209 F.3d 163 (2d Cir. 2000)................................................. 52
*Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967)............................................................................ 33
*Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017)............................................................. 41
*Fetler v. Houghton Mifflin Company,* 364 F.2d 650 (2d Cir.1966)............................................. 42
*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir.1980) ...................................................................... 42
*Gilman v. Spitzer*, 538 F.Appx. 45 (2nd Cir. 2013) ............................................................... 41, 42
*Glennon v. Rosenblum*, 325 F. Supp. 3d 1255 (N.D. Ala. 2018) .............................................. 21
*Gray v. Derderian*, 472 F. Supp. 2d 172 (D.R.I. 2007)............................................................. 27
*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) .................................................... 18
*Hamze v. Cummings*, 652 Fed. App'x 876 (11th Cir. 2016) ...................................................... 48
*Harris v. Huffco Petroleum Corp.*, 633 F. Supp. 250 (S.D. Ala. 1986) .................................... 26
*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)............................................................. 26
*Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080 (D.C. 2007) ..................................................... 41, 42
*Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487 (1941) ...................................................... 19
*Lapkoff v. Wilks,* 969 F.2d 78 (4th Cir.1992) ............................................................................. 20
*Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301 (N.D. Ala. 2017), <u>app. filed</u>, 11th Cir., July 17, 2018.................................................................................................................................. 40
*Michel v. NYP Holdings, Inc.*, 816 F.3d 686 (11th Cir. 2016) ............................................. 20, 22, 33, 61
*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)............................................................... passim
*Naantaanbuu v. Abernathy*, 746 F.Supp. 378 (1990) ............................................................... 42
*Neitzke v. Williams*, 490 U.S. 319 (1989) .................................................................................. 30
*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)......................................................... 33, 62
*Paradise Divers, Inc. v. Upmal*, 402 F.3d 1087 (11th Cir. 2005)............................................. 18
*Perez v. Wells Fargo N.A.*, 774 F.3d 1329 (11th Cir.2014)...................................................... 61
*Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705 (S.D.N.Y. 2014)............. 24
*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065 (11th Cir. 2004) 18
*St. Amant v Thompson*, 390 U.S. 727 (1323)............................................................................. 62
*St. Clair v. Righter*, 250 F.Supp. 148 (W.D.Va.1966)............................................................. 20

*Watts v. Fla. Int'l Univ.*, 495 F.3d 1289 (11th Cir. 2007) ........................................................ 18
*Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) ............................................................................. 20

**State Cases**

*Bowling v. Pow*, 293 Ala. 178 (1974) ........................................................................................ 32
*Butler v. Town of Argo*, 871 So. 2d 1 (Ala. 2003) ............................................................... 33, 64
*Camp v. Yeager*, 601 So. 2d 924 (Ala. 1992) ................................................................. 53, 55, 62
*Ceravolo v. Brown*, 364 So. 2d 1155 (Ala. 1978) ................................................................. 34, 55
*Clark v. America's First Credit Union*, 585 So. 2d 1367 (Ala. 1991) ...................................... 34
*Clark v. America's First Credit Union*, 585 So.2d 1367 (Ala. 1991) ....................................... 55
*Cottrell v. Nat'l Coll. Athletic Ass'n*, 975 So. 2d 306 (Ala. 2007) ...................................... 34, 62
Cousins v. T.G. & Y. Stores Co., 514 So. 2d 904 (Ala. 1987) .................................................... 62
*Davis v. Boeheim*, 24 N.Y.3d 262 (2014) ............................................................................. 21, 52
*Dunning v. Boyes*, 351 So. 2d 883, 885 (Ala. 1977) ...................................................... 23, 54, 55
*Ex Parte Bole*, 103 So. 3d 40, 51 (Ala. 2012) ......................................................................... 33
*Ex parte Crawford Broad. Co.*, 904 So. 2d 221 (Ala. 2004) .................................................... 33
*Ex parte U.S. Bank Nat. Ass'n*, 148 So. 3d 1060 (Ala. 2014) ........................................... 19, 20
*Finebaum v. Coulter*, 854 So. 2d 1120 (Ala. 2003) ................................................................. 55
*Fitts v. Minnesota Min. & Mfg. Co.*, 581 So. 2d 819 (Ala. 1991) ............................................ 20
*Fullani v. N.Y. Times Co.*, 260 A.D.2d 215, 686 N.Y.S. 703 (1st Dept. 1999) ...................... 41
*Gary v. Crouch*, 867 So.2d 310 (Ala. 2003) ........................................................................... 21
*Harrell v. Dodson*, 398 So. 2d 272 (Ala. 1981) ...................................................................... 22
*Harris v. School Annual Publ'g Co.*, 466 So. 2d 963 (Ala. 1985) ............................................ 33
*LeBlanc v. Skinner*, 103 A.D.3d 202 (2012) ........................................................................... 21
*Loveless v. Graddick*, 295 Ala. 142, 325 So.2d 137 (1975) ..................................................... 62
*Mann V. Abel*, 856 N.Y.S.2d 31, 885 N.E.2d 884 (2008) ....................................................... 21
*McCaig v. Talladega Publishing Co.*, 544 So.2d 875 (Ala. 1989) ........................................... 33
*McGowan v. Chrysler Corp.*, 631 So.2d 84 (Ala. 1993) ......................................................... 22
*Nann v. Raimist*, 255 N.Y. 307 (1931) .................................................................................... 25
*O'Neil v. Peekskill Faculty Ass'n*, 507 N.Y.S.2d 173 (App. Div. 1986) .................................. 54
*Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d 339 (Ala. Civ. App. 2015) ................ 53
*Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118 (S.D.N.Y. 2016) ........................ 54
*S.B. v. Saint James School, 959 So. 2d 72 (Ala. 2006)* .......................................................... 24
*Sanders v. Smitherman*, 776 So. 2d 68 (Ala. 2000) ................................................................ 62
*Slack v. Stream*, 988 So.2d 516 (Ala. 2008) ........................................................................... 24
*Sprecher v. Thibodeau*, 148 A.D.3d 654 (N.Y. App. Div. 2017) ............................................. 26
*Stapleton Studios, LLC v. City of N.Y.*, 26 A.D.3d 236 (N.Y. App. Div. 2006) ....................... 26
*Surrency v. Harbison*, 489 So. 2d 1097 (Ala. 1986) .......................................................... 23, 55
*Triguero v. ABN AMRO Bank N.V.*, 273 Ga.App. 92, 614 S.E.2d 209 (2005) ......................... 21
*Trojan Elec. & Mach. Co. v. Heusinger*, 162 A.D.2d 859 (N.Y. App. Div. 1990) .................... 25
*Ullmannglass v. Oneida, Ltd.*, 86 A.D.3d 827 (N.Y. App. Div. 2011) ...................................... 26
*Williams v. A.L. Williams and Assoc., Inc.*, 555 So. 2d 121 (Ala. 1989) ................................ 20

**Unreported Cases**

*Austin v. Auto Owners Ins. Co.*, No. CIV.A. 12-0345-WS-B, 2012 WL 3101693 (S.D. Ala. July 30, 2012) ........................................................................................................................... 23, 24
*Bain v. Jockey Club Tech. Servs., Inc.*, No. 07-80371-CIV, 2007 WL 9706995 (S.D. Fla. Nov. 29, 2007) ................................................................................................................................... 29, 30
*Bankers Leasing Ass'n, Inc. v. Middle States Fin. Servs., Inc.*, No. 88 C 4783, 1989 WL 8519 (N.D. Ill. Jan. 26, 1989) ..................................................................................................................... 23
*Bell v. Smith*, No. 1171108, ___ So. 3d ____, 2019 WL 1305886 (Ala. Mar. 22, 2019) ......................... 22

*Covenant Servs., Inc. v. Jones-Blair Co.*, No. 3:15-CV-0025-N, 2015 WL 13118197 (N.D. Tex. Mar. 3, 2015) ................................................................................................................................. 30

*Green Grp. Holdings, LLC v. Schaeffer*, No. CV 16-00145-CG-N, 2016 WL 6023841 (S.D. Ala. Oct. 13, 2016) ................................................................................................................................. 20

*Greif v. Jupiter Med. Ctr., Inc.*, No. 08-80070-CIV-MARRA, 2008 WL 2705436 (S.D. Fla. July 9, 2008) ................................................................................................................................. 24

*Lovingood v. Discovery Commc'ns, Inc.*, No. 5:14-CV-00684-MHH, 2015 WL 5719169 (N.D. Ala. Sept. 30, 2015) ........................................................................................................ 40, 42, 43

*Maledy v. City of Enterprise*, 2012 WL 1028176 (M.D. Ala. Mar. 26, 2012) ............................................. 18

*Weakley v. Roberts*, No. 3:16-CV-00403-HGD, 2017 WL 7201526 (N.D. Ala. Mar. 7, 2017) .............. 26

*Whisenant v. CSX Transp. Inc.*, No. 2:13-CV-1730-WMA, 2015 WL 1061166 (N.D. Ala. Mar. 11, 2015) ................................................................................................................................. 26

## PRELIMINARY STATEMENT

SPLC's motion to dismiss Plaintiff's complaint (the "Motion") is a cynical exercise of wrapping a bundle of ordinary – but unquestionably damaging – torts in the flag of free speech. The effort is akin to SPLC's all too successful success at camouflaging campaigns of reputational and commercial assassination for ideological gain in the raiment of "stopping hate." Plaintiff's claims for tortious interference with economic advantage, defamation, false light invasion of privacy and violation of the New York Labor Law are all soundly pleaded, and arise from SPLC's malicious campaign to destroy his good name, deprive him of a livelihood and deny him the ability to defend himself in the public square.

SPLC places nearly all its eggs in its putative "free speech" basket.  But that container has a major defect in it, and it is not (merely) constitutional.  Rather, SPLC submits an entire brief premised on New York law, and argues that New York's expansive defamation jurisprudence is dispositive of virtually Plaintiff's entire lawsuit. However, under Alabama choice of law principles, all three of Plaintiff's tort claims should be decided under Alabama law, despite Plaintiff's New York residence.  Neither Alabama nor New York law actually places the obstacles SPLC claims exist between Plaintiff and the restoration of his reputation and compensation for the harm done to him.

Tortious interference with contract is not defamation, and SPLC's suggestion that it be dismissed as duplicative of Plaintiff's defamation claim does not hold water.  As to Plaintiff's defamation claim, while SPLC errs in asserting a barrage of New York law defenses not available under Alabama law, as demonstrated below, they are unavailing.  Even under New York law, SPLC's attempt to veil every single defamatory statement as alleged "opinion" (or some New York-related protections) is unsupported by fact and a proper understanding of what

is and is not an opinion. Nor is there, any question, as demonstrated below, that Plaintiff successfully pleads actual malice, as required in defamation case involving a public figure: Seldom will the Court encounter a more explicit and public expression of determination to destroy enemies, both by public opprobrium and direct interference with third parties, than demonstrated here.

Finally, in SPLC's haste to bulldoze the Court into accepting its incorrect premise that New York law applies, SPLC waives the opportunity to argue that Plaintiff's false light invasion of privacy claim should be dismissed on other grounds.  While New York does not recognize that tort, Alabama, does.   SPLC's waiver notwithstanding, Plaintiff more than adequately meets the pleading standards for that cause of action under Alabama law.

For these reasons, and for reasons regarding the fourth count under New York statutory law set out in that section, SPLC's Motion should be denied and Plaintiff should be permitted to expose the truth about SPLC's damaging conduct and the very real losses he has sustained as a result, of reputation, of economic benefit and of the precious right:  to be heard in his own voice by anyone who wishes to listen.

## STATEMENT OF FACTS[2]

### A.     Gavin McInnes

Plaintiff is a New York State resident, a humorist, businessman, political commentator and social critic, whose work as an Internet "television" personality is billed and understood widely as satirical, meant for grownups and the "rebellious."  In his published work, past social media posts and videos, Mr. McInnes, an immigrant, has stated that he opposes

---

[2] Unless otherwise noted, the statements set forth herein are taken directly from the Complaint ("Compl.").  Other facts of record, in particular those submitted by SPLC, are incorporated in the Argument and appropriate citations provided there.

2

discrimination based on race, religion or sexual preference, and ideologies and movements that espouse extremism, nationalism and/or white supremacy. In an October 16, 2018 article, the *New York Times* described Plaintiff as "a former Brooklyn hipster turned far-right provocateur," notable for "his egghead glasses, pocket-protector and heavy-drinking, angry-nerd aesthetic," and whose "obsessions seem to be more cultural than political. Mr. McInnes, a fiscal conservative and libertarian, calls himself a champion of Western values and reserves a burning ire for the political correctness of people on the left whom he describes as busybodies who have lost their sense of humor." While Mr. McInnes does not accept the *Time's* "far-right" label, the article accurately describes Plaintiff's iconoclastic and often "offensive" style, "offending liberals, women, 'beta male culture' and transgender people, writing in a voice inflected with a crass, contrarian bigotry that left him just enough room to declare it all a joke."

In fact, Mr. McInnes is a comedian and political commentator who has been working in media for a quarter century. After creating Vice Media, Plaintiff ran most of the editorial or content side of the operation until his departure in 2008. After, he made several movies, wrote books and founded an advertising agency called Rooster Worldwide in 2010. After 2014, he focused entirely on talk show hosting and had a successful career up until December 2018, when SPLC's relentless campaign to silence him succeeded.

Plaintiff is also the founder of a youth group called the Proud Boys. As the *Times* article explains, in 2016 Plaintiff founded its first official chapter "in New York after, he said, he realized that fans of his former television program, 'The Gavin McInnes Show,' liked to spend time in his studio, drinking beer with him and telling private [*sic*] jokes. He has described the group, which has since spread to dozens of cities and to countries, like Australia and Japan, as an ordinary men's club, like the Shriners or the Elks. It serves as a sort of safe space for him and

what he calls his fellow 'Western chauvinists.'" According to the *Times*, "In its guise as a fraternal organization, the Proud Boys get together in New York and other cities once a month at beery meet-ups that can draw as many as a hundred participants. Women are not allowed at the group's formal gatherings (though they are permitted at the 'warm up' sessions, Mr. McInnes has written).

The Proud Boys' culture reflects to some extent Mr. McInnes's own goofy sense of humor.  As the *Times* article explains, as "a character-building exercise, the Proud Boys forbid both masturbation and the watching of pornography. The group's initiation rituals include reciting the names of five breakfast cereals while being slugged by other members. The monthly meet-ups are largely 'social events where people have fun and laugh and drink and share stories about their kids and businesses and stuff like that,' said Pawl Bazile, the editor of Proud Boy magazine. 'It's a celebration of the West, of America and of freedom and liberty.'"  "The Proud Boys are a politically incorrect men's social club," the group's leadership was quoted in one press report.

**B.     SPLC: Arbiter of "Hate"**

SPLC declares itself to be the "premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists, including the Ku Klux Klan, the neo-Nazi movement, neo-Confederates, racist skinheads, black separatists, anti-government militias, Christian identity adherents, and others."

SPLC has its own definition of a "hate group," which is found on its website.[3] SPLC designates an organization as a hate group based on what SPLC describes as a factual assessment that weighs a combination of empirical criteria.  It reads as follows:

> The Southern Poverty Law Center defines a hate group as an organization that – based on its official statements or principles, the statements of its leaders, or its activities – has beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics. We do not list individuals as hate groups, only organizations.

> The organizations on our hate group list vilify others because of their race, religion, ethnicity, sexual orientation or gender identity – prejudices that strike at the heart of our democratic values and fracture society along its most fragile fault lines. . . .

> We define a "group" as an entity that has a process through which followers identify themselves as being part of the group. This may involve donating, paying membership dues or participating in activities such as meetings and rallies. . . .

According to the United States Department of Justice ("**DOJ**"), "most hate/bias crimes do not involve organized hate groups, whose members are dedicated to the goal of achieving racial purity." Indeed, the DOJ reports that "Hate/bias crimes are more often committed under ordinary circumstances by otherwise unremarkable types." Despite the relative unimportance of "hate groups" and their members in the scheme of hate- or bias-based violence and crime, the cornerstone of SPLC's agenda and promotion is the identification of groups and persons as "hate groups," "extremists" and "white supremacists."  SPLC acknowledges that its goal is to destroy organizations and persons it targets as "hate groups" or as members of "hate groups" as a matter of "political struggle."

---

[3] "What is a hate group," SPLC website, found at https://www.splcenter.org/20171004/frequently-asked-questions-about-hate-groups#hate%20group (visited April 16, 2019).

While SPLC's rhetoric routinely associates "hate groups" with actual "hate crimes," SPLC has acknowledged that what it defines as "hate group" activity includes constitutionally protected "marches, rallies, speeches, meetings, leafleting or publishing," and that the SPLC's designation of a "hate group" "does not imply a group advocates or engages in violence or other criminal activity."  Indeed, in a 2018 *Washington Post* article, SPLC President Richard Cohen admitted that, in SPLC's view, it does not matter whether a SPLC Hate Designation is accurate in terms of identifying conduct motivated by actual "hate" since it is part of "an effort to hold them accountable for their rhetoric and the ideas they are pushing."

## C.    Deplatforming and Defunding

As hate-group researcher Wilcox observed, with its "hate" designations, SPLC has "specialized a highly developed and ritualized form of defamation." Specifically, SPLC "harm[s] and isolate[s] people by denying their humanity and trying to convert them into something that deserves to be hated and eliminated."  As a result, Wilcox concludes, "ordinary people expressing their values, opinions, and beliefs [are] up against a very talented and articulate defamation machine."

SPLC uses its self-proclaimed "moral authority," and indisputably, widely-adopted "hate" designations, to defame – and thereby cow – proprietors and providers of the very forums in it uses.  In doing so, SPLC ensures its defamation victims are denied the opportunity to respond to accusations in any manner approaching the way in which they were defamed.  As recounted by David Montgomery in the 2018 *Washington Post* article, charitable organizations that SPLC has characterized as extremists, have been barred by Amazon.com from its AmazonSmile program, which enables customers to designate a nonprofit charity to receive a portion of the customer's purchase price – from raising money through its site.  Amazon acknowledges that it relies "uncritically" on SPLC's "hate" designations to determine whether a

6

charity is ineligible for the AmazonSmile program. The heart of SPLC's attack on those unfortunate enough to be on its enemies list, is no longer the civil rights litigation and legal advocacy that made it famous. SPLC's current "weapon" of choice has none of the drawbacks of litigation and offers many comparative advantages.

In the past, prosecuting civil cases against actual hate groups garnered SPLC headlines and widespread support. However, the expensive and time-consuming process of proving a legitimate case to a jury (or a judge), and collecting damages was not always (if ever) financially rewarding. Moreover, civil litigation, is governed by due process considerations that translate into "good faith," "non-harassing" pleading standards, the right to counsel, burdens of proof, fairness and reliability provided by evidence rules, presumptions of "innocence" or "not liable," public and open proceedings and an ultimate determination of the merits by a disinterested judicial officer or a jury of peers, from which a party dissatisfied with the outcome has a right to appeal.

According to a June of 2018 report by Peter Hasson, four of the world's biggest social media platforms – Facebook, Amazon, Google and Twitter – have established working partnerships with SPLC, which is deemed an "external expert" that "informs" the "hate speech policies" of those media platforms. Hasson reported that of those platforms, Amazon affords SPLC the most direct authority, granting SPLC veto power over the Amazon Smile charitable program and automatically removing from that program any organization "SPLC deems as ineligible." Similarly, Twitter has publicly acknowledged that SPLC is a "safety partner" and that SPLC advises Twitter how to combat "hateful conduct and harassment." Google, which owns YouTube, uses SPLC to help police "hate speech" as part of YouTube's "Trusted Flagger" program. The public record demonstrates that once branded with SPLC's Hate Group

7

Designation, a company or individual is almost certain to be banned by Twitter, Google and their related services and platforms.

**D.      "Changing the Terms" of Free Speech**

The most recent manifestation of SPLC's comprehensive deplatforming and defunding campaign is its "Change the Terms" program unveiled in October of 2018, and which SPLC refers to as "a set of policy recommendations to help social media and other internet companies reduce hateful activities on their platforms."  SPLC dedicates a webpage on its website to "Change the Terms" <u>and</u> has set up a separate site under the domain, www.changetheterms.org  (the "**CTT Website**"), which is presumably another source of SPLC revenue.

According to SPLC, Change the Terms is based on the premise that "[m]ost tech companies are committed to providing a safe and welcoming space for all users. But when tech companies try to regulate content arbitrarily, without civil rights expertise, or without sufficient resources, they can exacerbate the problem." SPLC promotes itself as a "non-arbitrary" source of "civil rights expertise" and "resources," and the solution to solve this supposed problem.

SPLC's announces on its "Change the Terms" home page that, "WHITE SUPREMACISTS ARE USING ONLINE PLATFORMS FOR HATE. IT'S TIME TO CHANGE THE TERMS," as shown below.



*Image 1*

As depicted, SPLC's Change the Terms home page includes a downward pointing arrow that suggests that the material below substantiates its assertion regarding white supremacists.

Immediately below the arrow, SPLC states:

### REDUCING HATE ONLINE

As internet platforms provide more opportunities for people around the world to connect, they have also provided a forum for certain groups to spread hate, fear, and abusive behavior.

The deadly neo-Nazi march in Charlottesville, Virginia, was organized with the use of Facebook, PayPal, and Discord.

**The violent Proud Boys group** vets new applicants through Facebook, and have seen an uptick in applications since summer 2018.

Some technology companies have made steps in the right direction to reduce hateful activities online, but more work needs to be done.

Over the past year, the Change the Terms coalition has met with experts on terrorism, human rights, and technology around the world to gather insights on how hate operates online and how it can be stopped.

The result of those conversations was the creation of recommended corporate policies and terms of service to ensure that social media platforms, payment service providers, and other internet-based services are not places where hateful activities and extremism can grow.

(Emphasis added).

Following the arrow and scrolling down the Change the Terms website reveals three compelling, powerful photographs depicting what appear to be violent confrontations involving unidentified persons whose faces are mainly obscured. (See, Image 2, below). Sandwiched between those two photographs is a third photograph of an eminently recognizable Plaintiff, holding up a raised fist and surrounded by anxious-looking faces.

9



CHANGE THE TERMS
REDUCING HATE ONLINE

ADOPT THE TERMS | FAQS | PETITION | ORGANIZATIONAL SIGN ON | ABOUT

## WHAT IS HATEFUL ACTIVITY?

Hateful activities are those that incite or engage in violence, intimidation, harassment, threats, or defamation targeting an individual or group based on their actual or perceived race, color, religion, national origin, ethnicity, immigration status, gender, gender identity, sexual orientation, or disability.

READ THE FAQS

## WHY THIS MATTERS

Just as the internet has created immense positive value by connecting people and creating new communities, it has also given new tools to those who want to threaten, harass, intimidate, defame, or even violently attack people different from themselves.

READ THE REPORT

## WHY WE CARE

Change the Terms has developed model corporate policies to help internet companies stop hate and extremism online and ensure that they do more to protect people of color, women, LGBTQIA people, religious minorities and other marginalized communities. We are made up of civil rights, anti-hate and open-internet organizations.

ABOUT THE COALITION

*Image 2*



*Image 3*

On a mobile phone, from which most website content is now viewed, the photograph of Mr. McInnes is the only one shown on the homepage of the Change the Terms website, as shown in Image 3.

Although both versions of the Change the Terms home page, featuring Plaintiff's photograph, suggest he was part of a hate group involved in a "violent" confrontation with police, the photo was actually taken at an event during which no violence whatsoever occurred.  It was taken as Plaintiff departed the speaker's platform at an event in Berkeley, California, at which time,  he pumped his fist and repeated the word, "Uhuru," Swahili for "freedom."

On another screen view of the SPLC's Change the Terms home page (Image 4 below), SPLC posts this same image of Plaintiff next to text, decrying those who "threaten, harass, intimidate, defame, or even violently attack people different from themselves" obviously suggesting to the viewer that what he or she is seeing is a person doing all the hateful, and likely unlawful, activities SPLC identifies.

4842-5970-7542, v. 2



*Image 4*

The policy SPLC urges by way of its Change the Terms program – and that is employed against its victims, including Plaintiff – expressly requires that the organizations adopting it prohibit any "facilitation" of SPLC's definition of "hateful activities" – "whether online or offline."  As SPLC explains on it, the Change the Terms explains,

> While an online payment processor may not be the vehicle through which a group directly engages in hateful activities, the online payment processor should not knowingly allow the group to use its services to fund hateful activities. Not denying services under this example would mean that the online payment processor is financially profiting from hateful activities.

(*Id*. ¶¶145-146.)  According to SPLC these "policies are intended for internet companies that provide the following types of services: Social media, video sharing, communications, marketing, event scheduling, or ticketing; Online advertising; Financial transactions or fundraising; Public chat or group communications; Domain names; Building or hosting websites,

blogs, or message boards. . . . After we have given tech companies a reasonable amount of time to digest, adopt, and implement these policies, we will initiate an evaluation process to see how companies stack up. . . . Without effective and even-handed execution, a formal policy is just empty words."

SPLC is not interested in empty words, and its Change the Terms initiative is not an idle threat.  As shown above, it means what it says – and has gotten results, that destroy numerous organizations and careers, including Plaintiff's.

**E.      Bringing Down the Proud Boys, Shutting Down McInnes**

Plaintiff and the Proud Boys first appeared on SPLC's radar in June of 2017, when SPLC's website reported that he was a speaker at a New York "anti-Sharia" event and described him as a "neo-masculine reactionary" guilty of making "blatantly misogynistic comments."  The SPLC post, which is still on the SPLC website, also falsely suggests that Plaintiff is associated with "Vanguard America," a "white nationalist group."

After this post, SPLC's mentions of Mr. McInnes and Proud Boys, who were attracting increasing attention in the national media and in social media – fundamental criteria for SPLC's fundraising purposes – ramped up concomitantly. So did SPLC's pressure on online channels and payment processors to de-person Plaintiff and the Proud Boys.  In February 2018, the Proud Boys received the unwelcome "honor" of being "inducted" into SPLC's hall of fame – "Hall of Hate," that is, i.e., its enemies list or "Hate Map."

The specific articles defaming Mr. McInnes are set out in detail in the Complaint. In the interest of brevity, they are not repeated here.  Specific examples of how SPLC's articles constitute defamatory statements, are provided in the Legal Argument section of this Brief.

**F.**      **The Dominoes Fall**

The first social media domino fell on August 10, 2018, when Plaintiff was banned from Twitter, where he had approximately a quarter of a million followers, for "violations of the terms of service."  No further explanation was provided, but media reports that the reason was his association with the Proud Boys, which – the media also reported – had been deemed a "hate group" by SPLC.  The terms of "Change the Terms" were now in effect.

On October 19, 2018, SPLC attacked again by oversimplifying, taking out of context, and deliberately misconstruing Plaintiff's commentary on swear words, slurs, and thought police, to tar him as "anti-gay."  This is false; Plaintiff is not "anti-gay."  Nonetheless, SPLC's aim was true:  On October 31st, 2018, Plaintiff was banned from Facebook and its affiliated service, Instagram, "because of policies against hate groups."  Mr. McInnes, of course, is not a "group," and the reference, presumably, was to the Proud Boys – which, because of SPLC, had been welded to Mr. McInnes's identity and whose supposed sins would now be ascribed to him personally. The other major platforms followed in due course.  On November 9, 2018, PayPal banned both Plaintiff and the Proud Boys, informing Plaintiff that "We do not allow PayPal services to be used to promote hate, violence or other forms of intolerance that is discriminatory."

On November 30, 2018, Plaintiff was denied a visa for a paid speaking tour in Australia based on his "bad character."  Credit for his exclusion from Australia was taken by a *Guardian* columnist who cited SPLC's Hate Group Designation of the Proud Boys as his motivation.

On December 8, 2018, Mr. McInnes was fired from his primary place of employment, Blaze TV, which had recently acquired CRTV, where his program was among the three most popular.  Plaintiff was given no reason for his abrupt termination.

4842-5970-7542, v. 2

On December 10, 2018, Plaintiff was banned from YouTube on spurious grounds of copyright infringement concerning certain videos on his YouTube channel. In response to Plaintiff's inquiry, YouTube informed him that he could not appeal the ban, contrary to YouTube's own terms and conditions, and inconsistent with its usual practice regarding copyright infringement claims. Indeed, although the YouTube ban was reversed, when Plaintiff's account was restored several days later, it was "demonetized" – deemed ineligible for the sale of advertisements through Google AdSense. Mr. McInnes was informed that the demonetization of his account could not be appealed.  Moreover, after restoring his account, YouTube inserted a "Description" of Plaintiff at his YouTube channel, credited to Wikipedia, that included the claim, "He is the founder of the Proud Boys, a chauvinist men's group considered to be a 'general hate' organization by the Southern Poverty Law Center."  Indeed, that statement was also found at the Wikipedia entry, "Gavin McInnes," as of the date of the Complaint. Wikipedia's entry on Plaintiff quotes SPLC seven times.

On January 10, 2019, Plaintiff was banned from MailChimp, an email-based marketing service, on the ground that his account was "in violations of our Terms of Use." Likewise, in January of 2019, Plaintiff's podcasts were banned from iTunes.

SPLC has successfully deplatformed Plaintiff and rendered him virtually unemployable or, at best, has severely compromised his earning capacity and bargaining power with respect to future employment and compensation.  SPLC's has successfully deplatformed Plaintiff, due, to a great extent, because virtually no person or institution, regardless of the financial and technical resources available, can at the present time found or establish alternative social media or communications platforms to compete with those already in place.

Beyond that, SPLC has destroyed Plaintiff's reputation and declared open season on him and his family.  As recounted in a November, 2018 article in *The Daily Beast*, Plaintiff and his family have been the subject of an escalating social boycott in the Westchester County neighborhood where they live, whose "residents' real problem, locals say, is with McInnes' role in the Proud Boys, which has been designated as a hate group by the Southern Poverty Law Center."  The article recounts, an email circulated among his neighbors reading,

> So the founder of the proud boys lives [around here]. I suggest we buy the 'Hate Has No Home Here' lawn signs and ask our friends and neighbors in [the neighborhood] to put one on their lawn. Imagine if everyone had one. It would send a clear message to him and his ilk. The signs are $20 each and bulk orders ship free. Spread the word.

According to the article, the email "was quickly forwarded to other community members. . . .By the following day, the campaign had 'gone way beyond me and farther than anything I can manage,' the original emailer wrote . . . ."  The article ends with a quote from another of Plaintiff's neighbors, who says, "Of course he's got to live somewhere. But I consider this as factual: The Proud Boys are a gang. They're listed as a hate group. When the leader of a hate group moves within driving range of you and people you care about, that's concerning. That's not petty, that's real."

For Plaintiff and his family, the false "reality" SPLC has created as part of its intentional campaign to destroy Plaintiff – may very well affect whether Plaintiff, the family breadwinner, can even remain with his family in the United States, where all of them were born and grew up.  Because Mr. McInnes is a non-citizen who is a legal immigrant in the United States from Canada and holds a "Green Card," SPLC's false and malicious designation of Mr. McInnes as a member of a "hate group" could affect his immigration status and even, potentially, result in his deportation.

16

This is not the only respect in which, because of the SPLC, Plaintiff – once known as an edgy, sometimes vulgar and highly opinionated performer and commentator – is now, because of SPLC's campaign against him, widely known as the "leader of a hate group" and has been deemed fair game both online. Plaintiff cannot even defend himself in the forums in which he is savaged due to SPLC's deplatforming success. And in person he has had to defend himself and his family from numerous physical and aggressive confrontations and other forms of harassment.  Because of the SPLC's targeting of Plaintiff, the McInneses continue to experience relatively mild, but, for a young family, painful, harassment and social ostracism in their neighborhood of the kind described in the *Daily Caller* article, including vandalism of their property.

Besides losing the ability to rehabilitate his reputation by presenting his own case in the social media channels through which he is being harmed by SPLC, Mr. McInnes used and relied on these platforms to reach and expand his audience and to promote services and activities that enhanced his earning capacity both directly and indirectly, all of which he is now unable to do.

## ARGUMENT

## APPLICABLE STANDARDS

### A.    STANDARD OF REVIEW

A motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the complaint against the legal standard set forth in Rule 8:  "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). It is axiomatic that the Court "must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff." *Paradise Divers, Inc. v. Upmal*, 402

F.3d 1087, 1089 (11th Cir. 2005) (internal quote omitted). In reviewing the pleadings, the Court must construe the pleadings broadly and view the allegations of the Complaint "in the light most favorable to the plaintiff." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). The Court should not dismiss a case "unless it appears **beyond doubt** that the plaintiff can prove no set of facts in support of his claim." *Beck v. Deloitte & Touche*, 144 F.3d 732, 735-36 (11th Cir. 1998) (emphasis added).

      To survive a 12(b)(6) Motion, the Complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). All that is required is that Plaintiff present "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim and provide "plausible" grounds for recovery. *Twombly*, 550 U.S. at 556. *In accord*, *Maledy v. City of Enterprise*, 2012 WL 1028176 at *1 (M.D. Ala. Mar. 26, 2012) (a complaint need not contain 'detailed factual allegations,' but rather 'only enough facts to state a claim to relief that is plausible on its face.'") (*quoting*, *Twombly*, 550 U.S. at 570. This Court has held that in reviewing a 12(b)(6) Motion "a court should assume [the allegations'] veracity and then determine whether they <u>plausibly</u> give rise to an entitlement to relief." *Ala. State Conference of the NAACP v. Alabama*, 264 F. Supp. 3d 1280, 1284 (M.D. Ala. 2017) (emphasis added; *citing*, *Ashcroft*, 556 U.S. at 679).

      Dismissal is <u>highly disfavored</u> and only appropriate "where it is certain that no relief could be granted under any set of facts that could be proved." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989) (emphasis added). Indeed, "[t]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low… ." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004).

4842-5970-7542, v. 2

The Eleventh Circuit has articulated its strong preference to afford a plaintiff the opportunity to present its case fully, including factual and expert testimony, and not be barred at the first stage of the proceedings.

SPLC asserts the Plaintiff fails to plead sufficient factual allegations to state valid claims. To the contrary, it is SPLC that cannot meet the high burden required to dismiss this action "with prejudice in its entirety" as SPLC demands.  (SPLC Br. 4).  Plaintiff respectfully submits that he pleads cognizable legal claims, supports these claims with a sufficient factual basis meet the correct legal standard. As such he asks this Honorable Court to deny SPLC's demand that the action be dismissed and to be permitted to proceed.

**B.     ALABAMA LAW APPLIES TO PLAINTIFF'S DEFAMATION AND FALSE LIGHT CLAIMS, NOT NEW YORK LAW**

SPLC's Motion is premised on the assumption that New York law applies to Mr. McInnes's defamation and false light claims – notionally because Mr. McInnes lives in New York; pragmatically, because SPLC prefers New York law. But it is well established that under Alabama choice of law principles, defamation-type actions are decided under the law of the place of publication.  In this case, that is the location of the defendant:  Alabama.

A federal court sitting in diversity applies the forum's choice of law principles, of course. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97 (1941).  *Lex loci delicti,* the conflicts of law principle that governs which state's substantive law applies to tort claims, "has been the rule in Alabama for almost 100 years. Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred."  *Ex parte U.S. Bank Nat. Ass'n,* 148 So. 3d 1060, 1069 (Ala. 2014).

The fact that Mr. McInnes lives in New York, however, does not mean that his defamation and false light injuries (sounding in defamation) "occurred" in New York. In *Wells v.*

*Liddy*, 186 F.3d 505 (4th Cir. 1999), the Fourth Circuit explained:

> In defamation actions, the place of the harm has traditionally been considered to be the place where the defamatory statement was published, i.e., seen or heard by non-parties. *See* Restatement (First) of Conflicts § 377 n. 5 ("[…] the place of wrong is where the defamatory statement is communicated."); *Lapkoff v. Wilks,* 969 F.2d 78, 81 (4th Cir.1992) (applying *lex loci delicti* rule and concluding that when defamatory statements occurred in Virginia, Virginia law applied); *St. Clair v. Righter,* 250 F. Supp. 148, 150 (W.D.Va.1966) ([…] the place of publication is the last event necessary to render the tort-feasor liable in a defamation action); *see also* James R. Pielemeier, *Constitutional Limitations on Choice of Law: The Special Case of Multistate Defamation,* 133 U. Pa. L. Rev. 381, 393–94 (1985) (noting that as a general rule the place of publication is the place of the harm).

186 F.3d at 521–22. Based on these principles, this Court held in *Green Grp. Holdings, LLC v. Schaeffer*, No. CV 16-00145-CG-N, 2016 WL 6023841 (S.D. Ala. Oct. 13, 2016) that:

> "In a diversity action such as this one, a federal court must apply the choice-of-law principles of the state in which it sits." *Michel v. NYP Holdings, Inc*., 816 F.3d 686, 694 (11th Cir. 2016) . "*Lex loci delicti has* been the rule in Alabama for almost 100 years. Under this principle, an Alabama court will determine the substantive rights of an injured party *according* to the law of the state where the injury occurred." *Ex parte U.S. Bank Nat. Ass'n*, 148 So. 3d 1060, 1069 (Ala. 2014) *citing*, *Fitts v. Minnesota Min. & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991)). "[T]he place of injury is in the state where the fact which created the right to sue occurs." *Id.* at 1070.
>
> Per the allegations in the Amended Complaint, neither of the [plaintiff] limited liability company[ies]…is based in Alabama (both were organized under Georgia law and have their principal places of business there). However, the Defendants' allegedly defamatory statements were published from Alabama and concern the Plaintiffs' Alabama business operations. Moreover, all parties have argued that Alabama law applies to the slander and libel claims at issue in their briefing. . . . . Accordingly, the undersigned will apply Alabama law to the Plaintiffs' claims for purposes of the present motion.

*Id*. at *6. *See also*, *Williams v. A.L. Williams and Assoc., Inc.*, 555 So. 2d 121 (Ala. 1989)

(under Alabama choice of law principles, "substantive law governs [a] libel claim because the place of the wrong is where the defamatory statement is communicated, and that the law of that place generally controls the claim"); *citing*, Restatement (Second) of Conflicts § 149 (1971); *Triguero v. ABN AMRO Bank N.V*., 273 Ga.App. 92, 95, 614 S.E.2d 209, 212 (2005)("[T]he law of the jurisdiction where the publication occurs determines the rights and liabilities of the parties").

As demonstrated below, SPLC's barrage of defamatory statements are actionable under Alabama <u>and</u> New York law.  In many respects there is little difference between the law of the two states inasmuch as the basic elements of the claim are the same. In Alabama, it is defamatory per se "if the language used exposes the plaintiff to public ridicule or contempt, though it does not embody an accusation of crime, the law presumes damage to the reputation, and pronounces it actionable per se." *Gary v. Crouch*, 867 So.2d 310, 316 (Ala. 2003); *quoted in*, *Glennon v. Rosenblum*, 325 F. Supp. 3d 1255, 1265 (N.D. Ala. 2018).  Similarly, in New York, a defamation per se claim will lie "if it tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society."  *LeBlanc v. Skinner*, 103 A.D.3d 202, 214 (2012).

However, in other respects the standards differ considerably. For example, Alabama's and New York's approaches to the issue of a whether a statement is one of fact or an opinion is critically different. Under New York law this issue "is a question of law for the courts, to be decided based on what the average person hearing or reading the communication would take it to mean." *Davis v. Boeheim,* 24 N.Y.3d 262 (2014) (internal quotation marks omitted); *see also Mann V. Abel,* 856 N.Y.S.2d 31, 885 N.E.2d 884, 885 (2008). "In making this

determination,… New York's law on this point is broader and more protective of speech than the requirements found in the Federal Constitution." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 695 (11th Cir. 2016) (citations omitted).

Alabama, in contrast, entrusts issues of free speech to the United States Constitution.  That is, Alabama law protects a defendant in a defamation case up to the constitutional limit, and not beyond as New York presumes to do.  Thus, Alabama acknowledges that while in some instances, defamatory meaning may be determined on the pleadings as a matter of law, that is not an absolute.  As the Alabama Supreme Court held no more than two months ago:

> [I]n some cases it would not be appropriate to determine whether a communication is reasonably capable of a defamatory meaning at the motion-to-dismiss stage because submissions beyond the pleadings would be necessary to establish the context of the communication at issue.

> Indeed, this Court has observed:

> Whether a given representation is an expression of opinion or a statement of fact depends upon all the circumstances of the particular case, such as the form and subject matter of the *representation* and the knowledge, intelligence and relation of the respective parties. The mere form of the representation as one of opinion or fact is not in itself conclusive, and in cases of doubt the question should be left to the jury.

*Bell v. Smith*, No. 1171108, ___ So. 3d ____, 2019 WL 1305886 at *7 (Ala. Mar. 22, 2019), *quoting*, *McGowan v. Chrysler Corp.*, 631 So.2d 842, 846–47 (Ala. 1993) (dismissal based on plain reading of "the article" was appropriate; internal quotes omitted), *citing amg. others*, *Harrell v. Dodson*, 398 So. 2d 272, 274 (Ala. 1981) ("[w]hether a …representation is an expression of opinion or a statement of fact depends upon all the circumstances …, such as the form and subject matter of the representation and the knowledge, intelligence and relation of the respective parties"; fraudulent representation). *See also*, *Dunning v. Boyes*, 351 So. 2d 883, 885

22

(Ala. 1977)[4] (affirming denial of motion to dismiss defamation claim, finding it was for jury to determine whether reference to plaintiff as "a known Bigot" was a statement of fact or "pejorative opinion").  *Accord*, *Bankers Leasing Ass'n, Inc. v. Middle States Fin. Servs., Inc.*, No. 88 C 4783, 1989 WL 8519, at *5 (N.D. Ill. Jan. 26, 1989) (since entire context of alleged defamatory statement must be evaluated, "[c]ourts have repeatedly asserted, and we agree, that the most appropriate vehicle for considering a defamation action is the motion for summary judgment").

Here too, notwithstanding SPLC's extensive submissions, the entire "context" of each statements is not and, as a practical matter, should not be, part of the record on this motion based on the pleadings.  These include videos, interviews and social media material published by SPLC, as set forth in further detail below.  Given the already ponderous volume of factual material submitted by SPLC in support of its motion to dismiss, it is hard to imagine how the Court could consider the vast amount of factual material and keep its reckoning within the confines of a 12(b)(6) motion to dismiss for failure to state a claim under the notice pleading standards of that Rule.  As the Court observed in *Austin v. Auto Owners Ins. Co.*, No. CIV.A. 12-0345-WS-B, 2012 WL 3101693 (S.D. Ala. July 30, 2012) regarding an insurance coverage dispute:

> Nothing in the *Twombly/Iqbal* line of precedents would require a plaintiff to drill down to that level of detail or to transform her complaint into a summary judgment-style memorandum of law setting forth the entirety of her coverage argument, extensive analysis and application of the relevant policy provisions, and so on. As such, defendant would stretch *Twombly/Iqbal* principles to impose a far more rigorous pleading hurdle on federal-court plaintiffs than they actually do.

---

[4] Overruled on other grounds by *Surrency v. Harbison*, 489 So. 2d 1097 (Ala. 1986) (relating to privilege).

WL 3101693 at *5.  See also, *Greif v. Jupiter Med. Ctr., Inc.*, No. 08-80070-CIV-MARRA, 2008 WL 2705436, at *5 (S.D. Fla. July 9, 2008) (no heightened pleading requirement for state law defamation claim).

       Another significant difference between New York and Alabama law is that New York law does not recognize two of Mr. McInnes's causes of action, those for tortious interference and false light invasion of privacy.  Thus, application of New York law would render SPLC unaccountable for the tortious conduct it committed here, in Alabama.

       As to tortious interference, "New York law considers claims sounding in tort to be defamation claims ... where those causes of action seek damages only for injury to reputation, [or] where the entire injury complained of by plaintiff flows from the effect on his reputation." *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 725 (S.D.N.Y. 2014) (internal citations and quotes omitted; dismissing tortious interference claim as duplicative of defamation claim).  Alabama does not share this approach.  *See*, *e.g.*, *Slack v. Stream*, 988 So.2d 516 (Ala. 2008) (affirming award of compensatory damages to professor who was prohibited from teaching summer courses while investigation false plagiarism claim was under investigation).  In terms of "false light," Alabama recognizes four "distinct wrongs" relating to "invasion of privacy," including false light and defamation, and each "has distinct elements and … establishes a separate privacy interest that may be invaded." *S.B. v. Saint James School, 959 So. 2d 72, 90 (Ala. 2006)*.

For these reasons, SPLC's assertion in a footnote that New York law applies here should be rejected.  Under Alabama choice of contract law rules, Alabama law governs the tort claims on this matter.

## POINT I

## PLAINTIFF'S TORTIOUS INTERFERENCE ALLEGATIONS STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED

SPLC's characterization of every action it takes and every harm in imposes on the world as an exalted and invulnerable exercise of its First Amendment rights has no basis in law, equity or the Constitution. Addressing precisely this categorical error, Justice Cardozo, writing as Chief Judge of the New York Court of Appeals, explained as follows in *Nann v. Raimist*, 255 N.Y. 307, 317 (1931):

> Equity does not intervene to restrain the publication of words on a mere showing of their falsity. It intervenes in those cases where restraint becomes essential to the preservation of a business or of other property interests threatened with impairment by illegal combinations or by other tortious acts, the publication of the words being merely an instrument and incident.

*Id*. at 317 (internal citation omitted). This reasonable and necessary limitation on the invocation of the right of free speech to situations where not speech, but conduct, are at issue is axiomatic in a world where almost every act with which the law may be concerned is accompanied by some form of associated utterance.  For this reason, courts will not hesitate to impose liability for and to limit what is, at least in one sense, literally "speech" in order "to redress a private wrong and not to suppress public expression" and where, as here, "[t]he actions of defendant[] were calculated to injure plaintiff['s] business and constitute an unjustified interference" in his affairs. *Trojan Elec. & Mach. Co. v. Heusinger*, 162 A.D.2d 859, 860 (N.Y. App. Div. 1990) (internal citations and quotes omitted). SPLC's error in this regard extends to its mistaken assertion that its conception of the First Amendment disposes of every claim in this action.

Plaintiff addresses, first, SPLC's argument that once defamation is alleged in a lawsuit there is no room for any other claims, especially if – as SPLC incorrectly argues – the

25

defamation claim fails.  But, in fact, courts in both Alabama and New York have acknowledged, in decisions handed down after *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), that tortious interference claims need not be duplicative of defamation claims.  *See*, e.g., *Weakley v. Roberts*, No. 3:16-CV-00403-HGD, 2017 WL 7201526, at *5 (N.D. Ala. Mar. 7, 2017) (separately analyzing defamation and tortious interference claims); *Whisenant v. CSX Transp. Inc.*, No. 2:13-CV-1730-WMA, 2015 WL 1061166, at *3 (N.D. Ala. Mar. 11, 2015) (same). *See also*, *Harris v. Huffco Petroleum Corp.*, 633 F. Supp. 250, 256 (S.D. Ala. 1986) (dismissal of tortious interference claim in earlier action did not give rise to preclusion regarding defamation); *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 48 (N.Y. App. Div. 2009) ("Because the complaint does not rely merely on generalized reputational harm, we find that it sounds in tortious interference"); *Stapleton Studios, LLC v. City of N.Y.*, 26 A.D.3d 236, 237 (N.Y. App. Div. 2006) ("The complaint . . . makes out a claim for tortious interference with prospective business relations based on its allegations of slander and business defamation"); *Sprecher v. Thibodeau*, 148 A.D.3d 654 (N.Y. App. Div. 2017); *Ullmannglass v. Oneida, Ltd.*, 86 A.D.3d 827, 828 (N.Y. App. Div. 2011).

SPLC claims that Mr. McInnes has "made no plausible allegation that any specific statement by SPLC was the proximate cause of his alleged loss of economic advantage" and that "alleged losses could have resulted from an endless number of other reasons, including the intensive news coverage he received from other sources or the decision-makers' disagreement with his widely published views." (Def. Br. at 54.) If it were enough to say that any number of things could have caused the harm alleged in order to defeat a legal claim at the pleadings stage, however, none would ever be sustained. As one court explained it:

> When the procedural posture of a case is a motion
> to dismiss pursuant to Rule 12(b)(6), the requirements for alleging

> causation are no more stringent than they are for any other element of a legal theory. That is, the plaintiff must only give sufficient notice of his claim and the basis for it. . . . The allegations being made here . . . give adequate notice of the claim . . .  The Court is satisfied that even though proximate causation has yet to be factually established, the possibility of achieving that end has not been extinguished. Plaintiffs' allegations sufficiently advise [defendant] that the issue of proximate cause will be an area in which to do battle at a later phase in this litigation.

*Gray v. Derderian*, 472 F. Supp. 2d 172, 180–81 (D.R.I. 2007).  The proper course is not to speculate about what else may have happened to cause Mr. McInnes's harm, but rather to consider the allegations actually before the Court, which SPLC omits to address.  Mr. McInnes will pick up the baton.

As an initial matter, a plausible prima facie claim of proximate cause exists here because, as the Complaint allege, SPLC said publicly what it was going to do, how it was going to do it – and, the facts show, did it.  This includes the public chest beating SPLC engaged in when it announced its game plan for deplatforming its enemies via the Change the Terms program (Compl. ¶¶ 118-149), and not least its statements about how it was going to bring down Gavin McInnes and the Proud Boys.  As the Complaint recounts, SPLC's Change the Terms website states as follows:

> The violent Proud Boys group vets new applicants through Facebook, and have seen an uptick in applications since summer 2018. Some technology companies have made steps in the right direction to reduce hateful activities online, but more work needs to be done. Over the past year, the Change the Terms coalition has met with experts on terrorism, human rights, and technology around the world to gather insights on how hate operates online and how it can be stopped. The result of those conversations was the creation of recommended corporate policies and terms of service to ensure that social media platforms, payment service providers, and other internet-based services are not places where hateful activities and extremism can grow.

(*Id*. at ⁋125.)  Here SPLC identified its victims, illustrated by screen after screen centered on the photogenic Gavin McInnes, and explained how it was going to pressure technology companies – including the ones that banned Mr. McInnes – to adopt terms of service stating, "Users may not use these services to engage in hateful activities or use these services to facilitate hateful activities engaged in elsewhere, whether online or offline." (*Id*. at. ⁋143.)  The juxtaposition of Gavin McInnes images, the repetitive, dominant identification of the Proud Boys he founded as Public Enemy Number One and the ominous warning of what the "violent Proud Boys" group would do if not pulled off the Internet make it eminently clear what "users" these terms would affect. In fact, if anything is implausible, it is SPLC's denial that its Change the Terms website and the conduct it describes did not target Gavin McInnes.

There is much more. SPLC also urged such companies to close off payment processing and fundraising resources to its targets, which obviously – based on SPLC's obsessive focus on Mr. McInnes – included, if anyone, Mr. McInnes.  SPLC explains exactly how, premised on its fallacious definition of "hate groups" and "hateful activities," it intended to get its way and ruin its victims:

> While an online payment processor may not be the vehicle through which a group directly engages in hateful activities, the online payment processor should not knowingly allow the group to use its services to fund hateful activities. Not denying services under this example would mean that the online payment processor is financially profiting from hateful activities."

(*Id.* at ⁋⁋145-146.)

These specific financial and political measures were expressly intended to censor Plaintiff and others like him and to deprive him of income and business opportunities.  Among the companies SPLC influenced, of course, were Facebook and Twitter, which banned Mr. McInnes; and Google, owner of YouTube, which demonetized him.  (Compl. ⁋⁋113, 115, 116.)

And SPLC made no bones about what measures it would take and what it expected of these companies:

> These policies are intended for internet companies that provide the following types of services: Social media, video sharing, communications, marketing, event scheduling, or ticketing; Online advertising; Financial transactions or fundraising; Public chat or group communications; Domain names; Building or hosting websites, blogs, or message boards. . . . After we have given tech companies a reasonable amount of time to digest, adopt, and implement these policies, we will initiate an evaluation process to see how companies stack up. This process will measure both tech companies' formal policies and how they implement them. Without effective and even-handed execution, a formal policy is just empty words

(Compl. at ¶ 148.) A more malicious, vindictive announcement of intention to destroy a man's ability to support his family – by depriving him of every molecule of oxygen in the economic and sales channels in which he operates – can hardly be fathomed. This action for tortious interference is not a "mere" defamation claim, and there is no constitutional privilege in such conduct.

SPLC's suggestion that these allegations do not meet the standards of *Twombly* because maybe something else caused Mr. McInnes to suddenly be banned from social media misapprehends the notice pleading concept.  As explained in *Bain v. Jockey Club Tech. Servs., Inc.*, No. 07-80371-CIV, 2007 WL 9706995 (S.D. Fla. Nov. 29, 2007).

> Neither argument has merit. Plaintiffs have not alleged merely attempts, but successful interference by defendants with plaintiffs' computers. *See*, e.g., Pl. Am. Compl. ¶18 ("Upon information and belief, Defendant The Jockey Club Technology Services, Inc. and Bloodstock Research Information Services, Inc. transmitted and caused a virus to shut down Ed Bain and EDBAIN.COM LLC's servers, *which resulted in financial damage* including a total disruption of Plaintiff Ed Bain and EDBAIN.COM LLC's online services, resulting in a loss of forty customers....") (emphasis added). This allegation is sufficient to state a claim under *Twombly*, which requires that factual allegations "be enough to raise a right to relief above the speculative level." 127 S.Ct. at

> 1965. *Twombly* does not change the rule that on a motion
> to dismiss, the court must accept the complaint's allegations as
> true. *See id.* (citing *Neitzke v. Williams*, 490 U.S. 319, 327 (1989))
> ("Rule 12(b)(6) does not countenance ... dismissals based on a
> judge's disbelief of a complaint's factual allegations.")

2007 WL 9706995 at *2. *See*, e.g., *Covenant Servs., Inc. v. Jones-Blair Co.*, No. 3:15-CV-0025-N, 2015 WL 13118197, at *2 (N.D. Tex. Mar. 3, 2015) (allegation that plaintiff "entered into multiple contracts with multiple real property owners within South Florida for maintenance of roof coating systems.... too voluminous to attach herein, but [which] will be made available through discovery" deemed to sufficiently identify the existence of a contract subject to interference).

Here the allegations are that Mr. McInnes has been a well-known media and online personality for well over a decade and, although his views were widely known, his career was only in ascendance before he was targeted by SPLC.  Indeed, Mr. McInnes founded the Proud Boys in 2016 (Compl. ⁋ 26), yet

> until the conduct by SPLC complained of here, the Proud Boys
> had virtually no involvement in "scrapes," physical or otherwise,
> and were properly perceived as a social group for young men of
> all races and ethnic backgrounds looking for companionship, the
> opportunity to develop character and ways to reinforce each
> other's self-respect as young men. "The Proud Boys are a
> politically incorrect men's social club," the group's leadership
> [i.e., Mr. McInnes] was quoted in one press report; "We are a
> social club, a fraternity," in another.

(Compl. ⁋ 31.)   Neither the Proud Boys nor Mr. McInnes were banned from any social media platforms until after June of 2017, when the first of many SPLC articles and tweets condemning Plaintiff – meant to provide the muscle to enforce and complement the policies in its Change the Terms program – appeared online. The accelerating tempo of these attacks is set out in detail in ⁋⁋ 153- 167 of the Complaint and, within a year, led to the cascading deplatformings suffered by Mr. McInnes.  Given the specificity of these pleadings, Mr. McInnes is entitled to

4842-5970-7542, v. 2

the opportunity to prove that SPLC's conduct was the proximate cause of his damages.  Merely positing alternative theories of causation is not a ground for preventing him from doing so at the pleadings stage.

SPLC also argues that the Complaint fails to allege malice, or to allege that SPLC used improper or illegal means amounting to an independent tort.  As stated in the very case cited by SPLC on this point, however, defamation "is a predicate wrongful act for a tortious interference claim in New York." *Amaranth LLC v. J.P. Morgan Chase & Co.*, *supra*, 71 A.D.3d at 47.  Defamation is, of course, the second cause of action in this lawsuit and, as demonstrated in the next section, SPLC's basis for dismissing it is not meritorious.  Nor is an independent tort claim necessary to establish tortious interference anyway.  As the *Amaranth* court explained:

> [T]he argument that the alleged statement, which disparages the Fund's solvency and possibly Advisors' honesty in business, is nonactionable opinion is without merit. The alleged statement has a precise meaning, and whether or not the Fund was solvent at the time the statement was made is a fact capable of being proven true or false by a fact-finder. The Fund pleads the underlying defamation with the required specificity, setting forth the particular words that were said, who said them and who heard them, when the speaker said them, and where the words were spoken.

71 A.D.3d at 48. This "who, what, where and how" formulation tracks the detailed, specific allegations of interference in this case as well.

As for malice, the Complaint's allegations fairly drip with specific facts demonstrating SPLC's malice, as set forth in detail in the section below regarding Plaintiff's defamation claim.  SPLC's alternative suggestion that because it maliciously sought to deplatform *numerous* targets, its connivance in Mr. McInnes's destruction is not actionable, would make a virtue out of widespread tortious conduct as compared to merely interfering with

31

the economic advantage of one target at a time.  And, to say the least, SPLC's pious assertion that its conduct cannot be malicious because its "obvious and wholly salutary motivation" is "to monitor hate groups and thereby to inform the public about them and their activities" would require the Court to disregard 12(b)(6)'s requirement that the allegations of the Complaint be accepted as true.  The Complaint alleges that SPLC's "hate group" designations are malicious, defamatory and tortious lies; that SPLC's primary mission is not saving the world from hate, pushing an ideological agenda and justifying its own luxurious existence; and that the conduct complained of is not "public reporting" but a series of *specific*, elaborately executed acts involving arrangements with *specific* social media platforms that were meant to, and did, maliciously cause *specific* unlawful harm, to a *specific* human being and his blameless family.

Plaintiff respectfully submits that if anything is "obvious" about SPLC at this point, it is that there is precious little that is "salutary" about it.  For present purposes, however, Mr. McInnes respectfully submits that, based on the allegations in the Complaint concerning SPLC's unprivileged tortious conduct, the motion to dismiss Plaintiff's tortious interference claim should be denied.

## POINT II

### PLAINTIFF STATES A VIABLE DEFAMATION CLAIM

> "…Words, words, words," sometimes apparently meaningless,… often have such a variety of meanings that the context of particular words must be examined at times in order to determine their meaning on the occasion of their use.

*Bowling v. Pow*, 293 Ala. 178, 182 (1974) (*quoting*, *Hamlet*, Act. II, ii).

SPLC demands that the Plaintiff's defamation claim be dismissed for three reasons: (1) the Hate-Group Designation and HGD Statements are "not of and concerning Plaintiff (SPLC Brf. at 38 and 52); (2) the Hate Group Designation and HGD Statements are

32

"nonactionable opinion" (*id*. at 41 and 48); and (3) Plaintiff has not alleged facts that "plausibly

establish actual malice" in a manner that satisfies the *Iqbal/Twombly* standard as required by

*Michel v. NYP Holdings*, 816 F.3d 686, 702 (11th Cir. 2016)  (*Id*. 36).  SPLC further contends

that to the extent Plaintiff's claim is predicated on the HGD Statements, it must be dismissed

under New York's (a) Subsidiary Meaning Doctrine (*id*. at 46) and (b) Incremental Harm

Doctrine. (*Id*. at 54).

      As to SPLC's reliance on New York law, SPLC errs, as discussed *supra*. Alabama

law applies (and supports) Plaintiff's claim.  Under Alabama law the elements of defamation are

"[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory

statement to another [4] concerning the plaintiff, [5] which is either actionable without having to

prove special harm (actionable *per se*) or actionable upon allegations and proof of special harm

(actionable *per quod*)." *Ex Parte Bole*, 103 So. 3d 40, 51 (Ala. 2012) (*quoting*, *Ex parte

Crawford Broad. Co.*, 904 So. 2d 221. 225 (Ala. 2004) (emphasis and internal quotation marks

omitted)). *See also*, *McCaig v. Talladega Publishing Co.*, 544 So.2d 875, 877 (Ala. 1989) ("fault

amounting at least to negligence on the part of the defendant").  A public figure must also

demonstrate actual malice by the person publishing the statement.  *Curtis Pub. Co. v. Butts*, 388

U.S. 130, 134 (1967), *citing*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

      A communication is considered defamatory "if it tends to harm the reputation of

another as to lower him in the estimation of the community or to deter third persons from

associating or dealing with him."  *Harris v. School Annual Publ'g Co.*, 466 So. 2d 963, 964 (Ala.

1985). "If the language used exposes the plaintiff to public ridicule or contempt, though it does

not embody an accusation of crime, the law presumes damage to the reputation, and pronounces

it actionable *per se*."  *Butler v. Town of Argo*, 871 So. 2d 1, 16 (Ala. 2003) (*quoting*, *Ceravolo v.*

33

*Brown*, 364 So. 2d 1155, 1156-57 (Ala. 1978)). "In the absence of language that is defamatory *per se*, a plaintiff must allege and prove special damages resulting from the defamation." *Clark v. America's First Credit Union*, 585 So. 2d 1367, 1371 (Ala. 1991)("A statement that is libelous per quod is not libelous on its face and instead is actionable only by reference to "extrinsic facts showing circumstances under which" the statement was published. *Cottrell v. Nat'l Coll. Athletic Ass'n*, 975 So. 2d 306, 346 (Ala. 2007). As demonstrated below, Plaintiff meets both standards here.

SPLC does not address Plaintiff's allegations that SPLC's defamatory campaign is interfering with his economic expectations, resulted in the termination of his employment and his "an almost complete deplatforming and defunding" and has caused, and is continuing to cause, Plaintiff financial damage. (Compl. ¶¶13-14). Plaintiff thus limits his analysis to the remaining elements of defamation and, for the reasons demonstrated below, respectfully submits that as he pleads facts sufficient to withstand SPLC's demand to dismiss his claim.

### A. SPLC's Defamatory Statements Also Include Plain Statements of Purported Fact

SPLC's attempt drape its defamation in First Amendment protection relies mainly on its argument that the SPLC hate group designations are mere opinion. Plaintiff demonstrates the falsity of that premise in the next section. SPLC's discourse on free speech, however, should not distract the Court from the extensive allegations of "plain old" defamatory statements set out in the Complaint that have nothing to do with hate group designations ("HGD"'s). These Non-HGD Statements are just false statements of purported fact which are false and defamatory, as argued more fully in connection with the defamation argument in the following sections.

While some percentage of SPLC's "plain fact" defamatory statements by SPLC are, inevitably, in the same vein as the "hate designation" variety, the ones set out here are not even

34

remotely in the category of "mere" opprobrium.  These allegations set out provably false statements of what purport to be plain facts published with actual malice by SPLC.  They are set out as follows, along with the respective paragraphs of the Complaint where they are found:

- The false claim that Mr. McInnes supported the infamous "Charlottesville Rally." ¶¶240 – 244, 285 – 287

- The false claim that Mr. McInnes an anti-Semite. ¶245 – 250.

- The false claim that Mr. McInnes devised a recruiting ground for white supremacists and anti-Semites within the Far Right. ¶¶245 – 250

- The false claim that Mr. McInnes was a speaker at an "anti-Muslim" event in 2017. ¶281

- The false claim that Mr. McInnes is associated with "Vanguard America," a "white nationalist group." ¶151

- The false claim that the Proud Boys, and by extension Mr. McInnes, threatened violence at a rally. ¶¶154-155

- The false claim that Mr. McInnes is anti-gay. ¶159-160.

- The false claim that Mr. McInnes and the Proud Boys seek the opportunity to engage in street violence against people they disagree with. ¶¶234, 238, 251 – 254, 282, 289

- The false suggestion, via juxtaposition of Mr. McInnes's photograph with website copy, that he is involved in threatening, harassing, intimidating, defaming or violently attacking people different from himself. ¶126 – 140, ¶141

- The false suggestion, via juxtaposition of Mr. McInnes's photograph with website copy, that he is involved in hateful activities that incite or engage in violence, intimidation, harassment, threats, or defamation targeting an individual or group based on their actual or perceived race, color, religion, national origin, ethnicity, immigration status, gender, gender identity, sexual orientation, or disability." ¶129

- The false suggestion that Mr. McInnes was involved in a New York City attack against gays (shown below) ¶197



- The false claim that Mr. McInnes commits, tolerates or promotes violence and "hate" (shown below).  ¶197



- That false claim that Mr. McInnes commits, tolerates or promotes violence (shown below). ¶197, 282



- The false claim that Mr. McInnes commits, tolerates or promotes violence and that he committed copyright infringement (shown below). ¶197



- The false claim that Mr. McInnes is an "Islamophobe" or hates Muslims. ¶234, 239, 251, 256.

- The false claim that Mr. McInnes denigrated Muslims and called Asian Americans by calling them "slopes" and "riceballs." ¶256

- The false claim that Mr. McInnes is a member or leader of the "Alt Right" or "Radical Right" ¶¶257 – 262, 282 – 288

- The false claim that Mr. McInnes is an extremist who utilizes subterfuge and lies. ¶¶282, 291

- The false claim that Mr. McInnes commits, tolerates or promotes violence by encouraging the Proud Boys to take out their aggression on political opponents. ¶¶263, 267

- The false claim that Mr. McInnes, as leader of the Proud Boys, threatened violence at a rally in the Pacific Northwest. ¶¶270 – 273

- The false claim that the Proud Boys, under Mr. McInnes's guidance or encouragement, were the aggressors in the altercation that took place in New York City on October 13, 2018. ¶¶274 – 278

- The false claim that Mr. McInnes ever carried a weapon in New York City. ¶¶279 – 280

These statements are not expressions of opinion, protectable or otherwise.  Either Mr. McInnes approved of Proud Boys attending the Charlottesville rally, or he did not. Either he wielded a sword at a New York event, or he did not. Either he created the Proud Boys as a gang of street fighters, or he did not.  Either he encourages, endorses or participates in violence or he does not.  Either he is a bigot, or he is not. Because of the Non-HGD Statements, this Court cannot, it is respectfully submitted, dismiss the defamation claims in this action as a matter of law because each one of them qualifies as a false statement of purported fact, made – as demonstrated below – with actual malice and otherwise meeting every other prima facie requirement for a defamation action, whether under Alabama or New York law.

**B.**      **The Hate Group Designation is "Of and Concerning" Plaintiff**

SPLC's repeated assertions that the "Hate Group Designation" is not "of and concerning" Plaintiff, does not make it so. (SPLC Br. 3 (twice), 4, 38, 39, 40 (twice), 39, 41, 44, 46, 48 and 52; *see also*, *id*. at 39 ("is "not 'of or concerning McInnes' in the literal sense") (emphasis added)).  SPLC devotes an entire section of SPLC's website to the Proud Boys, the youth group founded by Plaintiff, located at www.splcenter.org/fighting-hate/extremist-

files/group/proud-boys.[5] (Hereafter, the "**Proud Boys Page**").  According to SPLC,

> The Articles, as well as the Proud Boys Page on SPLC's website
> (which explains the basis for the Proud Boys' designation as a hate
> group and is hyperlinked in several of the Articles), report on the
> Proud Boys' activities and trace the group's evolution. …

(SPLC Br. 2).  In support of SPLC's demand to dismiss Plaintiff's action with prejudice, SPLC

attaches a printout of the Proud Boy Page to their counsel's declaration. (SPLC Exh. 11, ECF 17-

13).  The Proud Boys Page consists of approximately sixteen printed pages.  In those sixteen

pages, SPLC refers to Plaintiff <u>by name 59 times</u>.  (*Id.*) ("Established in … 2016 by VICE Media

co-founder by Gavin McInnes…"; "McInnes himself has ties to the racist right and has

contributed to hate sites,…" "McInnes plays a duplicitous rhetorical game,…" and "Gavin

McInnes has been flaunting his contempt for PC culture for decades…" and "McInnes took

pleasure in stepping over the line," etc.).  Those 59 occurrences do <u>not</u> include SPLC's

multitudinous references to Plaintiff by way of a pronoun (*i.e.*, "he," "him," "himself"), the

statements "of and concerning" available through the hyperlinks that SPLC publishes next to his

name, or the 70 instances SPLC embeds Plaintiff's name in the Proud Boy Page's source code.

(*See*, source code available at <u>www.splcenter.org/fighting-hate/extremist-files/group/proud-</u>

<u>boys</u>.)

Further, SPLC's Proud Boys Page includes five lengthy paragraphs describing

<u>Plaintiff's</u> "Background" before ever mentioning the Proud Boys. (*See*, Holiday Exh. 11)

("Canadian Gavin McInnes … co-founded Vice Magazine …" "[McInnis] thought about his

neighbors in New York's Williamsburg neighborhood," "McInnes also started writing for

VDare.com …," "McInnes left VICE in 2008…"). The SPLC Proud Boy's Page also includes a

section entitled "In its Own Words" that consists of eleven quotations that SPLC attributes to

---

[5]Last visited May 5, 2019.

McInnes, and only two to other Proud Boy members. *Id.* Finally, SPLC refers to the Proud Boys as "Plaintiff's organization," specifically, as "<u>his</u> organization." *Id.*[6]

The Proud Boy Page belies SPLC's assertion that "no reasonable person could interpret it as being about McInnes." (SPLC Brf. at 40). Based on its content, SPLC may as well have labeled the SPLC Proud Boys Page "the Gavin McInnes Dartboard." SPLC's defamatory statements (including the Hate Boy Designation) are not merely "<u>of and concerning</u>" Plaintiff, they are <u>personal</u> to Plaintiff. In this regard, *Lovingood v. Discovery Commc'ns, Inc.*, No. 5:14-CV-00684-MHH, 2015 WL 5719169 (N.D. Ala. Sept. 30, 2015) in on point.[7] In *Lovingood*, a "NASA engineer" sued for defamation based on a scene in the film, "The Challenger Disaster." The scene "depict[ed]" the plaintiff "testifying before the Presidential Commission that investigated the disaster," as to "NASA's calculation" of the probability of total shuttle failure. *Id.* at *2. According to the plaintiff, he never testified before the Commission, "no engineer ever calculated th[at] probability," and the film falsely "suggests that 'NASA and [he] knew this made-up calculation … and ignored it." *Id.* *2.

One defendant moved to dismiss the defamation claim pursuant to Rule 12(b)(6), arguing that "the statements in the film concern only NASA, as an organization," and were not "of and concerning" the plaintiff. *Id.* at *3. The Court denied the Motion, holding that the "alleged defamation is personal to [plaintiff]" – as is true here. The Court's decision was based on findings that [t]he film portrays [plaintiff – identified by name while under oath –

---

[6]The foregoing references to Plaintiff are just those on SPLC's Proud Boys Page. Plaintiff's "image, typically with inflammatory, misleading or defamatory text superimposed on it, is ubiquitous on the SPLC website and Twitter feed as well." (Compl. at 197). As of the filing of the Complaint, a site-wide "search for the term 'McInnes' on the SPLC website return[ed] 72 results, with articles or other postings almost every month since his first appearance." (Comp. at ¶196).

[7]Subsequently dismissed on summary judgment on other grounds, *Lovingood v. Discovery Commc'ns, Inc*., 275 F. Supp. 3d 1301 (N.D. Ala. 2017), *app. filed*, 11th Cir., July 17, 2018.

underrepresenting NASA's probability-of-failure estimates … thereby suggesting that [plaintiff] attempted to manipulate the Commission's investigation.  *Id*.

Here too, SPLC targets Plaintiff <u>personally</u>.  Not tangentially. Plaintiff, personally, is the subject of SPLC's defamatory assault. After decorating its website with a plethora of posts and references to Plaintiff, SPLC now attempts to hide behind a phalanx of Proud Boys.  Just as the defendant in *Lovingood* argued unavailingly that The Challenger Disaster was "just" about NASA, not the plaintiff, SPLC argues that the Hate Group designation "just" "applies to the [Proud Boys] organization," not McInnes.  Unable to break its habit even now, SPLC undermines its argument by completing that sentence with the phrase "notwithstanding that he is the <u>group's founder</u> and is otherwise associated with it." (<u>SPLC Brf.</u> at 40)(emphasis added).

In support of SPLC's "Plaintiff's-just-one-of-the-crowd" argument, and its claim that its defamatory statements are not "of and concerning" Plaintiff, SPLC relies on *Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017), *Gilman v. Spitzer*, 538 Fed. App'x 45, 47 (2nd Cir. 2013), *Fullani v. N.Y. Times Co.*, 260 A.D.2d 215, 686 N.Y.S. 703 (1st Dept. 1999) and *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080 (D.C. 2007).  Although New York law does not apply, those cases actually compel the opposite conclusion.

In *Elias*, the Second Circuit found two plaintiffs had sufficiently pled defamation based an article that did <u>not</u> identify them by name, but generally referred to their school fraternity.  *Id.*, 872 F.3d at 110. According to the Court "[b]ecause the [defamatory material] plausibly implied that all fraternity brothers knew about the alleged rapes, Plaintiffs sufficiently alleged that they were defamed because they were members of the fraternity at the relevant time." In *Gilman*, the court dismissed the claim because plaintiff was "plainly exempted" from the group

41

of employees who were the subject of first statement, and the second merely referred to the company. *Id.*, 538 F. Appx. at 47. No such "exemption" occurs here. Similarly, in *Fulani*, the suit was dismissed because the alleged defamatory phrase, "acting like a cult," was used to describe the political group in which plaintiff was a member, not plaintiff, personally, who was "not in any manner distinguished from any other members of th[e] group." No such thing can be said about the treatment of Plaintiff or the SPLC website. Finally, in *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007), the D.C. Court dismissed the claim finding that the "Report" on which plaintiff relied "neither mention[ed] [him] directly nor refers to indirectly… ."[8] - again, entirely unlike the facts here.

SPLC's reliance on these readily distinguishable reflects is fundamental misunderstanding of Plaintiff's defamation claim. Plaintiff's claim is not that the Hate Group Designation defames him because he is a Proud Boys member or otherwise "identified with the Proud Boys." (SPLC Brf. at 40). As in *Lovingood*, SPLC's defamation "is personal" to Plaintiff. In *Lovingood*, the Court found, based on a depiction of Plaintiff only, in a single "sequence" of a feature-length film, that the false statement were "of or concerning Plaintiff,"

---

[8]Moreover, although SPLC specifically refers to Plaintiff by name at least 59 times on the Proud Boy's Page, includes *his* "Background," and numerous pictures elsewhere on its site, as to whether a statement is "of and concerning" Plaintiff,

> It would be entirely inappropriate under controlling Second Circuit authority to dismiss plaintiff's suit with prejudice before giving her an opportunity to adduce evidence probative of the very point upon which defendants founded their motion to dismiss.

*Naantaanbuu v. Abernathy*, 746 F. Supp. 378, 382 (1990) (denying 12(b)(6) motion to dismiss where plaintiff was not referred to by name), *citing*, *Geisler v. Petrocelli*, 616 F.2d 636, 637 (2d Cir.1980) (reversing district court's dismissal under Rule 12(b)(6), concluding plaintiff "is entitled to develop and present a full evidentiary record on the issue," including "affidavits from individuals stating that upon reading or hearing of [the novel] they believed the protagonist to be derived from appellant"); and *Fetler v. Houghton Mifflin Company,* 364 F.2d 650, 651 (2d Cir.1966).

not "only NASA." *Lovingood*, *supra*, at \*3.  Here, SPLC's Proud Boy Page is virtually dedicated to Plaintiff - or at least to information "of and concerning" Plaintiff.  Indeed, SPLC's website speaks for itself:  had SPLC intended only to direct the statements at Proud Boys, as a "group," it would not have included Plaintiff's "Background" (biography), multiple links to videos and interviews of Plaintiff and identified Plaintiff by name in nearly every paragraph on the Proud Boy Page.

Nor do the statements on that SPLC's Proud Boys Page and SPLC's Hate Group Designation "concern only [the Proud Boys] as an organization."  Plaintiff's name and image is plastered throughout the Proud Boys Page (as well as elsewhere on SPLC's website and, especially, the SPLC's Change the Terms Website.  (Compl. ¶¶118-149)).  And obviously, Facebook understood SPLC's defamatory statements about the Proud Boys as being "of or about" Plaintiff:  As Plaintiff alleges, "[o]n October 31st, 2018, [he] was banned from both Facebook and its affiliated service, Instagram, 'because of policies against hate groups.'" (Compl. ¶161).  "A defamatory communication is made concerning the person to whom its recipient correctly or mistakenly but reasonably, understands that it is intended to refer." Restatement of Torts (Second) § 564.  There is liability if the "defamer … knew that the communications would be understood by the recipient to refer to the [p]laintiff or was negligent in failing to recognize that that might happen." *Id.*, Comment (F).  SPLC made the Proud Boys Page and the Hate Designation personal to, and personally about Plaintiff, and is responsible for the consequences.

Based on the foregoing, it is respectfully submitted that the allegations, viewed in the light most favorable to Plaintiff as the non-moving party, sufficiently allege that the Hate Group designation is "of and concerning" Plaintiff.

**C.**     **SPLC's Hate Group Designation is Not a First Amendment Protected Opinion**

SPLC's reliance on *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)

("*Milkovich*") in support of its argument that the Hate Group Designation is a First Amendment-

protected opinion, is completely misguided. (SPLC Brf. at 41). As established below (1) the Hate

Group Designation is a factual statement that consists of a compilation of clear, empirical facts;

(2  SPLC's "opinion argument" contradicts SPLC's stated purpose and intended use for its Hate

Group Designation; and (3) the First Amendment does not protect self-proclaimed opinions that

and made with knowledge or a reckless disregard of the truth.

**(1)**     SPLC's Hate Group Designations are Compilations of Empirical Facts and, as
Applied to Plaintiff, False and Defamatory

SPLC asserts that its "Hate Group" and "Extremist" designations are mere

opinions and hence privileged.  (SPLC Brf. at 41). Again, SPLC's website belies this claim.

SPLC's representations and express purpose for its "hate group" label, as published on its

website, compels one, intended inference:  that these designations are the tightly-reasoned,

empirical conclusions of the world's leading expert on extremism:  SPLC.

As stated in the Complaint, SPLC declares itself

"the premier U.S. non-profit organization monitoring the activities
of domestic hate groups and other extremists, including the Ku
Klux Klan, the neo-Nazi movement, neo-Confederates, racist
skinheads, black separatists, anti-government militias, Christian
identity adherents, and others."

(Compl. ¶39, *quoting*, SPLC at  www.splcenter.org/fighting-hate).

SPLC defines "hate group" on its webpage as:

an organization that – based on its official statements or principles,
*the statements of its leaders*, or its activities – has beliefs or
practices that attack or malign an entire class of people, typically
for their immutable characteristics.

(*Id.*, SPLC Brf. at 17).  SPLC states that "organizations" "placed" on its "hate group list," which include the "Ku Klux Klan, neo-Nazi's, neo-Confederates, and racist skinheads,"

> vilify others because of their race, religion, ethnicity, sexual orientation or gender identity – prejudices that strike at the heart of our democratic values and fracture society along its most fragile fault lines.

(www.splcenter.org/fighting-hate).  In the next sentence SPLC explains:

The Federal Bureau of Investigation ("**FBI**") uses similar criteria in its definition of a hate crime:

> *[A] criminal offense against a person or property motivated in whole or in part by an offender's bias against a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity.*

(Compl. ¶41). *Id.*

Thus, according to SPLC's definition, a "hate group" is an "organization" that "attacks," "maligns" or "vilifies others because of their race, religion, ethnicity, sexual orientation or gender identity," as evidenced by its "official statements or principles, the statements of its leaders or its activities."  (*Id.*)  These are specific, concrete terms, not expressions of opinion.

This is consistent with SPLC's acknowledged goal:  to "destroy organizations and persons it targets as 'hate groups' or as members of 'hate groups' as a matter of 'political struggle.'" (Compl. ¶45) (emphasis added).  "To achieve SPLC's own ideological, political and financial (i.e., fundraising) ends," (Compl. ¶3), SPLC applies its Hate Group Designation liberally (and without accountability) to a broad swathe of people and organizations, including "Secretary of Housing and Urban Development Dr. Ben Carson…former Vanderbilt University professor and scholar Carol Swain… [and] Christian organizations such as the Family Research Council, Traditional Values Coalition, ADF, [and] Freedom … ." (Compl. 46).  Once unilaterally branded by SPLC as a "hate group," or as a member of a "hate group," and cast,

without any distinction, among some of the most violent, criminal organizations in America, there is no appeal.

While SPLC's self-serving decision to apply the label is wholly subjective, its definition is not.  According to SPLC's definition, a "hate group" must have "beliefs or practices that attack... or malign… or vilify … others because of their race, religion, ethnicity, sexual orientation or gender identity."  This is a clearly defined, objective standard.  "Beliefs" and "practices" are nouns – they either exist or do not, and if SPLC believes there is any "wiggle room" concerning these terms, it certainly does not suggest so on its website.  "Attacks," "maligns" and "vilify" are specific actions.  SPLC's categories of "others" (identified by "race, religion, ethnicity," etc.). are equally precise.  Both (such acts and "others") are facts that SPLC claims determine whether an organization is a "hate group."  Stated differently, whether a group attacks/maligns/vilifies "others" based on "race, religion," etc. and is thus, a "hate group" under SPLC's definition is an objectively verifiable fact.

Indeed, SPLC claims to make these factual determinations "based on" a group's "official statements or principles, the statement of its leaders or its activities."  (SPLC "hate group" definition, *quoted supra*).  That is, SPLC claims to determine who merits its Hate Group Designation by reference to a group's "official statements or principles, the statements of its leaders [and activities]."  A group's "official statements or principles," the "statements" of its leaders and its "activities" are nouns – they exist, or they do not.  As such, SPLC claims it makes this factual determination "based on" verifiable facts.  Moreover, specifically with respect SPLC's Hate Group Designation of the Proud Boys," SPLC asserts it "copiously documents <u>the factual basis</u>" for that designation. (SPLC Brf. at 43).  In other words, SPLC admits that it determines whether to use its Hate Group Designation, based on objectively verifiable, and

46

"provably" true or false, facts. (SPLC Brf. at 45, *citing*, *Milkovich*, 497 U.S. at 19-20.  SPLC cannot have it both ways.

In support of the Motion, SPLC erroneously conflates its empirical definition of the term "hate group," with its subjective application of that label.  According to SPLC, "the Complaint … all but admits that SPLC's" Hate Group Designation is "an expression of opinion" by acknowledging "the inherently 'subjective nature of labeling groups.'" (SPLC Brf. at 42, *quoting*, Compl. ¶73).  Not so.  SPLC's definition of "hate group" – what it says to the world about Plaintiff – is entirely different from SPLC's subjective, and in the instant case, false and defamatory – <u>application</u> of that label. SPLC's <u>definition</u> of a "hate group" is a compilation of precise, verifiable facts.  The Hate Group Designation is SPLC's self-serving application of that label.  It is one thing to have an objective tool of measurement; it is another to use, or more aptly, <u>not</u> use, it.

SPLC's definition of "hate group" is a yardstick that SPLC constructed, made up of empirical facts instead of feet and inches.  But SPLC tossed away its own yardstick.  Now, in an attempt to defend itself, SPLC argues that the Hate Group Designation is a mere "opinion," and <u>admits</u> that it applies that designation based on "<u>its … judgment and experience</u>… just as screen guild members might rate the '<u>quality</u>' of films in voting for an Oscar [and] food critics might evaluate the '<u>taste</u>' of dishes in awarding restaurant stars… ." (SPLC Brf. at 42) (emphasis added).  But to the extent that SPLC <u>ever</u> utilized the objective standard it established for its Hate Group Designation, SPLC renounces it here.  Now, having done its considerable damage, SPLC now argues, the Hate Group Designation is merely an "opinion" akin to subjective determinations of "quality" and "taste."  Suddenly SPLC finds it useful to trivialize the Hate Group Designation that it holds out to the world as an unassailable standard and which is its

stock in trade.  SPLC's defense may be an honest admission – that SPLC levies its Hate Group

Designation according to its own "taste" and sense of "quality."   That is <u>not</u>, however, how

SPLC defines "hate group," how SPLC promotes its Hate Group Designation to the world, or

why its hate group designations wreak havoc on the lives of SPLC's victims.

        In short, notwithstanding SPLC argument (or admission), SPLC's definition of a

"hate group," <u>is</u> objectively verifiable and, as applied to Plaintiff and the Proud Boys is

verifiably <u>false</u>. (Discussed *infra* at Point (II)(C)(2)).  Inasmuch as a statement that has even a

"provably false connotation" supports a common-law defamation claim, *Hamze v. Cummings*,

652 Fed. App'x 876, 881 (11th Cir. 2016), and there is substantial evidence that supports

Plaintiff's claim, Plaintiff respectfully requests that the Court deny SPLC's demand to dismiss

this action.

    **(2)**    SPLC's Claim that the Hate Group Designation is merely an "Opinion"
          <u>Contradicts SPLC's Stated Purpose for its Use</u>

        SPLC proclaims itself to be the "premier U.S. non-profit organization monitor[er]

… of domestic hate groups and other extremists" (Compl. at ¶39).[9]  According to SPLC,

> We monitor hate groups and other extremists throughout the
> United States and expose their activities to the public, the media
> and law.[10]

In furtherance of its purported purpose, "fighting hate," SPLC boasts,

> We publish investigative reports, train law enforcement officers
> and share key intelligence, and offer expert analysis to the media
> and public.

*Id*.  Specifically, with respect to law enforcement, SPLC claims that it "equip[s] officers with

---

[9]*Fighting Hate*, Southern Poverty Law Center, at <u>www.splcenter.org/fighting-hate</u> (last visited May 8, 2019).

[10]*Id*.

information and other resources" to "help them carry out their duties with a minimum of danger

to themselves." (Compl. ¶215 (*quoting*)). Such "information" and "resources" includes SPLC's

> free law enforcement trainings [that] teach officers how to
> recognize hate groups, symbols and activity; the threat potential of
> specific groups; and how to respond to hate group activity. …And
> our Hate Map helps officials locate extremist groups within their
> communities.

(*Id.*).

Thus, SPLC intends the "public, the media and law enforcement" to rely on

SPLC's information, training, and intelligence. And, in fact, SPLC's "resources" are "used …

and relied on [by] numerous law enforcement and other government agencies," often "without

further inquiry or investigation regarding the SPLC Hate Group Designations" (Compl. ¶216),

and by "courts, administrative tribunals and other government bodies and organizations… as

plain fact … without analysis or discussion." (*Id.* at ¶219-220).[11]

Now, however, SPLC claims the Hate Group Designation is merely an "opinion."

Again, SPLC cannot have it both ways. If SPLC claims to have actionable intelligence and

analysis worthy of governmental attention and law enforcement, encourages and allows those

agencies to rely and act on that information, how can it simultaneously assert that the same

information is mere "opinion"? Indeed, it is not credible that government and law enforcement

would make strategic security decisions based on SPLC's Hate Group Designation if they

understood the information provided by SPLC to be merely SPLC's "opinion." Such reliance

enables SPLC to ensure that "hate groups" (by SPLC's definition) and their members are banned

from "entry, membership, access to resources, employment and other rights and benefits" – and

deplatformed. (Compl. ¶¶217 and 6). SPLC's defense that Hate Group Designation is merely an

---

[11] Among others, Amazon acknowledges that it relies uncritically on the SPLC Hate Group
Designations to determine whether a charity is ineligible for the AmazonSmile program.
(Compl. at ¶98)

"opinion" defies its express purpose and intentions.

SPLC also attempts to get the Court to ignore the forest by focusing on trees. Throughout its website, SPLC refers to "hate groups" and its Hate Group Designation as a matter of fact.  ("We monitor hate groups…, "organizations on our hate group list vilify others…," "SPLC has published an annual census of hate groups operating within the United States…").[12] SPLC does not so much as hint that it monitors, lists, and keeps "an annual census" of groups that SPLC <u>believes</u> are hate groups.  There is no asterisk on SPLC's "Hate Map" or next to any of the "1,020 hate groups" SPLC identifies on the Hate Map[13] that indicates that SPLC's Hate Group Designation is merely its "<u>opinion</u>."  Likewise, SPLC's quarterly publication, which it proclaims is "the nation's preeminent periodical monitoring of the radical right in the U.S,"[14] is called the SP "Intelligence Report," not the "Opinion Report."  SPLC's "opinion" argument nullifies the credibility of the "key intelligence" and "training" it offers, and demeans all who accept, without further inquiry, SPCL's Hate Group Designation and related "resources" that the information SPLC offers as the "premier" authority of "domestic hate groups."

**(3)**   Self-Proclaimed "Opinions" are Not Constitutionally Protected if they are Made with Knowledge of their False Implications or a Reckless Disregard of the Truth

SPLC's reliance on *Milkovich v. Lorain Journal Co*, 497 U.S. 1 (1990) (SPLC Brf. at 41), is unavailing for the additional reason that the SPLC Hate Group Designation is outside the protections afforded opinions under the First Amendment.

Self-described opinions are not entitled to First Amendment protection just because they may be opinion – even assuming that is what they really are. Only "a statement of

---

[12] www.splcenter.org/20171004/frequently-asked-questions-about-hate-groups#hate%20group (last visited May 12, 2019).

[13] www.splcenter.org/hate-map (last visited May 11, 2019).

[14] www.splcenter.org/intelligence-report (last visited May 11, 2019).

opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Milkovich*, at 20 (1990). As such, a so-called "opinion" on a public matter that contains containing defamatory material about a public figure is not protected under the First Amendment if "such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Id.*

Notwithstanding SPLC's attempt to drape its defamatory statements in the First Amendment, the U.S. Supreme Court has concluded, in no uncertain terms, that the "freedom of expression guaranteed by the First Amendment" does not require a categorical "constitutional privilege for 'opinion.'" *Id.* at 21 ("We are not persuaded that … an additional separate constitutional privilege for 'opinion' is required"). As established *infra*, at Point (II)(D), the Complaint sufficiently alleges facts to support Plaintiff's claim that SPLC's statements (including its Hate Group Designation) were made with knowledge of its false implications or with reckless disregard of its truth.

**(4)** SPLC's Reliance on the "Absolute" Protection New York Affords Opinions is Unavailing.

Plaintiff maintains that Alabama law applies to his defamation claim, and that SPLC's effort to impose New York law on this Court is not merely erroneous, but presumptuous. That said, even if New York law were applied, it does not immunize SPLC for its defamatory statements.

In *Milkovich*, the United States Supreme Court established that a "provably false" statement about a matter of public concern will support a claim of defamation. *Id.*, 497 U.S. 1, 19-20 (1990). SPLC boasts that "New York law goes further." (SPLC Brf. at 41). According to SPLC, "'unlike the Federal "Constitution, the New York Constitution provides for absolute protection of opinions.'" *Id.*, quoting, *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 178 (2d

Cir. 2000).  According to SPLC,

> New York courts weigh three factors in determining whether a
> statement qualifies as opinion: (1) whether it is "capable of being
> proven true or false"; (2) whether it "has a precise meaning which
> is readily understood"; and (3) "whether either the full context of
> the communication in which the statement appears or the broader
> social context and surrounding circumstances are such as to signal
> . . . readers or listeners that what is being read or heard is likely to
> be opinion, not fact."

*Id*., *quoting*, *Davis v. Boeheim*, 22 N.E.3d 999, 1005 (N.Y. 2014).  As established *supra*,

however, SPLC's definition of "hate group" is "capable of being proven true or false," indeed,

SPLC claims to "copiously document[ ] the factual basis" for its Hate Group Designation. (SPCL

Brf. At 44).  This formulation also has "a precise meaning which is readily understood" and

explicitly defined by SPLC, as discussed above.  In terms of New York's third factor, the context

of the statement and what that "signals" to the reader, there are two elements to consider.  The

first is the "surrounding circumstances."  Here, SPLC issues (or inflicts) its Hate Group

Designation, as "the premier U.S. non-profit …  monitor[ ] … of domestic hate groups," the

publisher of "key intelligence" and the provider of "law enforcement training" on "hate groups."

The second element, the "broader social context," extends beyond SPLC's self-anointed position

and declared purpose.  The "broader social context" available "readers or listeners" of SPLC's

Hate Group Designation includes other definitions of that term that are equally false (and

defamatory) as applied to Plaintiff.

As stated in the Complaint, in the United States, the FBI is the agency "primarily

tasked with identifying and prosecuting illegal acts of hate groups."  (Compl. at 40).  The FBI

defines

> a 'hate group' as an "organization whose primary purpose is to
> promote animosity, hostility, and malice against persons of or with
> a race, religion, disability, sexual orientation, ethnicity, gender, or

> gender identity which differs from that of the members or the
> organization, e.g., the Ku Klux Klan, American Nazi Party."

(Comp. ¶40). Certainly, the SPLC must be aware of the FBI's definition inasmuch as it quotes

it. "More generally, the term 'hate group'…refers to an association or group acting in a criminal

or violent fashion or threatening to do so, based on an expressed enmity toward and menace of

one or more identified target of hate." (*Id*. at 41).

Plaintiff, however, is not required to plead (much less establish) that there is a

definitive, controlling definition for the term "hate group." Even if SPLC did not expressly

define the term, what matters is what the normal reader or hearer would think is meant by the

allegedly defamatory words. The court must give the term "hate group," the "meaning that

would be ascribed to the language by a reader or listener of average or ordinary intelligence, or

by a common mind." *Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d 339, 351 (Ala. Civ.

App. 2015), *quoting*, *Camp v. Yeager*, 601 So.2d 924, 927 (Ala. 1992) ) (other internal

quotations omitted). Accordingly, even if SPLC did not expressly define the term "hate group,"

and accepting SPLC's argument that its Hate Group Designation is merely "an opinion,"

whatever SPLC may have subjectively meant "is not dispositive in light of the commonly

understood meaning of the words used." *Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d

339, 351 (Ala. Civ. App. 2015).

Again, blithely ignoring its own precise, fact-based definition, SPLC argues that

New York courts "consistently recognized that characterizations such as 'hate group' are classic

expressions of subjective opinion and … therefore ... non-actionable." (SPLC Brf. at 43). SPLC

relies on *Buckley v. Littell*, 539 F.2d 882, 893-95 (2d Cir. 1976) and *Ratajack v. Brewster Fire

Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016), in which the Court found the terms

"fascist" (in the former) and "racist" (in the latter) were "loose" and "ambiguous" expressions,

not statements of fact due to their "tremendous imprecision").[15]  This is not New York.  In

*Dunning v. Boyes*, 351 So.2d 883 (1977), the Alabama Supreme Court rejected the precise

argument that SPLC attempts to make now. In *Boye's*, the defamation "arose out of a letter…

written in connection with a [Union] grievance proceeding. Id. at 884.  "The letter state[d],

among other things," that based on its "investigation," it "had no trouble" until the defendant, "a

known Bigot," arrived.  Id.  Defendants moved to dismiss under 12(b)(6), on the basis that

the  statement was privileged. The Court affirmed the trial's court denial of defendants' motion

to dismiss.  In doing so, the Court rejected the defendants' contention that

> the defamatory characterization "known Bigot" is not a statement
> of fact, but a "pejorative opinion: 'rhetorical hyperbole,' like
> calling one's adversary a 'scab,' or a 'blackmailer,' or a 'Fascist,'
> or 'unfair.'"

*Id*. at 885.  Although the Court recognized that in the context of "labor disputes"

> "robust language" is sometimes used, … it is for a jury to say
> whether there was an abuse of the qualified privilege under all the
> facts and circumstances of the case. It would be inappropriate to
> determine this question on a motion to dismiss unless it were
> shown that the plaintiff could not recover under any set of
> circumstances, or that no issue of a material fact remained in the
> case… .
>
> The plaintiff may be able to prove that the characterization of him
> was a deliberate or reckless untruth. The jury could infer that the
> characterization meant that [plaintiff had] discriminated …
> because of … race.

*Id*.[16]  *See also*, *Camp v. Yeager*, 601 So. 2d 924 (Ala. 1992) (political television

commercial alleging that a candidate had approved three utility rate increases when

---

[15]SPLC also relies, *O'Neil v. Peekskill Faculty Ass'n*, 507 N.Y.S.2d 173, 180 (App. Div. 1986).
However, in *O'Neill*, the defamation claim failed because the language at issue was not used to
describe plaintiff, but to describe plaintiff's statement.

[16] On the issue of privilege, *Boyes* was ultimately overruled in *Surrency v. Harbison*, 489 So. 2d
1097 (Ala. 1986).

president of Public Service Commission, and was now being paid $700,000 as consultant

for the utility was reasonably capable of defamatory meaning).  *And see*, *Ceravolo v.*

*Brown*, 364 So. 2d 1155, 1157 (Ala. 1978) (finding that to be actionable, "berat[ing]

someone in public with threats and ethnic slurs and … attack[ing] someone with epithets

such as 'dead beat' a 'crook,'" would require allegation of "special damages").

What SPLC fails to acknowledge is that "the test to be applied [by the

court] in determining the defamatory nature of an imputation is that meaning which

'would be ascribed to the language by a reader or listener of ordinary or average

intelligence, or by a "common mind," *Finebaum v. Coulter*, 854 So. 2d 1120, 1128 (Ala.

2003), "and is not to be determined by 'critical analysis of a trained legal mind'" *Camp*

*v. Yeager*, 601 So. 2d 924, 928 (Ala. 1992)  (internal quote omitted).  "Any statement

from which a reasonable person might infer a false factual connotation which would

harm the victim's reputation in the eyes of the community, is 'capable of a defamatory

meaning.'" *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438, 1457 (M.D.

Ala. 1996), *quoting*, *Clark v. America's First Credit Union*, 585 So.2d 1367, 1370–71

(Ala. 1991).  As established, SPLC's definition of "hate group" is precisely defined.

Were it not, the general meaning of that term, as understood by "a reader…of ordinary

intelligence" or by "a common mind," is equally false (and defamatory) as when applied

to Plaintiff.  Based on the foregoing, Plaintiff respectfully submits whatever SPLC may

subjectively intended by the term "hate group," it up to the average reader to determine

whether Plaintiff has been defamed and SPLC's motion should be denied.

**D.    SPLC's Applied the Hate Group Designation to Plaintiff and the Proud Boys**
       <u>**Knowing it to Be False and/or With a Reckless Disregard of the Truth**</u>

SPLC created the SPLC Proud Boys Page in April 2017 (SPLC Brf. at 17).

According to SPLC, in creating the Proud Boys Page, and publishing

> periodic articles about the Proud Boys…, SPLC has repeatedly
> acknowledged the group's insistence that it is simply a men's club
> that does not endorse racism or hate.

(SPLC Brf. at 18).  That warrants repeating.  SPLC "acknowledges" that the Proud Boys "insist,"

by way of its "official statements or principles" or "statements of its leaders," that the group

"*does not endorse racism or hate*."  That is an absolute – "does not endorse."  Yet, SPLC admits

that it "nonetheless … designated the Proud Boys as a hate group in February 2018." (*Id*. at 18).

In short, SPLC purposefully – that is, with actual malice – disregarded the Proud Boy's

"insistence" that the group does not "endorse racism or hate," and branded it with the Hate

Group Designation.

In an effort to defend its defamation, SPLC claims that the "basis for its"

designation, "is set out both on the SPLC Proud Boys Page and related articles." (*Id*.)  (*See also*,

*id*. 44) ("SPLC copiously documents the factual basis" to its Hate Group Designation "both the

Proud Boy Page and in the Articles") (emphasis added).  However, the "evidence" SPLC claims

supports its designation does not (or, at least creates a factual issue for the jury).  To the contrary,

SPLC's evidence, including the Proud Boys "insistence" that group does "not endorse racism or

hate," contradicts SPLC's definition of "hate group."  Thus, SPLC's Hate Group Designation of

the Proud Boys is false.

SPLC's definition of "hate group" is, it claims everywhere but here, based on a

compilation of verifiable facts.  Specifically, a "hate group" is one "that – based on its official

statements or principles, the statements of its leaders, or activities – has beliefs or practices that

attack or malign an entire class of people… ."  In that regard, SPLC summarizes the Proud Boys'

admission policy as follows:

> Any man – no matter his race or sexual-orientation – can join the fraternal organization as long as they "recognize that white men are not the problem."  Women have their own contingent called the Proud Boys' Girls.

(SPLC Exh. 11, ECF 17-13) (emphasis added).  Thus, according to SPLC, the Proud Boys'

membership policy does not "attack, malign or vilify" (or even discriminate against) "others"

based on "race or sexual-orientation" because the Proud Boys sponsor a women's "chapter," "the

Proud Boys' Girls."

SPLC further states on SPLC's Proud Boy Page that:

- the Proud Boys are self-described "'western chauvinists" who adamantly deny any connection to the racist 'alt-right,' insisting they are simply a fraternal group spreading an 'anti-political correctness' and 'anti-white guilt' agenda.

- The oddball humor that tinges Proud Boy culture, ... creates a set of incomprehensible references to those on the outside….

- The Proud Boys' pro-western posture allows them to position themselves– somewhat counterintuitively – as a tolerant and progressive social force. If Islamic backwardness, as they imagine, threatens gay people and women, then they serve as their guardians by protecting and promoting "western values."

- [Proud Boys take] pains … to distance themselves from open white nationalists and antisemites [sic].

- [Acknowledging] the fratty and innocuous Proud Boys' brand.

- A number of journalists … have received letters [in which the Proud Boys] insist[ ] they "do not now, nor have they ever, espoused white nationalist, white supremacist, anti-Semitic, or alt-right views."

(SPLC Exh. 11, ECF 17-13) (emphasis added).  SPLC also discloses that

> [t]here are three degrees of membership within the Proud Boys, and to become a first degree in the "pro-West fraternal organization" a prospective member simply has to declare "I am a western chauvinist, and I refuse to apologize for creating the modern world."  To enter the second degree, a Proud Boy has to endure a beating until they can yell out the names of five breakfast

> cereals (in order to demonstrate "adrenaline control") and give up
> masturbation because, in theory, it will leave them more inclined to
> go out and meet women. Those who enter the third degree have
> demonstrated their commitment by getting a Proud Boys tattoo.

(SPLC Exh. 11 at 6-7).[17]   According to SPLC, the Proud Boys' initiation  <u>activities</u> are readily

described as "fratty and innocuous."  SPLC makes no mention of "violence," "harassment,"

"intimidation" or "threats."

  SPLC also quotes statements of Proud Boys members – mainly – Plaintiff on

SPLC's Proud Boy Page.  In addition to referring generally to those statements as "irony," "a

joke," "a ruse" and "oddball humor" (*id.*), SPLC includes many that defy SPLC's definition of

"hate group," and reveal that Plaintiff, specifically, and the Proud Boys, generally, are neither

racist nor sexist, and which are clearly intended to be empathetic and supportive.  Those

quotations include:

- The white liberal ethos tells us blacks aren't at MIT because of racism. They say blacks dominate the prison population for the same reason. They insist America is a racist hellhole where 'people of color' have no future. This does way more damage to black youth than the KKK. When you strip people of culpability and tell them the odds are stacked against them, they don't feel like trying… Gavin McInnes, "America in 2034," American Renaissance, June 17, 2014

- [Commenting on Sharia law]: "Put something on the table! Give us a reason to accept you, because you know what? Sharia law ain't it. Raping women ain't it. Cutting off clits ain't it. Throwing gay people of roofs ain't it. You are a disgrace." –Pawl Bazile, a production director of Proud Boys' magazine, on Muslims, March against Sharia rally, New York City, New York, June 10, 2017

  Thus, the Proud Boys' "official statements [and] principles,"  including the

group's membership policy, practices, and "pains" to distance themselves from racists, the "alt-

right," and white-nationalists; the group's "official statements" and "the statements of its

---

[17]This summary is a notable contrast to the inflammatory description in SPLC Moving Brief: the "initiation … include[es] a public declaration of allegiance, undergoing a physical beating, and getting a "Proud Boy" tattoo." (SPLC Brf. at 12).

leaders" – particularly Plaintiff – and activities; as well as SPLC's own descriptions of the Proud

Boys, fail to meet SPLC's definition of "hate group."  Indeed, those facts of which SPLC is

plainly aware establish that the Proud Boys do <u>not</u> to "attack," "malign" or "vilify others," and

their purpose is <u>not</u> to "incite or engage in violence, intimidation, harassment, threats, or

defamation" on the basis of "immutable characteristics."  All these are facts concerning what a

group says or does, not opinions of what a group is and what its members are.

The Proud Boys' philosophy regarding racial supremacy and terrorist

organizations is memorialized in its bylaws:

> A person that believes in the inherent supremacy of any one race
> over another, or who is a member of any organization promoting
> the supremacy of any one race over another, may not become or
> remain a member of this Fraternity. This includes, but is not
> limited to, any person who currently identifies as white nationalist,
> white supremacist, or alt-right (or any person who is a member of
> an organization identifying as such). Similarly, members of
> terrorist[18] organizations or cells, including but not limited to
> Antifa, are prohibited from membership in the fraternity.

(Quoted in, Compl. ¶33).

SPLC could (and should) have verified whether the Proud Boys was a "hate

group" before levying its Hate Group Designation on them and, concomitantly, on Plaintiff.  As

alleged in the Complaint, it did not.  (Compl. ¶292.)  There is no suggestion on SPLC's website,

or anywhere in SPLC's moving papers, that SPLC did interview Plaintiff or attempt to speak

with him, or that SPLC even read the Proud Boy's bylaws before announcing its factual

conclusion that the organization is a "hate group." In fact, according to SPLC's Proud Boy's

Page, SPLC has no personal knowledge of Plaintiff or the Proud Boys, and relied <u>entirely</u> on

---

[18] Webster's defines "terrorism" as "the act of terrorizing; use of force or threats to demoralize,
intimidate, and subjugate, esp. such use as a political weapon or policy." Webster's New World
College Dictionary, 5th Ed. (2014).

secondary sources, edited interviews and purported, i.e. second-hand, statements.

Worse yet, SPLC was not merely negligent. It did not merely fail to verify its factual conclusion that the Proud Boys is a "hate group."  SPLC intentionally and admittedly ignored the information it did have to the contrary. SPLC disregarded its own "repeat[ed] acknowledgements" that the Proud Boys "insist[ ] that [the group] … does not endorse racism or hate."  SPLC chose to ignore its own information, including the fact that "any man – no matter his race or sexual orientation" may join the Proud Boys, that the group sponsors a "women's contingent… the Proud Boys' Girls," and that the Proud Boy's "adamantly deny any connection to the racist 'alt-right'".  It ignored the Proud Boys' insistence that the group does not and never has "espoused nationalist, white-supremacist, anti-Semitic or alt-rights views," as well as the Proud Boys' "position … as a tolerant and progressive force."  (SPLC's Proud Boy's Page, ECF 17-13, Exh. 11).  And when SPLC rejected the Proud Boy's "official principles and statements," the statements of its "leaders" and the information SPLC has published on the Proud Boys' Page, it willingly defied the empirical standard it claims to abide by, maliciously condemning the Proud Boys and Plaintiff by levying its Hate Group Designation.[19]

As further evidence of SPLC's intentional and reckless disregard of the information SPLC admittedly has and that establishes that the Proud Boy's do not meet SPLC's definition of a "hate group," SPLC claims that the "basis for" its Hate Designation of the Proud Boys is

> how the group can [serve] and has served as a "gateway" through which membership in the Proud Boys can lead to involvement in more overtly extreme ideologies and groups.

(SPLC Brf. at 18) (emphasis added).  Accepting as true, solely for this argument, SPLC's

---

[19] www.splcenter.org/fighting-hate (last visited May 12, 2019).

statement that the Proud Boys "has served as a gateway," that "fact" does not meet any of SPLC's criteria for defining a "hate group." Indeed, inferentially, SPLC's reference "to "more overtly extreme … groups," suggests that Proud Boys do <u>not</u> engage in "hateful activities" as SPLC defined. Ultimately, even if SPLC were to claim it has additional evidence that supports it Hate Group Designation of the Proud Boys, consideration of that evidence and the determination of that issue would be a question for the finder of fact. And there is "no constitutional value in false statements of fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (internal quote omitted). SPLC's own account of the Proud Boys, and the other information SPLC publishes on the Proud Boy's Page, do not suffice to label the Proud Boys as a "hate group" under SPLC's own definition. Indeed, such "evidence" controverts SPLC's Hate Group Designation, demonstrating that SPLC's application of that term to Plaintiff is false.

**E.      Plaintiff Alleges Facts Sufficient to Support Actual Malice[20]**

Plaintiff acknowledges he is a "public figure" (Compl. at ¶1), and understands he must (as he does) plead facts that "give rise to a reasonable inference of actual malice," *Michel v. NYP Holdings*, 816 F.3d 686, 702 (11th Cir. 2016). The Alabama Supreme Court defines "actual malice" as "'knowledge" that "the statement was made with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Cottrell v. Nat'l Coll. Athletic Ass'n*, 975 So.2d 306, 333 (Ala. 2007) (*quoting*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). "A defendant acts with 'reckless disregard' if, at the time of publication, the defendant '"entertained

---

[20] In the event the Court finds that Plaintiff has not pled sufficient fact to show it is plausible that SPLC acted with actual malice, Plaintiff respectfully requests leave to amend. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 706 (11th Cir. 2016) ("A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice and the plaintiff should have the opportunity to amend his complaint") (*citing*, *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1341–42 (11th Cir.2014)).

serious doubts as to the truth of [its] publication" or acted "with a high degree of awareness of ... [its] probable falsity.'" *Id*. *quoting*, *St. Amant v Thompson*, 390 U.S. 727, 731 (1323).

"'The actual malice standard is subjective." *Id*. *quoting*, *St. Amant*, at 731. "In order to prove" – not plead – "actual malice, the plaintiff must provide sufficient evidence to show at least that the defendant "entertained serious doubts as to the truth of the publication." *St. Amant v. Thompson*, 390 U.S. 727 (1968) . (emphasis added). Since malice "concerns motive, intent, and subjective feelings and reactions," Courts regularly refer determination of those issues to the trier of fact. *Camp v. Yeager*, 601 So.2d 924, 926 (Ala. 1992) ("the issue of actual malice on the part of defendants seems peculiarly inappropriate for disposition by summary judgment because it concerns "motive, intent, and subjective feelings and reactions.") As the Alabama Supreme noted, "[t]he determination of malice in defamation cases is particularly within the province of the jury." *Cousins v. T.G. & Y. Stores Co.*, 514 So. 2d 904, 906 (Ala. 1987) (emphasis added), citing, *Loveless v. Graddick*, 295 Ala. 142, 325 So.2d 137 (1975).

Actual malice may be shown by circumstantial evidence, including "the mode and extent of publication" of the false statement. *Sanders v. Smitherman*, 776 So. 2d 68, 73 (Ala. 2000) (internal quotation marks omitted). Actual malice may also be shown by circumstantial evidence, "for example," that the information "was (1) 'fabricated', [or] (2)"so inherently improbable that only a reckless man would have put [it] in circulation." *Id*. citing, *Smith v. Huntsville Times Co.*, 888 So. 2d 492, 500 (Ala. 2004) (among others).

As established *supra*, SPLC claims that branded Plaintiff and the Proud Boys with its Hate Group Designation despite possessing information the Proud Boys do not  meet SPLC's definition of "hate group." The analysis above relies only on the information that SPLC chose to publish on the its website. It is unknown what additional information SPLC may have that

similarly controverts Hate Group Designation as applied to Plaintiff and the Proud Boys.  At a minimum, the information SPLC indisputably (and published the Proud Boys Page) should have raised doubts as to the truth of that designation.

For the following reasons, Plaintiff has met his burden to plead facts sufficient to establish actual malice on the part of SPLC.

<center>**POINT III**</center>

<center>**PLAINTIFF STATES A VIABLE CLAIM FOR FALSE LIGHT<br>INVASION OF PRIVACY**</center>

SPLC contends that Plaintiff's claim false light invasion of privacy must be dismissed because New York law does not recognize that claim.  But, as demonstrated *supra*, it is Alabama, not New York law, that governs here.  Plaintiff will not rely on SPLC's waiver of this point, however, having no hesitation about reassuring that Court that his false light invasion of privacy claim is a valid one.

"Although false-light invasion of privacy is sometimes compared to defamation, they are separate torts."  *Minnifield v. Ashcraft*, 903 So. 2d 818, 822 (Ala. Civ. App. 2004). This is why states, such as New York, that do not recognize the false light claim describe it as not actionable, as opposed to merged into or a variety of defamation claim.  *Compare*, *Cumberland Farms, Inc. v. Raisch*, 37 Misc. 3d 1213(A), 964 N.Y.S.2d 58 (Sup. Ct. 2012) (cause of action alleging breach of implied covenant of good faith and fair dealing must be dismissed if it is merely duplicative of breach of contract claim).

> Despite the declaration of some courts that recognition of the tort of false light invasion of privacy serves no worthwhile interests not already protected by actions for libel and slander (§4[c]), a number of courts considering the admittedly close relationship between false light and defamation have observed substantial differences between the two types of action, including differences in actual interest protected (§§7- 11). Thus, courts have stated that while the

> essence of a defamation action is injury to reputation in the
> community, the thrust of a false light action, however much the
> elements of the action and damages recoverable might overlap, is
> the subjective suffering, embarrassment, and outrage of the subject
> of the depiction (§7), so that a false statement about, or depiction
> of, an individual might, if "highly offensive" to a reasonable
> person, be actionable as false light invasion of privacy, even if it
> could not be said to be defamatory (§8), since there is considerably
> less emphasis on public reputation in the false light tort than in
> defamation, the thrust of the former action being towards the
> subjective "privacy" of the subject.

57 A.L.R.4th 22 (Originally published in 1987).  The elements of this tort were set out by the

Alabama Supreme Court in *Butler v. Town of Argo*, 871 So.2d 1, 18 (Ala. 2003), which adopted

the definition in the Restatement (Second) Torts § 652E which states:

> One who gives publicity to a matter concerning another that places
> the other before the public in a false light is subject to liability to
> the other for invasion of privacy, if:
>
> a)   The false light in which the other was placed would be
>      highly offensive to a reasonable person, and
>
> b)   The actor had knowledge of or acted in reckless disregard
>      as to the falsity of the publicized matter and the false
>      light in which the other would be placed.

The false light tort, in other words, consists of "putting the Plaintiff in a false, but not necessarily

defamatory position in the public eye."  *Ex Parte Birmingham News, Inc.*, 778 So.2d 814, 818

(Ala. 2000) *citing*, *Johnston v. Fuller*, 706 So.2d 700, 701 (Ala. 1997).  In contrast to a claim for

defamation, truth is not an affirmative defense to a false light; "rather, 'falsity' is an element of

the Plaintiff s claim."  *Regions Bank v. Plott*, 897 So.2d 239, 244 (Ala. 2004). Defamatory

meaning is not a component of a false light claim, and if the light in which the claimant is

placed by virtue of the defendant's false statement causes him to be perceived in a way that

would offend a reasonable person, a claim has been stated if the other elements are met. Put

another way, the purpose of the false light tort is to "to protect the rights of plaintiffs who have

had attributed to them certain qualities, characteristics, or beliefs that, while not injurious to their reputation, place those persons in an undesirable false light." *Montgomery v. Jones*, 355 F. Supp. 3d 720, 730 (M.D. Tenn. 2019) (internal quotations omitted).

All the elements of a false light invasion of property claim are met here. Alabama has adopted the formulation of *Restatement (Second) of Torts* § 652D, cmt. a. (1977) that "giving publicity is making a matter public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Regions Bank v. Plott*, 897 So. 2d 239, 245 (Ala. 2004). The question of "publicity" is obviously not in dispute; this lawsuit involves SPLC's extensive and relentless publication and distribution of statements about Mr. McInnes on the Internet to such a wide extent that they have resulted even in the cancellation of a speaking engagement in Australia (Compl. ¶165) and of his ability to accept payments via third parties such as PayPal (Compl. ¶162).

Regarding the constitutional requirement that SPLC acted with actual malice, per element (b) of the Restatement standard, the actual malice standard is the same for both defamation and false light claims. *Smith v. Huntsville Times Co.*, 888 So. 2d 492, 496 (Ala. 2004). As demonstrated in the section concerning defamation, the allegations here more than adequately meet that standard.  Finally, SPLC has, by the conduct alleged in the Complaint and detailed at length in the defamation section of this brief, described and depicted Mr. McInnes in a light that would cause and has caused him to be perceived in a light that is offensive to a reasonable person.  The defendant in this case – though no more so than any other party appearing before this Court – can hardly be heard to deny that accusations of being a racist, extremist, religious bigot and promoter of violence constitute " qualities, characteristics, or

beliefs" that, if false, would be regarded by anyone as an "undesirable false light."

That these characteristics are as undesirable and offensive as can be described in our time is an understatement, and how acutely powerful that offense is proved not only by how such accusation affected Mr. McInnes. It is self-evident from the specific allegations in the Complaint demonstrating that SPLC understood what the effect of making such allegations would be on anyone, including Mr. McInnes, and that SPLC welcomed and indeed celebrated the destructive power of their offensiveness on his life – or, as the Restatement quotes it, his "privacy." And, based on the analysis in Plaintiff's section on defamation, he has demonstrated that these statements and characterizations about him were both statements of purported fact, not mere opinion, and that the allegations raise a plausible claim that they were false and made with actual malice. For these reasons, Mr. McInnes's claim for false light invasion of privacy states a cause of action for which relief can be granted.

<div align="center">

**POINT IV**

**PLAINTIFF STATES A VIABLE CLAIM UNDER NEW
YORK LABOR LAW**

</div>

Count IV of the Complaint pleads facts sufficient to give rise to a facially plausible claim that Defendant aided and abetted an unlawful act under applicable New York law. If inartfully drafted, Count IV's core substantive claim is that Defendant's defamatory campaign against Plaintiff – which Defendant waged to harm Plaintiff due to his out-of-work association with the Proud Boys – caused him to be terminated from his employment in violation of New York Labor Law § 201-d, which prohibits adverse employment action based on an employee's out-of-work activities. From these facts, the Court may plausibly infer that (1) Defendant's defamatory publications brought Plaintiff's Proud Boys association to his employer's attention; and (2) Defendant knew, or should have known, that its dissemination of such defamatory content

would, and, in fact, did, cause Plaintiff to suffer an unlawful discriminatory employment practice with foreseeably harmful consequences.  As we explain briefly below, under relevant New York law – entirely ignored by Defendant's Motion – Defendant may be held liable as an aider-and-abettor for facilitating Plaintiff's employer's wrongdoing.

In New York, civil liability may attach to one who aids and abets the commission of a wrongful act against another.  *See*, *e.g.*, *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 580–81 (N.Y. 1982); *Wilson v. DiCaprio*, 278 A.D.2d 25, 25–26 (2d Dep't 2000); *Lindsay v. Lockwood*, 625 N.Y.S.2d 393, 397 (Sup. Ct. 1994) (citing RESTATEMENT (SECOND) OF TORTS § 876).  Such wrongful acts may include, for example, an unlawful discriminatory employment practice like that which Plaintiff has alleged here.  *See*, *e.g.*, *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 187 (N.Y. 2017) (holding, under New York law, that a non-employer may be held liable as an aider-and-abettor of an employer's unlawful termination of employees for their prior criminal history); *National Organization for Women v. State Division of Human Rights*, 34 N.Y.2d 416, 419 (N.Y. 1974) (holding that non-employer newspaper company that divided employment listings into discriminatory sex-based categories "directly perpetuate[d]" sex discrimination and, thus, was liable, for aiding and abetting discriminatory acts").

Rather than addressing New York substantive law on aider-and-abettor liability, Defendant, instead, engages in obfuscation.  Citing to an irrelevant Supreme Court case concerning Section 10(b) of the Securities Exchange Act of 1934, Defendant claims that "on the federal level" there is "no presumption that a statutory scheme provides for aider-and-abettor liability."  Def. Br., at 59 (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180-182 (1994)).  Because, however, this presumption governs only the interpretation of Congressional enactments, *see Cent. Bank of Denver*, 511 U.S. at 181,

Defendant's suggestions to the contrary should be disregarded as a diversion.   Applying the above-described applicable substantive law, therefore, the Court should conclude that Count IV pleads factual allegations sufficient to give rise to a plausible claim for relief.

Similarly misguided is Defendant's reliance on the admittedly inartful drafting of Count IV's legal statements.   But the sole question raised by a Rule 12(b)(6) motion to dismiss is whether a complaint's *factual* allegations give rise to a claim for relief; the adequacy of the precise wording of its legal conclusions is immaterial.   So long as "there are well-pleaded factual allegations," a court will assume them to be true and "determine whether they plausibly give rise to an entitlement to relief."   *Iqbal*, 556 U.S. at 679.   Since, here, Count IV's *factual* allegations give rise to a plausible claim that Defendant is subject to aider-and-abettor liability under New York law, as described above, Count IV should survive Defendant's Motion.

In the same vein, Defendant's contention that Count IV should be dismissed because of "obvious, alternative explanations" for Plaintiff's termination fails too.   As Justice Souter, the author of *Twombly*, has explained: "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss."   *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 30 (1st Cir. 2010) (opinion of Souter J).   Thus, the "possibil[ity] that other, undisclosed facts may explain the sequence [of factual allegations] better . . . does not negate plausibility . . . it is simply a reminder that plausibility of allegations may not be matched by adequacy of evidence." *Id.*   For this reason, Defendant can find no refuge in the existence of other potential alternative explanations for Plaintiff's termination.

Insofar, however, as the Court concludes that Count IV does not plead a plausible claim that Defendant is liable to Plaintiff, either as an aider-and-abettor or under another theory of secondary liability, for Plaintiff's wrongful termination, the Court should decline to dismiss

Count IV and, instead, order Plaintiff to replead the claim.  Indeed, "it is the law of this circuit that ordering repleader of the claim, pursuant to Federal Rule of Civil Procedure 12(e), is favored over dismissal."  *Williamson v. Williamson*, No. 2:17-cv-289-SRW, 2018 WL 6822620, at *2 (M.D. Ala. Mar. 7, 2018) (citing *Wagner v. First Horizon Pharmaceutical Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006)).

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny SPLC's Motion to Dismiss the Complaint in its entirety.

Respectfully submitted on this
14th day of May, 2019.

/s/ G. BARON COLEMAN
    By:  Baron Coleman

**BARON COLEMAN LAW FIRM**
PO Box 789
Montgomery AL 36101-0789
baroncoleman@gmail.com
334-625-9097

RONALD D. COLEMAN (admitted *phv*)
LAUREN X. TOPELSOHN (admitted *phv*)
**MANDELBAUM SALSBURG PC**