## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **GAVIN MCINNES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **VS.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:19-cv-00098-MHT-GMB** |
| **THE SOUTHERN POVERTY LAW** | ) | |
| **CENTER, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT SOUTHERN POVERTY LAW CENTER, INC.'S MOTION
## TO DISMISS THE REVISED AMENDED COMPLAINT AND MEMORANDUM OF
## LAW IN SUPPORT THEREOF

Shannon Holliday [ASB-5440-Y77S]
Robert D. Segall [ASB-7354-E68R]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
Telephone:  334-834-1180
Facsimile:  334-834-3172
Email:  holliday@copelandfranco.com
Email:  segall@copelandfranco.com
Email:  maxymuk@copelandfranco.com

**Attorneys for Defendant Southern Poverty Law
Center, Inc.**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................... 1

RELEVANT BACKGROUND ............................................................................. 5

A.     GAVIN McINNES ..................................................................................... 5

B.     THE "PROUD BOYS" .............................................................................. 11

C.     THE SOUTHERN POVERTY LAW CENTER ...................................... 17

D.     THE COMPLAINT ................................................................................... 19

     1.     The Defamation Claim ................................................................... 20

          i.     April 25, 2017 Article:  "New 'Fight Club' Ready for Street Violence," by Bill Morlin ................................................. 21

          ii.     August 7, 2017 Article:  "Extremist's 'Unite the Right' Rally: A Possible Historic Alt-Right Showcase?" by Bill Morlin ...................... 22

          iii.     August 10, 2017 Article:  "Do you want Bigots, Gavin? This is how you get Bigots" by Hatewatch Staff ................................ 23

          iv.     April 19, 2018 Article:  "McInnes, Molyneux, and 4Chan: Investigating Pathways to the Alt-Right" by Hatewatch Staff ................ 24

          v.     June 8, 2018 Article:  Hatewatch Staff Report:  Last Month in Europe: May 2018 ................................................................. 26

          vi.     July 25, 2018 Article:  "Another Charlottesville?  Threats of Violence Loom Over Upcoming Portland Proud Boys, Patriot Prayer Rally" by Hatewatch Staff ................................................. 26

          vii.     August 5, 2018 Article:  "One Year Later:  Leaders from 'Unite the Right' Fall From Grace" by Ryan Lenz .................................. 28

          viii.     August 17, 2018 Article:  "Kessler Falls Flat, But the Radical Right Marches On" by Rachel Janik ................................................ 28

          ix.     October 13, 2018 Article:  "Far-right Skinheads Join Proud Boys in Assaulting Protestors in New York City Following Gavin McInnes Event" by Rachel Janik ................................. 30

i

x.      October 18, 2018 Article: "Weekend Read:  Violence and Hate, That's the Proud Boys in a Nutshell"................................................30

xi.     "Change the Terms" Website.................................................................32

2.      Other Claims ...................................................................................................33

ARGUMENT .................................................................................................................34

I.      THE COMPLAINT FAILS TO STATE A VALID DEFAMATION CLAIM................35

        A.      The Complaint Does Not Allege Facts That, If Proven, Would Plausibly Establish Actual Malice ........................................................35

                1.      McInnes Is a Public Figure ...................................................36

                2.      The Complaint Does Not Plausibly Allege Actual Malice.....................36

        B.      The Hate Group Claim is Not "Of and Concerning" McInnes............................38

        C.      The Hate Group Claim is Non-Actionable Opinion .................................................41

        D.      The Specific Claims Should Be Dismissed Under New York's Subsidiary Meaning Doctrine ........................................................46

        E.      The Specific Claims Each Fail as a Matter of Law When Considered Separately...........................................................................48

                1.      Opinion .......................................................................................48

                2.      Substantial Truth.......................................................................50

                3.      The "Of and Concerning" Requirement ...................................52

                4.      Defamatory Meaning .................................................................52

                5.      New York's "Incremental Harm" Doctrine .............................54

II.     McINNES'S NON-DEFAMATION CLAIMS SHOULD ALSO BE DISMISSED .................................................................................................................54

        A.      Counts I, III, and IV Are Subject to the Same First Amendment Protections as the Defamation Count.........................................54

        B.      The Non-Defamation Claims Also Fail on State-Law Grounds............................56

                1.      Intentional Interference with Economic Advantage ...................56

                2.      False Light Invasion of Privacy ................................................58

3.    N.Y. Labor Law § 201-d..........................................................................58

CONCLUSION...........................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*Adelson v. Harris*,
    402 P.3d 665 (Nev. 2017) ................................................................................38

*Adelson v. Harris*,
    876 F.3d 413 (2d Cir. 2017) ...........................................................................38

*Adelson v. Harris*,
    973 F. Supp. 2d 467 (S.D.N.Y. 2013) ........................................................5, 44

*Algarin v. Town of Wallkill*,
    421 F.3d 137 (2d Cir. 2005) ...........................................................................39

*Amaranth LLC v J.P. Morgan Chase & Co.*,
    888 N.Y.S.2d 489 (App. Div. 2009) ...............................................................57

*Aronson v. Wiersma*,
    483 N.E.2d 1138 (N.Y. 1985) .........................................................................53

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................34, 37

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................34, 37

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union,
Local 655*,
    39 F.3d 191 (8th Cir. 1994) ............................................................................55

*Biro v. Condé Nast*,
    807 F.3d 541 (2d Cir. 2015) ...........................................................................37

*Boley v. Atl. Monthly Grp.*,
    950 F. Supp. 2d 249 (D.D.C. 2013) ...............................................................44

*Brian v. Richardson*,
    660 N.E.2d 1126 (N.Y. 1995) .........................................................................42

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*,
    116 F.3d 1364 (11th Cir. 1997) ........................................................................5

*Buckley v. Littell*,
    539 F.2d 882 (2d Cir. 1976) ...........................................................................43

*Celle v. Filipino Reporter Enters.*,
    209 F.3d 163 (2d Cir. 2000) ......................................................................41, 53

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)................................................................................59

*Chaparro v. Carnival Corp.*,
    693 F.3d 1333 (11th Cir. 2012) ......................................................57, 60

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001)...................................................4, 39, 54

*Church of Scientology Int'l v. Time Warner, Inc.*,
    932 F. Supp. 589 (S.D.N.Y. 1996) .................................................46, 47

*Condit v. Clermont Cty. Rev.*,
    675 N.E.2d 475 (Ohio Ct. App. 1996)................................................43

*Covino v. Hagemann*,
    627 N.Y.S.2d 894 (Sup. Ct. 1995) .....................................................43

*Crenshaw v. Lister*,
    556 F.3d 1283 (11th Cir. 2009) ..........................................................38

*Davis v. Boeheim*,
    22 N.E.3d 999 (N.Y. 2014).................................................41, 42, 45

*Edelman v. Croonquist*,
    No. 09-CV-1938, 2010 WL 1816180 (D.N.J. May 4, 2010)................43

*Elias v. Rolling Stone, LLC*,
    872 F.3d 97 (2d Cir 2017)..............................................................38, 39

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ........................................................5, 55

*Fitts v. Minn. Min. & Mfg. Co.*,
    581 So. 2d 819 (Ala. 1991)...............................................................39

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) ..........................................................55, 56

*Forte v. Jones*,
    2013 WL 1164929 (E.D. Cal. Mar. 20, 2013) .....................................43

*Freihofer v. Hearst Corp.*,
    480 N.E.2d 349 (N.Y. 1985)...............................................................58

*Fulani v. N.Y. Times Co.*,
    686 N.Y.S.2d 703 (App. Div. 1999) ...................................................39

*Garrison v. Louisiana*,
379 U.S. 64 (1964).............................................................................................3

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)...................................................................................35, 36

*Gilman v. Spitzer*,
538 F. App'x 45 (2d Cir. 2013) .......................................................................39

*Gilman v. Spitzer*,
902 F. Supp. 2d 389 (S.D.N.Y. 2012)..............................................................52

*Gomer ex rel. Gomer v. Philip Morris Inc.*,
106 F. Supp. 2d 1262 (M.D. Ala. 2000) ..........................................................45

*Greenberg v. Spitzer*,
62 N.Y.S.3d 372 (App. Div. 2017) .............................................41, 42, 43, 44

*Gubarev v. BuzzFeed, Inc.*,
340 F. Supp. 3d 1304 (S.D. Fla. 2018) ............................................................38

*Guilford Transp. Indus., Inc. v. Wilner*,
760 A.2d 580 (D.C. 2000) .........................................................................48, 49

*Herbert v. Lando*,
781 F.2d 298 (2d Cir. 1986)..............................................................................46

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988)........................................................................................4, 55

*Immuno AG v. Moor-Jankowski*,
567 N.E.2d 1270 (N.Y. 1991) ....................................................................45, 46

*Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*,
No. 2:07-CV-461, 2009 WL 10704261 (N.D. Ala. Feb. 23, 2009).................43

*James v. Gannett Co.*,
353 N.E.2d 834 (N.Y. 1976).......................................................................52, 53

*Jankovic v. Int'l Crisis Grp.*,
494 F.3d 1080 (D.C. Cir. 2007) ..........................................................39, 40, 41

*Jewell v. NYP Holdings, Inc.*,
23 F. Supp. 2d 348 (S.D.N.Y. 1998).................................................................54

*Kelly v. Schmidberger*,
806 F.2d 44 (2d Cir. 1986)................................................................................52

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)......................................................................39

*Krepps v. Reiner*,
    588 F. Supp. 2d 471 (S.D.N.Y. 2008)......................................................56

*Mann v. Abel*,
    885 N.E.2d 884 (N.Y. 2008).....................................................................45

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
    838 F.2d 1287 (D.C. Cir. 1988)................................................................38

*Lil' Joe Wein Music, Inc. v. Jackson*,
    245 F. App'x 873 (11th Cir. 2007) ...........................................................5

*Marten Transp., Ltd. v. PlattForm Adver., Inc.*,
    184 F. Supp. 3d 1006 (D. Kan. 2016).......................................................14

*Martin v. Brock*,
    No. 07-CV-3154, 2007 WL 2122184 (N.D. Ill. July 19, 2007)................43

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991)............................................................................50, 51

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
    674 F.3d 369 (4th Cir. 2012) ....................................................................37

*McDonald v. Wise*,
    769 F.3d 1202 (10th Cir. 2014) ................................................................37

*Michel v. NYP Holdings, Inc.*,
    816 F.3d 686 (11th Cir. 2016) ..................................................... *passim*

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)......................................................................41, 42, 45

*Montgomery Ward & Co. v. McGraw-Hill Publ'g Co.*,
    146 F.2d 171 (7th Cir. 1944) ..............................................................48, 49

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964).............................................................................3, 35

*O'Neil v. Peekskill Faculty Ass'n*,
    507 N.Y.S.2d 173 (App. Div. 1986).........................................................43

*Pasqualini v. MortgageIT, Inc.*,
    498 F. Supp. 2d 659 (S.D.N.Y. 2007)..................................................56, 57

*Phila. Newspapers, Inc. v. Hepps,*
    475 U.S. 767 (1986).................................................................50

*Pippen v. NBCUniversal Media, LLC,*
    734 F.3d 610 (7th Cir. 2013) ...................................................37

*Pitcock v. Kasowitz, Benson, Torres & Friedman LLP,*
    903 N.Y.S.2d 43 (App. Div. 2010)...........................................51

*Provisional Gov't of New Afrika v. ABC, Inc.,*
    609 F. Supp. 104 (D.D.C. 1985)...............................................40

*Ratajack v. Brewster Fire Dep't, Inc.,*
    178 F. Supp. 3d 118 (S.D.N.Y. 2016)........................................43

*Rehak Creative Servs., Inc. v. Witt,*
    404 S.W.3d 716 (Tex. Ct. App. 2013) .......................................44

*Roberts v. Perry,*
    No. 16-CV-34, 2017 WL 3277122 (W.D.N.C. Aug. 1, 2017) .................17

*Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.,*
    812 F.3d 824 (11th Cir. 2016) ..................................................39

*Rosanova v. Playboy Enters., Inc.,*
    580 F.2d 859 (5th Cir. 1978) ...................................................38

*Sandals Resorts Int'l Ltd. v. Google Inc.,*
    925 N.Y.S.2d 407 (App. Div. 2011)..........................................44

*Schatz v. Republican State Leadership Comm.,*
    669 F.3d 50 (1st Cir. 2012).......................................................37

*Silvester v. ABC, Inc.,*
    839 F.2d 1491 (11th Cir. 1988) ................................................36

*Squitieri v. Piedmont Airlines, Inc.,*
    No. 3:17-CV-441, 2018 WL 934829 (W.D.N.C. Feb. 16, 2018) ............43

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)...........................................................36, 44

*Standing Comm. on Discipline v. Yagman,*
    55 F.3d 1430 (9th Cir. 1995) ...................................................43

*Steinhilber v. Alphonse,*
    501 N.E.2d 550 (N.Y. 1986).....................................................49

*Tannerite Sports, LLC v. NBC Universal News Grp.*,
    864 F.3d 236 (2d Cir. 2017)........................................................................51, 52

*Thome v. Alexander & Louisa Calder Found.*,
    890 N.Y.S.2d 16 (App. Div. 2009) ...................................................................57

*Three Amigos SJL Rest., Inc. v. CBS News Inc.*,
    65 N.E.3d 35 (N.Y. 2016) ................................................................................39

*Toston v. Thurmer*,
    689 F.3d 828 (7th Cir. 2012) ...........................................................................17

*Turner v. Wells*,
    879 F.3d 1254 (11th Cir. 2018) ............................................................... *passim*

*Unelko Corp. v. Rooney*,
    912 F.2d 1049 (9th Cir. 1990) .........................................................................56

*Ward v. Zelikovsky*,
    643 A.2d 972 (N.J. 1994)................................................................................43

*Williams v. Kanemaru*,
    309 P.3d 972 (Table), 2013 WL 4458887 (Haw. Ct. App. 2013) ..........................43

*Worthy v. City of Phenix City*,
    No. 17-CV-73, 2017 WL 4478333 (M.D. Ala. Oct. 6, 2017)................................5

## Statutes & Other Authorities

Federal Rule of Civil Procedure 12(b)(6) ...............................................................1, 4

N.Y. Lab. Law § 201-d ........................................................................................58

New York City Administrative Code
    § 8-107 ........................................................................................................59
    § 8-130 ........................................................................................................59

Restatement (Second) of Conflict of Laws § 150(2) (2019)........................................39

Robert D. Sack, *Sack on Defamation* (5th ed. 2018)
    § 2:4.7 ........................................................................................................43
    § 2:4.18 ......................................................................................................54
    § 5:5.2 ........................................................................................................38
    § 16.2.1.......................................................................................................34, 35

Defendant Southern Poverty Law Center, Inc. ("SPLC") respectfully submits this Motion to Dismiss the Revised Amended Complaint and Memorandum of Law in Support Thereof.  The Revised Amended Complaint (RAC) (Doc. 48-1) differs from the Complaint substantively only in Paragraphs 16 and 17 relating to diversity, something not at issue here.  However, the RAC has multiple, confusing paragraph numbering errors, including many paragraph numbers repeated three times. Thus, this motion/memorandum cites the initial Complaint for the sake of clarity.

## PRELIMINARY STATEMENT

Plaintiff Gavin McInnes is a well-known media personality and founder of a self-described "western chauvinist" men's group, the "Proud Boys."  His views and conduct, and that of the Proud Boys, have been the subject of extensive public attention and controversy at least since the group's founding in 2016, drawing headlines around the world and profiles in publications like *The New York Times*, *Newsweek*, and *The Guardian*.  Amidst an avalanche of public scrutiny, McInnes brought this lawsuit for defamation and related torts against SPLC, which monitors and tracks hate and extremism in the United States.  SPLC first characterized the Proud Boys as a "hate group" in February 2018, some two years after the group's founding, based on an evaluation of the by then extensive public record of its conduct, including its members' involvement in violent street protests, public associations with white nationalist and neo-Nazi organizations, and statements disparaging women, minorities, and other marginalized groups.  *See generally* pp. 5-19 *infra*.

The principal, overarching grievance set out in McInnes's Complaint is that SPLC's description of the Proud Boys as a "hate group" (the "Hate Group Claim") has injured *his* reputation.  *See, e.g.*, Complaint ("Compl.") ¶¶ 211-294; *see also id*. ¶ 13 ("Mr. McInnes brings this action against SPLC for defaming him by use of the SPLC Hate Designations . . . .").  Subsidiary to this claim, the 60-page, 303-paragraph Complaint also challenges more than thirty

discrete statements within ten separate articles (the "Articles") posted on SPLC's website between April 2017 and October 2018, which it similarly alleges are false and defame McInnes (the "Specific Claims"). *See generally id.* ¶¶ 229-294.[1]

The Articles, as well as the Proud Boys Page on SPLC's website (which explains the basis for the Proud Boys' designation as a hate group and is hyperlinked in several of the Articles), report on the Proud Boys' activities and trace the group's evolution. Through hyperlinks and embedded images as well as textual references, the Articles and the SPLC Proud Boys Page cite as their sources mainstream news reports, excerpts and photographs from social media accounts held by Proud Boys members and others, direct quotes from members, and video of events in which members participated. While these publications identify the numerous links between the Proud Boys and violence, white nationalism, misogyny, and other abhorrent ideologies, they also include statements from McInnes ostensibly repudiating at least some such views and comparing the Proud Boys to traditional fraternal organizations.

The challenged statements within the Articles (*i.e.*, the Specific Claims) range from the general, such as referring to the Proud Boys as "far-right" or "right wing," *id.* ¶¶ 237, 260, 264, 275, or stating that the Proud Boys "relish street-fighting" and are "always looking to rumble," *id.* ¶¶ 238, 241, 254, 268, 289, to the specific, such as a report noting that McInnes has referred to Asian people as "slopes" and "riceballs," *id.* ¶ 256, or that he once brought a samurai sword to a speaking event, *id.* ¶ 279-80. In addition to defamation, McInnes claims that, as a result of its characterization of the Proud Boys as a hate group and other published statements, SPLC has

---

[1] Full copies of the Articles placed at issue by the Complaint are attached as Exhibits 1-10 to the accompanying Declaration of Shannon L. Holliday ("Holliday Decl.").

tortiously interfered with his business relationships, cast him in a false light, and aided and abetted violations of New York's statutory labor laws.[2]

Each of these claims fails as a matter of law.  First, because McInnes is unquestionably a public figure, he is required to show not only that SPLC's characterization of the Proud Boys as a "hate group," as well as each of the statements comprising the Specific Claims, is provably false, but also that each of them was published with constitutional "actual malice"—that is, with at least a "high degree of awareness" of its "probable falsity."  *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).  At the pleading stage, therefore, he must allege facts plausibly establishing that essential element of his claim.  *See Michel v. NYP Holdings, Inc*., 816 F.3d 686, 701-02 (11th Cir. 2016)*.* Because the Complaint contains only boilerplate, conclusory allegations of actual malice, both the Hate Group and Specific Claims must be dismissed.  *Id.*  Moreover, dismissal should be with prejudice because, in the wake of the public record of McInnes's and the Proud Boys' own statements and conduct, which is cited and linked to in the Articles and on the SPLC Proud Boys Page, the requisite knowledge of probable falsity *cannot* plausibly be alleged as a matter of law.

 Second, all apart from actual malice, McInnes has failed to state a viable defamation claim based on SPLC's characterization of the *Proud Boys* as a "hate group."  Under both the First Amendment and controlling New York law, a plaintiff can only base a defamation claim on statements that are "of and concerning" *him*—not a separate organization he founded.  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964).  And, third, even if SPLC's description of the Proud Boys were deemed to be "of and concerning" McInnes, it is not actionable in defamation because it is not capable of being proven false. Whether a statement is one of empirically provable fact or

---

[2] As explained in note 92 *infra*, the substantive law of New York governs the claims in this case because McInnes is a New York resident.

non-actionable opinion is a question of law for the court, *Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018), and SPLC's characterization of the Proud Boys constitutes a classic, protected expression of opinion under both federal constitutional and controlling New York law.

In addition, McInnes's Specific Claims are not only precluded because he fails plausibly to allege that they were published with actual malice, but also by the subsidiary meaning doctrine, which holds that such statements are not actionable if they "merely imply the same view, and are simply an outgrowth of and subsidiary to" other statements that are either unchallenged or non-actionable. *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001). And each of the Specific Claims is also subject to dismissal for one or more additional reasons—including that certain of them are either: (i) non-actionable statements of opinion themselves; (ii) demonstrably true even on the limited record properly before the Court; (iii) not "of and concerning" McInnes; (iv) not reasonably capable of the defamatory meaning the Complaint attributes to them; or (v) non-actionable under the "incremental harm" doctrine which, under New York law, precludes recovery where the alleged injury resulting from actionable statements adds only incrementally to the harm caused by non-actionable statements. *See id.* at 176.

Finally, McInnes's non-defamation claims are equally without merit, primarily because both the First Amendment and New York law prohibit his attempt to "plead around" his failed defamation claims by characterizing them as some other tort or legal wrong. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988). In addition, these "tag along" claims fail to state a viable cause of action for multiple, independent reasons.

In short, this action should be dismissed with prejudice in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). The relevant context and applicable law is set forth below, in the detail made necessary by the sprawling nature of the Complaint.

## RELEVANT BACKGROUND[3]

### A.  GAVIN McINNES

Quoting a 2018 profile of him in *The New York Times*, the Complaint acknowledges that McInnes has long been "a controversial figure in the news media."  Compl. ¶ 23.  A founder of media and advertising businesses, a filmmaker and author, and a talk show host on internet websites, *id.* ¶ 24-25, McInnes is perhaps best known for what the Complaint characterizes as his "iconoclastic" and "'offensive'" style, *id.* ¶ 25—in particular, his well-documented history of provocative statements on race, gender, religion, and culture.  For example:

- In 2002, when a *New York Press* reporter asked McInnes what he thought about the residents of New York's Williamsburg neighborhood, he responded, "Well, at least they're not f***ing n***ers or Puerto Ricans. At least they're white."[4]

- In 2003, McInnes told *The New York Times*: "I love being white and I think it's something to be very proud of . . . .  I don't want our culture diluted. We need to

---

[3] The Complaint refers to and quotes extensively from multiple news reports, including the SPLC publications upon which McInnes bases his claims.  The full text of these articles, including their incorporated hyperlinks, are properly considered on a motion to dismiss because they comprise the necessary context in which the allegedly defamatory statements were made.  *See, e.g.*, *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).  In addition, it is well-established that documents referred to in a complaint and central to a plaintiff's claims are properly considered on a motion to dismiss.  *See, e.g.*, *Worthy v. City of Phenix City*, No. 17-CV-73, 2017 WL 4478333, at *2 (M.D. Ala. Oct. 6, 2017) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368-69 (11th Cir. 1997), *rev'd on other grounds,* 930 F.3d 1206 (11th Cir. 2019).

This Memorandum also references other news reporting about McInnes and the Proud Boys.  SPLC relies on these reports not for the truth of the information they contain, but because their existence provides the necessary context for evaluating the challenged statements and for assessing whether McInnes could plausibly plead that SPLC published them with the requisite actual malice.  Federal courts properly take judicial notice of such press reports, videos, speeches, and other publicly available materials on a motion to dismiss in defamation cases such as this one where the broader context in which a given statement was disseminated is an important element of the legal analysis.  *See, e.g.*, *Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 879 (11th Cir. 2007) (taking judicial notice of widespread distribution of a film based on newspaper articles); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (taking judicial notice of prior news articles in considering motion to dismiss defamation claims).

[4] *Vice Rising: Corporate Media Woos Magazine World's Punks*, N.Y. Press, Oct. 8, 2002 (updated Feb. 16, 2015) (Holliday Decl. ¶ 27) (asterisks substituted for actual words used).

close the borders now and let everyone assimilate to a Western, white, English-speaking way of life."[5]

- In a 2013 article written for *Taki's Magazine*, McInnes proclaimed that, "through trial and error, I learned that women want to be downright abused" by men.[6]

- Also in 2013, in a different article he wrote for *Taki's Magazine*, McInnes referred to Asian-Americans as "slopes" and "riceballs."[7]

- In a 2014 article published on the website *Thought Catalog*, McInnes wrote: "We're all transphobic. . . .  We see there are no old trannies.  They die of drug overdoses and suicide way before they're 40 and nobody notices because nobody knows them.  They are mentally ill gays who need help, and that doesn't include being maimed by physicians."[8]

-  In 2017, in an on-camera interview with NBC News, McInnes stated "I'm not a fan of Islam.  I think it's fair to call me Islamophobic."[9]

And this merely scratches the surface.  In addition to a host of interviews, McInnes has authored dozens of articles—including for websites directed at white supremacists, such as

---

[5] Vanessa Grigoriadis, *The Edge of Hip: Vice, the Brand*, N.Y. Times, Sept. 28, 2003 (Holliday Decl. ¶ 28).

[6] Gavin McInnes, *Everything I Learned in College Was A Lie*, Taki's Magazine, July 19, 2013 ("When I got an email that said, 'Thank you for raping me last night,' I realized everything I learned in college was a lie.") (Holliday Decl. ¶ 29).

[7] Gavin McInnes, *OK, Let's NOT Kill Everyone in China*, Taki's Magazine, Nov. 15, 2013 ("I recently made the mistake of doing a humorous piece about 'Asian privilege,' which was nothing more than an article about white privilege with the word 'white' replaced with 'Asian.'  Virtually no **slopes** got the joke and my phone almost overheated with angry emails, re-Tweets, Facebook posts, and texts. (How did those tenacious **riceballs** get my number?)" (emphases added)) (Holliday Decl. ¶ 30).

[8] The article was removed after publication because it espoused "hateful or abusive content."  In its place, *Thought Catalog* later provided a link to "criticism gathered from across the web" about McInnes's article.  *See* Holliday Decl. ¶ 31.

[9] *The America First Fraternity Pledges Trump*, NBC News Left Field, Nov. 1, 2017 at 3:17 (Holliday Decl. ¶ 32).

VDare.com[10] and American Renaissance[11]—with titles like "I'm Not A Racist, Sexist, or a Homophobe, You N***er Slut F***ot,"[12] "A Woman Should Vote with Her Husband,"[13] and "Transphobia Is Perfectly Natural."[14]  From at least 2014 through the end of 2018, he has hosted various internet talk shows that traffic in the same type of rhetoric.  *See* Compl. ¶ 24.  On his own program, for example, McInnes has referred to U.S. Senator Cory Booker as "Sambo . . . shucking and jiving for the white man"; said that "a disproportionate number" of Muslims "are mentally damaged inbreds" who "have a problem with inbreeding"; and asserted that "the reason [he is] sexist is because women are dumb."[15]  He also explained in a video posted to social media that he was "becoming anti-Semitic" after a trip to Israel[16] and posted a separate video entitled "10 Things I Hate About Jews" following the same trip.[17]

Beyond his own statements, news reports across a broad spectrum of media have documented McInnes's extensive interactions with individuals and groups known for bigotry.  For

---

[10] Multiple news reports identify VDARE—named for Virginia Dare, the first English child born in the Americas, at the Roanoke settlement in 1587—as a white supremacist group.  *See, e.g.*, Sam Frizell, *GOP Shows White Supremacist's Tweet During Trump's Speech*, Time, July 22, 2016; *see generally* VDARE Wikipedia Page.  *See* Holliday Decl. ¶¶ 33-34.

[11] American Renaissance magazine is also commonly identified as a white supremacist publication in published reports.  *See, e.g.*, Emily Shugerman, *White supremacist sues Twitter for allegedly violating his right to free speech*, The Independent, Feb. 22, 2018; *see generally* American Renaissance (magazine) Wikipedia Page.  *See* Holliday Decl. ¶¶ 35-36.

[12] Gavin McInnes, *I'm Not a Racist Sexist, or a Homophobe, You N***er Slut Fa**ot*, Taki's Magazine, Aug. 12, 2011, (asterisks substituted for actual words used) (Holliday Decl. ¶ 37).

[13] Gavin McInnes, *A Woman Should Vote with Her Husband*, Taki's Magazine, Oct. 27, 2016 (Holliday Decl. ¶ 38).

[14] *See* note 8 *supra*.

[15] *See* Holliday Decl. ¶ 15 & Ex. 11.

[16] *See* Jonathan Goldsbie, *We Watched Gavin McInnes's Full Anti-Semitic Rant So You Don't Have To*, Canadaland, Mar. 14, 2017 (Holliday Decl. ¶ 39).

[17] The Forward & Daniel J. Solomon, *Vice Co-founder Lists the '10 Things He Hates the Most About Jews'*, Haaretz, March 18, 2017 (Holliday Decl. ¶ 40).

example, one analysis noted McInnes's penchant for inviting prominent white nationalists to be guests on his shows, including the likes of Jared Taylor,[18] David Duke,[19] and Richard Spencer.[20] McInnes's writing appears in publications known for publishing white supremacists and so-called "race realists" such as VDare, American Renaissance, and *Taki's Magazine*.[21]

 For many years, McInnes has also maintained an active social media presence, including frequently sharing racist memes (virally transmitted cultural symbols or ideas), such as warnings of a "white genocide":



McInnes has also defended neo-Nazis accused—and eventually convicted—of beating two college students outside a New York bar, publicly identifying the victims and claiming they fabricated the

---

 [18] The Complaint itself acknowledges Taylor's "extreme racist views."  Compl. ¶ 258.  According to *The New York Times*, he has "long [been] one of the country's most prominent white supremacists." Jonathan Mahler, *Donald Trump's Message Resonates with White Supremacists*, N.Y. Times, Feb. 29, 2016 (Holliday Decl. ¶ 41).

 [19] David Duke is a former Grand Wizard of the Ku Klux Klan and an outspoken white supremacist. *See, e.g.*, Corky Siemaszko, *Who is David Duke, the White Supremacist Who Endorsed Donald Trump?*, NBC News, Feb. 29, 2016 (Holliday Decl. ¶ 42).

 [20] *The Atlantic* magazine recently referred to Richard Spencer as "our generation's most prominent white supremacist."  Graeme Wood, *His Kampf*, The Atlantic, June 2017 (Holliday Decl. ¶ 43). Regarding the appearance of these racists on McInnes's program, *see, e.g.*, Amanda Marcotte, *Gavin McInnes and the Proud Boys: 'Alt-right without the racism'?*, Salon, Oct. 17, 2018 ("As Jared Holt at Right Wing Watch has documented, McInnes frequently interviewed prominent white nationalists on his Compound show.") (Holliday Decl. ¶ 44).

 [21] *See* notes 10-13 *supra.*

 [22] *See* Holliday Decl. ¶ 6 & Ex. 3 (posting screen shot).

incident.[23]   And he has appeared as a speaker at numerous public events, including alongside British anti-Muslim advocate Tommy Robinson in the United Kingdom,[24] as well as at a nationwide "March Against Sharia" in the United States.[25]

In addition, McInnes has proudly proclaimed his incitement of—and proclivity for— fighting and violence.  In February 2017, for example, he told a cable news program that he "cannot recommend violence enough" as an "effective way to solve problems."[26]   In June 2018, he appeared in an online video in which he is depicted fiercely jabbing at a punching bag while offering opinions such as "what's wrong with hate?" and "what's wrong with fighting?  Fighting solves everything."[27]   And he has described the Proud Boys' ethos as: "We will kill you.  That's the Proud Boys in a nutshell."[28]   Indeed, according to McInnes, getting into a "major fight for the cause" is an official step towards becoming a full-fledged member of the Proud Boys.[29]

Moreover—and despite McInnes's occasional protestations that these statements are merely ironic, rhetorical, or both—published reports indicate that he is not afraid to practice what he preaches.  In January 2017, for example, it was widely reported that he punched a protestor on

---

[23] *See* Max Jaeger & Tina Moore, *Vice co-founder shames victims of alleged neo-Nazi beatdown*, N.Y. Post, Feb. 27, 2017 (Holliday Decl. ¶ 45).

[24] *See* Damien Gayle, *Thousands march in 'free speech' protest led by rightwing figures*, The Guardian, May 6, 2018 (Holliday Decl. ¶ 46).

[25] *See* Kurtis Lee & Jenny Jarvie, *Anti-Sharia rallies around the U.S. denounce Islam while stoking concerns among Muslim groups*, Los Angeles Times, June 10, 2017 (Holliday Decl. ¶ 47).

[26] *See The Steve Maltzberg Show*, NewsmaxTV, Feb. 3, 2017 (Holliday Decl. ¶ 48).

[27] *See* Jane Coaston, *The Proud Boys, the bizarre far-right street fighters behind the violence in New York, Explained*, Vox.com, Oct. 15, 2018 (Holliday Decl. ¶ 49).

[28] James Purtill, *Labor calls on Govt to deny visa to Proud Boys founder Gavin McInnes*, Australian Broadcasting Corporation, Oct. 25, 2018 (Holliday Decl. ¶ 50).

[29] Kimberly M. Aquilina, *Gavin McInnes explains what a Proud Boy is and why porn and wanking are bad*, Metro, Feb. 9, 2017 (Holliday Decl. ¶ 51).

his way into a party celebrating Donald Trump's election victory.[30]  On one program, he bragged that he had fought a man who "looked Hispanic."[31]

The Complaint suggests that *all* of this is just an elaborate, years-long joke, describing McInnes as a "comedian and political commentator."  Compl. ¶ 24.  In so doing, it quotes a 2018 profile in *The New York Times* that describes him as "offending liberals, women, 'beta male culture,' and transgender people, writing in a voice inflected with a crass, contrarian bigotry that left him just enough room to declare it all a joke."  *Id.* ¶ 25.[32]  Other media sources have similarly noted McInnes's attempts to avoid criticism by casting his statements as humor or irony—though many have questioned that characterization.[33]  As *The New York Times* noted in another article discussing McInnes, such "use of ironic, juvenile antics is something commonly seen on the fringes of the right because it allows a veneer of deniability."[34]

In McInnes's case, however, the veneer has failed to shield him from the consequences of his own statements and conduct. After he published his "Transphobia" article in 2014, for example,

---

[30] *See, e.g.*, Andrew Marantz, *Trump Supporters at the Deploraball*, The New Yorker, Jan. 29, 2017 (Holliday Decl. ¶ 52).

[31] Jared Holt, *Gavin McInnes Brags About Fight Over Dog Poop With Man Who Looked 'Kind of Hispanic'*, Right Wing Watch, June 13, 2018 (Holliday Decl. ¶ 53).

[32] *Quoting* Alan Feuer, *Proud Boys Founder: How He Went from Brooklyn Hipster to Far-Right Provocateur*, N.Y. Times, Oct. 16, 2018 (Holliday Decl. ¶ 23 & Ex. 19).

[33] *See, e.g.*, Andy Campbell, *Gavin McInnes' Wife Threatens Neighbors Over 'Hate Has No Home Here' Signs*, Huffington Post, Jan. 8, 2019 (noting that, in an effort to win over his neighbors, McInnes, "a gang leader famous for years of violent misogyny, was now trying to characterize himself as a misunderstood jokester."); Nicole Hemmer, *Tweedy Racists and "Ironic" Anti-Semites: the Alt-Right Fits a Historical Pattern*, Vox.com, Dec. 2, 2016 (opining in discussing McInnes that "[t]here is no functional difference between white supremacy and misogyny as acts of irony or acts of hatred."); Simon Houpt, *Everything Inside Gavin McInnes*, The Globe and Mail, Aug. 18, 2017 (updated Nov. 12, 2017) (noting that on McInnes' TV program, "irony and sincerity were dizzyingly fungible").  *See* Holliday Decl. ¶¶ 54-56.

[34] Alan Feuer & Jeremy W. Peters, *Fringe Groups Revel as Protests Turn Violent*, N.Y. Times, June 2, 2017 (Holliday Decl. ¶ 57).

McInnes was reportedly asked to leave the advertising agency he had co-founded.[35]  More recently, both McInnes and the Proud Boys were banned from Twitter on August 10, 2018—two days before a Washington, D.C. march held on the one-year anniversary of the Charlottesville, Virginia United the Right rally—for violating the company's "policy prohibiting violent extremist groups."[36]  On October 12, 2018 (and as discussed in more detail below), the Proud Boys were involved in a violent altercation in which several people were arrested after McInnes spoke at an event in New York City.  Approximately two weeks later, on October 30, McInnes and the Proud Boys were banned from Facebook and Instagram.[37]  Just over a week after that, online payment processor PayPal also banned McInnes and the Proud Boys, along with three left-wing "Antifa" groups.[38]  And on December 10, 2018, McInnes's videos were banned from YouTube as a result of "repeated copyright infringement offenses."[39]  *See* Compl. ¶ 168.  Within the next month, other online platforms, including MailChimp and iTunes, followed suit.  *Id*. ¶¶ 177, 179.

## B.  THE "PROUD BOYS"

McInnes publicly announced the founding of the Proud Boys in September 2016, through an article he published in *Taki's Magazine*.[40]  According to that article, the "basic tenet of the

---

[35] Kristina Monllos, *Rooster CCO Gavin McInnes Asked to Take Leave of Absence*, Adweek, Aug. 15, 2014 (Holliday Decl. ¶ 58).

[36] Ryan Mac & Blake Montgomery, *Twitter Suspended Proud Boys' And Founder Gavin McInnes' Accounts Ahead Of The 'Unite The Right' Rally*, Buzzfeed News, Aug. 11, 2018 (quoting McInnes saying that Twitter ban "will have zero effect on my reach or on the Proud Boys") (Holliday Decl. ¶ 59).

[37] Sean Keane, *Facebook bans pages linked to far-right Proud Boys group after arrests*, CNET, Oct. 31, 2018 (Holliday Decl. ¶ 60).

[38] Aaron Mak, *PayPal Banned the Proud Boys and Three Antifa Groups*, Slate, Nov. 9, 2018 (Holliday Decl. ¶ 61).

[39] McInnes was reportedly allowed to return to YouTube several days later. *See* Jon Levine, *YouTube Reinstates Gavin McInnes Just Days After Ban*, The Wrap, Dec. 13, 2018 (Holliday Decl. ¶ 62).

[40] Gavin McInnes, *Introducing: The Proud Boys*, Taki's Magazine, Sept. 15, 2016 (Holliday Decl. ¶ 19 & Ex. 15).

group is that they are Western chauvinists who refuse to apologize for creating the modern world."[41]   Even at that early date, McInnes identified a dozen Proud Boys chapters worldwide, comprising at least 1,000 members.[42]   The founding article went on to describe the specifics of initiation into the Proud Boys, including a public declaration of allegiance, undergoing a physical beating, and getting a "Proud Boy" tattoo.[43]  In subsequent public statements, McInnes has acknowledged the overlap between what he has described as "alt-light" groups such as the Proud Boys and what he has characterized as "alt-right" and white nationalist groups.[44]

Soon after McInnes unveiled the Proud Boys to the world, the group began making headlines for its members' involvement in often-violent, ideological street confrontations with other groups.  In April 2017, for example, CBS reported that the Proud Boys "sponsored [a] protest that descended into bloody violence at Berkeley's Civic Center Park" in California.[45]  Proud Boy Kyle Chapman was charged with a felony for wielding a leaded stick against counter-protestors at another Berkeley rally.[46]   In June 2017, the Canadian Broadcasting Corporation reported that a group of Proud Boys purposefully disrupted an Indigenous People's event in Halifax, Nova Scotia, by declaring the land a "British Colony" and singing "God Save the Queen."[47]  That same month,

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *See* Rebel Media, *Gavin McInnes: What is the Alt-Right?*, YouTube.com (video in which McInnes explains that "both sides have in common Western chauvinism, they're not embarrassed by whiteness or whatever, [and] they don't believe diversity is the end-all and be-all") (Holliday Decl. ¶ 63).

[45] *Alt Right 'Proud Boys' Declare Victory in Berkeley Melee*, CBS News San Francisco, Apr. 15, 2017 (Holliday Decl. ¶ 64).

[46] Natalie Orenstein, *Kyle 'Based Stickman' Chapman charged with felony after Berkeley rally*, Berklyeside, Aug. 18, 2017 (Holliday Decl. ¶ 65).

[47] *Who are the Proud Boys who disrupted an Indigenous event on Canada Day?*, CBC Radio, July 4, 2017 (Holliday Decl. ¶ 66).

*The New York Times* reported that the Proud Boys were visible (and violent) participants in a nationwide "Rally Against Sharia."[48]  In July 2017, the Proud Boys participated in a "ride through" of Islamberg, an Islamic community in Upstate New York.[49]  As later reported by *The New York Times*, a video of the event, produced for *Proud Boy* magazine, compared Muslims to a "virus" that "eat[s] and feed[s] off the host nation until it's dead."[50]

In August 2017, a Proud Boy named Jason Kessler was one of the principal organizers of the "Unite the Right" rally in Charlottesville, Virginia, that descended into violence and resulted in the death of a young woman named Heather Heyer.  Prior to the rally, on June 21, 2017, the Proud Boys had posted, on their official website/online magazine, a purported "disavowal" by McInnes of the Charlottesville rally.  That post, however, was taken down only three days later and replaced by an "official" statement that effectively retracted its predecessor, "wished [the Unite the Right organizers] nothing but the best," and "encouraged" interested Proud Boys chapters or individual members to attend the rally.[51]  This second statement remained up through

---

[48] *See* note 34 *supra.*

[49] *See* Dean Obeidallah, *Trump-Supporting Bigots to Target Upstate New York Muslims*, The Daily Beast, July 14, 2017 (Holliday Decl. ¶ 67).

[50] Alan Feuer & Ali Winston, *Founder of Proud Boys Says He's Arranging Surrender of Men in Brawl*, N.Y. Times, Oct. 19, 2018 (Holliday Decl. ¶ 68).

[51] *Official Statement on the "Unite the Right" Rally*, Proud Boy Magazine, (accessed by searching Internet Archive for Proud Boys website as it existed on June 24, 2017) (Holliday Decl. ¶ 16 & Ex. 12). In relevant part, the new statement provided:

> "The general consensus among the group is while we enthusiastically support EVERYONE's right to free speech/peaceably assemble, that doesn't mean we have to attend every single event." (emphasis in original)

> "The organizers [of the Charlottesville Unite the Right event] are correct when they say we have to unite against our common enemy, the far left."

> "[I]f a chapter or an individual Proud Boy feels compelled to go, we **encourage** him to do so." (emphasis supplied)

> "[W]e wish them nothing but the best."

the date of the rally itself (August 12, 2017).[52]  It was quietly removed thereafter and, by August 16, 2017, it had been replaced with McInnes's original statement.[53]  The rally and its aftermath dominated the national conversation for weeks, and Kessler's involvement—and membership in the Proud Boys—was widely reported by *The New York Times*, *Newsweek*, and numerous other news outlets.[54]  Other Proud Boys, including its current chairman, also attended the rally.[55]

National media coverage of the Proud Boys and individual Proud Boys members intensified after the violence in Charlottesville, documenting members' increasingly violent rhetoric.  Much of that reporting focused on a series of planned demonstrations in the Pacific Northwest throughout last summer.  An organizer publicly announced an intention to bring guns to these events and to engage in "mutual combat" with counter-protestors, and stated that the Proud Boys would be on hand to provide "security."[56]  Not surprisingly, these rallies ultimately

---

"NOTE: An original version of this statement appeared earlier that included the ridiculous term 'disavow' and was meant to lampoon the elders. That is not who we are and that is not OK."

Judicial notice may properly be taken of such materials from the Internet Archive's Wayback Machine. *See, e.g.*, *Marten Transp., Ltd. v. PlattForm Adver., Inc.*, 184 F. Supp. 3d 1006, 1009-10 (D. Kan. 2016) (citing cases).

[52] *Official Statement on the "Unite the Right" Rally*, Proud Boy Magazine (accessed by searching Internet Archive for Proud Boys website as it existed on Aug. 12, 2017) (Holliday Decl. ¶ 17 & Ex. 13).

[53] *Official Statement on the "Unite the Right" Rally*, Proud Boy Magazine (accessed by searching Internet Archive for Proud Boys website as it existed on Aug. 16, 2017) (Holliday Decl. ¶ 18 & Ex. 14).

[54] *See, e.g.*, Tom Porter, *Who are the Alt-right Leaders Addressing the White Nationalist Rally in Charlottesville?*, Newsweek, Aug. 12, 2017; Alan Feuer, *Proud Boys Founder: How He Went From Brooklyn Hipster to Far-Right Provocateur*, N.Y. Times, Oct. 16, 2018; *Explained: Who are the far-right Proud Boys?*, Al-Jazeera, July 18, 2018; Luke Barnes, *Proud Boys Founder Disavows Violence at Charlottesville But One of Its Members Organized the Event*, Think Progress, Aug. 24, 2017.  *See* Holliday Decl. ¶¶ 23, 69-71 & Ex. 19.

[55] Meg O'Connor, *Hate Goes Mainstream with the Miami Proud Boys*, Miami New Times, Dec. 10, 2018 (Holliday Decl. ¶ 72).

[56] *See, e.g.*, *Right-wing rally, counter-protesters face off in Portland*, PBS Newshour, Aug. 4, 2017 (quoting a Facebook post from event organizer Joey Gibson stating "We've always had guns at the rally

descended into violence.[57]   Then, in October, after McInnes gave a speech to the Metropolitan Republican Club in New York City (at which, according to multiple news accounts, he brandished a Samurai sword to re-enact the assassination of Japanese leader Inejiro Asanuma in 1960),[58] Proud Boys members participated in a brawl outside the club's headquarters.[59]   Parts of the altercation recorded and posted online documented the use of anti-gay slurs by Proud Boys.[60]   The fight resulted in the arrest of nine Proud Boys, and ultimately in a decision by McInnes publicly to "disassociate" himself from the group—although not because he disagreed with either its actions or rhetoric.   In a video posted online, McInnes explained that he did so on advice of counsel, in an effort to "alleviate [the members'] sentencing."[61]   Eight Proud Boys arrested in connection with the incident have since pled guilty.[62]

---

. . . I cannot think of one rally when we didn't have guns with us . . .  Everywhere we go, we have guns"); Will Sommer, *Proud Boys, the Infamous Right-Wing Brawlers, Head to the Heart of Antifa Country*, The Daily Beast, July 19, 2018 ("[Rally organizer Joey] Gibson claims that the Portland Police Bureau told him the rally would be treated as 'mutual combat'—demonstrators facing off against one another, without police in the middle to separate them.").  *See* Holliday Decl. ¶¶ 73-74.

[57] *See, e.g.*, Katie Shepherd, *Portland Police Declare a Riot After Right-Wing Marchers Begin Beating Antifascists with Flag Poles*, Willamette Week, June 30, 2018 (updated July 1, 2018); Shane Dixon Kavanaugh, *Proud Boys, a fixture at Portland protests, labeled 'extremist group' by FBI*, The Oregonian, Nov. 19, 2018.  *See* Holliday Decl. ¶¶ 75-76.

[58] *See, e.g.*, Caroline Linton, *Video shows alleged assault of protestors after event featuring Proud Boys founder*, CBS News, Oct. 13, 2018 (Holliday Decl. ¶ 77).  McInnes later claimed the sword was a toy.  *See* Compl. ¶ 279.

[59] *See, e.g.*, Shane Goldmacher, *Fight Breaks Out Near Republican Club After Visit by Gavin McInnes, Police Say*, N.Y. Times, Oct. 12, 2018; Tim Fitzsimons, *Proud Boys Guilty of a Hate Crime? Experts Say Probably Not*, NBC News, Oct. 17, 2018.  *See* Holliday Decl. ¶¶ 78-79.

[60] *Id.*

[61] Jason Wilson, *Proud Boys founder Gavin McInnes quits 'extremist' far-right group*, The Guardian, Nov. 22, 2018, (quoting McInnes: "'I am told by my legal team and law enforcement that this gesture could help alleviate their sentencing.'"); *see also id.* ("'[A]t the very least this will show jurors they are not dealing with a gang and there is no head of operations.'") *See* Holliday Decl. ¶ 80.

[62] *See Far-right Proud Boys members sentenced over Manhattan brawl*, BBC, Mar. 2, 2019 (Holliday Decl. ¶ 81).

Despite its founder's "disassociation," the beat of press coverage about the Proud Boys has continued unabated. Those press reports regularly refer to it as an "alt-right," "far-right," or "extremist" group.[63] In 2019, a Proud Boys member garnered headlines for warning the mayor of Portland, Oregon that his "days are fucking numbered" in a video posted to Facebook.[64]

Social media plays a prominent role in the Proud Boys' operations. It is, according to published reports, the primary means through which the group recruits new members.[65] Members regularly associate with or traffic in outright bigotry through social media or other internet platforms. For example, the hosts of the prominent anti-Semitic radio program *The Daily Shoah*[66] have discussed enthusiastically the prevalence of anti-Semitism amongst the Proud Boys' membership.[67] Indeed, Proud Boys members have posted social media pictures of themselves with prominent Holocaust deniers, white nationalists, and known neo-Nazis.[68] Media outlets have reported extensively on the Proud Boys' affiliations with neo-Nazi groups such as DIY Division, "a loose collective of violent neo-Nazis and fascists from Southern California that's organized and trains primarily to engage in fighting and violence at political rallies."[69]

---

[63] *See, e.g.*, notes 20, 24, 27, 32, 37, 45, 54, 56, 57, 61 & 62 *supra*.

[64] Jason Wilson, *Portland: far-right activist threatens mayor as groups change tactics*, The Guardian, Jan. 29, 2019 (Holliday Decl. ¶ 82).

[65] Taylor Hatmaker, *Facebook is the recruiting tool of choice for far-right group the Proud Boys*, TechCrunch, Aug. 10, 2018 (Holliday Decl. ¶ 83).

[66] "Shoah" is a Hebrew word meaning "catastrophe." It is commonly used to refer to the Holocaust.

[67] *See, e.g.*, *The Daily Shoah #159*, June 2, 2017, at 13:30-15:45 (approvingly discussing anti-Semitic statements by Proud Boys members) (Holliday Decl. ¶ 84).

[68] Holliday Decl. ¶ 6 & Ex. 3 at 14-36.

[69] Paul Bass, *Nationalists? Or Whitehoodwinkers?*, New Haven Independent, July 13, 2017 (Holliday Decl. ¶ 85).

## C.  THE SOUTHERN POVERTY LAW CENTER

Founded in 1971 in Montgomery, SPLC is a non-profit organization with a stated mission to fight hate and bigotry and to seek justice for the most vulnerable members of society.[70] In furtherance of that purpose, SPLC endeavors to identify and monitor hate groups throughout the United States and expose their activities to the public.[71] SPLC defines a hate group as an organization that–based on its official statements or principles, the statements of its leaders, or its activities–has beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics.[72]  SPLC does not characterize individuals as hate groups.

As part of its mission, SPLC has participated in a project, along with several other advocacy groups, aimed at providing tools to combat hateful activities online.  The project, called the "Change the Terms" initiative, provides "a set of policy recommendations to help social media and other internet companies reduce hateful activities on their platforms."  Compl. ¶ 118.

As part of its larger mission, beginning in April 2017, SPLC periodically reported on the activities of both the Proud Boys and its founder. *See generally* Compl. ¶¶ 229-92 (describing articles posted on SPLC's website).  SPLC created a publicly accessible "home page" for its research on the Proud Boys (the "SPLC Proud Boys Page"), which contains dozens of links to external sources of information, including both the group's own words posted on social media and

---

[70] *See, e.g.*, *What We Do*, SPLC, Holliday Decl. ¶ 86.

[71] *Id.*; *see also* Compl. ¶ 4.

[72] *See* Holliday Decl. ¶ 86; *see also, e.g.*, *Toston v. Thurmer*, 689 F.3d 828, 831 (7th Cir. 2012) (citing testimony that, "[i]n the United States, [the] two main organizations that monitor intolerance and hate groups are the Anti–Defamation League (ADL) and the Southern Poverty Law Center (SPLC)"); *Roberts v. Perry*, No. 16-CV-34, 2017 WL 3277122, at *6 (W.D.N.C. Aug. 1, 2017) (noting that SPLC "researches and tracks right-wing, extremist hate groups in America"), *aff'd*, 707 F. App'x 777 (4th Cir. 2017).

other online forums, and the voluminous mainstream news reporting about it.[73]  Through the SPLC Proud Boys Page and periodic articles describing the group's activities and public statements, SPLC has informed the public about the Proud Boys and sought to situate it within the taxonomy of right-wing groups in the United States.  In so doing, SPLC has repeatedly acknowledged the group's insistence that it is simply a men's club that does not endorse racism or hate.  Indeed, the SPLC Proud Boys Page notes at the very top that the group's members "adamantly deny any connection to the racist 'alt-right,' insisting they are simply a fraternal group spreading an 'anti-political correctness' and 'anti-white guilt' agenda."[74]  Nonetheless, based on its members' documented history of public statements and actions (as partially described above), SPLC designated the Proud Boys as a hate group in February 2018.  Compl. ¶ 153.

The basis for this characterization is set out both on the SPLC Proud Boys Page and in related articles, which document not only the Proud Boys' statements and conduct, but also how, in SPLC's view, the group has come to function, in practice, as something of a "minor league" from which more brazenly bigoted organizations recruit members.   In other words, while acknowledging that the Proud Boys characterize themselves as "pro-western," rather than as "white nationalists" or "Nazis," SPLC has nevertheless explained that their role and influence are more "complicated" than that simple dichotomy would suggest and has documented how the group can and has served as a "gateway" through which membership in the Proud Boys can lead to involvement in more overtly extreme ideologies and groups.[75]

---

[73] *See* Holliday Decl. ¶ 15 & Ex. 11.

[74] *Id.* at 1.

[75] *Id.*; *see also* Holliday Decl., Ex. 3 at 14-36 (documenting increasing radicalization of three specific Proud Boys by tracing their social media history over time from Proud Boys events to associations with Holocaust deniers and neo-Nazis); Holliday Decl., Ex. 4 at 2, 7, 13,  (noting that posters to white-nationalist online message board "describe their radicalization as a gradual process, with charismatic alt-lite personalities like Gavin McInnes introducing them to ideas they would eventually take to their

## D.  THE COMPLAINT

Filed on February 3, 2019, the Complaint runs more than 300 paragraphs over 60 pages, including lengthy sections devoted to broad allegations about SPLC's activities and operations. Some 22 pages are devoted to allegations about SPLC's supposed "business model" that purportedly incentivizes it to label organizations as "hate groups" in order to attract donations.  *See generally* Compl. ¶¶ 39-149.  While these allegations are not a model of clarity, the primary aspect of SPLC's operations that the Complaint appears to find objectionable is its practice of designating specific entities as "hate groups."  *Id.* ¶¶ 47-60.  The Complaint asserts that, because "hate is in the eye of the beholder," *id.* at p. 11, and because of "the subjective nature of labeling hate groups," *id.* ¶ 73, SPLC's designations amount to little more than "call[ing] people names."  *Id.* ¶ 94.  In addition, the Complaint takes umbrage at efforts by SPLC and other advocacy groups to develop "policy recommendations to help social media and other internet companies reduce hateful activities on their platforms." *Id.* ¶¶ 118; *see generally* ¶¶ 118-149.

Despite its length, the gravamen of the Complaint is its overarching contention that, through its designation of the Proud Boys as a hate group, SPLC has harmed McInnes's reputation and thereby caused him to sustain a host of injuries, including his inability to access various social media platforms and retain employment.  *Id.* ¶¶ 211-294; *see also id.* ¶ 13 ("Mr. McInnes brings this action against SPLC for defaming him by use of the SPLC Hate Designations . . . .").

---

extreme" and citing specific examples such as an individual who said he formed white nationalist beliefs "from Gavin because there was a time about 2-3 years ago when Gavin would take [sic] to people like Jared Taylor and Richard Spencer," and another recounting his use of McInnes's online content as "softer step[]" before introducing friends to more "'radical' perspectives" like those of leading neo-Nazi Andrew Anglin).

## 1.  The Defamation Claim

According to the Complaint, designation as a "hate group" by SPLC "renders a company or individual almost certain to be banned by Twitter, Google and their related services and platforms."  *Id*. ¶ 117.  The Complaint alleges that multiple online platforms, including Twitter, Facebook, and Instagram, all banned McInnes from using their services between August 2018 and January 2019—approximately six months to a year after SPLC first designated the Proud Boys as a hate group.  *Id*. ¶¶ 157-179.  McInnes alleges that SPLC—and not his own conduct or that of the Proud Boys—was the "proximate cause" of this "de-platforming."  *Id.* ¶¶ 182-83.

In addition to this general allegation of defamation arising from SPLC's characterization of the Proud Boys as a "hate group," the Complaint identifies as defamatory more than 30 statements or "suggestions" allegedly contained in ten separate articles ("the Articles").  The Complaint further alleges that these statements were made "with knowledge of or in reckless disregard of their falsity, or both."  *Id*. ¶ 293.  The challenged publications, each of which is attached to the Declaration of Shannon Holliday filed herewith, are summarized below, in chronological order.[76]

---

[76] In the Complaint, the Articles are not presented in chronological order and are introduced with lettered paragraphs. For the Court's ease of reference, SPLC has re-ordered them chronologically and refers to them as Articles 1-10 in this Memorandum.  Articles 1-10 also correspond with Exhibits 1-10 of the Holliday Declaration.  In addition, this Memorandum is accompanied by an Addendum consisting of a chart that addresses each of the thirty-plus Specific Claims.  For purposes of the Addendum, SPLC has presented the Articles in the order they appear in the Complaint, along with the corresponding letter identifier found in the Complaint.

i. April 25, 2017 Article: "New 'Fight Club' Ready for Street Violence," by Bill Morlin (Compl. ¶¶ 251-56)[77]

This article ("Article 1") discusses the formation of a group called the Fraternal Order of Alt Knights, or "FOAK," which, according to its founder, Proud Boy Kyle Chapman, would act as the "tactical defensive arm" of the Proud Boys.  Based on Chapman's own description, the article offers the view that, while FOAK does not appear to have "any overt racist themes," it "sounds quite similar to a neo-Nazi 'fight club' called DIY Division."  The article also discusses public statements made by McInnes, including those "denigrat[ing] Muslims and refer[ring] to Asian-Americans as 'slopes' and 'riceballs'" on a right-wing website, as well as describing the Proud Boys as a "group that shows up at Trump rallies looking to rumble" and one that "others have described as the military arm of the Alt-Right."  Article 1 explains that McInnes describes the Proud Boys as a "pro-Western fraternal organization."

Article 1 contains a number of primary sources and hyperlinks supporting the opinions it expresses.  For example, it quotes from a social media post by Chapman, in which he states that FOAK would be "partnering with Proud Boys," that it had the "full approval" of McInnes, and that its "emphasis would be on street activism, preparation, defense and confrontation."  The article also contains links to a previous SPLC article reporting on the violent Berkeley protests in April 2017, which in turn links to actual footage of the incident, as well as to news reporting (including quotes from Chapman, who participated in it) from the *Los Angeles Times* and *CBS San Francisco*, among others.  With respect to its reference to DIY Division, Article 1 links to an  SPLC article regarding a similar protest a month earlier in which DIY Division participated, which includes links to and quotes from the *Los Angeles Times*, *Orange County Register*, and *OC Weekly*.

---

[77] Holliday Decl. ¶ 4 & Ex. 1.  The Complaint incorrectly identifies the article as authored by Bill Merlin, and incorrectly identifies the publication date as August 25, 2017.

The Complaint alleges that Article 1 defames McInnes by stating that he "denigrated Muslims and called Asian Americans 'slopes' and 'riceballs,'" Compl. ¶ 256, as well as through three statements referring to the Proud Boys—one noting that "others have described the Proud Boys as the military arm of the Alt-Right"; one stating that the Proud Boys "look to rumble"; and one allegedly comparing the Proud Boys to a "neo-Nazi organization." Compl. ¶¶ 253-54.

> ii. August 7, 2017 Article: "Extremist's 'Unite the Right' Rally: A Possible Historic Alt-Right Showcase?" by Bill Morlin (Compl. ¶¶ 240-44)[78]

SPLC published this article ("Article 2") in advance of the "Unite the Right" rally in Charlottesville, and it examines several of the groups and personalities scheduled to attend the rally, including KKK members, self-avowed anti-Semites, and self-proclaimed white nationalists. The 43-paragraph article contains only one sentence referencing the Proud Boys:

> The Trump-inspired "Proud Boys," called the "Alt-Light" by some and always seeming to be looking for a rumble, may or may not show up in sizeable numbers, although the group's founder, Gavin McInnes, says he full-heartedly supports the rally.

The Complaint alleges that this sentence is defamatory because the Proud Boys are not "always looking for a rumble" and McInnes did not "full-heartedly support the rally." Compl. ¶¶ 241-42. The Complaint further alleges that McInnes had actually disavowed the rally through a statement "found on the Proud Boys website" and "dated on June 21, 2017." *Id*. ¶ 243.

Article 2 in fact contains a hyperlink to McInnes's purported "disavowal" of the Charlottesville rally, which was posted on June 21, 2017. Moreover, as explained above, *see* notes 51-53 & accompanying text, McInnes's statement was removed shortly after it was posted, and, at the time Article 2 was published, the same link led to a message on the Proud Boys website emphasizing that they "enthusiastically support EVERYONE's right to free speech/peaceably

---

[78] Holliday Decl. ¶ 5 & Ex. 2.

assemble," that "[t]he organizers [of the Charlottesville Unite the Right rally] are correct when they say we have to unite against our common enemy, the far left," and that, "if a chapter or an individual Proud Boy feels compelled to go, we encourage him to do so."

      iii.   August 10, 2017 Article: "Do you want Bigots, Gavin? This is how you get Bigots" by Hatewatch Staff (Compl. ¶¶ 245-50)[79]

This article ("Article 3"), published the day before the Unite the Right rally, examines the history of the Proud Boys and the group's connections to various white nationalist figures based on its analysis of shared platforms (such as *Taki's Magazine*, a favorite outlet for both McInnes and avowed white supremacists like Richard Spencer) and influences (such as Pat Buchanan's book *Death of the West*). It goes on to examine how, despite the fact that McInnes is "adamant that his stable of 'Western chauvinists' aren't bigots," many individuals connected to the Proud Boys have gone on to become involved with overtly bigoted groups:

> Despite McInnes's protestations on social media and elsewhere, he's devised, perhaps inadvertently, the most fertile "in-real-life" recruiting ground for white nationalists and anti-Semites within today's organized far-right.

> And some of its leaders, like Mike "Enoch" Peinovich, have openly celebrated what amounts to a "western chauvinist" farm league from which they are happy to call up new followers.

The article acknowledges McInnes's efforts to expel or disavow some of the Proud Boys' most overtly bigoted members. But, ultimately, it opines that, despite McInnes's near-constant refrain that the Proud Boys do not accept and will not tolerate bigots, "the Proud Boys phenomenon is far more complex than" the "Nazi-or-not binary" that McInnes has tried to construct:

> [A]t least some Proud Boys appear to be following paths into hate groups after a gestation period in McInnes' group . . . The Proud Boys phenomenon is far more complex than McInnes wants to admit, and that appears to be benefiting—and delighting—the leaders of the Alt-Right.

---

[79] Holliday Decl. ¶ 6 & Ex. 3.

Article 3 contains excerpts of and hyperlinks to material supporting its published opinions about the Proud Boys.  It includes, for example, a screenshot of a tweet by McInnes in which he opines that abortion and immigration will lead to "white genocide"—a common white nationalist meme.  Article 3 also contains links to McInnes's writing, including the article in *Taki's Magazine* in which he announced and described the Proud Boys.  It also contains lengthy excerpts (as well as links to broadcasts) from the *Daily Shoah* podcast, in which the hosts applaud anti-Semitism within the ranks of the Proud Boys.  And it provides screen-shots of a host of social media posts and hyperlinks to articles in which Proud Boys members express anti-Semitic sentiments and hobnob with Holocaust deniers.  The bulk of the article is devoted to explaining the increasing radicalization of three Proud Boys, using primary sources from these individuals' own social media accounts to illustrate their path from the Proud Boys to more extreme groups.

The Complaint alleges that Article 3 falsely implies McInnes is an anti-Semite and white nationalist; that it falsely states he "perpetuates racist memes" and "devised … [a] recruiting ground for white supremacists and anti-Semites"; and that it defames him through its false description of the Proud Boys as a "hate group." Compl. ¶¶ 246–250.[80]

        iv.  April 19, 2018 Article: "McInnes, Molyneux, and 4Chan: Investigating Pathways to the Alt-Right" by Hatewatch Staff (Compl. ¶¶ 257-62)[81]

Like Article 3, this article ("Article 4") is primarily concerned with examining how people are attracted to the "alt-right ecosystem."  To explore that issue, Article 4 closely analyzes comment threads appearing on the white-nationalist forum "The Right Stuff" in which "74

---

[80] While none of these allegations has merit, the last is particularly puzzling, given that the article never refers to the Proud Boys as a hate group and that McInnes himself acknowledges that SPLC published the article six months before it first designated the Proud Boys as a hate group.  *See* Compl. ¶ 153.

[81] Holliday Decl. ¶ 7 & Ex. 4.

individual users . . . describe their radicalization narrative."  Among those users, McInnes was one

of the most-cited influences leading individuals to more "hardcore" white nationalist groups.[82]

Article 4 again notes, as SPLC had in previous articles, the inherent tension between McInnes's

characterization of the Proud Boys as merely a "right-wing men's drinking club" and its many

connections with bigotry and white nationalism:

> McInnes, who formed the Proud Boys in 2016, has repeatedly insisted the SPLC-designated hate group is simply a right-wing men's drinking club in the vein of the Elks Lodge, and has taken pains to distance himself from the alt-right. But even he agrees that there's overlap between his "Western chauvinist" Proud Boys and self-proclaimed white nationalists: "both sides have in common Western chauvinism, they're not embarrassed by whiteness or whatever, [and] they don't believe diversity is the end-all and be-all."

In addition to quoting  McInnes's statements and its statistical analysis of comment threads on

white nationalist websites, Article 4 reports that he has interviewed and complimented extremists,

including Jared Taylor, a self-avowed white nationalist "who [he has] called a 'super smart guy.'"

The Complaint does not identify any specific statement in Article 4 as defamatory. Rather,

it alleges that Article 4 defames McInnes by associating him with more "extreme racist views" of

far-right figures like Jared Taylor (including by an illustration of a maze connecting McInnes (on

the outside) with Jared Taylor (on the inside) via a red arrow).  Compl. ¶ 258. The Complaint also

alleges that the article defames McInnes by "giving readers the impression" that he could be

described as "Alt-Right"—which he claims has acquired a connotation of racism, *id.* ¶ 261—

despite the article's specific reference to "alt-lite figures like Gavin McInnes" and express

juxtaposition of the "alt-lite" to the "racist 'alt-right.'"

---

[82] Specifically, the article found that 11 of the 74 users cited McInnes as an influence.  McInnes was the fifth-most cited source (and the third-most cited individual, behind Jared Talyor and a man named Stefan Molyneux) among the more than 20 sources identified.

v.   June 8, 2018 Article: Hatewatch Staff Report: Last Month in
Europe: May 2018 (Compl. ¶¶ 229-33)[83]

This article ("Article 5") catalogues a broad array of events that occurred in Europe in May 2018, particularly those in which Americans played a role.  As Article 5's subtitle explains: "the following is a list of activities and events linked to American white supremacist, neo-Nazi, anti-LGBT, anti-immigrant and anti-Muslim groups and personalities in Europe."   The article is organized into separate sections for eight European countries and describes the activities of more than twenty different individuals and groups.  Article 5 describes a number of these actors in the body of the article where they are each specifically designated as either white supremacist, neo-Nazi, anti-LGBT, anti-immigrant, or anti-Muslim.  While McInnes is separately mentioned in the article as speaking at a march in support of British anti-Muslim activist Tommy Robinson, Article 5 does not apply any of these designations to him, noting only that "Gavin McInnes, the founder of the Proud Boys,* which SPLC lists as a hate group . . . spoke at the event."

McInnes claims he was defamed by this brief mention of the Proud Boys, which is coupled with a hyperlink to the SPLC Proud Boys Page—a page that, as described above, contains extensive links to mainstream reporting about the Proud Boys' confrontations and rhetoric. *See* Compl. ¶¶ 231-33.  Article 5 also contains a hyperlink to an article in *The Guardian* describing the demonstration and reporting McInnes's presence there.

vi.   July 25, 2018 Article: "Another Charlottesville?  Threats of
Violence Loom Over Upcoming Portland Proud Boys, Patriot
Prayer Rally" by Hatewatch Staff (Compl. ¶¶ 270-73)[84]

This article ("Article 6") recounts the violent rallies held by the Proud Boys and a group called Patriot Prayer throughout the Pacific Northwest over the course of 2018, as well as a

---

[83] Holliday Decl. ¶ 8 & Ex. 5.

[84] Holliday Decl. ¶ 9 & Ex. 6.

ratcheting up of violent rhetoric in the lead-up to additional rallies planned for August 4, 2018 in Portland, Oregon, and August 5, 2018, in Berkeley, California.  It includes a graphic, cataloguing and hyperlinking media reports about violence at previous events, and it cites examples from social media of the "markedly more aggressive tone" the groups' rhetoric had taken in the lead-up to the August rallies. In one social-media video, embedded in the article, a Proud Boy asserts both that "we're gonna have some swollen fists" and that counter-protestors are going to "get smacked." Article 6 also reports, in an update added a week after the original publication date, that McInnes issued a statement on behalf of the Proud Boys stating that they "disavow" the Berkeley event.

In addition, Article 6 includes links to prior SPLC reporting on similar rallies in Portland, which in turn link to the substantial press coverage of those events from outlets such as *Oregon Live* and *Willamette Week*.  And it embeds video footage from the leader of Patriot Prayer, Joey Gibson, opining that the Portland police would allow "mutual combat" at the August 2018 rally.

The Complaint claims that the article defames McInnes by falsely claiming that the Proud Boys (and, by implication, McInnes) are "threatening violence" at the Portland rally, "despite the contradictory information" about the group's disavowal of the event, Compl. ¶ 272,[85] and—again by implication—by falsely claiming that the Proud Boys had "talk[ed] of bringing weapons" and "threaten[ed] to make [the Portland rally] the most combustible yet."  *Id.* ¶ 273.

---

[85] Contrary to this allegation, the article in fact states that McInnes's disavowal pertained only to the Berkeley rally, not the Portland rally.

vii.   August 5, 2018 Article: "One Year Later: Leaders from 'Unite the Right' Fall From Grace" by Ryan Lenz (Compl. ¶¶ 263-69)[86]

This article ("Article 7") analyzes what it characterizes as changes in the "alt-right ecosystem" in the year after the Unite the Right rally.  While the bulk of the article is not about either McInnes or the Proud Boys, it does mention the various rallies held in the Pacific Northwest:

> Since early last year, the far-right groups Patriot Prayer and the Proud Boys (an SPLC-designated hate group) have held more than a dozen rallies throughout the Pacific Northwest under the banner of "freedom." These events have always been about exhibiting machismo, but—as political divisions in the country have grown—they've developed a more targeted purpose: far-right activists taking out their aggression on political opponents. As Proud Boys founder Gavin McInnes once put it, "Fighting solves everything."

The paragraph contains a hyperlink to another SPLC article detailing McInnes and the Proud Boys' history with violence, and linking to a press report describing a violent incident following a McInnes speech at New York University in February 2017, as well as quoting McInnes's appearance on a cable news program after that incident where he opined that he "cannot recommend violence enough" as a way to "solve problems."

The Complaint claims SPLC defamed McInnes in this paragraph when it "suggest[ed]" he was speaking literally when he concededly remarked that "[f]ighting solves everything," and when it "falsely descr[ibed]" the Proud Boys as "far-right," as a "hate group" and as "taking out its aggression on political opponents."  Compl. ¶¶ 264-68.

viii.   August 17, 2018 Article: "Kessler Falls Flat, But the Radical Right Marches On" by Rachel Janik (Compl. ¶¶ 234-39)[87]

This article ("Article 8") contrasts two separate rallies held in August 2018—the Proud Boys and Patriot Prayer's August 4 rally in Portland, discussed above, and Jason Kessler's sparsely

---

[86] Holliday Decl. ¶ 10 & Ex. 7.

[87] Holliday Decl. ¶ 11 & Ex. 8.

attended Washington, D.C. rally attempting to commemorate the one-year anniversary of Unite

the Right.  As is relevant to the Complaint, the article states that:

> The Proud Boys (an SPLC-designated hate group started by Vice co-founder, original hipster and self-described Islamophobe Gavin McInnes) and Joey Gibson's Patriot Prayer, have found great success recruiting converts to their cause in the Pacific Northwest with an approach that focuses on the same old reactionary politics and fear, just with fewer vulgar racist overtures and more Americana. And another thing: they offer their right-wing converts a chance to duke it out in the street with people they disagree with.

Article 8 contains a hyperlink to the SPLC Proud Boys Page, which itself contains a link to

McInnes identifying himself as "Islamophobic," as well as links to Articles 3 and 4, which, as

described above, themselves contain a wealth of primary sources and press reporting about both

the Proud Boys' recruiting processes and the group's history with violence.  Article 8 also includes

links to press reports regarding the Proud Boys' activities in Berkeley and Portland, including

articles published in (among other sources) *Berkleyside*, *Willamette Week*, and *The Daily Beast*.

The Complaint purports to identify five defamatory statements in the referenced paragraph,

alleging that the article falsely states: (i) that the Proud Boys (and by extension McInnes) are a

"hate group"; (ii) that the Proud Boys (and by extension McInnes) "recruit converts to their cause

in the Pacific Northwest with an approach that focuses on the same old reactionary politics and

fear"; (iii) that the Proud Boys (and by extension McInnes) "make right-wing converts"'; (iv) that

the Proud Boys (and by extension McInnes) "offer their [converts] a chance to duke it out in the

street with people they disagree with"; and (v) that McInnes is an "'Islamophobe' as the word is

used and understood on the website."  Compl. ¶¶ 235-39.

ix.   October 13, 2018 Article: "Far-right Skinheads Join Proud Boys in
      Assaulting Protestors in New York City Following Gavin McInnes
      Event" by Rachel Janik (Compl. ¶¶ 274-81)[88]

This article ("Article 9) reports on the altercation involving the Proud Boys after McInnes's

speech at the Metropolitan Republican Club in New York City.  In particular, Article 9 focuses on

the fact that several individuals associated with skinhead groups, including the so-called "211

Bootboys," took part in the altercation on the side of the Proud Boys.  The article goes on to

document connections between these men, the Proud Boys, and past violence, including noting

that McInnes was photographed with one of the men at an anti-Muslim rally in 2017.

The report describes and contains hyperlinks to several videos of the incident, noting that

"in one video, a far-right assailant in a group of at least 15 screams, 'Fa**ot!' as he kicks a person

lying curled up on the pavement," and in another, a man "says of his beating victim": "That son

of a bitch!  He was a fucking foreigner.'"  It also includes links to a sampling of the wealth of press

reports about the incident, including *The New York Times*.  Article 9 also shows a photograph of

McInnes posing with a member of 211 Bootboys who was present at the altercation.

The Complaint alleges that Article 9 defames McInnes by: (i) describing the Proud Boys

(and, by extension, McInnes) as a "far right group"; (ii) falsely claiming that McInnes "'brought a

samurai sword to his event' when in fact [he] . . . appeared with a toy sword"; and (iii) falsely

claiming that McInnes "attended 'an anti-Muslim rally' in 2017."  Compl. ¶¶ 275, 279, 281.

x.   October 18, 2018 Article: "Weekend Read: Violence and Hate,
     That's the Proud Boys in a Nutshell" (Compl. ¶¶ 282-91)[89]

This article ("Article 10") recaps the Proud Boys' October 2018 altercation in New York

City and provides an overview of the group's activities, including hyperlinks to many of the other

---

[88] Holliday Decl. ¶ 12 & Ex. 9.

[89] Holliday Decl. ¶ 13 & Ex. 10.

articles cited in the Complaint (which in turn contain links to video footage, social media content, and press articles from various sources about the group's history of violent incidents and connections to white nationalists).  The article also references these statements by McInnes:

> McInnes has denied that his group has any connection to the racist "alt-right," even as its members marched in Charlottesville, Virginia, alongside Richard Spencer, the most prominent alt-right leader.

> He's denied that the group is any different from other fraternal orders, like the Shriners or the Elks. But the Proud Boys calls its members "Western chauvinists," and they initiate prospective members by beating them up while requiring them to name five breakfast cereals.

> McInnes has also denied that the hate group seeks out violence, even as his thugs march alongside neo-Nazis and white supremacist hate groups. "We don't start fights, but we will finish them," he wrote last year.

> "We will kill you. That's the Proud Boys in a nutshell. We will kill you," he said on his Compound Media show in mid-2016.

> Groups like the Proud Boys represent a new face of the radical right. They relish street-fighting, simultaneously disavow the term "white nationalism" and embrace its central tenets, and they insist on calling their agenda simply one of "anti-political correctness" — a wild understatement that signals how far we seem to have wandered, in this political moment, from the facts.

In addition to the many links described above, Article 10 also quotes from a *New York Times* article about McInnes—the same article on which the Complaint extensively relies—in which an anti-racism expert is quoting as opining that the Proud Boys use "subterfuge and lies" to try to avoid being recognized as a hate group.

The Complaint challenges three statements in Article 10: (i) that it "falsely claims that the Proud Boys' 'members marched in Charlottesville, Virginia alongside Richard Spencer, the most prominent alt-right leader'"; (ii) that it falsely claims that the Proud Boys [and, by extension, McInnes] 'represent a new face of the radical right,' 'relish street fighting,' and 'embrace the central tenets of white nationalism'"; and (iii) that it "falsely describes [McInnes] as an 'extremist' whose [sic] utilizes 'subterfuge and lies.'"  Compl. ¶¶ 285-291.

xi.   "Change the Terms" Website (Compl. ¶¶ 118-43)

While not included in the section of the Complaint that purports to describe his defamation claim, McInnes also appears to take issue with the website for the "Change the Terms" coalition in which SPLC participates.  While the Complaint characterizes this website as "SPLC's," a brief perusal of it reveals that SPLC is just one of a number of advocacy groups that form the coalition, which also includes the Center for American Progress, Color of Change, Free Press, the Lawyers' Committee for Civil Rights Under Law, and the National Hispanic Media Coalition.[90]  In relevant part, the Change the Terms website catalogues examples of the use of social media to spread abuse (including noting that the "violent" Proud Boys employ Facebook for recruiting purposes) and explains that the coalition has conducted substantial research with the goal of developing model policies and terms of service so that "internet-based services are not places where hateful activities and extremism can grow."  Compl. ¶ 125.

The website also contains a photograph depicting several protesters at a Berkeley rally, which includes McInnes (who is not otherwise identified or described by name) raising his fist, next to text reading "[j]ust as the internet has created immense positive value by connecting people and creating new communities, it has also given new tools to those who want to threaten, harass, intimidate, defame, or even violently attack people different from themselves."  *Id.* ¶¶ 126, 141. Below this text is a button labelled "read the report," which links to a report describing the research conducted and conclusions reached.  On the mobile version of the site, the photograph appears on a page that elsewhere contains text reading: "hateful activities are those that incite or engage in violence, intimidation, harassment, threats or defamation targeting an individual or group based

---

[90] *See* Holliday Decl. ¶ 24 & Ex. 20 at 5-6.

on their actual or perceived race, color, religion, ethnicity, national origin, ethnicity, immigration status, gender, gender identity, sexual orientation, or disability." *Id*. ¶ 129.

The Complaint alleges that the "Change the Terms" website "falsely characterizes the Proud Boys as 'violent,'" *id*. ¶ 141, and that the photograph including McInnes "suggest[s] falsely that [he] is a militant leader of white supremacist hoodlums," *id*. ¶ 140.

### 2.   Other Claims

The Complaint also contains three other "tag-along" claims allegedly arising from the same SPLC "hate group" designation and publications.  The first of these is for tortious interference with economic advantage (Count I), and is centered on McInnes's allegation that SPLC's various publications caused him to be "deplatformed"—that is, blocked from using various means of communicating with the public, in particular via social media—as well as fired from his talk-show hosting job. *See id*. ¶¶ 181, 200, 205, 208.

The second claim is for false light invasion of privacy (Count III) which, after incorporating by reference the allegations of the defamation claim, concludes that, "by virtue of the foregoing alleged conduct, defendant SPLC placed Mr. McInnes in a false and defamatory light that is offensive to a reasonable person." *Id*. ¶ 296.

Finally, the Complaint purports to assert a claim that SPLC has "aided and abet[ted]" a violation of a New York Labor Law statute that prohibits discrimination against employees based on their "lawful leisure-time activity" (Count IV).  *Id*. ¶ 301.  In support of this claim, the Complaint alleges that a prior employer, BlazeTV, illegally fired McInnes because of his association with the Proud Boys, and that "the conduct of SPLC in procuring Mr. McInnes's dismissal from employment because of his involvement in a protected recreational activity was a violation of or constituted aiding and abetting of a violation of" the New York statute. *Id.* ¶ 303.

33

**ARGUMENT**

To survive a motion to dismiss, a plaintiff must set forth factual allegations sufficient plausibly to allege each element of the stated cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). These factual allegations must "'raise a right to relief above the speculative level.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). As a result, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557); *see also Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (rejecting "conclusory" allegations in defamation case).

In this Circuit, rigorous application of the plausibility standard takes on particular importance in cases, such as this one, arising from speech that implicates constitutional rights. As the Court of Appeals recently explained, "the plausibility pleading standard makes particular sense when examining public figure defamation suits." *Michel*, 816 F.3d at 702. This is because, in such cases, "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation" and "[f]orcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict th[e] breathing space" that is "needed to ensure robust reporting on public figures and events." *Id.* Such claims are also susceptible to early judicial resolution for a more practical reason: "[U]nlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage. He or she may assess it upon a motion to dismiss, firsthand and in context." 2 Robert D. Sack, *Sack on Defamation* § 16.2.1 at 16-3 (5th ed. 2018). As Judge Sack has documented in his authoritative treatise on the subject, courts frequently dismiss defamation claims on a motion to dismiss where, as here, an examination of the challenged statements, in the context in which they were disseminated, demonstrates either

that the plaintiff has not (and often cannot) plausibly allege actual malice or that the statements themselves are not actionable as a matter of law. *Id.*; *see also Turner*, 879 F.3d 1254 (affirming dismissal of defamation claims for failure plausibly to plead actual malice and because the challenged statements were non-actionable opinion); *Michel*, 816 F.3d at 702-706 (affirming dismissal of defamation claims for failure plausibly to plead actual malice).

I.   **THE COMPLAINT FAILS TO STATE A VALID DEFAMATION CLAIM**

A.   **The Complaint Does Not Allege Facts That, If Proven, Would Plausibly Establish Actual Malice**

In claims for defamation or other torts seeking to recover for the alleged reputational harm arising from speech, the First Amendment distinguishes private figures from public figures. Public figures are those individuals "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention," assume a place on the public stage and thereby both "run[] the risk of closer public scrutiny" and achieve "access to the channels of effective communication" to correct alleged falsehoods published about them. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-44 (1974). In light of our "profound national commitment" to the "uninhibited, robust, and wide open" debate of controversial issues, those who have chosen to engage in public endeavors or participate in public debate accept a greater risk of critical comment and scrutiny. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). To prevail in a defamation action, therefore, such public figures must plead, and ultimately prove, by clear and convincing evidence, "actual malice"—a term of art that encompasses not personal spite or ill will, but rather whether the defendant actually "entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Turner*, 879 F.3d at 1273 (internal marks omitted).

The actual malice standard is not an objective one; the beliefs or actions of a hypothetical reasonable person are irrelevant. *Michel*, 816 F.3d at 702-03 (citing *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). "Rather, courts ask whether the defendant … *actually* entertained serious doubts as to the veracity of the published account, or [*actually*] was highly aware that the account was probably false." *Id.* (emphasis added). The plaintiff bears the ultimate burden to prove actual malice by "clear and convincing" evidence. *Id.* This heightened burden of proof must of necessity be taken into account when applying the plausibility pleading standard. *See id.* at 702.

1.    McInnes Is a Public Figure

It is a question of law for this Court to decide whether McInnes qualifies as a public figure. *Michel*, 816 F.3d at 702. There can be no serious debate that he does. A public figure is someone who "voluntarily place[s] themselves in a position and act[s] in a manner which invite[s] public scrutiny and comment." *Silvester v. ABC, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988); *accord Gertz*, 418 U.S. at 342. By his own admission, McInnes "has been a controversial figure in the news media for nearly 20 years." Compl. ¶ 23; *see also supra* at 5-11. The Complaint details his activities as a well-known "performer and commentator," on-air host of various radio and television shows, and prolific author, Compl. ¶¶ 23-24, and points to multiple examples where his conduct has been subject to public scrutiny entirely independent of the SPLC's description of the Proud Boys or the Articles he claims are defamatory, Compl. ¶¶ 23, 25-29, 36-37, 163-65. Accordingly, McInnes is a public figure required to prove actual malice. *Michel*, 816 F.3d at 702.

2.    The Complaint Does Not Plausibly Allege Actual Malice

With respect to both the Hate Group and Specific Claims, the Complaint fails to allege *any* facts supporting its conclusory assertion that SPLC published either its characterization of the Proud Boys or any of the other challenged statements with actual malice. Indeed, despite its length, the Complaint contains only a single allegation of actual malice—and that allegation is wholly

conclusory.  *See* Compl. ¶ 293 ("SPLC made the foregoing false and defamatory statements with knowledge of or in reckless disregard of their falsity, or both.").

This type of boilerplate allegation is inadequate as a matter of law.  *See, e.g.*, *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to [state a claim] . . . requires more than labels and conclusions ….").  As the Court of Appeals has emphasized, "every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice."  *Michel*, 816 at 702 (citing *Biro v. Condé Nast*, 807 F.3d 541, 544-45 (2d Cir. 2015); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012)).  Indeed, the federal courts have uniformly dismissed cases, such as this one, in which the complaint's allegations of actual malice consist of little more than "actual malice buzzwords."  *See, e.g.*, *Turner*, 879 F.3d at 1273 (allegations that defendants "knowingly and recklessly" ignored information insufficient to plead actual malice); *Schatz*, 669 F.3d at 56 (affirming dismissal where defamation complaint merely "used actual-malice buzzwords" that were not "backed by well-pled facts"); *Mayfield*, 674 F.3d at 378 (assertion that defendants' allegedly defamatory statements "were known by [them] to be false at the time they were made, were malicious or were made with reckless disregard as to their veracity is entirely insufficient.")

Because paragraph 293 of the Complaint is a textbook example of a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, McInnes's defamation claim must be dismissed. Moreover, dismissal should be **with prejudice**, because any attempt at re-pleading would be demonstrably futile.  It has been

extensively reported (as documented in great detail on, among other places, the SPLC Proud Boys Page) that both McInnes and the Proud Boys have used incendiary racial and religious slurs; made anti-LGBTQ, anti-Asian, misogynist, and anti-Semitic statements; disseminated threats of and paeans to violence; and published references to white supremacist conspiracy theories.  *See supra* at 5-19.  Both the SPLC Proud Boys Page and the Articles themselves extensively document these statements and activities, though hyperlinks and other referenced sources, all of which are properly before the Court on this motion.  *See, e.g.*, *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1319 (S.D. Fla. 2018) (considering records referenced by online report through hyperlink); *Adelson v. Harris*, 876 F.3d 413, 415 (2d Cir. 2017) (hyperlink was sufficient to incorporate linked material into publication at issue); *Adelson v. Harris*, 402 P.3d 665, 670 (Nev. 2017) (same).  These cited and hyperlinked sources collectively render implausible, as a matter of law, any allegation that SPLC disseminated its characterization of the Proud Boys as a hate group, much less any of the specifically challenged statements, despite being "highly aware that the account was probably false."  *Turner*, 879 F.3d at 1273.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) ("It is the law in this Circuit that when the exhibits [to a complaint] contradict the general and conclusory allegations of the pleading, the exhibits govern." (citation omitted)).[91]

### B.      The Hate Group Claim is Not "Of and Concerning" McInnes

A defamation plaintiff bears the burden of pleading and proving that the alleged defamation is about or, put differently, "of and concerning" him or her.  *Elias v. Rolling Stone, LLC*, 872 F.3d

---

[91] It is well settled that "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law."  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) ("The subjective awareness of probable falsity required by [the Supreme Court] cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied."); *Sack on Defamation* § 5:5.2 at 5-104 ("An author or publisher may rely on previously published accounts in reasonably reliable sources.").

97, 104 (2d Cir 2017); *accord, e.g.*, *Gilman v. Spitzer*, 538 F. App'x 45, 47 (2d Cir. 2013) (summary order).[92]  Moreover, where, as here, the alleged defamation involves a matter of public concern, the First Amendment requires the plaintiff to demonstrate that he or she was "clearly identifiable" as the challenged statement's subject.  *Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (citation omitted).  "This burden is not a light one," *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 65 N.E.3d 35, 37 (N.Y. 2016), and "[t]he 'of and concerning' requirement stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory," *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006).  Whether a statement is "of and concerning" the plaintiff is a question of law that "should ordinarily be resolved at the pleading stage."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

The Hate Group Claim is obviously not "of and concerning" McInnes in a literal sense— it is, by its very terms, about a *group*, the Proud Boys, and not an individual.  This disconnect is legally significant because an allegedly false statement about an entity is not actionable by those associated with it.  *See, e.g.*, *Gilman*, 538 F. App'x at 47 (allegations of illegal activity by company and its "employees" were not "of and concerning" senior executive); *Fulani v. N.Y. Times Co.*, 686 N.Y.S.2d 703, 703 (App. Div. 1999) (statement defaming political group not "of and concerning" its coordinator).  As the D.C. Circuit has emphasized:

> [D]efamation is personal; . . . Allegations of defamation by an organization and its members are not interchangeable. Statements which refer to individual members of

---

[92] Subject to constitutional limitations, New York law governs the substance of each of McInnes's claims.  A district court sitting in diversity looks to the choice-of-law rules of the forum state. *Rosa & Raymond Parks Inst. for Self Dev. v. Target Corp.*, 812 F.3d 824, 829 (11th Cir. 2016).  In tort cases, Alabama generally applies "*lex loci delicti* . . . the law of the state where the injury occurred." *Fitts v. Minn. Min. & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991); *see also Target Corp.*, 812 F.3d at 829.  And in the case of an "aggregate communication" such as one distributed over the Internet, the primary place of injury is generally considered to be the domicile of the plaintiff—here, New York. *See, e.g.*, Restatement (Second) of Conflict of Laws § 150(2) (2019).

an organization do not implicate the organization. By the same reasoning, statements which refer to an organization do not implicate its members.

*Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (quoting *Provisional Gov't of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) (also cited in *Fulani*)). Accordingly, in *Jankovic*, the court rejected the contention that "the namesake of a corporation can be defamed when false misdeeds are attributed to his company." *Id.* The same reasoning governs this case. Designation of the *Proud Boys* as a hate group by its terms applies to the organization, and the law does not allow McInnes to treat it as "of and concerning" him, notwithstanding that he is the group's founder and is otherwise associated with it.[93]

Clearly aware of this disconnect, the Complaint alleges that McInnes has been defamed "by juxtaposition of his name and persona with that of the Proud Boys." Compl. ¶ 223. In essence, McInnes tries to argue a "transitive property of defamation": if the Proud Boys are designated as a hate group, and he has been identified with the Proud Boys, then he has been designated as a hate group. To read this syllogism is to discount it—the mere fact that an allegedly defamatory statement contains the word "group" is enough to conclude that no reasonable person could interpret it as being *about* McInnes, much less that he is "clearly identifiable" as the subject of that designation.[94] Nor does the Complaint offer any allegation that McInnes and the Proud Boys are somehow alter egos, or that any other form of legally cognizable synecdoche applies.

---

[93] The same analysis forecloses any claim McInnes might assert based on the Complaint's allegations regarding the "Change the Terms" website. *See supra* at 32-33. Those allegations state, in relevant part, that the website "falsely characterize[] the Proud Boys as 'violent.'" Compl. ¶ 141. But just as the designation of the Proud Boys as a "hate group" is not "of and concerning" McInnes himself, neither is the statement that the Proud Boys are "violent."

[94] Indeed, the Complaint itself recognizes that SPLC provides different designations for groups and individuals—even if those individuals are closely associated with groups. *See, e.g.*, Compl. ¶¶ 46, 111.

In the final analysis, the "of and concerning" requirement is designed to weed out defamation claims, like this one, that are based on alleged harm to a plaintiff's reputation resulting from purportedly defamatory statements made, not about them, but about other persons or groups with which they are affiliated. *See, e.g.*, *Jankovic*, 494 F.3d at 1089. As that court explained, statements directed at an entity, even if they "reflect[] poorly upon an individual" associated with it, are not "of and concerning" that person *unless* he is alleged to be "solely" responsible for the entity's conduct. *Id.* (citation omitted). There is no such allegation in the Complaint, nor could there be. Indeed, it affirmatively alleges the contrary—*i.e.*, that, as of November 2018, McInnes had "severed his connections with the Proud Boys." Compl. ¶ 38. Accordingly, the Hate Group Claim is not "of and concerning" McInnes as a matter of law and must be dismissed.

### C.     The Hate Group Claim is Non-Actionable Opinion

Because the First Amendment allows only provably *false* statements to be potentially actionable as defamation, subjective characterizations and opinions cannot give rise to a valid claim as a matter of law. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (a statement about a matter of public concern "must be provable as false before there can be liability under state defamation law, at least in situations like the present, where a media defendant is involved"). New York law goes even further—"unlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 178 (2d Cir. 2000). Under New York law, protected opinion can take either of two forms:

> It may be a statement of opinion which is accompanied by a recitation of the facts upon which it is based, or it may be an opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts. Conversely, an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, is a mixed opinion and is actionable.

*Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 384 (App. Div. 2017) (internal marks omitted) (quoting *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014)).   New York courts weigh three factors in determining whether a statement qualifies as opinion: (1) whether it is "capable of being proven true or false"; (2) whether it "has a precise meaning which is readily understood"; and (3) "whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Boeheim*, 22 N.E.3d at 1005.

While "[d]istinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task," *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995), it is not so here.   Indeed, the Complaint itself all but admits that SPLC's characterization of the Proud Boys as a hate group is correctly understood as an expression of opinion.   It expressly notes, for example, not only that "hate is in the eye of the beholder," Compl. at p. 11, but also the inherently "subjective nature of labeling hate groups," *id*. ¶ 73.   In this, if in little else, the Complaint is correct.   SPLC may bring its considerable judgment and experience to bear in this area, just as screen guild members might rate the "quality" of films in voting for an Oscar, food critics might evaluate the "taste" of dishes in awarding restaurant stars, or consumer bureaus may give a grade to local businesses.   One might ultimately disagree with such evaluations, debate them, or even denounce them in the court of public opinion.   But the Complaint's own allegations underscore the reality that characterizing a group as one whose views espouse hate is not, as an empirical matter, "provably false" as required under both the First Amendment and New York law for it to be actionable as defamation.   *Milkovich*, 497 U.S. at 19-20; *Boeheim*, 22 N.E.2d at 1004.

Not surprisingly, courts applying New York law have consistently recognized that characterizations such as "hate group" are classic expressions of subjective opinion and have

therefore consistently held statements asserting bigotry, racism, prejudice, and political extremism to be non-actionable opinion. *See, e.g.*, *Buckley v. Littell*, 539 F.2d 882, 893-95 (2d Cir. 1976) (description of plaintiff as "fascist" is "loose" and "ambiguous" and cannot be regarded as statement of fact because of "tremendous imprecision" of the term); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (statement "that Plaintiff was a racist or a future threat to others . . . is nonactionable opinion"); *O'Neil v. Peekskill Faculty Ass'n*, 507 N.Y.S.2d 173, 180 (App. Div. 1986) (holding that "characterizations of plaintiff's alleged statement as a 'reprehensible racial slur' and as an expression of 'bigotry'" were "classic examples of pure opinions"); *Covino v. Hagemann*, 627 N.Y.S.2d 894, 896-97 (Sup. Ct. 1995) (noting that "[a]ccusations of racism and prejudice" have routinely been held non-actionable).[95]

Moreover, even if the term "hate group" somehow could be construed as provably false, it would still be non-actionable opinion as presented by SPLC. That is because SPLC copiously documents the factual basis for its description of the Proud Boys as a hate group, both on the SPLC

---

[95] This is no quirk of New York law, but is well-established across the country. *See, e.g.*, *Sack on Defamation* § 2:4.7 at 2-47-48 & n.193; *Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, No. 2:07-CV-461, 2009 WL 10704261, at *39 (N.D. Ala. Feb. 23, 2009) (holding statement that plaintiff "was a 'racist' and a 'radical'" non-actionable and collecting cases); *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (calling a judge "anti-Semitic" was a non-actionable opinion); *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17-CV-441, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false.") (collecting cases); *Forte v. Jones*, 2013 WL 1164929, at *6 (E.D. Cal. Mar. 20, 2013) ("[T]he allegation that a person is a 'racist' . . . is not actionable because the term 'racist' has no factually-verifiable meaning."); *Edelman v. Croonquist*, No. 09-CV-1938, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010) ("[The] characterization of [plaintiffs] as racists is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation."); *Martin v. Brock*, No. 07-CV-3154, 2007 WL 2122184, at *3 (N.D. Ill. July 19, 2007) ("[U]nder Illinois law, statements of opinion that someone is racist 'fit comfortably within the immunity for name-calling' unless they imply the existence of undisclosed, defamatory facts." (citation omitted)); *Williams v. Kanemaru*, 309 P.3d 972 (Table), 2013 WL 4458887, at *2 (Haw. Ct. App. 2013) (accusation of racism based on disclosed facts not actionable for defamation); *Ward v. Zelikovsky*, 643 A.2d 972, 983 (N.J. 1994) (accusation that plaintiffs "hate[d] . . . Jews" non-actionable opinion); *see also, e.g.*, *Condit v. Clermont Cty. Rev.*, 675 N.E.2d 475, 478 (Ohio Ct. App. 1996) ("Numerous courts have concluded that allegations of fascism, anti-Semitism, or other accusations of ethnic bigotry are not actionable as defamation.") (citing cases).

Proud Boys Page and in the Articles.  *See Greenberg*, 62 N.Y.S.3d at 384 (discussing "a statement of opinion which is accompanied by a recitation of the facts upon which it is based").  These factual bases are largely drawn from the Proud Boys' own words and actions (none of which the Complaint can or does allege are false), as well as with hyperlinks to articles from reputable media sources, the "accuracy" of which SPLC would have no "obvious reasons to doubt." *St. Amant*, 390 U.S. at 732; *see also* note 91 *supra* (discussing permissible reliance on reported facts in context of actual malice).[96]  Thus, viewing SPLC's description of the Proud Boys in the full context in which it was published, including the links and documentation provided on the SPLC Proud Boys Page and in the Articles themselves, that characterization is non-actionable in defamation both because it is not subject to empirical proof and because it is a conclusion based on disclosed facts.[97]

The Complaint engages in a curious attempt to circumvent its own admission that the Hate Group Claim is a subjective opinion by alleging—at some length—that designation as a hate group by SPLC "is understood and treated as essentially an 'official' or empirical determination of fact

---

[96] "The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law . . . Indeed, as a form of attribution, a hyperlink provides benefits that a footnote does not. Unlike a footnote on a piece of paper—which merely provides one with directions to the source—the hyperlink instantaneously permits the reader to verify an electronic article's claims." *Adelson*, 973 F. Supp. 2d at 484.  Indeed, many courts have concluded that hyperlinked content is properly deemed part of a publication's overall context in a defamation action, including in determining that a challenged statement constitutes a protected opinion based on disclosed facts. *See, e.g.*, *Sandals Resorts Int'l Ltd. v. Google Inc.*, 925 N.Y.S.2d 407, 416 (App. Div. 2011) (allegedly defamatory statement in an email "is supported by links to the writer's sources"); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262 (D.D.C. 2013) (hyperlinking to earlier article sufficient to "incorporat[e] that article by reference and provid[e] the necessary context for the allegedly defamatory remark"); *Rehak Creative Servs., Inc. v. Witt*, 404 S.W.3d 716, 732 (Tex. Ct. App. 2013) ("[T]he linked documents are part of the context that must be taken into consideration when assessing what the website actually conveyed . . . .").

[97] The same is true with respect to any contention McInnes might make that the Change the Terms website has defamed him.  The Complaint, for example, appears to take umbrage at that website's positioning of a photograph that includes McInnes on the same screen with the statement that the internet has "given new tools to those who want to threaten, harass, intimidate, defame, or even violently attack people different from themselves."  Compl. ¶ 141.  For all of the reasons set forth above, this statement, even if it were "of and concerning" McInnes (which, for the reasons also explained above, it is not), constitutes a non-actionable opinion under both the First Amendment and New York law.

by a significant and material proportion of the public" and that a "reasonably prudent and typical person encountering SPLC's false and defamatory statements alleged herein, in the context in which SPLC published and continues to publish them, would understand them to be meant as statements of purported fact[.]"  Compl. ¶¶ 212, 223; *see generally id*. ¶¶ 212-22.  This attempt at alchemy—turning opinion to fact—fails on multiple levels.

First, it is well established that the fact/opinion determination is a question of law.  *Mann v. Abel*, 885 N.E.2d 884, 885 (N.Y. 2008) ("Whether a particular statement constitutes an opinion or an objective fact is a question of law.")  Thus, the Complaint's various allegations seeking to characterize the Hate Group Claim as "factual" are legal conclusions that are entitled to no deference on a motion to dismiss.  *See, e.g.*, *Gomer ex rel. Gomer v. Philip Morris Inc.*, 106 F. Supp. 2d 1262, 1268 (M.D. Ala. 2000) ("Unlike factual allegations, unsupported legal conclusions . . . are not admitted as true for the purposes of a motion to dismiss.").  Second, and more importantly, McInnes's assertion fundamentally misconstrues the fact/opinion analysis in two respects.  To begin with, under *Milkovich*, a statement must be "provably false" to be actionable—full stop.  *Milkovich*, 497 U.S. at 19-20.  That inquiry has nothing to do with how a statement is received or may be acted upon, and no amount of context can change a statement that cannot be proven false into one that can.  Moreover, New York law makes plain that context matters as a "signal [to] readers or listeners that what is being read or heard is likely to be ***opinion, not fact***." *Boeheim*, 22 N.E.3d at 1005 (emphasis added) (citation omitted).  In other words, the contextual factors work only in one direction—context can turn fact into opinion, but not the other way around.  Indeed, this is precisely the import of the New York Court of Appeals' unambiguous declaration that New York law provides *more* protection for expression of opinion than even the First Amendment.  *See, e.g.*, *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1282 (N.Y. 1991)

(New York law's consideration of context is designed to avoid "hypertechnical parsing of a possible 'fact' from its plain context of 'opinion'" in order to ensure that "the cherished constitutional guarantee of free speech is preserved."). Simply put, McInnes's attempt to invert the fact/opinion analysis has no basis in law or logic and must therefore be rejected.

### D. The Specific Claims Should Be Dismissed Under New York's Subsidiary Meaning Doctrine

As explained above, the Hate Group Claim must be dismissed because the Complaint fails to plead facts plausibly establishing actual malice, because it is not "of and concerning" McInnes, and because it is a non-actionable expression of opinion in any event. These defects are fatal not only to the Hate Group Claim, but to the Specific Claims as well. This is because, under the "subsidiary meaning" doctrine, if a court determines that the statements primarily challenged in a publication are not actionable, then other challenged statements that "merely impl[y] the same view" must also be dismissed, even if they are both provably false and defamatory. *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 595 (S.D.N.Y. 1996), *aff'd*, 238 F.3d 168 (2d Cir. 2001); *see also id.* at 594 ("[W]here a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication [which is non-actionable,] a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views'" (quoting *Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir. 1986))). This is true whether the primary statements are non-actionable as a matter of law (*e.g.*, they are opinion), because they are concededly true, or simply because they have not been challenged. *Id.* at 595.

In *Church of Scientology*, for example, the court dismissed such subsidiary claims after determining that a publication's primary contention—*i.e.*, that the challenged article had falsely alleged "that Scientology's purpose is making money by means legitimate and illegitimate"—was non-actionable. *Id.* The court so held even though it concluded that one of the challenged

statements otherwise presented a fact issue as to both defamation and actual malice.  *Id.*  Because that specific statement "merely implie[d] the same view which [the court had] held to be nonactionable," claims based on it were properly subject to dismissal.  *Id.*

The same result obtains here, for the same reasons.  The overarching, allegedly defamatory statement challenged by the Complaint is SPLC's designation of the Proud Boys as a hate group.  *See* Compl. ¶¶ 13-14.  That statement is non-actionable for all of the reasons set out above.  The Specific Claims, which the Complaint itself concedes consist entirely of statements tending to support that view, *see supra* at 21-33 (summarizing articles and challenged statements), are simply subsidiary aspects of that overarching characterization.[98]  Put differently, even if all of the statements on which the Specific Claims are based were excised from the challenged Articles, their gist or sting would remain unchanged.

This conclusion is buttressed by the innumerable statements that McInnes does *not* challenge.  These statements include, first and foremost, the voluminous primary source materials directly cited or linked to in the Articles themselves—*i.e.*, the Proud Boys' and McInnes's own statements and conduct.  To take just the most obvious example, the Complaint does not challenge a single specific statement made on the SPLC Proud Boys Page, which, through hyperlinks and other citations, cogently and extensively lays out SPLC's case for why it considers the Proud Boys to be a hate group.  McInnes's failure to grapple with the Proud Boys Page alone demonstrates that the overarching thrust of SPLC's publications about him and the Proud Boys would be the same with or without the statements on which he bases the Specific Claims.

---

[98] In fact, at least five of the thirty-plus Specific Claims are *literally* the same as the Hate Group Claim, *i.e.*, that SPLC's designation of the Proud Boys as a hate group defames McInnes.  *See* Compl. ¶¶ 231, 235, 246, 265, 283.

Thus, the Court need not evaluate each of the dozens of Specific Claims in order to conclude that the Complaint should be dismissed in its entirety, with prejudice. Nonetheless, Section I.E., below, explains why, as a matter of law, each and every one of the Specific Claims must also be dismissed even when considered individually.

### E. The Specific Claims Each Fail as a Matter of Law When Considered Separately

As noted above, *see* note 98 *supra*, several of the Specific Claims are *identical* to the Hate Group Claim and must therefore be dismissed for all the same reasons. Each of the Specific Claims also fails to state a valid cause of action for one or more *additional* reasons—*i.e.*, because it is, on its own terms, either an expression of opinion, substantially true, not "of and concerning" McInnes, not reasonably construed as conveying a defamatory meaning, and/or could only cause incremental harm to McInnes. *See generally* Addendum.[99]

#### 1. Opinion

Like the Hate Group Claim, many of the Specific Claims arise from statements that are not provably false or otherwise constitute non-actionable opinion. *See* Section I.C *supra*; *see generally* Addendum. For example, McInnes claims to be defamed by a statement that the Proud Boys "approach" to recruiting new members "focuses on the same old reactionary politics and fear," Compl. ¶¶ 234, 236, and that he is an "Islamophobe," *id.* ¶¶ 234, 239. Such characterizations—of politics as "reactionary" or of McInnes as anti-Islam—are classic expressions of subjective opinion that are protected by the First Amendment and under New York law. As one court explained:

---

[99] Given the sheer number of statements challenged in the Complaint, filed as an Addendum to this Memorandum for the Court's convenience is a chart addressing each of the specific statements alleged to be defamatory, in the order they are set out in the Complaint ("Addendum"). The Addendum catalogues the specific legal bases—beyond the failure to plead actual malice, the subsidiary meaning doctrine, and the incremental harm doctrine—pursuant to which the Complaint fails to state a claim with respect to each Specific Claim.

> To say that one is unfair to labor is not a statement of a fact, but of an opinion.  Likewise to say of one: you are reactionary, you are undemocratic, you are a nationalist, you are an isolationist, you are a New Dealer, you are a Union Leaguer, you are opposed to labor, you are a coddler of labor, is similarly to express an opinion.

*Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 598 (D.C. 2000) (quoting *Montgomery Ward & Co. v. McGraw-Hill Publ'g Co.*, 146 F.2d 171, 176 (7th Cir. 1944)); *see also supra* at 43 & n. 95 (citing well-established precedent in New York and around the country that characterizations of bias or racism are non-actionable).  Similarly, although the Complaint challenges the statement that McInnes "perpetuated racist memes," Compl. ¶ 248, whether or not a particular meme is "racist" constitutes a subjective appraisal that is simply not subject to empirical proof.  *See supra* at 43 & n. 95.

The Complaint's fundamental misunderstanding of defamation law—*i.e.*, that it can properly serve as a mechanism to litigate points of view rather than to seek redress for empirically provable falsehoods—is perhaps best illustrated by its assertion that a graphic depicting McInnes somehow defames him.  Compl. ¶¶ 257-58.  The Complaint describes the graphic as "a red arrow winding through a black maze against a white background —evoking the colors and geometry of the Nazi flag —that starts with Mr. McInnes and leads to alt-right radical Jared Taylor."  *Id.* ¶ 257. This image—a visual representation of SPLC's stated opinion (in the article it accompanies) that exposure to McInnes's rhetoric is problematic because it can serve as a pathway to more extreme groups and personalities (like Jared Taylor)—is self-evidently based on "a recitation of the facts upon which it is based" in that accompanying article.  *See Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986); *see also* Holliday Decl., Ex. 4.

Specifically, Article 4 is expressly constructed around a question: "What brings someone into the alt-right ecosystem?"  The article then examines the postings of individual users on a white

nationalist on-line forum and recounts their own descriptions of "their radicalization narratives." *Id*. at 1-2. It reports that, of the seventy-four people who described their path to the Alt-Right, eleven mentioned McInnes as "an influence that led them to the 'movement.'" *Id*. at 6. Based on these disclosed facts, the article opines that "[t]he respondents in these threads show how the current media landscape – replete with podcasts, YouTube channels and blogs that contain tempered bits of white nationalist propaganda under the guise of patriotism, Western chauvinism, science or hard truths – can aid that agenda, coaxing the 'normies' down the path to white nationalism." *Id*. That conclusion, and the graphic representation of it that the Complaint purports to challenge, each constitute classic, non-actionable expressions of opinion based on disclosed facts.

The Complaint similarly takes issue with statements that the Proud Boys offer recruits a chance to "duke it out in the streets," Compl. ¶ 238, or that they are "looking to rumble," *see id.* ¶¶ 241, 254, or "relish street-fighting," *id.* ¶¶ 287, 289. But these statements are all contained within articles that base such assessments on disclosed facts, from the founding of a "tactical defense arm" of the Proud Boys with an emphasis on "defense and confrontation," to discussions and links to news reports about prior street violence involving Proud Boys. *See* Holliday Decl. Ex. 1; *see also id.* Exs. 2, 6, 7, 8, 10. Accordingly, such statements constitute non-actionable opinions based on disclosed facts.

### 2. Substantial Truth

In cases, like this one, that involve speech about matters of public concern, a defamation plaintiff has the burden of establishing *substantial* falsity. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). The "substantial" adjective is important, as a matter of both constitutional and New York law: "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker*

*Magazine, Inc.*, 501 U.S. 496, 517 (1991) (citation omitted); *see also Tannerite Sports, LLC v. NBC Universal News Grp.*, 864 F.3d 236, 243 (2d Cir. 2017) ("'Substantial truth' is the standard by which New York law … determines an allegedly defamatory statement to be true or false."). A statement is substantially true if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite Sports, LLC*, 864 F.3d at 242.

Several of the challenged statements are non-actionable because, as the allegations of the Complaint itself reveal, they are substantially true. *See generally* Addendum. For example, McInnes claims to be defamed by a statement that members of the Proud Boys marched in Charlottesville with Richard Spencer. Compl. ¶ 286. The same paragraph of the Complaint in which that claim is asserted also acknowledges that the Proud Boys "expelled four members for attending the event." *Id.* It is, therefore, concededly (and literally) true that Proud Boys members marched in Charlottesville, as did Richard Spencer. *See, e.g.*, *Pitcock v. Kasowitz, Benson, Torres & Friedman LLP*, 903 N.Y.S.2d 43, 45 (App. Div. 2010) (defamation claim dismissed where plaintiff's "pleading . . . effectively admitted" accuracy of challenged statement).

Similarly, McInnes claims to be defamed by being described as an "Islamophobe," Compl. ¶ 239, but he does not (and cannot) dispute that he has referred to himself in precisely that manner in published interviews. *See* note 9 *supra*. And while McInnes denies calling Asian American "'slopes' and 'riceballs' on FOX News or the VDARE website," Compl. ¶ 256, this statement is substantially true as well. As McInnes well knows, an article under his byline used precisely these slurs to describe Asian Americans—albeit in *Taki's Magazine*, rather than on VDARE. *See* note 7 *supra*; *see also* Holliday Decl. ¶ 28. A statement that McInnes called Asian Americans "slopes" and "riceballs" in *Taki's Magazine* would have absolutely the same effect on a reasonable reader as an assertion that he did so on VDARE. Accordingly, the challenged statement is substantially

true as a matter of law.  *Tannerite Sports*, 864 F.3d at 243 ("[L]ibel law is not a system of technicalities . . . ." (citation omitted)).

### 3.   The "Of and Concerning" Requirement

As explained in Section I.B *supra,* under both constitutional and New York law, only the subject of an allegedly defamatory statement may assert a claim based on that statement. In addition to precluding McInnes from pursuing his Hate Group Claim, this "of and concerning" requirement bars several of the Specific Claims as well.  *See generally* Addendum.

For example, McInnes claims he was defamed because Article 10 reported that "Proud Boys' 'members marched in Charlottesville, Virginia alongside Richard Spencer, the most prominent alt-right leader.'"  Compl. ¶ 285.  Even if this statement were not *true* (which, for the reasons stated above, it is), it is simply not *about* McInnes.  Rather, it addresses what some *other* members of the group did on a specific occasion.  No reasonable reader would think a statement that unnamed members of the Proud Boys marched in Charlottesville was *about* McInnes. *See Gilman v. Spitzer*, 902 F. Supp. 2d 389, 394 (S.D.N.Y. 2012) ("It is essential that the allegedly defamatory comment refer to the plaintiff." (internal marks and citation omitted)), *aff'd*, 538 F. App'x 45 (2d Cir. 2013).  The same is true with respect to the Complaint's multiple allegations that challenged statements regarding recruitment efforts *by the Proud Boys*, Compl. ¶¶ 236-38, or the Proud Boys' proclivity for street altercations, *id.* ¶¶ 241, 245, 252, 267, 272, 287, are somehow "of and concerning" McInnes.  They are not.

### 4.   Defamatory Meaning

Under New York law, "it is for the court to decide . . . whether the offending words pleaded in a libel action are susceptible of a libelous meaning."  *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986).  In so doing, challenged statements must be read in the context of the entire publication in which they are contained and without straining to give the publication either an

innocent or a defamatory construction. *James v. Gannett Co.*, 353 N.E.2d 834, 838 (N.Y. 1976). A statement is defamatory only if it would "expose[] an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... induce[] an evil opinion of one in the minds of right-thinking persons, and deprive[] one of confidence and friendly intercourse in society.'" *Celle*, 209 F.3d at 177.  If a statement is "not reasonably susceptible" of such a defamatory meaning, it is not actionable as a matter of law and "cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985).

Several of the Specific Claims challenge statements that are not defamatory as a matter of law. *See generally* Addendum.  For example, McInnes challenges the statement in Article 9 that he "brought a samurai sword" to a speaking engagement. Compl. ¶ 279.  But the article's assertion that McInnes used a sword as a prop at a speaking event—whether or not it was a toy, as the Complaint alleges—would not expose him to public hatred or shame. The article contains no assertion or suggestion that McInnes either used or intended to use it to hurt or threaten anyone. Similarly, in the year 2019, it can hardly be claimed that being described as "right-wing," even if that description were capable of being proven false, is defamatory.  *Id*. ¶ 237.

Moreover, several of the challenged statements cannot reasonably be construed to convey the defamatory meaning the Complaint ascribes to them.  For example, McInnes contends that Article 6 asserted that the Proud Boys were "threatening violence" at an upcoming rally.  *Id*. ¶ 272. The portion of the article in which the quoted language appears, however, nowhere contains such an assertion—rather, it states that "threats of violence loom over" the rally due to multiple, expressly elaborated factors, none of which involved the Proud Boys making any threat.  Where,

as here, McInnes has simply mischaracterized what the Articles say to allege a defamatory meaning where none exists, his claims must fail.

5.     New York's "Incremental Harm" Doctrine

The "incremental harm" doctrine, applicable under New York law, provides that "when unchallenged or non-actionable parts of a publication are damaging, an additional statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm." *Behar*, 238 F.3d at 176; *see also Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 387 (S.D.N.Y. 1998) ("This doctrine measures the difference between the harm caused by non-actionable statements when compared with the harm caused by purportedly actionable statements and dismisses the latter when the difference is incremental."). In other words, "if a communication contains enough true or unchallenged derogatory material about the plaintiff so that additional defamatory statements of questionable accuracy do not add materially to the overall defamatory impact of the statement, the publication is not actionable." 1 *Sack on Defamation* § 2:4.18 at 2-86.

To the extent that the Court dismisses most, but not all, of the Specific Claims for one or another of the grounds described in this section and in the Addendum, it could not reasonably be contended that any remaining statement injured McInnes's reputation in more than an incremental manner.  As a result, under New York's incremental harm doctrine, the claims based on those statements must be dismissed as well because, by definition, their publication cannot be said to have caused him any "appreciable additional harm," *Behar*, 238 F.3d at 176.

## II.     McINNES'S NON-DEFAMATION CLAIMS SHOULD ALSO BE DISMISSED

### A.     Counts I, III, and IV Are Subject to the Same First Amendment Protections as the Defamation Count

In Counts I, III and IV, McInnes pleads tortious interference with economic advantage, false light invasion of privacy, and aiding and abetting a violation of New York's labor laws—all

arising from the same statements and publications that undergird his defamation claim.  Thus, in Count III (false light invasion of privacy), the Complaint alleges that, "[b]y virtue of the foregoing alleged conduct, defendant SPLC placed Mr. McInnes in a false and defamatory light that is offensive to the reasonable person."  Compl. ¶ 296.  Count IV (aiding and abetting employment discrimination) similarly alleges that, "[a]s alleged above," where the Complaint describes SPLC's various public statements and publications about the Proud Boys, "SPLC targeted Mr. McInnes, and acted to cause him to be dismissed from his employment in the City of New York and to discourage or intimidate other employers from hiring Mr. McInnes because of his past involvement with the Proud Boys."  *Id*. ¶ 300.  And, in Count I (tortious interference), the Complaint claims, again "as alleged above," where it recounts various challenged statements and publications, that SPLC "selects, attacks and destroys targets such as Mr. McInnes as part of 'an effort to hold them accountable for their rhetoric and the ideas they are pushing.'"  *Id*. ¶ 203; *see also*, *e.g.*, *id*. ¶ 141 (allegations regarding the Change the Terms website).

The Supreme Court, however, has directed that the First Amendment-based safeguards that limit the reach of the defamation tort govern *all* claims seeking to recover damages for reputational injury, regardless of how those claims are styled.  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51-57 (1988).  Put another way, "a plaintiff may not avoid the protection afforded by the Constitution . . . merely by the use of creative pleading."  *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) (holding that constitutional standards governing defamation claims "must equally be met for a tortious interference claim based on the same conduct or statements"); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013) (First Amendment precludes claims for false light and tortious interference based on defendants' non-defamatory speech); *Food Lion, Inc. v. Capital Cities/ABC,*

*Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (plaintiff could not "recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim" because "such an end-run around First Amendment strictures is foreclosed by *Hustler*"); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) ("claims for product disparagement, or 'trade libel,' and for tortious interference with business relationships" arising from published statements about plaintiff's product "are subject to the same first amendment requirements that govern actions for defamation").

At bottom, the three "tag along" claims asserted in the Complaint are based on the same fundamental contention that undergirds the defamation claim—*i.e.,* that SPLC's designation of the Proud Boys as a "hate group" and various statements contained in the Articles injured McInnes's reputation and caused him to sustain a variety of harms as a result, ranging from emotional distress to the loss of employment.  For all of the reasons that the defamation claim fails, therefore, *see* Section I *supra*, Counts I, III and IV must be dismissed as well.

## B.  The Non-Defamation Claims Also Fail on State-Law Grounds

### 1.  Intentional Interference with Economic Advantage

In addition to the First Amendment's bar on a plaintiff's ability to "end-run" the limitations it places on defamation actions, *Food Lion¸*194 F.3d at 522, New York law is equally clear that a "[p]laintiff is not permitted to dress up a defamation claim as a claim for intentional interference with a prospective economic advantage," *Krepps v. Reiner*, 588 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (applying New York law), *aff'd*, 377 F. App'x 65 (2d Cir. 2010); *see also Pasqualini v. MortgageIT, Inc.,* 498 F. Supp. 2d 659, 670 (S.D.N.Y. 2007) ("New York Courts have consistently ruled that a claim which is ostensibly based upon the intentional torts of interference with advantageous or contractual relations, but which alleges injury to reputation, is a disguised

defamation claim." (citation omitted)).  That is exactly what McInnes has done here and Count I must be dismissed under New York law for the same reasons that preclude his defamation claim.

In addition, McInnes fails to plead a plausible claim. The elements of a tortious interference claim under New York law are: (1) "the plaintiff had business relations with a third party"; (2) "the defendant interfered with those business relations"; (3) "the defendant acted either with the *sole purpose* of harming the plaintiff" or interfered by using "means amount[ing] to a crime or an independent tort"; and (4) damages.  *See Thorne v. Alexander & Louisa Calder Found.*, 890 N.Y.S.2d 16, 29-30 (App. Div. 2009) (emphasis added); *Amaranth LLC v J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 494 (App. Div. 2009).  McInnes has alleged only that he:

> had numerous protectable business interests prior to their destruction by reason of the conduct of SPLC, including but not limited to his highly remunerative employment by CRTV / Blaze TV, the promotional opportunities arising from that position and from his preexisting reputation as a humorist and social commentator, speaking opportunities across the globe, and the opportunity to raise money through operation of a YouTube channel.

Compl. ¶ 205.  He has made no plausible allegation that any specific statement by SPLC was the proximate cause of his alleged loss of economic advantage.  His alleged losses could have resulted from an endless number of other reasons, including the intensive news coverage he received from other sources or the decision-makers' disagreement with his widely published views. "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal marks and citation omitted).

Moreover, McInnes has failed adequately to plead, and cannot plausibly allege, the third element of New York's intentional interference tort, which requires that "the defendant acted *solely* out of malice or used improper or illegal means that amounted to a crime or an independent tort."  *Amaranth LLC*, 888 N.Y.S.2d at 494 (emphasis added).  In addition to the absence of any

57

viable independent tort claim (such as defamation), McInnes cannot plausibly allege that SPLC acted for the "*sole* purpose of harming" him.  Indeed, the Complaint itself acknowledges that SPLC had an additional, overarching purpose for publishing the challenged statements—*i.e.,* to monitor hate groups and thereby to inform the public about them and their activities.  *See, e.g.*, Compl. ¶¶ 39, 44. This obvious and wholly salutary motivation precludes, as a matter of law, any plausible contention that SPLC's "sole purpose" in disseminating either its designation of the Proud Boys as a hate group, or any of the other challenged statements, was to harm McInnes.

> 2. <u>False Light Invasion of Privacy</u>

Count III, the false light invasion of privacy claim, must also be dismissed on independent grounds.  New York simply does not recognize the tort.  *See Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 353 (N.Y. 1985) ("[T]here is no common-law right of privacy" in New York.).

> 3. <u>N.Y. Labor Law § 201–d</u>

McInnes fails to allege facts plausibly establishing a New York labor law violation for multiple reasons.  First, and most centrally, SPLC did not employ him.  New York Labor Law § 201-d prohibits discrimination based on certain employee activities undertaken outside of work. McInnes apparently alleges that he was fired because SPLC brought his involvement with the Proud Boys, through its publications, to the attention of his actual employer.  Thus, McInnes alleges what amounts to a cause of action for aiding and abetting the kind of discrimination forbidden under the statute.  The statute, however, is unambiguous that only an employer or employment agency may be held liable pursuant to its terms:

> Unless otherwise provided by law, it shall be unlawful *for any employer or employment agency* to refuse to hire, employ or license, or to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of … [listing of reasons].

N.Y. Lab. Law § 201-d(2) (emphasis added).

The Supreme Court has explained that, on the federal level, there is no presumption that a statutory scheme provides for aider-and-abettor liability.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180-82 (1994).  There is likewise no reason to presume that New York's statute implicitly provides aider-and-abettor liability, particularly where the express language applies only to employers and employment agencies.

Apparently recognizing this, the Complaint cites the wholly unrelated New York City Administrative Code § 8-107, titled Unlawful Discriminatory Practices, and New York City Administrative Code § 8-130, which governs construction of § 8-107.  Section 8-107 sets forth multiple bases on which employers may not discriminate, but neither administrative code provision references or incorporates the New York law on which Count IV is based or otherwise prohibits discrimination based on an employee's outside-of-work activities. Because there is no basis for holding an aider and abettor liable under the statutory scheme, Count IV must be dismissed.

The claim also fails on another ground.  As the Complaint itself acknowledges, there was substantial press coverage of McInnes and the Proud Boys prior to his alleged termination. *See generally supra* at 5-19.  Indeed, just a few weeks prior to his dismissal from Blaze TV on December 8, 2018, there was a spate of media reporting about the Proud Boys' October 12, 2018 violent interaction with protesters in New York City after McInnes's speech at the Metropolitan Republican Club.[100]  Given such obvious, alternative explanations for McInnes's termination, he

---

[100] For example, Article 10, through hyperlinks to an earlier SPLC report, notes that Gov. Andrew Cuomo issued a statement on October 14, 2018, asking the FBI to investigate the incident.  *See* Nick R. Martin, *These six New York officials are calling for action against the Proud Boys after NYC attacks*, SPLC, Oct. 16, 2018.  The hyperlinked SPLC article also cited and linked to an article from *The Daily Beast* reporting that the NYPD intended to bring criminal charges against nine Proud Boys. *See* Pervaiz Shallwani & Kelly Weill, *NYPD Looks to Charge 9 Proud Boys With Assault for Manhattan Fight*, The Daily Beast, Oct. 15, 2018.  *See* Holliday Decl. ¶¶ 88-89.

has not and cannot plead any facts plausibly establishing proximate causation of his termination

by SPLC. In fact, all he asserts is a bare conclusion:

> 166. On December 8, 2018, Mr. McInnes was fired from his primary place of employment, Blaze TV, which had recently acquired CRTV, where his program was among the top three most popular.

> 167. Mr. McInnes was given no reason for his termination, but upon information and belief, a proximate cause of it was SPLC's conduct as alleged above.

This is not enough.  "Factual allegations that are merely consistent with a defendant's liability fall

short of being facially plausible."  *Chaparro*, 693 F.3d at 1337 (internal marks and citation

omitted).  For this independent reason, too, McInnes has not plausibly alleged a viable Section

201-d claim.

WHEREFORE, for the foregoing reasons, SPLC respectfully requests that the Court

dismiss the Complaint in its entirety, with prejudice, and grant such other relief as it deems just

and proper.

   */s/ Shannon Holliday*          
Shannon Holliday [ASB-5440-Y77S]
Robert D. Segall [ASB-7354-E68R]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
Telephone:  334-834-1180
Facsimile:  334-834-3172
Email:  holliday@copelandfranco.com
Email:  segall@copelandfranco.com
Email:  maxymuk@copelandfranco.com

**Attorneys for Defendant Southern Poverty Law Center, Inc.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY on this 27th day of September, 2021, that I caused a copy of the foregoing Motion to Dismiss the Revised Amended Complaint and Memorandum of Law in Support Thereof, the accompanying Addendum, and the Declaration of Shannon L. Holliday and Exhibits thereto, to be served upon all counsel of record by filing same on the court's ECF system.

*/s/ Shannon L. Holliday*
Shannon L. Holliday