IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
GAVIN McINNES,               )
                             )
      Plaintiff,             )
                             )        CIVIL ACTION NO.
      v.                     )         2:19cv98-MHT
                             )            (WO)
THE SOUTHERN POVERTY LAW     )
CENTER, INC.,                )
                             )
      Defendant.             )
```

OPINION AND ORDER

Plaintiff Gavin McInnes filed this lawsuit against
defendant Southern Poverty Law Center, Inc. (SPLC),
alleging that SPLC defamed him, tortiously interfered
with his business, and invaded his privacy by casting him
in a false light.  He also alleges SPLC violated New York
labor law by aiding and abetting his employer in its
wrongful termination of his employment.  At the heart of
all four claims is McInnes's allegation that SPLC's
designation of the Proud Boys, an organization he
founded, as a "hate group" is false and defamatory.  Aside
from the hate-group designation, he also alleges that,
through dozens of statements that were published by SPLC

in ten different articles, SPLC defamed him, such as by calling the Proud Boys a "far-right group."  This case is, therefore, unlike others that turn one or two allegedly defamatory remarks.  Rather, it involves a whole host of different, allegedly defamatory statements.

The court allowed McInnes to amend his original complaint to assert proper jurisdiction over the three tort claims (tortious interference, false-light invasion of privacy, and defamation), and the New York labor-law claim, under 28 U.S.C. § 1332 (diversity).

The lawsuit is before the court on SPLC's motion to dismiss McInnes's later amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.


## I.   MOTION-TO-DISMISS STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff." *Michel*, 816 F.3d at 694.

The court, however, need not accept as true "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d. 1182, 1188 (11th Cir. 2002).  "Conclusory allegations are those that express 'a factual inference without stating the underlying facts on which the inference is based.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1268 (M.D. Ala. 2019) (Thompson, J.) (quoting *Conclusory*, Black's Law Dictionary (12th ed. 2024)), *aff'd,* 6 F.4th 1247 (11th Cir. 2021).

As recognized by the Eleventh Circuit Court of Appeals, the "application of the plausibility pleading standard makes particular sense when examining public figure defamation suits" such as this one, given that "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel*, 816 F.3d at 702.

In considering a motion under Rule 12(b), the court is generally limited to considering the operative complaint and its attachments. This rule has exceptions. For example, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim" or if certain documents are judicially noticeable under Federal Rule of Evidence 201, then the court "may consider [those] documents part of the pleadings." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Here, the amended complaint refers to and quotes from multiple news reports, including the SPLC publications

upon which McInnes bases his claims.  As a result, the full text of these referenced and quoted articles, Exhibits 1–11 (Doc. 49), is properly considered on a motion to dismiss, and both sides have relied on them.

## II. FACTUAL BACKGROUND

This case is about the alleged "destruction" of McInnes's reputation and ensuing "social boycott[s]," bans from social media, and McInnes's termination, which he says was all caused by SPLC making false, negative statements about him and the organization he founded, the Proud Boys.  Am. Compl. (Doc. 47) ¶¶ 157–58.  The 60-page, 303-paragraph amended complaint alleges that SPLC's hate group designation, along with over 30 statements published in 10 separate articles, injured McInnes.  The following is a summary of the facts relevant to the claims presented, relayed in the light most favorable to McInnes.

## A. *McInnes and the Proud Boys*

McInnes, a New York resident, is a self-described humorist, businessman, political commentator, and social critic whose work as an internet "personality" is "understood widely as satirical, meant for grownups and the 'rebellious.'" Am. Compl. (Doc. 47) ¶ 1. For over 25 years, he worked in media spaces, having cofounded *Vice* magazine and an advertising agency called Rooster Worldwide, which he sold in 2014. From 2014 to 2018, he "focused entirely on talk show hosting," primarily through his hosting of 'The Gavin McInnes Show,' and he was successful enough in his endeavors to become, as he admits, a public figure. *Id*. ¶ 24. His persona and style are admittedly controversial. In his complaint he states that an accurate description of his style is as follows: "offending liberals, women, 'beta male culture' and transgender people, writing in a voice inflected with a crass, contrarian bigotry that left him just enough room to declare it all a joke." *Id*. ¶ 25. Nonetheless, McInnes, an immigrant himself, states that he is an

"avowed and vocal opponent of discrimination based on race, religion or sexual preference, and of ideologies and movements espousing extremism, nationalism and white supremacy." *Id.* ¶ 2.

In 2016, McInnes founded the first official chapter of the Proud Boys. In its beginnings, he described the group, which has since formed chapters across the country and globe, as "an ordinary men's club, like the Shriner or the Elks," which "serves as a sort of safe space" for "Western Chauvinists." *Id.* ¶ 26. He wrote that the "basic tenet of [the Proud Boys] is that they are Western chauvinists who refuse to apologize for creating the modern world," which he says confuses "the media because the group is anti-SJW without being alt-right."[1] Def.'s Mot. to Dismiss, Ex. 15 (Doc. 49-17) at 2. "Western chauvinist includes all races, religions, and sexual

---

1.  Apparently, "anti-SJW" refers to "anti-Social Justice Warrior." *See Social Justice Warrior*, WIKIPEDIA https://en.wikipedia.org/wiki/Social_justice_warrior (last visited October 15, 2025).

preferences," but women "are not allowed" to be a Proud Boy.  *Id.*


   B. *SPLC, Hate Groups, and 'Change the Terms'*

In February 2018, roughly two years after McInnes founded the Proud Boys, SPLC designated the Proud Boys as a hate group.  *See* Am. Compl. (Doc. 47) ¶ 126. According to McInnes, SPLC positions itself as the "premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists, including the Ku Klux Klan, the neo-Nazi movement, neo-Confederates, racist skinheads, black separatists, anti-government militias, Christian identity adherents, and others."  *Id.* ¶ 33.  As part of its work, SPLC designates certain organizations as hate groups.  The amended complaint and briefing provide several definitions of hate group.

First, SPLC defines hate group as an organization that, "based on its official statements or principles, the statements of its leaders, or its activities[,] has

beliefs or practices that attack or malign an entire class of people, typically for their immutable characteristics." *Frequently Asked Questions About Hate and Antigovernment Groups*, Southern Poverty Law Center, https://www.splcenter.org/20220216/frequently-asked-questions-about-hate-and-antigovernment-groups#hate-group (last visited October 15, 2025). SPLC clarifies that "[a]n organization does not need to have engaged in criminal conduct or have followed their speech with actual unlawful action to be labeled a hate group." *Id.* SPLC does "not list individuals as hate groups, only organizations." *Id.*

Second, the Federal Bureau of Investigation (FBI) defines "hate group" as "an organization whose primary purpose is to promote animosity, hostility, and malice against persons of or with a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity which differs from that of the members or the organization." Am. Compl. (Doc. 47) ¶ 35.

Third, and finally, McInnes proposes his own definition: "More generally, the term 'hate group' typically refers to an association or group acting in a criminal or violent fashion or threatening to do so, based on an expressed enmity toward and menace of one or more identified target of hate." *Id.* ¶ 36. Notably, McInnes's definition departs from SPLC's and the FBI's by inserting criminal activity, violence, or threats of violence as a necessary condition of the hate-group label.

When SPLC designated the Proud Boys as a hate group in February 2018, it provided the basis for its characterization through photographs, quotes, and hyperlinks to related publications. While SPLC's Proud Boys page acknowledges that the Proud Boys "adamantly deny any connection to the racist 'alt-right' ... [and] insist they are simply a fraternal group spreading an 'anti-political correctness' and 'anti-white guilt' agenda," SPLC nevertheless designated the group as a

"general hate" hate group based, in small part, on the following[2]:

(1) A quote from Brian Brathovd stating, if the Proud Boys "were pressed on the issue, I guarantee you that like 90% of them would tell you something along the lines of 'Hitler was right. Gas the Jews.'"

(2) "I'm not a fan of Islam. I think it's fair to call me Islamophobic." – Gavin McInnes, NBC interview, Nov. 2, 2017.

(3) "We brought roads and infrastructure to India and they are still using them as toilets. Our criminals built nice roads in Australia but aboriginals keep using them as a bed. The next time someone bitches about colonization, the correct response is 'You're welcome.'" – Gavin McInnes, "10 Things I

_____

2. *Proud Boys*, Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/group/proud-boys (last visited October 15, 2025).

Like About White Guys," Taki's Magazine, March 2, 2017.[3]

*See generally* Ex. 11 (Doc. 49-13).

2018 also saw the arrival of another SPLC initiative: the "Change the Terms" website/program.  Am. Compl. (Doc. 47) ¶ 90.  This program, unveiled in October 2018, provides "recommended corporate policies and terms of service, which are designed to ensure that social-media platforms, payment-service providers and other internet-based services are not places where hateful activities and extremism can grow."  CHANGE THE TERMS, www.changetheterms.org (last visited October 15, 2025). SPLC encourages organizations to adopt these policies, and, in doing so, to prohibit, among others, any facilitation of SPLC's definition of "hateful activities" on their platforms and otherwise.  Am. Compl. (Doc. 47) ¶ 117.  Or, according to McInnes, the Change the Terms program is SPLC's effort at institutionalized

_____

3. SPLC's designation also now notes that Canada has gone a step further and labelled the Proud Boys a terrorist entity in February 2021.

deplatforming. To date, over 40 organizations have signed on in support of the Change the Terms recommendations. None of the organizations that ultimately banned McInnes are alleged to have signed onto the Change the Terms recommendations.

### C. Ten Articles

From April 25, 2017, to October 18, 2018, SPLC published ten articles referencing either the Proud Boys or McInnes. McInnes challenges over 30 statements made in these articles as being false and defamatory.

The statements come in two varieties: (1) statements that are reiterations of the hate-group designation, and (2) all other statements that are independent of the hate-group designation.

The court will not recount here each of the many statements across the ten articles. However, charts have been provided in the attached appendix that, as best the court could, lay out each challenged statement, its alleged falsity, and its place and time of publication.

13

For all of the statements, and the hate-group
designation generally, McInnes factually alleges that
SPLC published them with actual malice because: (1) SPLC
never contacted McInnes before making the statements and
(2) SPLC knew McInnes and the Proud Boys adamantly denied
the hate-group characterization.

### D. *"Deplatforming" and Reputational Injury*

McInnes alleges that, as a result of the hate-group
designation and SPLC's many other statements, he was
banned from virtually all social-media platforms, that
he was fired from his job in New York, that he lost
prospective job opportunities, that his reputation was
ruined, that he has suffered a social boycott in his
community around New York, and that he has been
ostracized by his neighbors.

More specifically, on August 10, 2018, McInnes and
the Proud Boys were banned from Twitter.  On October 30,
they were banned from Facebook and Instagram.  A week
later, PayPal banned McInnes and the Proud Boys, along

with several left-wing "antifa" groups.  On December 10,
2018, McInnes's videos were banned from YouTube.  Over
the next few months, more platforms, including iTunes and
MailChimp, followed suit.  The lion's share of these bans
was due to the platforms' policies against "hate" or,
according to McInnes, because of SPLC's hate-group
designation.  *See* Am. Compl. (Doc. 47) ¶¶ 130-57.

In addition to the loss of access to certain
internet-based platforms, he alleges that SPLC's
statements caused him to be fired from his New York-based
job with Blaze TV and that he and "his family have been
the subject of an escalating social boycott in [their]
neighborhood ... [in that they] experience relatively
mild, but, for a young family, painful, harassment and
social ostracism in their neighborhood."  *Id.* ¶ 158.

SPLC's Proud Boys page notes that McInnes "announced
on Nov. 21, 2018, that he was officially dissociating
himself from [the Proud Boys]."[4]

---

4.  *Proud Boys*, SOUTHERN POVERTY LAW CENTER,
https://www.splcenter.org/fighting-hate/extremist-
files/group/proud-boys (last visited October 15, 2025).

### III. DISCUSSION

As stated, McInnes brings four types of claims.  One New York labor-law claim for aiding and abetting a wrongful termination, and three state tort claims: tortious interference, false-light invasion of privacy, and defamation.  The court will address the claim under New York labor law first, then turn to tortious interference and false-light invasion of privacy, and conclude with defamation.

### A.  *Aiding and Abetting Employment Discrimination, N.Y. Labor Law § 201-d (Count IV)*

McInnes brings a claim under New York Labor Law § 201-d, arguing that SPLC, through its publications, aided and abetted his former employer, Blaze TV, in discriminatorily terminating him.  Put differently, he alleges (1) that Blaze TV, his employer, violated New York labor law when it discriminatorily terminated him and (2) SPLC should be liable for that discriminatory

16

termination because SPLC aided and abetted Blaze TV
through its defamatory publications.

His claim fails because the statutory provision he
relies on, New York Labor Law § 201-d, does not provide
for aider-and-abettor liability for wrongful-employment
actions.  The statute unambiguously provides that
employers or employment agencies may be held liable under
its terms: "Unless otherwise provided by law, it shall
be unlawful for *any employer or employment agency*
to ... discharge from employment ... because of [various
reasons]."  N.Y. Lab. Law § 201-d(2) (emphasis added).
However, nowhere in the text, whether explicitly,
implicitly, or by inference, does the statute provide for
aider-and-abettor liability.  And the court cannot "read
into the statute that which was specifically omitted by
the legislature."  *N. Mar. I. v. Canadian Imperial Bank
of Commerce*, 990 N.E.2d 114, 118 (N.Y. 2013).

When New York's legislature wished to create
aider-and-abettor liability under other statutes, it has
done so.  *See, e.g.*, N.Y. Exec. Law § 296(6).  It did not

do so here and McInnes has cited no authority to the contrary. Accordingly, because SPLC was not McInnes's employer, it cannot be held liable for his allegedly wrongful termination under the plain language of New York Labor Law § 201-d. This claim will be dismissed with prejudice.[5]

### B. Tortious Interference (Count I) & False-Light Invasion of Privacy (Count III)

Before turning to the merits of McInnes's claims for tortious interference and false-light invasion of privacy, the court must first determine a contested issue: whether Alabama or New York substantive law applies. The determination of this choice-of-law issue affects each of these claims. If Alabama law applies, McInnes will have an easier, albeit still unavailing, path. If New York law applies, his false-light and

_____

5. The court had considered certifying this question to New York's highest court, the New York Court of Appeals, but that court does not accept certifications from federal district courts. *See* N.Y. Const. art. 6, § 3(b)(9).

tortious-interference claims are dead on arrival, as he concedes. For the following reasons, New York law provides the substantive basis.

A federal court sitting in diversity applies the forum state's choice-of-law principles. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Here, the case arises under diversity jurisdiction and the forum is Alabama. Therefore, Alabama choice-of-law principles dictate what substantive law applies to McInnes's claims. *Id.*

The parties agree that for tort claims, the choice-of-law principle *lex loci delicti* "has been the rule in Alabama for almost 100 years." *Ex parte U.S. Bank Nat. Ass'n*, 148 So. 3d 1060, 1069 (Ala. 2014) (quoting *Fitts v. Minn. Min. & Mfg. Co.*, 581 So. 2d 819, 820 (Ala. 1991)). Under this rule, the "court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Id.*

19

The parties disagree, however, as to where the "injury" occurred under Alabama law. McInnes argues that the injury "occurred" where the allegedly injurious statements were published. And, according to McInnes, the place of publication is Alabama because that is where SPLC is located (and presumably whence the defamatory statements originated). This argument is incorrect and misunderstands the law of torts based on reputational damage.

The Alabama Supreme Court has clearly set out that "the place of injury is in the state where the 'fact which created the right to sue' occurs." *Ex parte U.S. Bank*, 148 So. 3d at 1069 (quoting *Ala. Great S. R.R. v. Carroll*, 11 So. 806, 806 (Ala. 1892)).

McInnes's own factual allegations reveal that his injuries occurred primarily in New York. His amended complaint extensively alleges the reputational damage he has suffered in New York. Indeed, over the course of ten paragraphs, he describes the damage done to his reputation literally in the New York neighborhood where

he resides: "Mr. McInnes and his family have been the subject of an escalating social boycott in [their] neighborhood ... [they] experience relatively mild, but, for a young family, painful, harassment and social ostracism in their neighborhood." Am. Compl. (Doc. 47) ¶ 158. McInnes's neighbor said, "Of course he's got to live somewhere," but "[w]hen the leader of a hate group moves within driving range of you and people you care about, that's concerning." *Id.* ¶ 161. The complaint is rife with allegations of injury done to McInnes in New York. Absent from his complaint, however, are any facts that McInnes's reputation was harmed in Alabama--a state where he has never lived nor been employed.

Having determined that New York law applies to McInnes's claims for tortious interference and false-light invasion of privacy, the court now turns to the merits of those claims. In Count I of the amended complaint, McInnes alleges that SPLC intentionally interfered with his "protectable business interests" through "its role as censor, consultant, or advisor to

the various social media platforms and payment processors from which he has been banned." Am. Compl. (Doc. 47) ¶ 181. However, McInnes concedes in his briefing that "New York law does not recognize" his cause of action for "tortious interference." Response (Doc. 32) at 24. This is not because New York lacks a tortious-interference tort--it has such a claim[6]--but because "New York law considers claims sounding in tort to be defamation claims where those causes of action seek damages only for injury to reputation, or *where the entire injury complained of by plaintiff flows from the effect on his reputation.*" *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 725 (S.D.N.Y. 2014) (Ramos, J.) (internal quotes omitted) (emphasis in original) (dismissing

---

6. Under New York law, the elements of a claim for tortious interference with prospective economic advantage are (1) a business relationship with a third party; (2) the defendant's knowledge and intentional interference with that relationship; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) injury to the business relationship. *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)).

tortious interference claim as duplicative of defamation claim). That is, under New York law, McInnes is "not permitted to dress up a defamation claim as a claim for intentional interference with a prospective economic advantage." *Krepps v. Reiner*, 588 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (Sweet, J.), *aff'd*, 377 F. App'x 65 (2d Cir. 2010); *see also Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 670 (S.D.N.Y. 2007) (Conner, J.) ("New York Courts have consistently ruled that a claim which is ostensibly based upon the intentional torts of interference with advantageous or contractual relations, *but which alleges injury to reputation*, is a disguised defamation claim." (emphasis added)).

Here, there is no doubt that the gravamen of McInnes's injury is reputational. *See* Am. Compl. (Doc. 47) ¶ 7 (alleging that SPLC deprived McInnes of his most "priceless possession, [his] reputation"). His alleged injuries for his tortious-interference claim are as follows: the loss of his "highly remunerative employment by CRTV / Blaze TV, the promotional

opportunities arising from that position and from his preexisting reputation as a humorist and social commentator, speaking opportunities across the globe, and the opportunity to raise money through operation of a YouTube channel." *Id*. ¶ 178. Each of these injuries allegedly "flows from the effect on his reputation." *Restis*, 53 F. Supp. 3d at 725. Indeed, the "factual allegations underlying the [tortious interference] claim" are "virtually identical" to the facts underlying his defamation claim. *Id*.

Because McInnes's tortious-interference claim is "based wholly on [SPLC's] dissemination of negative statements about [him] and the resulting harm to [his] professional reputation ... [i]t is thus, in essence, a defamation claim," *Pasqualini*, 498 F. Supp. 2d at 670, and cannot stand separate and apart from the defamation claim. *Cf. Amaranth LLC v. J.P. Morgan Chase & Co.*, 888 N.Y.S.2d 489, 495 (App. Div. 1st Dept. 2009) ("Because the complaint does not rely merely on generalized

reputational harm, we find that it sounds in tortious interference.").

To the extent that McInnes alleges that his tortious-interference claim derives not from the identical reputational damage alleged in his defamation claims but from SPLC's "Change the Terms" website, such argument falls flat. SPLC's "Change the Terms" website encourages organizations to sign on in "support of [] recommended policies" that SPLC has promoted. Am. Compl. (Doc. 47) ¶ 121. McInnes alleges that 40 companies have signed on in support of the Change the Terms website's model policies. *Id.* However, he does not allege that any of the organizations that SPLC allegedly interfered with are among those that signed onto the Change the Terms policies. For example, he alleges that SPLC's Change the Terms website interfered with his business relationships with Facebook, Twitter, Instagram, and YouTube, among others. But none of those organizations--which kicked McInnes off their platforms--are alleged to have signed on to SPLC's Change

25

the Terms policies.  Accordingly, those organizations'
decisions to "deplatform" McInnes were not allegedly
because SPLC interfered via the Change the Terms website,
but were, in the light most favorable to McInnes, because
of the reputational damage those organizations perceived
from SPLC's negative statements, *i.e.,* exactly what
McInnes alleges in his defamation claims.

Therefore, as McInnes concedes (despite later
appearing to backtrack on this concession), "New York law
does not recognize" his cause of action for tortious
interference because it is redundant of his defamation
claims and is merely a disguised defamation claim.
Response (Doc. 32) at 24.  Accordingly, McInnes's New
York law tortious-interference claim will be dismissed
with prejudice because it is subsumed by his defamation
claim.

In Count III, McInnes alleges that, through its
allegedly defamatory publications, "SPLC placed Mr.
McInnes in a false and defamatory light that is offensive
to a reasonable person."  Am. Compl. (Doc. 47) ¶ 269.

McInnes acknowledges that, if New York law applies, his false light claim must be dismissed. Response (Doc. 32) at 24 ("New York law does not recognize ... false light invasion of privacy. Thus, application of New York law would render" the claim moot.). This is so because "there is no common-law right of privacy" in New York. *See Freihofer v. Hearst Corp.*, 480 N.E.2d 349, 353 (N.Y. 1985). Accordingly, McInnes's false-light invasion-of-privacy claim will be dismissed with prejudice because, as discussed above, New York substantive law applies to his tort claims.[7] *See Restis*, 53 F. Supp. 3d at 725 ("New York law considers claims []

---

    7. Nonetheless, even if Alabama law applied, the result would be the same because Alabama's false-light invasion-of-privacy tort requires allegations of actual malice and, as explained below, McInnes fails to plausibly plead actual malice against SPLC for any of his claims. *See Smith v. Huntsville Times Co.*, 888 So. 2d 492, 496 (Ala. 2004) (holding that false light invasion of privacy claims "must be analyzed under the constitutional protections enunciated under the *New York Times v. Sullivan* doctrine," including the actual malice requirement).

27

to be defamation claims ... where those causes of action seek damages only for injury to reputation.").

### C.  Defamation (Count II)

Finally, the court turns to the heart of this matter: the defamation claim.[8]   In Count II, McInnes alleges that SPLC defamed him through various publications.

Because "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern," *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988), "[w]hen applying state defamation law to public figures, the First Amendment imposes additional limitations."  *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (footnote omitted).  McInnes "acknowledges he is a public

---

8. The court declines to decide at this stage whether New York or Alabama law applies to McInnes's defamation claim because its conclusions rest on First Amendment principles that apply to all 50 states.

figure." Response (Doc. 32) at 61. Therefore, the First Amendment requires that he demonstrate (1) that the challenged statements are "sufficiently factual to be susceptible of being proved true or false," *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990); (2) that the statements are false, *id.* at 16, and (3) that SPLC made the statements with "actual malice," *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280 (1964).

This claim turns on the third element: actual malice.[9] Actual malice asks whether the defendant made

---

9. The Eleventh Circuit has noted that "there is a fair debate about whether the term hate group is definable in such a way that it is provable as false" and that the "debate is complicated [further] by the fact that SPLC put its own definition of the term on its website." *Coral Ridge*, 6 F.4th at 1252 n.7. This court need not resolve at this time the questions posed in that debate. But if it had to, it has already found that SPLC's hate group designation was not provable as false because "there is no single, commonly understood meaning of the term 'hate group'" from which to test the label's veracity. *Coral Ridge*, 406 F. Supp. 3d 1258, 1274 (M.D. Ala. 2019) (Thompson, J.).

The underlying issue highlighted throughout McInnes's arguments is that SPLC has amassed too much influence over social media companies. This is neither here nor there. It has been said that the film critic Roger Ebert could make or break a film's financial

a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280.   Contrary to what it may sound like, actual malice has little to do with "evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). Rather, actual malice concerns itself with the speaker's "subjective beliefs about the truth of their own statements." *Dershowitz v. CNN, Inc.*, No. 23-11270, __ F.4th __, __, 2025 WL 2585986, at *3 (11th Cir. Aug. 29, 2025).

The test is therefore a subjective one. *See Coral Ridge*, 6 F.4th at 1252.   The core of the inquiry is whether the speaker made a false publication with a 'high degree of awareness of probable falsity.'"   *St. Amant v.*

---

success in three words or less.  Ebert could have declared that "The Godfather" was a hateful, misogynistic, deeply racist film and that could have ruined the film's box-office.  But that would not, by fiat of Ebert's influence, make his judgment-based opinion a fact.  That is, Ebert calling the movie hateful does not make the movie, in fact, hateful.

*Thompson*, 390 U.S. 727, 731 (1968) (quoting *Garrison v. Louisiana*, 370 U.S. 64, 74 (1964)).  The test does not ask what a "reasonably prudent man would have published," but rather asks what the publisher in the instant case actually knew.  *Id.*  That means the plaintiff must put forth "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication."  *Id.*

While actual malice "can be inferred in certain circumstances," such as when allegations are so "inherently improbable that only a reckless man would have put them in circulation," *Michel*, 816 F.3d at 703 (quoting *St. Amant*, 390 U.S. at 732), that inference must be supported in the complaint by more than bare-bones allegations.  *See Coral Ridge*, 6 F.4th at 1253.  Thus, "the mere existence of a false statement does not, on its own, demonstrate [a defendant's] knowledge of its falsity." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 946 (11th Cir. 2017).  Neither does a "departure from reasonable journalistic standards" suffice.  *Michel*

31

at 703. "[A] failure to investigate, standing on its own, does not indicate the presence of actual malice." *Id.* "Rather there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id.* And a plaintiff cannot simply fall back on nefarious motives to prove intent to avoid the truth--as discussed earlier, "the actual malice standard is not about whether the speaker had evil intent." *Coral Ridge*, 6 F.4th at 1253 n.8. Thus, "the fact that the defendant published the defamatory material in order to increase its profits" does not "suffice to prove actual malice." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989). The complaint must contain allegations sufficient to show that "SPLC 'actually entertained serious doubts as to the veracity' of its hate group definition and that definition's application to [the Proud Boys], or that SPLC was 'highly aware' that the definition and its application was 'probably false.'" *Coral Ridge*, 6 F.4th at 1252.

As previously stated, this case involves both a general "hate group" designation, as well as a whole host of allegedly defamatory statements spread across ten articles. The following analysis addresses McInnes's actual malice allegations first with respect to the hate group designation, then with respect to the statements in the articles.

## 1. Hate Group Designation

McInnes fails to allege plausibly that SPLC made the "hate group" designation with actual malice. Across the amended complaint's more than 250 paragraphs of allegations, the court can find *only two allegations* relevant to whether SPLC had actual malice for *any* of the allegedly defamatory statements: (1) "SPLC made the foregoing false and defamatory statements with knowledge of or in reckless disregard of their falsity" and (2) "[i]n none of the instances of publications alleged above did SPLC ever obtain or seek information, clarification or confirmation from Mr. McInnes regarding claims about

or quotes attributed to him." Am. Compl. (Doc. 47)
¶¶ 265–66. Both allegations, alone, are insufficient to
allege plausibly that SPLC "seriously doubted the
accuracy of designating [the Proud Boys] a hate group."
*Coral Ridge*, 6 F.4th at 1253.

First, McInnes's allegation that SPLC made the
statements with "knowledge of or in reckless disregard
of their falsity" does nothing to aid in satisfying his
pleading burden because it constitutes a "[t]hreadbare
recital[] of the elements of" defamation "supported by
mere conclusory statements" and thus is insufficient to
state a claim. *Iqbal*, 556 U.S. at 678. The court must
therefore "disregard [this] portion[] of the complaint
where [McInnes] alleged in a purely conclusory manner
that [SPLC] acted" with malice. *Coral Ridge*, 6 F.4th at
1252.

Second, McInnes's lone assertion that SPLC never
contacted him before publishing also fails to establish
actual malice. "[A] failure to investigate, standing on
its own, does not indicate the presence of actual

malice." *Michel*, 816 F.3d at 703 (citing *Harte-Hanks Commc'ns*, 491 U.S. at 692). Instead, "there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id.* (citations omitted). McInnes makes no such allegation.

Third, while actual malice "can be inferred in certain circumstances," such as when allegations are so "inherently improbable that only a reckless man would have put them in circulation," that situation is not present here. *Michel*, 816 F.3d at 703. Regardless of the commonly understood definition of hate group, SPLC's approach to its designation, alone and without other facts plausibly showing malice, was not reckless--SPLC provided extensive support and reasoning via quotes, hyperlinks, and other resources, as to how it arrived at its designation.

Aside from what is actually alleged in the complaint (including materials adopted in it), which is all the court may look at, *see Coral Ridge*, 6 F.4th at 1253, McInnes's briefing returns to the same losing refrain:

35

the Proud Boys says it is not a hate group; SPLC acknowledges that the Proud Boys says it is not a hate group and that the group contends that it has engaged in non-hateful activity; therefore, SPLC acted with actual malice in describing it as a hate group.  Under this flawed formulation, any published statement denied by a public figure is, by virtue of that denial, published with actual malice.  This type of syllogism should be squarely rejected.

Thus, "the press need not accept 'denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'"  *Harte-Hanks Commc'ns*, 491 U.S. at 691 n.37 (quoting *Edwards v. Nat'l. Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977)); *see also Little v. Consol. Publ'g Co.*, 83 So. 3d 517, 524 (Ala. Civ. App. 2011) (same); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at *9 (S.D.N.Y. Sept. 29, 2018) (Gardephe, J.) ("[A]llegations that a speaker knew

of a plaintiff's denial of wrongdoing are insufficient
to establish actual malice."). To hold otherwise would
empower public figures to silence opposing speech, not
based on the veracity of the speech in the mind of the
speaker but based solely on the subject's denial of its
veracity.

At bottom, McInnes's sparse malice allegations fail
to allege plausibly that SPLC at all doubted the veracity
of its belief that the Proud Boys is a hate group.
McInnes asks the court to ignore the protections of the
First Amendment and to read actual malice into the
pleadings where none has plausibly been alleged. The
court will not do so.

Accordingly, McInnes's defamation claim based on
SPLC's designation of the Proud Boys as a hate group will
be dismissed.

## 2. The Articles' Statements

In Count II, McInnes asserts dozens of allegedly
defamatory remarks based on statements SPLC published in

ten articles from April 2017 to October 2018.  Most of the articles contain multiple allegedly defamatory statements.  The article statements can be discussed in two groups: (1) reiterations of the hate-group designation and (2) all other statements, which are many and varied in nature.  For the following reasons, the claim to the extent it is based on these statements will be dismissed without prejudice.

### i. Hate-Group-Designation Statements

McInnes not only alleges that SPLC's designation of the Proud Boys is generally defamatory to him but also that SPLC's reiteration of that hate-group designation in several discrete articles is defamatory.  For example, in one article, SPLC published the phrase, "the Proud Boys (an SPLC-designated hate group)."  *See* Am. Compl. (Doc. 47)  ¶¶ 236-242.  McInnes alleges this statement "falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, which is not a hate group." *Id*.  Because this statement, and the others like it, are

38

just reiterations of the hate-group designation discussed above, any claims thereby derived are due to be dismissed for not being plausibly published with actual malice.

### ii.  All Other Article Statements

McInnes asserts more than 20 other allegedly defamatory statements against SPLC based on non-hate-group statements published in articles between 2017 and 2018.  These statements range from calling the Proud Boys "far-right," to saying McInnes is a "self-described Islamophobe," and to saying that he "perpetuates racist memes," among many others.  *See* Am. Compl. (Doc. 47) ¶¶ 218-254.  McInnes's amended complaint does not break up each of these allegedly defamatory statements into separate counts so that the court can determine from the amended complaint whether *each statement individually* meets the First Amendment requirements, described previously: (1) that it is "sufficiently factual to be susceptible of being proved true or false," *Milkovich*, 497 U.S. at 21, and (2) that

it is false, *id.* at 16.   In addition, the amended
complaint fails (3) to allege facts of "actual malice"
specific to each statement.   While these failures are
cardinal sins of shotgun pleading, *see Weiland v. Palm
Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th
Cir. 2015), the court has attempted to outline its best
summation of each of the actions based on the statements
in the articles in the appendix below, as taken from the
amended complaint.[10]   The court's task has been made more
complicated because in its response to SPLC's dismissal
motion, McInnes offers a list of allegedly false
statements, *see* Response (Doc. 32) at 35–38, but his list
cites to paragraph numbers in the original complaint,
which are different from the numbers in the amended
complaint, and the list appears to include statements the
court does not understand McInnes to be relying on and

---

10. There also appear to be matters outside the
articles that McInnes alleges are defamatory, which adds
to the difficulty of parsing McInnes's claims.   These
matters are not outlined in the appendix.

omit statements on which the court thought from his complaint he was relying.[11]

However, this confusion is not determinative at this juncture, for dismissal is warranted for any and all statements because McInnes fails to allege plausibly that SPLC published them with actual malice, that is, "with knowledge that it was false or with reckless disregard of whether it was false or not," as required to state a public-figure-defamation claim under the First Amendment. *New York Times*, 376 U.S. at 280. For each statement, McInnes provides no additional factual allegations as to actual malice beyond what he provided for the hate-group designation. Accordingly, the defamation claim, to the extent it is based on the remainder of the allegedly defamatory statements in the articles, will be dismissed for lacking sufficient

_____

11. To be sure, the court gave the parties the option to rely on their motion-to-dismiss briefs submitted before the amended complaint was filed. However, McInnes did not supplement or correct his original brief so that the references to the original complaint would now be to the amended complaint.

allegations of actual malice for the same reasons outlined above (the actual malice discussion of the hate-group-designation claim).

The entire Count II defamation claim is therefore dismissed without prejudice. *See Michel*, 816 F.3d at 706 ("A dismissal based on the failure to plead facts giving rise to an inference of actual malice should be without prejudice."). If McInnes decides to file an amended complaint, he is instructed to separate each allegedly defamatory statement into individual counts, clearly identifying each statement and providing allegations that satisfy *all three* of the First Amendment requirements described above, including the actual-malice requirement.

***

For the reasons stated above, it is ORDERED that:

(1) Defendant Southern Poverty Law Center, Inc.'s motion to dismiss (Doc. 49) is granted.

42

(2) Plaintiff Gavin McInnes's tortious-interference claim brought in Count I of the amended complaint is dismissed with prejudice.

(3) Plaintiff McInnes's false-light-invasion-of-privacy claim brought in Count III of the amended complaint is dismissed with prejudice.

(4) Plaintiff McInnes's New York Labor Law claim brought in Count IV of the amended complaint is dismissed with prejudice.

(5) Plaintiff Gavin McInnes's defamation claim brought in Count II is dismissed without prejudice. Plaintiff McInnes is granted leave to file a second amended complaint on or before October 30, 2025. If plaintiff McInnes files a second amended complaint, he shall break each separate allegedly defamatory statement into its own count and provide factual allegations that satisfy the requirements of the First Amendment as set forth in the above opinion. If no second amended complaint is filed, the court will then enter a final

judgment pursuant to Rule 58 of the Federal Rules of

Civil Procedure.

    DONE, this the 16th day of October, 2025.

                     ___/s/ Myron H. Thompson___
                     UNITED STATES DISTRICT JUDGE

## APPENDIX

The following are ten charts, based on the ten articles McInnes challenges as containing defamatory statements. The charts reflect, to the best of the court's reading of the *amended complaint*, every statement that McInnes challenges as defamatory. The charts are ordered in the chronology of the articles' publication, as opposed to the order (a-j) presented in the amended complaint. All the articles are available online as of the date of this opinion. The first was published on April 25, 2017, the last was published on October 18, 2018.

## Challenged Statements in Article (e)

Bill Morlin, *New 'Fight Club' Ready for Street Violence*, Apr. 25, 2017, available at
https://www.splcenter.org/hatewatch/2017/04/25/new-fight-club-ready-street-violence

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| "[S]tates falsely that the Proud Boys are known as **'the military arm of the Alt-Right'** | "[F]alsely ascribed to [McInnes] characteristics of SPLC's false description of the **Proud Boys, which is not the 'military arm of the Alt-Right.'"** |
| "[S]tates falsely ... that the Proud Boys 'shows up at pro-Trump rallies **looking to rumble'"** | The Proud Boys, "which, **while its members do not fear to defend themselves, do not 'look to rumble' with anyone."** |
| "[S]tates falsely ... **that FOAK should be compared to 'a neo-Nazi 'fight club' called the 'DIY Division'"** | "[F]alsely ascribes to him characteristics of SPLC's false description of FOAK, which **is not in any meaningful way comparable to a neo-Nazi organization."** |
| "[F]alsely states that ... 'he **denigrated Muslims** and called Asian Americans 'slopes' and 'riceballs'." | McInnes did not denigrate Muslims. |
| "[F]alsely states that ... 'he denigrated Muslims **and called Asian Americans 'slopes' and 'riceballs'."** | McInnes did not call Asian Americans slopes and riceballs. |

*See* Amended Complaint (Doc. 47) at ¶¶ 224-229

## Challenged Statements in Article (c)

Bill Morlin, *Extremists' 'Unite the Right' Rally: A Possible Historic Alt-Right Showcase?*, Aug. 7, 2017, available at
https://www.splcenter.org/hatewatch/2017/08/07/extremists-unite-right-rally-possible-historic-alt-right-showcase

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| "The Trump-inspired 'Proud Boys,' called the 'Alt-Light' by some and **always seeming to be looking for a rumble . . ."** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the Proud Boys, **which is not 'always looking for a rumble'"** |
| The Proud Boys "may or may not show up in sizeable numbers, although the group's founder, **Gavin McInnes, says he fullheartedly supports the rally."** | "[F]alse ... because Mr. McInnes did not 'full-heartedly support the rally,' but instead **stated that he supported anyone's right to attend the rally."** |

*See* Amended Complaint (Doc. 47) at ¶¶ 213-217

| Challenged Statements in Article (d) |
|---|
| Hatewatch Staff, *Do You Want Bigots, Gavin? This Is How You Get Bigots*, Aug. 10, 2017, available at https://www.splcenter.org/hatewatch/2017/08/10/do-you-want-bigots-gavin-because-how-you-get-bigots |

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| Allegedly the article calls the Proud Boys a hate group. No such statement is in the article, and the hate group designation was not published until after this article. | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the Proud Boys, when in fact **the Proud Boys are not a hate group."** |
| "McInnes denies any connection between his group and the far right, dismissing the fact that they show up to the same events, take fashion cues from each other, read the same books, [and] **sympathize with each other's viewpoints** | "[S]uggests falsely that [McInnes] **is an anti-Semite."** |

| | |
|---|---|
| including, at times, anti-Semitism." | |
| "Denials aside, McInnes has himself, at times, **perpetuated racist memes** such as in a tweet from June 26 in which he echoed" a 'white genocide' meme. | "[S]tates falsely that [McInnes] **'perpetuates racist memes.'**" |
| "Despite McInnes's protestations on social media and elsewhere, **he's devised, perhaps inadvertently, the most fertile 'in real life' recruiting ground for white nationalists and anti-Semites within today's organized far-right.**" | "[S]tates falsely that [McInnes] **'devised'** what it falsely describes as the most fertile 'in-real-life' **recruiting ground for white supremacists** and anti-Semites within today's organized far-right" |
| | The article is defamatory because "in addition to highlighting his name and photograph in an article contained bigoted and extremist quotes by others, it attempts to argue, and leaves readers with the impression, that numerous affirmative statements by Mr. McInnes disavowing, condemning and distancing himself from white supremacists . . .proves that the Proud Boys is actually a white supremacist [organization]." |

*See* Amended Complaint (Doc. 47) at ¶¶ 218-223

---

# Challenged Statements in Article (f)

Hatewatch Staff, *McInnes, Molyneux, and 4Chan: Investigating Pathways to the Alt-Right*, Apr. 19, 2018, available at [https://www.splcenter.org/20180419/mcinnes-molyneux-and-4chan-investigating-pathways-alt-right](https://www.splcenter.org/20180419/mcinnes-molyneux-and-4chan-investigating-pathways-alt-right)

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| The challenged portion of the article is actually an image, which the Amended Complaint describes as follow: **"a red arrow winding through a black maze ... that starts with Mr. McInnes and leads to alt-right radical Jared Taylor."** | "[S]PLC's juxtaposition of Mr. McInnes and Taylor ... is defamatory toward Mr. McInnes because **Mr. McInnes does not share the latter's extreme racist views."** |
| The Amended Complaint alleges that the article "associates with [McInnes] the comments of unidentified speakers claiming to be extremists, white supremacists or similar adherents of far-right philosophies because of Mr. McInnes's work which does not espouse any such philosophy." | "By giving readers the impression that the 'Alt-Right' label which may have been accurate to describe Mr. McInnes in 2015 could still be used to describe him in 2018, SPLC defamed ... Mr. McInnes" |

*See* **Amended Complaint (Doc. 47) at ¶¶ 230-235**

| Challenged Statements in Article (a) | |
|---|---|
| Hatewatch Staff, *Hatewatch Staff Report: Last Month in Europe: May 2018*, June 8, 2018, available at [https://www.splcenter.org/hatewatch/2018/06/08/last-month-europe-may-2018](https://www.splcenter.org/hatewatch/2018/06/08/last-month-europe-may-2018) | |
| **Challenged Statement (In Bold)** | **Alleged Falsity** |
| **"Gavin McInnes, the founder of the Proud Boys[], which SPLC lists as a hate group."** | "[F]alse and defamatory toward Mr. McInnes because it falsely ascribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the **Proud Boys are not a hate group."** |

|  | "[F]alsely acribes to him characteristics of SPLC's false description of the Proud Boys, when in fact the **Proud Boys are not white supremacist, neo-Nazi, anti-LGBT, anti-immigrant or anti-Muslim."** |

*See* Amended Complaint (Doc. 47) at ¶¶ 202-206

| **Challenged Statements in Article (h)** |
| --- |
| Hatewatch Staff, *Another Charlottesville? Threats of Violence Loom Over Upcoming Portland Proud Boys, Patriot Prayer Rally*, July 25, 2018, available at https://www.splcenter.org/hatewatch/2018/07/25/another-charlottesville-threats-violence-loom-over-upcoming-portland-proud-boys-patriot |

| Challenged Statement (In Bold) | Alleged Falsity |
| --- | --- |
| The amended complaint states: "The article states, 'Since early last year, the far-right groups Patriot Prayer and the Proud Boys have held more than a dozen rallies ... and with talk of bringing weapons and declarations that 'this is war,' members are threatening to make next weekend's march the most combustible yet.'  The article goes on to provide an 'Update,' ... which admits, 'The status of the August 5 rally in Berkeley is uncertain after a rash of infighting and an announcement from Gavin McInnes that the Proud Boys 'DISAVOW' the event." | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the Proud Boys, which the article **falsely claims ... to be 'threatening violence' at an upcoming Portland 'Proud Boys Rally,' despite the contradictory information in the 'Update.'"**

"[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the Proud Boys, which the article **falsely claimed in its sub-headline was 'talking of brining weapons' and 'threatening to make next weekend's march the most combustible yet' despite the** |

| | contradictory information in the 'Update.'" |
|---|---|

*See* Amended Complaint (Doc. 47) at ¶¶ 243-246

## Challenged Statements in Article (g)

Ryan Lenz, *One Year Later: Leaders from 'Unite the Right' Fall From Grace*, August 5, 2018, available at [https://www.splcenter.org/fighting-hate/intelligence-report/2018/one-year-later-leaders-%E2%80%98unite-right%E2%80%99-fall-grace](https://www.splcenter.org/fighting-hate/intelligence-report/2018/one-year-later-leaders-%E2%80%98unite-right%E2%80%99-fall-grace)

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| "[T]he Proud Boys (**an SPLC-designated hate group)"** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, which is not a hate group."** |
| "Since early last year, the **far-right groups Patriot Prayer and the Proud Boys."** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, which is not a far-right group."** |
| The article refers to the Proud Boys events having a "**targeted purpose: far-right activists taking out their aggression on political opponents. As Proud Boys founder Gavin McInnes once put it, 'Fighting solves everything.'"** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, which does not take out its aggression on political opponents."** |
| The article refers to the Proud Boys events having a "**targeted purpose: far-right activists taking out their aggression on political opponents. As Proud Boys founder Gavin McInnes once** | "[F]alsely suggests, with the intention that readers understand, that **the statement, 'Fighting solves everything," was suggested as a literal truth,** a tactic or an |

51

| | |
|---|---|
| put it, 'Fighting solves everything.'" | organizational value by Mr. McInnes" |
| | "The phrase ... was wrenched from the context in which Mr. McInnes said the words in order to defame him." |

*See* Amended Complaint (Doc. 47) at ¶¶ 236-242

| **Challenged Statements in Article (b)** | |
|---|---|
| Rachel Janik, *Kessler Falls Flat in D.C., But the Radical Right Marches On*, Aug. 17, 2018, available at [https://www.splcenter.org/hatewatch/2018/08/17/kessler-falls-flat-dc-radical-right-marches](https://www.splcenter.org/hatewatch/2018/08/17/kessler-falls-flat-dc-radical-right-marches) | |
| **Challenged Statement (In Bold)** | **Alleged Falsity** |
| "**The Proud Boys (an SPLC-designated hate group** started by Vice co-founder, original hipster and self-described Islamophobe Gavin McInnes)" | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, which is not a hate group.**" |
| The Proud Boys "have found **great success recruiting converts to their cause in the Pacific Northwest with an approach that focuses on the same old reactionary politics and fear.**" | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, when in fact the Proud Boys do not recruit converts to their cause in the Pacific Northwest with an approach that focuses on the same old reactionary politics and fear.**" |
| "**Self-described Islamophobe Gavin McInnes**" | "[F]alse and defamatory ... because [McInnes] is **not an 'Islamophobe' as the word is used and understood on the website.**" |
| "And another thing: **they offer their right-wing converts** a | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false |

| | |
|---|---|
| chance to duke it out in the street with people they disagree with." | description of the **Proud Boys**, **when in fact the Proud Boys do not make 'right-wing converts.'"** |
| "And another thing: they offer their right-wing converts a **chance to duke it out in the street with people they disagree with."** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys**, **when in fact the Proud Boys do not offer anyone 'a chance to duke it out in the street with people they disagree with.'"** |

*See* Amended Complaint (Doc. 47) at ¶¶ 207-212

| **Challenged Statements in Article (i)** |
|---|
| Rachel Janik, *Far-right Skinheads Join Proud Boys in Assaulting Protestors in New York City Following Gavin McInnes Event*, Oct. 13, 2018, available at https://www.splcenter.org/hatewatch/2018/10/13/far-right-skinheads-join-proud-boys-assaulting-protesters-new-york-city-following-gavin |

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| "**Proud boys and far-right skinheads**" | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys**, **which is not a far-right group.**" |
| McInnes "**brought a samurai sword to his event.**" | "[F]alsely claims he '**brought a samurai sword to his event**' when in fact Mr. McInnes owns no such or weapons and, consistent with his persona as a humorist, appeared with a toy sword made of plastic." |
| McInnes attended "**an anti-Muslim rally**" | "[F]alsely claims he **attended 'an anti-Muslim rally'** in 2017, which he did not" |

|  | (Rather, as SPLC linked in the article, McInnes attended a March Against Sharia Rally, which SPLC subjectively interprets as being anti-Muslim.) |

*See* Amended Complaint (Doc. 47) at ¶¶ 247-254

## Challenged Statements in Article (j)

The Editors, *Weekend Read: Violence and Hate, That's the Proud Boys in a Nutshell*, Oct. 18, 2018, available at
https://www.splcenter.org/news/2018/10/18/weekend-read-violence-and-hate-thats-proud-boys-nutshell

| Challenged Statement (In Bold) | Alleged Falsity |
|---|---|
| "Last Friday, members of the **hate group Proud Boys . . .**" | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, when in fact the Proud Boys are not a hate group, a false claim repeated again in the article.**" |
| Proud Boys **"members marched in Charlottesville, Virginia alongside Richard Spencer, the most prominent alt-right leader."** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, when in fact the Proud Boys not only did not as a group participate ... but in fact expelled four members for attending the event after being forbidden from doing so by Mr. McInnes.**"<br><br>(The amended complaint admits that Proud Boys members did march in Charlottesville) |
| The article claims that the Proud Boys "represent **a new face of the radical right ...** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys,** |

| | |
|---|---|
| relish street fighting ... and embrace [the] central tenets of white nationalism." | **when in fact the Proud Boys are not ... an 'element of,' much less 'a new face of' the radical right."** |
| The article claims that the Proud Boys "represent a new face of the radical right ... **relish street fighting ...** and embrace [the] central tenets of white nationalism." | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, when in fact the Proud Boys do not 'relish street-fighting."** |
| The article claims that the Proud Boys "represent a new face of the radical right ... relish street fighting ... and **embrace [the] central tenets of white nationalism."** | "[F]alsely ascribes to [McInnes] characteristics of SPLC's false description of the **Proud Boys, when in fact the Proud Boys do not embrace the central tenets of white nationalism."** |
| "[McInnes is] **an 'extremist who[] utilizes 'subterfuge and lies.'"** | "[F]alsely describes [McInnes] as an **'extremist' who[] utilizes subterfuge and lies.'"** |

*See* **Amended Complaint (Doc. 47) at ¶¶ 255-267**