## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| GAVIN McINNES,<br><br>*Plaintiff*,<br><br><br>- *vs.*-<br><br><br>SOUTHERN POVERTY LAW CENTER, INC.,<br><br>*Defendant*. | CIVIL ACTION NO.<br>2:19-cv-00098-MHT-GMB<br><br><br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Gavin McInnes, by and through the undersigned counsel, as and for his Second Amended Complaint against defendant Southern Poverty Law Center, Inc. ("**SPLC**" or "Defendant"), hereby alleges as follows:

### INTRODUCTION

1.     Gavin McInnes is a humorist, businessman, political commentator and social critic whose work as an Internet "television" personality is, as shown at right, billed and understood widely as satirical, meant for grownups and the "rebellious."



2.     Mr. McInnes, an immigrant, is an avowed and vocal opponent of discrimination based on race, religion or sexual preference, and of ideologies and movements espousing extremism, nationalism and white supremacy.

1

3.      In an era, however, where dominant institutions demand and enforce cultural and political orthodoxy, however disguised as non-conformity, Mr. McInnes, his associates and his family have been successfully targeted for personal and professional destruction by a self-appointed enforcer of such orthodoxy, defendant SPLC, to achieve SPLC's own ideological, political and financial (i.e., fundraising) ends, as alleged further below.

4.      As also detailed below, the primary method SPLC uses to achieve its goals and those of its donors is by identifying activists, political figures and groups as targets or enemies of society and designating its enemies "extremists," "white supremacists," "hate groups" and the like (the "SPLC Hate Designations").

5.      Although the SPLC Hate Designations are not empirical statements of fact, and are frequently entirely counter-factual, the SPLC Hate Designations are nonetheless intended by SPLC and treated by the mainstream press, law enforcement, courts and social media organizations not as SPLC's opinion but rather as objective, empirical factual determinations.

6.      One way SPLC uses the SPLC Hate Designations is to cause its victims to be "deplatformed," or deprived of access to online and in-person venues in which they were, prior to being deplatformed, able to express their views to those who choose to listen, or "defunded," meaning blocked from access from both social-media-based crowdfunding sources and payment processors such as both online and traditional banks and credit card companies.

7.      By leveraging its remarkable power and influence to deplatform and defund targeted groups and individuals such as Mr. McInnes, SPLC deprives those with which it disagrees of venues in which their points of view may be expressed, of income and ultimately of their most priceless possession, their reputations.

8.    SPLC's campaign against Mr. McInnes is arguably the most successful employment of its system to personally destroy those it disagrees with, but who in fact is not an extremist, on ideological grounds, but not its first.

9.    In August 2018, at the Summit on Religious Liberty conference of the Alliance Defending Freedom ("ADF"), a Christian legal group, then–United States Attorney General Jeff Sessions observed as follows:

> You know I'm from Alabama—the home of the Southern Poverty Law Center, an organization that did important work in the South, vital work at a pivotal time. As you know well, the law is only words on paper until there are people brave enough to stand up for their rights.
>
> There were hate groups in the South I grew up in. They attacked the life, liberty, and the very worth of minority citizens. You may not know this, but I helped prosecute and secure the death penalty for a Klansman who murdered a black teenager in my state. The resulting wrongful death suit led to a $7 million verdict and the bankruptcy of the Ku Klux Klan in the South. That case was brought by the Southern Poverty Law Center.
>
> But when I spoke to ADF last year, I learned that the Southern Poverty Law Center had classified ADF as a "hate group." Many in the media simply parroted it as fact. Amazon relied solely on the SPLC designation and removed ADF from its Smile program, which allows customers to donate to charities.
>
> They have used this designation as a weapon and they have wielded it against conservative organizations that refuse to accept their orthodoxy and choose instead to speak their conscience. They use it to bully and intimidate groups like yours which fight for the religious freedom, the civil rights, and the constitutional rights of others.

10.    As alleged in detail below, Mr. McInnes brings this lawsuit because SPLC has wielded this weapon against him, to devastating effect.

11.    Because of SPLC's storied history of fortitude and success against actual bigotry and hatred during the Civil Rights Era, its reputation has survived a rising and non-partisan tide of criticism directed at SPLC itself, shocking revelations concerning the personal and professional conduct of its management and controversy concerning its financial practices. These are not the subject matter of this Complaint, however.

3

12.     What is relevant is that despite the considerable and substantive and justified assaults on its reputation, the SPLC Hate Designations are still so widely credited and so vigorously promoted by SPLC that they are commonly accepted, treated and understood as "official" and "factual" determinations in significant and influential ways, as intended by SPLC.

13.     Mr. McInnes brings this action against SPLC for defaming him by use of the SPLC Hate Designations, and publishing other false, damaging and defamatory statements about him, as alleged in detail below; for its concerted, obsessive and malicious actions taken to "deplatform" Mr. McInnes; for its tortious interference with his economic opportunities; and for intentionally interfering with his contractual relationships by causing, *inter alia*, the termination of Mr. McInnes's employment, an almost complete deplatforming and defunding and subjecting him to employment discrimination based on his lawful non-employment recreational activities.

14.     SPLC's defamatory, false, and misleading designation of Mr. McInnes as a "hate" figure is purposefully deceitful and intended to tarnish Mr. McInnes's reputation, disparage Mr. McInnes's good name and work, inflict harm and financial damage, reduce Mr. McInnes's goodwill and standing in the community, expose Mr. McInnes, his family and anyone else associated with him to public scorn, harassment, intimidation, and potential violence, and to denigrate, malign, and ridicule Mr. McInnes to countless individuals and potential employers and partners around the world.

15.     This action seeks damages and injunctive relief to remedy the damages done to Mr. McInnes by SPLC and to prevent further irreparable damage.

## PARTIES

16.     Plaintiff, Mr. McInnes, is and was at all times relevant herein a citizen of the State of New York, having his primary residence in the Village of Larchmont, County of Westchester, in the State of New York.

17.    Defendant SPLC is a corporation formed under the laws of the State of Alabama with its principal place of business in Montgomery, Alabama.

18.    SPLC is federally tax-exempt political fundraising and activism project that markets itself as a civil rights organization.

## JURISDICTION AND VENUE

19.    This Court has diversity jurisdiction over Mr. McInnes's claims pursuant to 28 U.S.C. § 1332(a)(1), because Mr. McInnes and SPLC are citizens of different states and the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

20.    This Court has personal jurisdiction over SPLC because it is incorporated in and its headquarters are located in the State of Alabama.

21.    This Court has pendent jurisdiction over Mr. McInnes's state law claims pursuant to 28 U.S.C. § 1367.

22.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because defendant's principal place of business is in this judicial district and a substantial part of the events or omissions giving rise to Mr. McInnes's claims occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.    <u>Gavin McInnes</u>

23.    11. In an October 16, 2018 article by Alan Feuer, the New York Times described Mr. McInnes as "a former Brooklyn hipster turned far-right provocateur," notable for "his egghead glasses, pocket-protector and heavy-drinking, angry-nerd aesthetic" whose "obsessions seem to be more cultural than political. Mr. McInnes, a fiscal conservative and libertarian, calls himself a champion of Western values and reserves a burning ire for the political correctness of people on the left whom he describes as busybodies who have lost their sense of humor."

24.    As set forth in the *Times* article, "Born in England and raised in Canada, Mr.

McInnes has been a controversial figure in the news media for nearly 20 years. In 1994, after emerging from the punk-rock music scene, he co-founded *Vice*, the Montreal-based hipster magazine that later moved to Brooklyn and delighted audiences from the start with its graphic articles on subjects such as drug-abusing models and decomposing pigeons."

25.    In fact, Mr. McInnes is a comedian and political commentator who has been working in media for a quarter century. After creating Vice Media, he ran most of the editorial or content side of the operation until his departure in 2008. After that, he made several movies, wrote books and founded an advertising agency called Rooster Worldwide in 2010, which he sold in March of 2014. He then focused entirely on talk show hosting and had a successful career up until December, 2018, when SPLC's relentless campaign to silence him finally achieved success.

26.    The *Times* article accurately describes the iconoclastic and often "offensive" nature of Mr. McInnes's style, "offending liberals, women, 'beta male culture' and transgender people, writing in a voice inflected with a crass, contrarian bigotry that left him just enough room to declare it all a joke."

**B.    The Proud Boys—Cereal "Killers"**

27.    "In 2016," the *Times* article continues, "Mr. McInnes founded the first official chapter of the Proud Boys in New York after, he said, he realized that fans of his former television program, 'The Gavin McInnes Show,' liked to spend time in his studio, drinking beer with him and telling private [*sic*] jokes. He has described the group, which has since spread to dozens of cities and to countries, like Australia and Japan, as an ordinary men's club, like the Shriners or the Elks. It serves as a sort of safe space for him and what he calls his fellow 'Western chauvinists.'"

28.    According to the *Times*, "In its guise as a fraternal organization, the Proud Boys get together in New York and other cities once a month at beery meet-ups that can draw as many as a hundred participants. Women are not allowed at the group's formal gatherings (though they are

permitted at the 'warm up' sessions, Mr. McInnes has written). As a character-building exercise, the Proud Boys forbid both masturbation and the watching of pornography. The group's initiation rituals include reciting the names of five breakfast cereals while being slugged by other members."

29.    The article in the *Times* goes on to explain, "The monthly meet-ups are largely "social events where people have fun and laugh and drink and share stories about their kids and businesses and stuff like that," said Pawl Bazile, the editor of Proud Boy magazine. 'It's a celebration of the West, of America and of freedom and liberty.'"

30.    Though the *Times* article states that "Mr. McInnes has in recent years set himself apart from the current crop of professionally outraged right-wing pundits, not only for being able to spout aggressive rhetoric, but also for being willing to get physical at times," it does not actually give an example of Gavin McInnes "getting physical," instead stating, "like the president, he tends to publicly disavow all violence while winkingly insisting that he—and the Proud Boys—will never back down during a scrape."

31.    Mr. McInnes did not, in fact, wink while making that statement to the *Times* reporter.

25.    Until the conduct by SPLC complained of here, moreover, the Proud Boys had virtually no involvement in "scrapes," physical or otherwise, and were properly perceived as a social group for young men of all races and ethnic backgrounds looking for companionship, the opportunity to develop character and ways to reinforce each other's self-respect as young men. "The Proud Boys are a politically incorrect men's social club," the group's leadership was quoted in one press report; "We are a social club, a fraternity," in another.

26.    Documented Proud Boys activities include collection and distribution of Christmas presents for toy drives in Oklahoma and Michigan, raising funds for military charities in Central Texas, assisting with emergency fire relief arising from the California "Camp Fire," distributing

food and essentials to homeless veterans in Boston on Veterans Day, rounding up food for a food

bank in South Florida and collating and shipping care packages to overseas troops from Michigan.

27.     Emblematic of Proud Boy's philosophy, its bylaws state:

> A person that believes in the inherent supremacy of any one race over another, or who is a member of any organization promoting the supremacy of any one race over another, may not become or remain a member of this Fraternity. This includes, but is not limited to, any person who currently identifies as white nationalist, white supremacist, or alt-right (or any person who is a member of an organization identifying as such). Similarly, members of terrorist organizations or cells, including but not limited to Antifa, are prohibited from membership in the fraternity.

28.     The *Times* however, uninterested in such mundane matters, instead goes on to

describe two recent incidents, in Charlottesville and Virginia, in which the Proud Boys or members

of the Proud Boys—though not Mr. McInnes himself—were accused of violence.

29.     For their part, the Proud Boys maintain that any use of force by them came was

only in self-defense to a violent attack by so-called "Anti-Fascist" or "antifa" groups.

30.     Indeed, the *Times* article does note that "Mr. McInnes did not go to Charlottesville"

and that he " explicitly forbade the Proud Boys from attending."

31.     The *Times* article continued, "[t]o be clear, all white nationalists/anti-Semites are

banned from Proud Boys even if they never bring up said topics,' he wrote in an article shortly

after the violence in Virginia."

32.     As a result of these incidents, however, and of the pressure applied by SPLC and

others on both him and the Proud Boys, in late November of 2018, Mr. McInnes severed his

connections with the Proud Boys.

**C.     Unaccountable Arbiter of "Hate"**

33.     SPLC declares itself to be the "premier U.S. non-profit organization monitoring the

activities of domestic hate groups and other extremists, including the Ku Klux Klan, the neo-Nazi

movement, neo-Confederates, racist skinheads, black separatists, anti-government militias, Christian identity adherents, and others."

34.     The Federal Bureau of Investigation ("FBI") defines hate crime or bias crime as "a criminal offense committed against a person, property, or society that is motivated, in whole or in part, by the offender's bias against a race, religion, disability, sexual orientation, or ethnicity/national origin."

35.     The FBI defines a "hate group" as an "organization whose primary purpose is to promote animosity, hostility, and malice against persons of or with a race, religion, disability, sexual orientation, ethnicity, gender, or gender identity which differs from that of the members or the organization, e.g., the Ku Klux Klan, American Nazi Party."

36.     More generally, the term "hate group" typically refers to an association or group acting in a criminal or violent fashion or threatening to do so, based on an expressed enmity toward and menace of one or more identified target of hate.

37.     That said, according to the United States Department of Justice ("DOJ"), "most hate/bias crimes do not involve organized hate groups, whose members are dedicated to the goal of achieving racial purity." Indeed, the DOJ reports that "Hate/bias crimes are more often committed under ordinary circumstances by otherwise unremarkable types."

38.     Despite the relative unimportance of "hate groups" and high-profile individuals in the scheme of hate- or bias-based violence and crime, the cornerstone of SPLC's agenda and promotion is the identification of groups and persons as "hate groups," "extremists" and "white supremacists".

39.     To that end, SPLC acknowledges that its goal is to destroy organizations and persons it targets as "hate groups" or as members of "hate groups" as a matter of "political struggle," even if those targets do not qualify based on the broadly understood definitions above.

40.     Among those whom SPLC has lumped together with neo-Nazis and the KKK, as "extremists" or affiliated with "hate groups," are (a) Secretary of Housing and Urban Development Dr. Ben Carson and former Vanderbilt University professor and scholar Carol Swain, who are both black; (b) Christian organizations such as the Family Research Council, Traditional Values Coalition, ADF, Freedom, American Family Association, and the Pacific Justice Institute; (c) Islamic anti-extremism activists Ayaan Hirsi Ali, Maajid Nawaz, Pamela Geller and Robert Spencer; (d) immigration enforcement advocacy groups FAIR, the Center for Immigration Studies, The Remembrance Project, ProEnglish and, Legal Immigrants for America; (e) American Enterprise Institute scholar Charles Murray; (f) writer and commentator David Horowitz; Accuracy in Media President Cliff Kinkaid; (g) WorldNetDaily founder Joseph Farah; (h) Senator Rand Paul; (i) Turning Point USA; and (j) plaintiff, Gavin McInnes.

**D.      "Hate" is in the Eye of the Beholder**

41.     While SPLC's rhetoric routinely associates "hate groups" with actual "hate crimes," SPLC has acknowledged that what it defines as "hate group" activity includes constitutionally protected "marches, rallies, speeches, meetings, leafleting or publishing," and that the SPLC's designation of a "hate group" "does not imply a group advocates or engages in violence or other criminal activity."

42.     In fact, however, notwithstanding this disclaimer, the "hate group" designation does indeed imply just that.

43.     Indeed, in a 2018 *Washington Post* article, SPLC President Richard Cohen admitted to journalist David Montgomery that it does not matter to SPLC whether the use of SPLC Hate Designations is accurate in terms of identifying conduct motivated by actual "hate," because its use is part of SPLC's "effort to hold them accountable for their rhetoric and the ideas they are pushing."

44.     SPLC has acknowledged, in fact, that merely renting a post office box, without more, may be sufficient "activity" to get a group on SPLC's "enemies list."

45.     SPLC's fluid definitions of "hate" keep SPLC busy and flush with donations from sympathizers who are grateful that, as they understand it, SPLC is doing the hard work of obliterating "hate" so they do not have to do so.

46.     The "growth" of hate groups, as defined by SPLC, is critical to SPLC's continued existence as well as its formidable fundraising success.

47.     According to JoAnn Wypijewski, a writer for *Nation* magazine, "No one has been more assiduous in inflating the profile of [hate] groups" than SPLC, whose leadership "would have [its] donors believe" that 'militia nuts' are 'lurking around every corner.'"

48.     SPLC projects that largely imaginary looming threat to the public, the media and even law enforcement via its "Hate Map," an annual online listing of "active hate groups in the United States" featured in the "Hatewatch" section of SPLC's website, located at www.splcenter.org.

49.     The SPLC Hate Map provides no index, summary listing, details or other tools that identify which groups it has damned by inclusion have violated the law, it any.

25.     On its 2014 SPLC Hate Map, SPLC listed 784 hate groups, down almost 20 percent from the year before—but significantly higher than the 537 groups SPLC claimed to be menacing America in 1998.

26.     SPLC further inflates the "hate" threat that is its primary source of fundraising income, by placing a color-coded virtual "pin" on the Hate Map that is intended to represent every location deemed as hosting a "chapter" of a "hate group," regardless of the size of a group's or chapter's actual membership.

27.     For example, the otherwise obscure "National Socialist Movement," appears 49 times in SPLC's 2015 Hate Map—once for each of its alleged local "chapters," the membership of which may be as few as one person or, even less if a member is affiliated with more than one chapter.

28.     Moreover, SPLC counts each "local chapter" (or map pin) as a separate "hate group."  On that basis, SPLC's 2012 Hate Map counted "1,007 active hate groups in the United States" including "organizations and their chapters," counting The American Third Position Party 17 times, the American Nazi Party six times and the Council of Conservative Citizens 37 times.

29.     If the 2012 Hate Map list is filtered for organizations with identical names that were counted multiple times, SPLC's 1,007 "hate groups" shrinks to 358.

30.     Unsurprisingly, based on SPLC's "math," while the FBI reported a reduction in hate crimes of 24% between 1998 and 2013, SPLC claimed the number of U.S.–based, "hate groups" shot up by 75% during this same period.

31.     SPLC's rewarded for exaggerating the threat of "hate groups" is not only enhanced prestige in the public eye because of its "heroic" efforts to "combat" them, but financial as well.

32.     According to public filings, SPLC had total assets of $477 million for the year ending October 2017, during which it received $132 million in contributions, an increase of $140 million in its total assets from the prior year.

33.     As of the end of 2017, $92 million of SPLC's "anti-poverty" assets had been transferred to entities located in the Cayman Islands.

34.     Thus, SPLC has been handsomely rewarded by its blatant inflation of "hate groups" numbers and strategy of keeping its pot of hate boiling.

E.    **"Hate" as a Business Model**

35.    The evolution of SPLC from heroic, civil rights advocate and shield against violent and unlawful bigotry and infringements of civil rights, to its modern-day role as the enforcer for a particular grouping of political and cultural forces—targeting ideological enemies on the Left, Right or otherwise—has been the subject of extensive analysis and commentary for years.

36.    As early as the year 2000, an article in *Harper's* magazine by Ken Silverstein entitled "The Church of Morris Dees," a reference to SPLC's once-legendary founder, described the fallacious nature of the organization's "hate group" agenda.

37.    The *Harper*'s article quoted a former SPLC staff lawyer, who admitted that admitting that the SPLC's "hate group" work consists

> mainly in spying on private citizens who belong to "hate groups," sharing its files with law-enforcement agencies, and suing the most prominent of these groups for crimes committed independently by their members—a practice that, however seemingly justified, should give civil libertarians pause, [and all of which is calculated to cash in on] black pain and white guilt.

38.    Echoing this criticism, Jerry Kammer, a Pulitzer prize-winning investigative journalist, and senior research fellow for the Center for Immigration Studies, demonstrated in a March 2010 research paper how SPLC acted as an "active ally" and "propaganda arm" of the National Council of La Raza—a Latino advocacy group that itself has been accused of espousing racial superiority—in a 2009 campaign to brand advocates of immigration control as "extremists" and advocates of "hate."

39.    According to Kammer, during this 2009 campaign, SPLC promulgated a definition of "hate" that encompassed simply taking stances at odds with SPLC and its client, La Raza (now known as UnidosUS), about immigration policy, widely recognized as a complex topic.

40.     As a result, in 2016 the DOJ's Disciplinary Counsel for the Executive Office for Immigration Review during the Obama administration (the "Disciplinary Counsel") sharply rebuked and reprimanded attorneys who represented SPLC and its allies for labeling a conservative advocacy group whose attorneys appeared the Executive Office for Immigration Review as a "hate group."

41.     Ultimately, the DOJ concluded that SPLC's use of the "hate group" designation to denigrate attorneys and public interest groups advocating positions contrary to those of SPLC "overstepped the bounds of zealous advocacy and was unprofessional," and "constitute[d] frivolous behavior" that "does not aid the administration of justice."

42.     SPLC's misleading and malicious use of the SPLC Hate Designations to disparage and delegitimize political opponents was also described in 2013 by J.M. Berger, a contributor to *Foreign Policy* magazine, in which he observed that SPLC bases its "hate" claims on "a fundamentally flawed methodology."

43.     The next year, in a paper entitled "Watching the Watchers: The Neglect of Academic Analysis of Progressive Groups," George Yancey, a professor of sociology at the University of North Texas, and a researcher in the area of extremist groups of both right and left, noted the subjective nature of labeling hate groups that is at the core of SPLC's present-day activities.

44.     Based on SPLC's apparent ideological selectivity, Yancy expressed doubt that SPLC's Hatewatch is "an objective clearinghouse for the identification of hatred" despite the widespread impression that it is" seen as embodying a gold standard.."

45.     In view of SPLC's liberal use of the Hate Group Designation—to any group or individual whose view differs from its own—Yancy's doubts were well-founded.

F.    **"Hate" is Blind**

46.    SPLC has even undermined its reputation among presumptive allies. In a November 2016 letter to SPLC's President Richard Cohen, Katrina Lantos Swett, the President of the Lantos Foundation for Human Rights and Justice, condemned SPLC for "betray[ing] its own noble mission of fighting bigotry and protecting the vulnerable by attacking moderate Muslim reformers like Ayaan Hirsi Ali and Maajid Nawaz." Ms. Swett described SPLC's conduct as "unjust and unwarranted."

47.    Indeed, pursuant to a $3.375 million settlement with Mr. Nawaz, SPLC was required to issue a public written and videotaped apology from Mr. Cohen in multiple forums.

48.    Also in 2016, journalist Lee Smith noted the incongruity of SPLC's condemnation of Mr. Nawaz for "blasphemy" against Islam, and observed that SPLC's accusation "belongs not to the tradition of an American Civil Rights organization, but rather to the ideology of a religious fundamentalist organization, of the type that inspired the ISIS cadre that executed the staff of *Charlie Hebdo*. The fact is that more than 40 years after its founding, the Southern Poverty Law Center is now aggressively defending the kind of violent supremacists it had once sought to prosecute and attacking types like Nawaz it had once defended against violence."

49.    Laird Wilcox, a leading researcher and expert on extremist organizations as well as the phenomenon of hate crime hoaxing, has also criticized the false, misleading, and destructive nature of SPLC's "hate group" designations. According to Professor Wilcox, SPLC has gone into "ideological overdrive and has developed many of the destructive traits that characterize moral crusaders, including the demonization of critics and dissenters." SPLC's "hate group" designations, states Wilcox, reflect a "kind of selective attention and biased reporting" that "simply illustrates [SPLC's] unscrupulousness."

50.     In another recent treatment published in the *City Journal* in 2017, SPLC's tactical use of the SPLC Hate Designations was summarized as follows:

> Despite numerous exposés over the years in publications spanning the political spectrum—including *Harper's*, *The Progressive*, *The Weekly Standard*, *Reason*, the *Baltimore Sun*, and even the SPLC's hometown newspaper, the *Montgomery Advertiser*—the liberal establishment continues to treat the group as credible, largely because its preoccupation with right-wing bigotry aligns with the stereotypical view of liberals who dominate newspapers like the *Washington Post* and *New York Times*.

51.     Indeed, SPLC continues to employ its business model of personally destroying those it identifies as "extremists," or political threats to its ideological agenda, as a fundraising lever, including even longstanding members of the Leftist camp.

52.     For example, in 2018 SPLC was forced to remove three (3) articles from its website when Max Blumenthal, an anti-establishment, radical iconoclastic writer, threatened legal action.

53.     The 2018 *Washington Post* article cited above notes that while SPLC's online "dossiers" for groups it deems deserving of an "accounting" present "extreme-sounding quotes by members of the group," SPLC relies on the "greatest hits" of a group no matter how stale or irrelevant those statements are in the present activism environment.

54.     According to the *Washington Post*, in the ADF's case "nearly half of the dozen quotes generally condemning the 'homosexual agenda' are more than a decade old" and, as confirmed ADF'S current leadership, reflect issues, initiatives and arguments that have long been mooted or that have essentially been retired due to shifts in the law, the organization's agenda or other developments—if they were ever representative of the group at all.

55.     Similarly, the Montgomery analyzed the SPLC's designation of the Center for Immigration Studies ("CIS") as a hate group and concluded that while immigration policy advocacy by CIS "resembles the standard think tank jousting that goes on in Washington. Nevertheless, overall SPLC had found enough data points to meet its standard of hate."

**G.**   **Scorched Earth, Broken Lives**

56.   SPLC's Hate Designations are far from abstractions.  They have resulted in consequences ranging from despicable acts of violence against groups recklessly designated as "hate groups" for nothing more than their position and viewpoint on controversial social issues, to the sort of personal and professional destruction sustained by Mr. McInnes.

57.   One of the more notorious instances of violence directly related to SPLC's "enemies' lists" occurred  in 2012, when Floyd Corkins II attempted to commit mass murder in the Washington D.C. office of the Family Research Council.

58.   During an FBI interrogation, Corkins confessed that he had been motivated by SPLC's designation of the Family Research Council as a "hate group." He also admitted that he learned of Family Research Council by reviewing at SPLC's "hate group" designations and "hate map," which  publishes the addresses of those  organizations it labels  as "hate groups."

59.   Based on SPLC's "hate" targeting, SPLC ultimately paid Family Research Council $3.4 million to settle its defamation claim.

60.   Three years later, in June of 2017, during a weekend softball game that had been announced publicly, James Hodgkinson attempted to kill  those Republican members  of Congress and their staff who were present, critically injuring U.S. Representative Steve Scalise and several congressional staffers.

61.   The ensuing investigation revealed that Hodgkinson "followed" SPLC on Facebook, and by all indications knew that SPLC had associated Rep. Scalise, a conservative Republican, with SPLC-designated "hate groups."

62.   Short of incitement to murder, SPLC's designation of an organization as a "hate group" or a person as a "extremist" can and does kill careers and reputations.

63.     SPLC's "power" is the direct result of its still-semi-official status in many circles, particularly progressive, i.e., Left Wing, political and cultural, environments such as the technology and new media sectors which, in turn, continually reinforce that status as well as enhance SPLC's ability to target people and organizations hostile to these circles to stoke SPLC's fundraising.

**H.     Deplatforming and Defunding**

64.     As hate-group researcher Wilcox observed that as to SPLC's "hate" designations, "[w]hen you get right down to it, all SPLC does is call people names. It's specialized a highly developed and ritualized form of defamation," specifically, SPLC "harm[s] and isolate[s] people by denying their humanity and trying to convert them into something that deserves to be hated and eliminated." As a result, Wilcox concludes, "ordinary people expressing their values, opinions, and beliefs [are] up against a very talented and articulate defamation machine."

65.     More than merely talented and articulate, the "SPLC defamation machine" is virtually impossible to resist because it attempts to make it literally impossible for SPLC enemies to clear their names.

66.     SPLC uses its self-proclaimed "moral authority," and indisputably, widely- adopted "hate" designations, to defame -- and thereby cow -- proprietors and providers of the very forums in it uses, ensuring its defamation victims are denied the opportunity to respond to accusations in any manner approaching the way in which they were defamed.

67.     As recounted by David Montgomery in the 2018 Washington Post article, organizations characterized as extremists by SPLC, such as ADF, have been barred by AmazonSmile from raising money through its site.

68.    AmazonSmile was an Amazon.com program that enables customers to designate a nonprofit charity to receive a portion of the customer's purchase price.

69.    Amazon acknowledged that it relied uncritically on the SPLC Hate Designations to determine whether a charity is ineligible for the AmazonSmile program.

70.    Other SPLC-deemed "hate groups," such as ADF, which successfully represented a Christian baker before the Supreme Court in the "gay wedding cake" case, have also been barred from AmazonSmile.

71.    The heart of SPLC's attack on those unfortunate enough to be on its enemies list, is no longer the civil rights litigation and legal advocacy that made it famous, but rather deplatforming and defunding those enemies.

72.    In the past, prosecuting civil cases against actual hate groups garnered SPLC headlines and widespread support.

73.    SPLC's current "weapons" of choice, however, have none of the drawbacks of litigation and offers many comparative advantages.

74.    While extensive factual and legal research is required to comply with ethical, tactical and strategic considerations before filing a legal case against a hate group, SPLC's form of deplatforming does entail those same efforts.

75.    By favoring deplatforming and defunding over litigation, SPLC exempts itself from its obligation before the courts to engage in rigorous factual investigation and legal analysis, or to incur any expense whatsoever, before it flushes out, identifies and breaks an enemy by pinning it to SPLC's Hate Map.

76.    So liberated from the ethical obligations that govern litigants, SPLC focuses far less on accurate reporting of facts than on identifying popular or effective advocates among individuals or groups that stand for the "wrong" things and "dropping the hammer" on them.

77.    SPLC's deplatforming and defunding approach is a relatively inexpensive and simple task achieved, upon information and belief, mostly by harvesting damaging information, or claims, about its targets from the Internet.

78.    In contrast, civil litigation, before a court and jury, is governed by due process considerations that translate into "good faith", "non-harassing" pleading standards, the right to counsel, the requirement that a plaintiff meet its burden of proof, fairness and reliability provided by the rules of evidence, the right to cross-examination, presumptively "innocent" or "not liable" burdens of proof, public and open proceedings and an ultimate determination of the merits by a disinterested judicial officer chosen through the democratic process or by a jury of a defendant's peers, from which a party dissatisfied with the outcome has a right to appeal.

## I.    "Changing the Terms" of Free Speech

79.    The most recent manifestation of SPLC's comprehensive deplatforming and defunding campaign is its "Change the Terms" program unveiled in October of 2018, and which SPLC refers to as "a set of policy recommendations to help social media and other internet companies reduce hateful activities on their platforms."

80.    SPLC's has dedicated a webpage on its website to "Change the Terms" and has set up a separate site under the domain, www.changetheterms.org (the "CTT Website").

81.    Upon information the CIT Website is another source, or anticipated source, of SPLC revenue.

82.    According to the CTT Website, Change the Terms is based on the premise that "Most tech companies are committed to providing a safe and welcoming space for all users. But when tech companies try to regulate content arbitrarily, without civil rights expertise, or without sufficient resources, they can exacerbate the problem."

83.    The clear implication is that SPLC is the "non-arbitrary" source of "civil rights expertise" and "resources" positioned to solve the supposed problem identified in the preceding paragraph.

84.    According to the SPLC's "Change the Terms" web page, "WHITE SUPREMACISTS ARE USING ONLINE PLATFORMS FOR HATE. IT'S TIME TO CHANGE THE TERMS," as shown below.



85.    SPLC's Change the Terms home page included, as shown below, a downward-pointing arrow that suggests that the content on the page at which it points substantiates SPLC's assertion regarding white supremacists. The text  below the arrow, as shown above, on the Change the Terms website's  home page stated as follows:

## REDUCING HATE ONLINE

As internet platforms provide more opportunities for people around the world to connect, they have also provided a forum for certain groups to spread hate, fear, and abusive behavior.

The deadly neo-Nazi march in Charlottesville, Virginia, was organized with the use of Facebook, PayPal, and Discord.

**The violent Proud Boys group** vets new applicants through Facebook, and have seen an uptick in applications since summer 2018.

Some technology companies have made steps in the right direction to reduce hateful activities online, but more work needs to be done.

Over the past year, the Change the Terms coalition has met with experts on terrorism, human rights, and technology around the world to gather insights on how hate operates online and how it can be stopped.

The result of those conversations was the creation of recommended corporate policies and terms of service to ensure that social media platforms, payment service providers, and other internet-based services are not places where hateful activities and extremism can grow.

(Emphasis added).

 86. Following the arrow and scrolling down the home page of the Change the Terms

website  reveals three photographs, as shown below:



 87. Two of the photographs depicted what appear to be violent confrontations

involving unidentified persons whose identities are unknown and whose faces are mainly obscured,

as shown below.

 88. Sandwiched between those two photographs is a third photograph of an eminently

recognizable Mr. McInnes, holding up a raised fist and surrounded by anxious-looking faces.



89.     On a mobile phone, from which most website content is now viewed, the photograph of Mr. McInnes was the only one shown on the homepage of the Change the Terms website, as shown on left.

90.     Although both versions of the Change the Terms home page, featuring Mr. McInnes's photograph, suggested he was part of a hate group involved in a violent confrontation with police, the photo of Mr. McInnes was actually taken in Berkeley, California at an April 2017 event at which no physical altercations occurred following the violent deplatforming of conservative provocatrice Ann Coulter.

91.     Mr. McInnes had traveled to Berkeley after Coulter canceled a planned speech at the University of California at Berkeley ("UC Berkeley") on April 27, 2017 after Antifa and other left wing protesters threatened violence.

92.     UC Berkeley subsequently settled a lawsuit by the organizers of the Coulter speech for causing Coulter to cancel the event.

93.     Pursuant to the settlement, UC Berkeley agreed to rescind its subjective "high-profile speaker policy" and viewpoint-based "security fee" policy; and to abolish its *de facto* enforcement of the on campus "heckler's veto" by which a calculated "threat of violence" was relied upon to silence speakers; and to pay $70,000 to the event sponsors, Young America's Foundation, to cover their legal fees.

94.     Several days later, Mr. McInnes went to Berkeley and read the text of Coulter's speech on a makeshift sound system to demonstrate the importance of free speech.

95.     As he spoke and prepared to depart from the platform, however, protesters attempted to surround Mr. McInnes.

96.     While the Berkeley police force present peacefully engaged the protesters, a phalanx of Proud Boys members surrounded Mr. McInnes and safely escorted him to his next designation.

97.     The photograph shown on the Change the Terms home page—actually a screen capture from a longer video—was taken as he departed the platform, at which time, he pumped his fist and repeated the word, "Uhuru," Swahili for "freedom,"

98.     Thus far from threatening violence, as suggested by SPLC's Change the Terms website, Mr. McInnes was, when photographed, being victimized by threats of violence and attempts at intimidation because of his non-violent, pro-free-speech activism in Berkeley.

99.     While in the context of SPLC's webpage, it may appear that Mr. McInnes was threatening imminent mayhem by his raised fist, no reasonable person present at the time the photograph was taken could be intimidated by it, juxtaposed as it was with his horn-rimmed glasses, buttoned-up white dress shirt, neatly Windsor-knotted cravat and the purpose of his presence—to present Coulter's speech.

100.    Nonetheless, Mr. McInnes's image was and still is being depicted and distorted by SPLC in a montage of words and pictures warning of imminent right-wing violence, suggesting falsely that Mr. McInnes is a militant leader of white supremacist hoodlums.

101.    Notwithstanding these facts, SPLC's Change the Terms home page uses the photo of Mr. McInnes and the Proud Boys—in particular, and specifically—engaged in peaceful protest

as a backdrop to copy that falsely characterizes the Proud Boys as "violent," and stating, "Just as the internet has created immense positive value by connecting people and creating new communities, it has also given new tools to those who want to threaten, harass, intimidate, defame, or even violently attack people different from themselves," as shown below.



102.    Besides using Mr. McInnes's image in a defamatory fashion as a "dog whistle" to inflame donors and supporters, the Change the Terms program of SPLC is also a serious attempt to institutionalize exactly the kind of deplatforming Mr. McInnes was protesting in Berkeley when the picture was taken.

103.    The "Change the Terms policies" that "organizational members" are to enforce are defined, on the SPLC Change the Terms website, simply as follows:

> Users may not use these services to engage in hateful activities or use these services to facilitate hateful activities engaged in elsewhere, whether online or offline.

104.    As alleged above, however, SPLC has already established and acknowledged that its definition of "hateful activities" includes any "activity," including activity expressly protected by the First Amendment, it deems ideologically objectionable.

105.    Moreover, the policy urged by SPLC via the Change the Terms program expressly requires that the organizations who adopt it prohibit any "facilitation" of SPLC's definition of "hateful activities"—"whether online or offline."

106.    As the Change the Terms website explains, "While an online payment processor may not be the vehicle through which a group directly engages in hateful activities, the online payment processor should not knowingly allow the group to use its services to fund hateful activities. Not denying services under this example would mean that the online payment processor is financially profiting from hateful activities."

107.    Under this rubric, all activities conducted by a group or individual affiliated with that group deemed "hateful" under SPLC's ideological standards subject to control by any online service provider regardless of the relationship, or lack of relationship, between the service being provided and the conduct of the group or any of its members, at any time, anywhere in the world, without condition.

108.    According to SPLC's Change the Terms website, "These policies are intended for internet companies that provide the following types of services: Social media, video sharing, communications, marketing, event scheduling, or ticketing; Online advertising; Financial transactions or fundraising; Public chat or group communications; Domain names; Building or hosting websites, blogs, or message boards    After we have given tech companies a reasonable amount of time to digest, adopt, and implement these policies, we will initiate an evaluation process to see how companies stack up. This process will measure both tech companies' formal

policies and how they implement them. Without effective and even-handed execution, a formal policy is just empty words."

109.    As of the date hereof, the Change the Terms website lists approximately 40 organizations, virtually all affiliated with left wing ideology, as having "signed on in support of the recommended policies for corporations to adopt and implement to reduce hateful activities on their platforms."

110.    SPLC is not interested in empty words.  As shown above and detailed below with regard to Mr. McInnes, SPLC means what it says—and it has gotten results, destroying numerous careers and organizations, including those of the plaintiff.

**J.        Bringing Down the Proud Boys**

111.    Gavin McInnes and the Proud Boys first appeared on SPLC's radar in June of 2017, when SPLC's website reported that he was a speaker at a New York "anti-Sharia" event and describing him as a "neo-masculine reactionary" guilty of making "blatantly misogynistic comments."

112.    The SPLC post, which is still on the SPLC website, also suggests falsely that Mr. McInnes is associated with "Vanguard America," a "white nationalist group."

113.    After this post, SPLC's mentions of Mr. McInnes and Proud Boys, who were attracting increasing attention in the national media and in social media—fundamental criteria for SPLC's fundraising purposes—ramped up concomitantly, as did the pressure brought to bear on online channels and payment processors to de-person Mr. McInnes and the Proud Boys.

114.    In February 2018, the Proud Boys received the unwelcome "honor" of being "inducted" into SPLC's hall of fame—"Hall of Hate," that is, i.e., its enemies list or "Hate Map."

115.    On August 1, 2018, SPLC's website attacked the entire Proud Boys organization over what it described as a "threat of violence" by the Proud Boys at an upcoming rally in the Pacific Northwest.

116.    The Proud Boys did not threaten violence in connection with that rally, and no violence occurred.

117.    On August 2, 2018, SPLC's website attacked the entire Proud Boys organization and plaintiff, as well as Facebook, for hosting Proud Boys' members' pages.

118.    On August 10, 2018, Mr. McInnes was banned from Twitter, where he had approximately a quarter of a million followers, for "violations of the terms of service."

119.    No more explanation was provided, but media reports s that the reason was Mr. McInnes's association with the Proud Boys, which—the media also reported—had been deemed a hate group by SPLC.

120.    On October 19, 2018, SPLC launched another attack on Mr. McInnes by oversimplifying, taking out of context, and deliberately misconstruing his commentary on swear words, slurs, and thought police to tar him as "anti-gay."

121.    Mr. McInnes is not "anti-gay."

122.    On October 31st, 2018, Mr. McInnes was banned from both Facebook and its affiliated service, Instagram, "because of policies against hate groups."

123.    On November 9, 2018, PayPal banned both Mr. McInnes and the Proud Boys, informing Mr. McInnes that "We do not allow PayPal services to be used to promote hate, violence or other forms of intolerance that is discriminatory."

124.    On November 19th, 2018, the British *Guardian* newspaper reported that "The FBI now classifies the far-right Proud Boys as an 'extremist group with ties to white nationalism,'

according to a document produced by Washington state law enforcement." Although the FBI refused to corroborate the claim when contacted by reporters at the time, the *Guardian*'s report, which also stated, "The Southern Poverty Law Center (SPLC) lists them as a hate group," gained extensive media coverage.

125.    In response to subsequent inquiries by journalists, the FBI subsequently acknowledged that it had never characterized the Proud Boys in the manner claimed by the *Guardian*, stating, "When it comes to domestic terrorism, our investigations focus solely on criminal activity of individuals—regardless of group membership—which appears to be intended to intimidate or coerce the civilian population or influence the policy of the government by intimidation or coercion. The FBI does not and will not police ideology." The FBI's statement, however, received virtually no coverage.

126.    Finally, in October of 2025, the FBI announced that it was cutting ties with SPLC after criticism that SPLC included Turning Point USA, a political organization for conservatives focusing on young people ("TPUSA"), on its list of hate groups. In fact, it was TPUSA's founder and leader, Charlie Kirk—who never called for or endorsed violence or hatred—who would be assassinated by a left-wing extremist.

127.    At the time of the FBI's announcement, its Director, Kash Patel, stated publicly that SPLC had become a "partisan smear machine" rather than a civil rights advocate.

128.    On November 30, 2018, Mr. McInnes was denied a visa for a paid speaking tour in Australia based on his "bad character." Credit for his exclusion from Australia was taken by a *Guardian* columnist who led a campaign to prevent Mr. McInnes's entry into the country, and who cited SPLC designation of the Proud Boys as a hate group in his *Guardian* column urging that the visa be denied.

129.   On December 8, 2018, Mr. McInnes was fired from his primary place of employment, Blaze TV, which had recently acquired CRTV, where his program was among the top three most popular.

130.   Mr. McInnes was given no reason for his termination, but upon information and belief, a proximate cause of it was SPLC's conduct as alleged above.

131.   On December 10, 2018, Mr. McInnes was banned from YouTube on spurious grounds of copyright infringement concerning certain videos on his YouTube channel.

132.   In response to his inquiry, Mr. McInnes was informed by YouTube that he could not appeal his ban, contrary to YouTube's own terms and conditions and inconsistent with its usual practice regarding copyright infringement claims.

133.   On information and belief, the "copyright explanation for Mr. McInnes's ban from YouTube was a pretext for a ban based on the SPLC's actions.

134.   Indeed, the YouTube ban was temporarily reversed only because of Mr. McInnes's diligence in establishing its falsehood and the earnestness of the copyright holder in acknowledging that it had made no complaint.

135.   When, however, , Mr. McInnes's YouTube account was restored several days later, it was "demonetized"—deemed ineligible for the sale of advertisements through Google AdSense.

136.   Mr. McInnes was informed that the demonetization of his account could not be appealed.

137.   Moreover, after his account was restored, YouTube inserted a "Description" of Mr. McInnes at his YouTube channel, credited to Wikipedia, that included the claim, "He is the founder of the Proud Boys, a chauvinist men's group considered to be a 'general hate' organization by the Southern Poverty Law Center."

138.    Indeed, that statement is also found at the Wikipedia entry, "Gavin McInnes," as of the date hereof, which entry quotes SPLC seven times.

139.    Ultimately Mr. McInnes's YouTube account was banned, without explanation, costing him considerable income and lost opportunities.

140.    Besides restoration of his account to a demonetized version of YouTube and ultimately his loss of the account, Mr. McInnes has, since the time SPLC added him to its enemies list, been effectively deprived of the ability to either express his view, defend himself from the false and malicious accusations against him via or to earn income through the social media platforms that have banned him.

141.    On January 10, 2019, Mr. McInnes was banned from MailChimp, an email-based marketing service, on the ground that his account was "in violations of our Terms of Use."

142.    Upon information and belief, Mr. McInnes the actions of the SPLC were a proximate cause of his being banned from MailChimp.

143.    In January of 2019, Mr. McInnes's podcasts were banned from iTunes.

144.    Upon information and belief, Mr. McInnes the actions of the SPLC were a proximate cause of his being banned from iTunes.

145.    SPLC has, through the actions alleged above, successfully deplatformed Mr. McInnes and rendered him virtually unemployable or, at best, has severely compromised his earning capacity and bargaining power with respect to future employment and the compensation therefor.

146.    The deplatforming of Mr. McInnes intended and achieved by SPLC is effective to a great extent because of the technological-economic phenomenon describes as "network effects," because of which virtually no person or institution, regardless of the financial and technical

resources available, can at the present time found or establish alternative social media or communications platforms to compete with those already in place.

147. The acts alleged herein by SPLC were, on information and belief, a proximate cause of the banning of Mr. McInnes from these platforms, payment processors and monetization channels.

148. Beyond this, SPLC has destroyed Mr. McInnes's reputation and declared open season on him and his family.

149. As recounted in a November, 2018 article in the only magazine *The Daily Beast*, Mr. McInnes and his family have been the subject of an escalating social boycott in the Westchester County neighborhood where they live, whose "residents' real problem, locals say, is with McInnes' role in the Proud Boys, which has been designated as a hate group by the Southern Poverty Law Center."

150. As the article recounts:

> "So the founder of the proud boys lives [around here]," read the email, which was reviewed by The Daily Beast. "I suggest we buy the 'Hate Has No Home Here' lawn signs and ask our friends and neighbors in [the neighborhood] to put one on their lawn. Imagine if everyone had one. It would send a clear message to him and his ilk. The signs are $20 each and bulk orders ship free. Spread the word." The email was quickly forwarded to other community members, a person familiar with the messages said. By the following day, the campaign had "gone way beyond me and farther than anything I can manage," the original emailer wrote neighbors, reminding them that the campaign should preach "the opposite of hate and intimidation."

151. The irony of this last formulation being lost on "the original emailer," the dependence of all concerned in this neighborhood-wide targeting of a mixed-race family that had done them or anyone else no harm on SPLC's Hate Designation is obvious from the *Daily Caller* article.

152.    Indeed, the article ends with a quote from another neighbor of the McInnes family, who says, "Of course he's got to live somewhere. But I consider this as factual: The Proud Boys are a gang. They're listed as a hate group. When the leader of a hate group moves within driving range of you and people you care about, that's concerning. That's not petty, that's real."

153.    For Mr. McInnes and his family, such "reality"—a false "reality" created by SPLC as part of a campaign purposely intended to destroy Mr. McInnes—may very well affect whether their father and breadwinner can even remain with them in the United States, where all of them were born and grew up.

154.    Because Mr. McInnes is a non-citizen who is a legal immigrant in the United States from Canada and holds a "Green Card," SPLC's false and malicious designation of Mr. McInnes as a member of a "hate group" could affect his immigration status and even, potentially, result in his deportation.

155.    This is not the only respect in which, because of the SPLC, Mr. McInnes has gone from being known as an edgy, sometimes vulgar and highly opinionated performer and commentator to the "leader of a hate group" and has been deemed fair game for physical and aggressive confrontations and other forms of harassment.

156.    Because of the SPLC's targeting of Mr. McInnes, the McInneses continue to experience relatively mild, but, for a young family, painful, harassment and social ostracism in their neighborhood of the kind described in the *Daily Caller* article, including vandalism of their property.

157.    Mr. McInnes has had little ability to fight back and defend the calumny directed at him and his family, however, because SPLC has so thoroughly deplatformed and defunded him.

158.    Besides losing the ability to rehabilitate his reputation by presenting his own case in the social media channels through which he is being harmed by SPLC, Mr. McInnes used and

relied on these platforms to reach and expand his audience and to promote services and activities that enhanced his earning capacity both directly and indirectly, all of which he is now unable to do.

**K.    SPLC's Golden Goose**

159.    Despite its dubious achievements in socially and professionally isolating Mr. McInnes and his family, SPLC's obsession with Mr. McInnes, and upon information and belief its commitment to promoting him and the Proud Boys as bogeymen to spur SPLC's fundraising, continued for years.

160.    As of the date hereof, a search for the term "McInnes" on the SPLC website returns 72 results, with articles or other postings almost every month since his first appearance.

161.    Besides being misleadingly featured on SPLC's Change the Terms website, Mr. McInnes's image, typically with inflammatory, misleading or defamatory text superimposed on it, is ubiquitous on the SPLC website and Twitter feed as well, as shown in the selection of tweets below.

 













162.    Besides maintaining, on its website and through its social media channels, all the content referred to above, SPLC so values Mr. McInnes as a stalking-horse for its fundraising efforts that it actually pays for Google ads to beckon Internet users to its website to when users search Google for relevant terms.

163.    An example is set forth below: a Google ad that appeared online in January of 2019 when Internet users search "Proud Boys by-laws" and directs inquirers to its "What You Need to Know" entry on the SPLC website as well as the Hate Groups Map and a web page on the SPLC site entitled, "Exposing Extremist Groups." At the time of the filing of this action, this search-triggered ad was still running on Google.



164.    Because the essence of the damage caused by SPLC to Mr. McInnes consists of both rendering (i) Mr. McInnes socially despicable and "radioactive" because of his alleged "hate group" and "extremist" sympathies, and (ii) deplatforming Mr. McInnes so that he is unable either to make a living as a performer and commentator via alternative channels of distribution or to rehabilitate his reputation, Mr. McInnes is essentially an untouchable, unable to retain or be considered for gainful employment in his line of work, much less work that is commensurate with the opportunities available to him prior to SPLC's campaign of destruction against him.

165.     SPLC's actions have injured Mr. McInnes in an amount to be determined at trial.

## CLAIMS FOR RELIEF

### I.     DEFAMATION
*False Claim that Mr. McInnes "Full-Heartedly Support[ed]"*
*the Unite the Right Rally*

166.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 165 as if fully set forth herein.

167.     Defendant published a false statement about plaintiff.

168.     In an article by Bill Morlin dated August 7, 2017 published on defendant's website entitled "Extremists' 'Unite the Right' Rally: A Possible Historic Alt-Right Showcase?", defendant falsely stated that plaintiff "full-heartedly supports the rally."

169.     This statement is false because plaintiff did not "full-heartedly support the rally."

170.     In fact, while plaintiff recognized anyone's right to attend the rally, he not only did not endorse the rally itself, but explicitly forbade Proud Boys members from attending the rally.

171.     Specifically, on June 20, 2017, plaintiff published a statement on the Proud Boys website disavowing the Unite the Right rally, stating: "I get that it's about free speech and we want everyone—even white nationalists—to have that right but I think it's coming at a time when we need to distance ourselves from them. I'm not punching right. I'm just not coming to your rally—no offense."

172.     The above statement on the Proud Boys website was published six weeks prior to defendants' false claim that plaintiff "full-heartedly supports the rally," was widely shared and received significant press-coverage.

173.     Defendant published this statement to third parties without authorization or privilege.

174.     Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

175.     Defendant made this statement with actual malice.

176.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant was aware or should have been aware of plaintiff's public disavowal of the Unite the Right rally, especially considering the extent to which it researched, monitored and reported on plaintiff, the Proud Boys and their activities.

177.     Defendant never contacted plaintiff or any other knowledgeable person to verify information before publishing this statement, despite having the means and opportunity to do so.

178.     On information and belief, defendant was well aware plaintiff's disavowal of Proud Boys participation in the rally, but nonetheless chose intentionally to falsely claim the exact opposite on its website.

179.     This statement caused special harm to plaintiff, especially in light of the subsequent tragic events at the rally, which did not involve either plaintiff or the Proud Boys.

180.     On information and belief, defendant made its intentional decision to make a false and defamatory statement concerning plaintiff's attitude toward the Unite the Right rally

because it could not resist what defendant saw as a perfect opportunity to discredit plaintiff and associate him with extremist, violent conduct.

181.    As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## II.    DEFAMATION
### *False Claim that Proud Boys are the "Military Arm of the Alt-Right"*

182.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 181 as if fully set forth herein.

183.    Defendant published a false statement about plaintiff.

184.    In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled "New 'Fight Club' Ready for Street Violence," defendant falsely stated that the Proud Boys are known as "the military arm of the Alt-Right."

185.    This statement is false because the Proud Boys organization is not known that way; is not affiliated with the Alt-Right movement; and is not a military organization.

186.    Plaintiff has explicitly disavowed the Alt-Right and has stated that the Proud Boys is a social club, not a militant organization.

187.    The plain inference of this false statement is that plaintiff himself founded the Proud Boys as a paramilitary organization, terrorist cell or other kind of violent group, which places him in a false and defamatory light.

188.    Defendant published this statement to third parties without authorization or privilege.

189.    Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

190.     Defendant made this statement with actual malice.

191.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant was aware that plaintiff explicitly disavowed the Alt-Right and had described the Proud Boys as a social club, not a militant organization.

192.     Defendant never contacted plaintiff to verify information before publishing this statement, despite having the means and opportunity to do so.

193.     Defendant never contacted any person with first-hand knowledge concerning the Proud Boys to verify information before publishing this statement, despite having the means and opportunity to do so.

194.     This statement caused special harm to plaintiff.

195.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

### III.     DEFAMATION
### *False Claim that the Proud Boys "Shows Up at Pro-Trump Rallies Looking to Rumble"*

196.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 195 as if fully set forth herein.

197.     Defendant published a false statement about plaintiff.

198.     In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled "New 'Fight Club' Ready for Street Violence," defendant falsely stated that the Proud Boys "shows up at pro-Trump rallies looking to rumble," i.e., to get into violent confrontations.

199.    This statement is false because while, under club policy, Proud Boys members may defend themselves if attacked, like all other citizens, they do not and may not proactively initiate physical confrontation.

200.    The Proud Boys does not attend rallies seeking to engage in violence and it is against the policies of the Proud Boys to do so.

201.    The plain inference of this false statement is that plaintiff himself founded the Proud Boys as a paramilitary organization, terrorist group or other kind of violent group, which places him in a false and defamatory light.

202.    Defendant published this statement to third parties without authorization or privilege.

203.    Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

204.    Defendant made this statement with actual malice.

205.    Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant had no evidence that the Proud Boys attended rallies seeking to engage in violence.

206.    Defendant never contacted plaintiff to verify information before publishing this statement, despite having the means and opportunity to do so.

207.    Defendant never contacted any person with first-hand knowledge concerning the Proud Boys to verify information before publishing this statement, despite having the means and opportunity to do so.

208.    This statement caused special harm to plaintiff.

209.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

### IV.     DEFAMATION
#### *False Claim that McInnes "Denigrated Muslims and Called Asian Americans 'Slopes' and 'Riceballs'"*

210.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 209 as if fully set forth herein.

211.     Defendant published a false statement about plaintiff.

212.     In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled "New 'Fight Club' Ready for Street Violence," defendant falsely stated that plaintiff "denigrated Muslims and called Asian Americans 'slopes' and 'riceballs'."

213.     This statement is false because plaintiff did not denigrate Muslims and did not call Asian Americans "slopes" and "riceballs."

214.     Defendant published this statement to third parties without authorization or privilege.

215.     Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

216.     Defendant made this statement with actual malice.

217.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant had no evidence that plaintiff made these statements.

218.     Defendant never contacted plaintiff to verify information before publishing this statement, despite having the means and opportunity to do so.

219.     This statement caused special harm to plaintiff.

220.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## V.    DEFAMATION
### False Claim that McInnes Devised the "Most Fertile 'In-Real-Life' Recruiting Ground for White Supremacists and Anti-Semites"

221.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 220 as if fully set forth herein.

222.     Defendant published a false statement about plaintiff.

223.     In an article by "Hatewatch Staff" dated August 10, 2017, published on defendant's website entitled "Do You Want Bigots, Gavin? Because This Is How You Get Bigots," defendant falsely stated that plaintiff "devised" what it falsely describes as "the most fertile 'in-real-life' recruiting ground for white supremacists and anti-Semites [sic] within today's organized far-right."

224.     This statement is false because plaintiff did not devise any recruiting ground for white supremacists and anti-Semites, much less the "most fertile" one, assuming that a "recruiting ground" can even be "fertile."

225.     The Proud Boys explicitly prohibits white supremacists and anti-Semites from membership, as stated in its bylaws.

226.     The article quoted, moreover, does not set forth facts to support the accusation that the Proud Boys is "the most fertile" recruiting ground for white supremacists and antisemites, but, rather, imputes to the organization the bigoted rhetoric of a handful of members or former members.

227.     Indeed, while the article itself admits that such comments "notably complicate the 'either-Nazi-or-not' binary that McInnes uses to define his own organization's boundaries—

"either-Proud Boy-or-not"—that is, his claim, while leader of the Proud Boys, that neo-Nazis were not welcome in the organization, the title of the article, far from alluding to any complications, simplistically and misleadingly tars Mr. McInnes with the brush of members or former members who admitted that their comments were inconsistent with plaintiff's stated positions.

228.     Defendant's headline and article placed plaintiff in a false, damaging and defamatory light.

229.     Defendant published this statement to third parties without authorization or privilege.

230.     Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

231.     Defendant made this statement with actual malice.

232.     Defendant knew the statement, as well as its framing in a manner meant to associate it with plaintiff, was false or acted with reckless disregard for its truth or falsity because defendant was aware of the Proud Boys' bylaws which explicitly prohibit white supremacists and antisemites from membership, and because the sources defendant quoted explicitly admitted that their sentiments were contrary to those bylaws and Mr. McInnes's views both personal and as a leader of the Proud Boys.

233.     Defendant never contacted plaintiff to verify information before publishing this statement, despite having the means and opportunity to do so.

234.     This statement caused special harm to plaintiff.

235.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## VI.    DEFAMATION
### *False Claim that Proud Boys "Offer Their Right-Wing Converts a*
### *Chance to Duke It Out in the Street"*

236.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 235 as if fully set forth herein.

237.    Defendant published a false statement about plaintiff.

238.    In an article published on defendant's website by Rachel Janik dated August 17, 2018, entitled "Kessler falls flat in D.C., but the radical right marches on," defendant falsely stated that the Proud Boys "offer their right-wing converts a chance to duke it out in the street with people they disagree with."

239.    This statement is false because the Proud Boys does not offer anyone "a chance to duke it out in the street with people they disagree with." The Proud Boys does not promote or encourage violence and certainly does not "offer" members the chance, nor does it approve of or permit members, to initiate violence against people who merely "disagree with" them.

240.    This plain implication of this statement is that plaintiff founded an organization that attracted and kept members by offering them the opportunity to engage in violence with persons with whom they disagree, a statement for which defendant could not and did not have any factual basis.

241.    Defendant's sneering use of the epithet "right-wing converts" to describe Proud Boy members exacerbates the defamatory nature of the statement because it implies that plaintiff founded and led an organization that "converted" or programmed individuals to change their political views as well as their attitude toward, tolerance of and appetite for violence.

242.    Defendant published this statement to third parties without authorization or privilege.

243.     Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

244.     Defendant made this statement with actual malice.

245.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant had no evidence that the Proud Boys offers people a chance to engage in street violence; had no factual basis for claiming it does; misleadingly described political adversaries of the Proud Boys—who themselves might initiate, and in fact have initiated violence against the Proud Boys—were merely persons who "disagree" with the Proud Boys; and misleadingly suggests, by the use of the word "convert," that members of the Proud Boys are programmed, weak-minded or mentally defective.

246.     Defendant purposely framed these false claims in such manner as to suggest that Mr. McInnes himself was responsible for these the "facts" falsely claimed in the article.

247.     Defendant never contacted plaintiff or any other person having first-hand knowledge to verify information before publishing this statement, despite having the means and opportunity to do so.

248.     This statement caused special harm to plaintiff.

249.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## VII.    DEFAMATION
### False Claim that Mr. McInnes
### "Brought a Samurai Sword" to a Public Event

250.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 249 as if fully set forth herein.

251.     Defendant published a false statement about plaintiff.

252.    In an article by Rachel Janik dated October 13, 2018, on defendant's website entitled "Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event," defendant falsely stated that plaintiff "brought a samurai sword to his event."

253.    This statement is false because plaintiff did not bring a samurai sword to his event. Consistent with his persona as a humorist, plaintiff appeared with a toy sword made of plastic, which was also broken.

254.    Defendant published this statement to third parties without authorization or privilege.

255.    Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

256.    Defendant made this statement with actual malice.

257.    Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant had access to information showing that the sword was a toy, not a real samurai sword.

258.    Defendant never contacted plaintiff to verify information before publishing this statement, despite having the means and opportunity to do so.

259.    Defendant, on information and belief, published this obviously false and outlandish statement in order to depict plaintiff as reckless, violent and unhinged.

260.    This statement caused special harm to plaintiff.

261.    As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## VIII.   DEFAMATION
### *False Claim that Mr. McInnes*
### *Attended "an Anti-Muslim Rally"*

262.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 261 as if fully set forth herein.

263.    Defendant published a false statement about plaintiff.

264.    In an article by Rachel Janik dated October 13, 2018 published on defendant's website entitled "Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event," the title of which is also false and misleading, defendant falsely stated that Mr. McInnes attended "an anti-Muslim rally" in 2017.

265.    This statement is false because plaintiff did not attend an anti-Muslim rally. Plaintiff attended a March Against Sharia rally.

266.    The rally was meant to express opposition to implementation of Islamic religious law in secular society, not to Islam or its adherents.

267.    In 2017 that view was shared by the majority of North American Muslims, according to a study by the University of Windsor, Canada's Institute for Social Policy and Understanding, which indicated that Muslims were just as unwilling to accept Islamic law in their new lands of residence as non-Muslims.

268.    Defendant published this false statement to third parties without authorization or privilege.

269.    Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

270.    Defendant made this statement with actual malice.

271.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant mischaracterized the nature of the rally plaintiff attended.

272.     Defendant knew that the rally attended by plaintiff was meant to express opposition to the promulgation in the U.S. of sharia law, not opposition to Muslims.

273.     On information and belief, defendant elided this distinction in order to give its readers and donors the false and defamatory impression that plaintiff was an anti-Muslim bigot, thereby justifying its obsession with him, its frequent publication of opprobrium directed at him, and to encourage donations to fund its efforts.

274.     This statement caused special harm to plaintiff.

275.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## IX.     DEFAMATION
### False Claim that the Proud Boys "Embrace the Central Tenets of White Nationalism"

276.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 275 as if fully set forth herein.

277.     Defendant published a false statement about plaintiff.

278.     In an article dated October 18, 2018, on defendant's website by "the Editors" entitled "Weekend Read: Violence and hate, that's the Proud Boys in a nutshell," defendant falsely stated that the Proud Boys "embrace [the] central tenets of white nationalism."

279.     This statement is false because the Proud Boys did not, and not, embrace the central tenets of white nationalism.

280.     White nationalism is a political and an ideological movement espousing the belief that a white national majority should be maintained within a historically white nation. White

nationalists embrace ideologies that identify white people as a specific race and seek to inspire a nationalist pride in this race. White nationalism also posits white people as the dominant, superior race and opposes such actions as the immigration of non-whites, multiculturalism, and the general mixing of different racial groups.

281.     The Proud Boys explicitly prohibit white nationalism in their bylaws and include members of all races.

282.     The present leader of the Proud Boys is of Afro-Cuban heritage.

283.     Defendant published this false statement to third parties without authorization or privilege.

284.     Defendant published this statement on its website, which is accessible worldwide and is viewed by numerous third parties.

285.     Defendant made this statement with actual malice.

286.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant was aware of, or recklessly disregarded, the fact that the Proud Boys' bylaws explicitly prohibit white nationalism.

287.     Defendant never contacted plaintiff or any other knowledgeable person to verify information before publishing this statement, despite having the means and opportunity to do so.

288.     Defendant, on information and belief, made this false statement in order to harm the reputation of plaintiff, the founder and former leader of the Proud Boys.

289.     This statement caused special harm to plaintiff.

290.     As a direct and proximate result of defendant's false statement, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## X.    DEFAMATION
### *False Claim that Mr. McInnes*
### *"Utilizes Subterfuge and Lies"*

291.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 290 as if fully set forth herein.

292.     Defendant published false statements about plaintiff.

293.     In an article dated October 18, 2018, on defendant's website by "the Editors" entitled "Weekend Read: Violence and hate, that's the Proud Boys in a nutshell," defendant falsely described plaintiff as an "extremist" who "utilizes subterfuge and lies."

294.     This statement is false because plaintiff is not an extremist and does not utilize subterfuge and lies. Plaintiff is a humorist and commentator who expresses his views openly and honestly.

295.     The article, in fact, builds its "subterfuge and lies" claims on a series of misstatements of its own.

296.     For example, the article states, "McInnes has denied that his group has any connection to the racist 'alt-right,' even as its members marched in Charlottesville, Virginia, alongside Richard Spencer, the most prominent alt-right leader."   As set forth above, notwithstanding the conduct of individual members, the Proud Boys were discouraged from attending the Charlottesville rally. The Proud Boys also have nothing to do with Richard Spencer.

297.     The article also states, "He's denied that the group is any different from other fraternal orders, like the Shriners or the Elks. But the Proud Boys calls its members 'Western chauvinists,' and they initiate prospective members by beating them up while requiring them to name five breakfast cereals." While defendant's subjective judgment about the beliefs and

initiation ceremonies of the Proud Boys might differ from that of plaintiff, this does not make plaintiff's comparison to other fraternal organizations a lie.

298.     Indeed, the Elks was founded as a social club for minstrel show performers, barred membership by women and minorities for most of its history, still requires members to affirm belief in God, and has its own set of silly bonding rituals.  The same can be said for the all-male Shriners, who as recently as 1991 were sued for hazing practices that required initiates to be blindfolded, jolted by electricity applied to their bare buttock, forced to walk on an electric mat meant to simulate the hot sands of the Sahara, and knocked unconscious.

299.     The article's next claim of a lie by Mr. McInnes is his denial that the hate group seeks out violence, "even as his thugs march alongside neo-Nazis and white supremacist hate groups."  Even if this claim were true, marching is not a form of violence, and plaintiff's statement is not a lie.

300.     The article's repeated claims that Mr. McInnes and the Proud Boys traded in dishonest and false claims are, ironically, supported only by defendant's own dishonest and false attempts to demonstrate its thesis.

301.     Defendant published these statements to third parties without authorization or privilege.

302.     Defendant published these statements on its website, which is accessible worldwide and is viewed by numerous third parties.

303.     Defendant made this statement with actual malice.

304.     Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant had no evidence that plaintiff or the Proud Boys engaged in

subterfuge and lies, and purposely misled readers as set forth above to give the false impression that they did.

305.    Defendant never contacted plaintiff to verify information before publishing these statements, despite having the means and opportunity to do so.

306.    These statements caused special harm to plaintiff.

307.    As a direct and proximate result of defendant's false statements, plaintiff has suffered damage to his reputation, loss of employment opportunities, and social ostracism.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in his favor and against defendant as follows:

a.  Compensatory damages in an amount to be determined at trial, but in excess of $75,000;

b.  Punitive damages in an amount to be determined at trial;

c.  A permanent injunction requiring defendant to remove all false and defamatory statements about plaintiff from its website and to publish a retraction;

d.  Pre-judgment and post-judgment interest as allowed by law;

  a.  Costs and reasonable attorneys' fees; and

  b.  Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**BARON COLEMAN LAW FIRM**

By:  G. BARON COLEMAN
Alabama Bar No. ASB-9562-O67C

PO Box 789
Montgomery AL 36101-0789
baroncoleman@gmail.com
334-625-9097

**COLEMAN LAW FIRM, PC**

By: _____
    Ronald D. Coleman

(*pro hac vice*)
50 Park Place, Suite 1105
Newark, NJ 07102
973-264-9611
rcoleman@colemanlaw-pc.com
*Attorneys for Plaintiffs*

Date: October 29, 2025