## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| GAVIN MCINNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:19-cv-98-MHT-GMB |
| THE SOUTHERN POVERTY LAW | ) | |
| CENTER, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT SOUTHERN POVERTY LAW CENTER, INC.'S MOTION
TO DISMISS THE SECOND AMENDED COMPLAINT AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

Robert D. Segall [ASB-7354-E68R]
Shannon Holliday [ASB-5440-Y77S]
COPELAND, FRANCO, SCREWS & GILL, P.A.
P.O. Box 347
Montgomery, AL 36101-0347
Telephone:  334-834-1180
Facsimile:  334-834-3172
Email:  segall@copelandfranco.com
Email:  holliday@copelandfranco.com

Chad R. Bowman (*pro hac vice*)
Maxwell S. Mishkin (*pro hac vice*)
Sasha Dudding (*pro hac vice*)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Telephone:  202-661-2200
Facsimile:  202-661-2299
Email:  bowmanchad@ballardspahr.com
Email:  mishkinm@ballardspahr.com
Email:  duddings@ballardspahr.com

**Attorneys for Defendant
Southern Poverty Law Center, Inc.**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ............................................ 2

    A.      PLAINTIFF GAVIN MCINNES ................................................... 2

    B.      THE PROUD BOYS ..................................................................... 8

    C.      DEFENDANT THE SOUTHERN POVERTY LAW CENTER ......... 14

    D.      THE INITIAL COMPLAINT AND THE FIRST AMENDED COMPLAINT ............................................................................. 15

    E.      THE SECOND AMENDED COMPLAINT ..................................... 16

            1.      April 25, 2017: "New 'Fight Club' Ready for Street Violence" (Counts II, III, and IV) ................................................ 17

            2.      August 7, 2017: "Extremist's 'Unite the Right' Rally: A Possible Historic Alt-Right Showcase?" (Count I) .................. 18

            3.      August 10, 2017: "Do you want Bigots, Gavin? This is how you get Bigots" (Count V) ........................................... 18

            4.      August 17, 2018: "Kessler Falls Flat, But the Radical Right Marches On" (Count VI) ................................................. 20

            5.      October 13, 2018: "Far-right Skinheads Join Proud Boys in Assaulting Protestors in New York City Following Gavin McInnes Event" (Counts VII and VIII) ................................ 20

            6.      October 18, 2018: "Weekend Read: Violence and Hate, That's the Proud Boys in a Nutshell" (Counts IX and X) ..................... 21

ARGUMENT ................................................................................................. 22

I.      THE SAC DOES NOT ALLEGE FACTS THAT, IF PROVEN, WOULD PLAUSIBLY ESTABLISH THAT SPLC PUBLISHED WITH ACTUAL MALICE ............................................................... 22

    A.      Count I ....................................................................................... 24

B.      Count II ...........................................................................................25

C.      Count III .........................................................................................26

D.      Count IV .........................................................................................26

E.      Count V ...........................................................................................27

F.      Count VI..........................................................................................28

G.      Count VII ........................................................................................29

H.      Count VIII .......................................................................................30

I.       Count IX...........................................................................................30

J.       Count X ............................................................................................31

II.     THE CHALLENGED STATEMENTS ARE PROPERLY DISMISSED ON
        SEPARATE AND INDEPENDENT GROUNDS AS WELL ..........................32

        A.      Various Challenged Statements Are Also Properly Dismissed as Not
                "Of and Concerning" McInnes .........................................................32

        B.      Nine of the Ten Challenged Statements Are Non-Actionable Opinion.................34

        C.      Even if They Were Deemed Statements or Implications of Fact,
                Numerous Challenged Statements Are Substantially True....................................38

        D.      Certain of the Challenged Statements Are Not, as a Matter of Law,
                Reasonably Subject to a Defamatory Meaning.......................................................39

        E.      The Challenged Statements Cannot, as a Matter of Law, Cause
                McInnes Additional Harm in Light of Unchallenged Statements ........................41

        CONCLUSION...........................................................................................................43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1st Amendment Praetorian v. N.Y. Times Co.*,
  2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ...........................................................33

*Adelson v. Harris*,
  876 F.3d 413 (2d Cir. 2017)..................................................................................24

*Algarin v. Town of Wallkill*,
  421 F.3d 137 (2d Cir. 2005)..................................................................................32

*Aronson v. Wiersma*,
  483 N.E.2d 1138 (N.Y. 1985)................................................................................40

*Bauer v. Baud*,
  2023 WL 2307413 (S.D.N.Y. Mar. 1, 2023) ........................................................38

*Brian v. Richardson*,
  660 N.E.2d 1126 (N.Y. 1995)...............................................................................35

*Buckley v. Littell*,
  539 F.2d 882 (2d Cir. 1976)..................................................................................36

*Celle v. Filipino Reporter Enterprises*,
  209 F.3d 163 (2d Cir. 2000).............................................................................34, 40

*Chau v. Lewis*,
  771 F.3d 118 (2d Cir. 2014)..................................................................................33

*Church of Scientology International v. Behar*,
  238 F.3d 168 (2d Cir. 2001)........................................................................32, 41, 42

*Church of Scientology International v. Time Warner, Inc.*,
  932 F. Supp. 589 (S.D.N.Y. 1996) ........................................................................42

*Coleman v. Grand*,
  158 F.4th 132 (2d Cir. 2025) ...........................................................................34, 38

*Cooper v. Franklin Templeton Investments*,
  2023 WL 3882977 (2d Cir. June 8, 2023) ............................................................38

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  406 F. Supp. 3d 1258 (M.D. Ala. 2019) ..........................................................35, 36

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  6 F.4th 1247 (11th Cir. 2021) ..........................................................................14, 22

*Cousins v. Goodier*,
  2022 WL 3365104 (Del. Aug. 16, 2022) ...............................................................36

*Covino v. Hagemann*,
  627 N.Y.S.2d 894 (Sup. Ct. 1995) ......................................................................36

*Crenshaw v. Lister*,
  556 F.3d 1283 (11th Cir. 2009) ...................................................................24, 31

*Cummings v. City of New York*,
  2020 WL 882335 (S.D.N.Y. Feb. 24, 2020) ..................................................36, 38

*Davis v. Boeheim*,
  22 N.E.3d 999 (N.Y. 2014) ................................................................................35

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) .............................................................................2

*Farrakhan v. Anti-Defamation League*,
  2025 WL 24066 (2d Cir. Jan. 3, 2025) ..............................................................38

*Florio v. Gallaudet University*,
  119 F.4th 67 (D.C. Cir. 2024) ...........................................................................36

*Forte v. Jones*,
  2013 WL 1164929 (E.D. Cal. Mar. 20, 2013) .....................................................36

*Fulani v. N.Y. Times Co.*,
  260 A.D.2d 215 (N.Y. App. Div. 1999) .............................................................33

*Ganske v. Mensch*,
  480 F. Supp. 3d 542 (S.D.N.Y. 2020) ................................................................37

*Gilman v. Spitzer*,
  538 F. App'x 45 (2d Cir. 2013) .........................................................................33

*Gilman v. Spitzer*,
  902 F. Supp. 2d 389 (S.D.N.Y. 2012) ...............................................................33

*Gubarev v. BuzzFeed, Inc.*,
  340 F. Supp. 3d 1304 (S.D. Fla. 2018) .............................................................24

*Horsley v. Feldt*,
  304 F.3d 1125 (11th Cir. 2002) ........................................................................37

*Hunt v. Liberty Lobby*,
  720 F.2d 631 (11th Cir. 1983) ..........................................................................25

*Jackson v. United Steel, Paper & Forestry, Rubber, Manufacturing, Energy,*
  *Allied Industrial & Service Workers International Union,*
  2009 WL 10704261 (N.D. Ala. Feb. 23, 2009) ...................................................................36

*James v. Gannett Co.,*
  353 N.E.2d 834 (N.Y. 1976) ......................................................................................40

*Jankovic v. International Crisis Group,*
  494 F.3d 1080 (D.C. Cir. 2007) ..................................................................................34

*Jewell v. NYP Holdings, Inc.,*
  23 F. Supp. 2d 348 (S.D.N.Y. 1998) ..........................................................................41

*Kelly v. Schmidberger,*
  806 F.2d 44 (2d Cir. 1986) ..........................................................................................39

*Kirch v. Liberty Media Corp.,*
  449 F.3d 388 (2d Cir. 2006) ........................................................................................32

*Law Offices of David Freydin, P.C. v. Chamara,*
  24 F.4th 1122 (7th Cir. 2022) ......................................................................................36

*Liberty Lobby, Inc. v. Dow Jones & Co.,*
  838 F.2d 1287 (D.C. Cir. 1988) ..................................................................................24

*Lil' Joe Wein Music, Inc. v. Jackson,*
  245 F. App'x 873 (11th Cir. 2007) ..............................................................................2

*Lindell v. Mail Media Inc.,*
  575 F. Supp. 3d 479 (S.D.N.Y. 2021) ........................................................................41

*Marten Transportation, Ltd. v. PlattForm Advertising, Inc.,*
  184 F. Supp. 3d 1006 (D. Kan. 2016) ........................................................................10

*Martin v. Brock,*
  2007 WL 2122184 (N.D. Ill. July 19, 2007) ..............................................................36

*Masson v. New Yorker Magazine, Inc.,*
  501 U.S. 496 (1991) ....................................................................................................38

*McCafferty v. Newsweek Media Group, Ltd.,*
  955 F.3d 352 (3d Cir. 2020) ........................................................................................36

*Michel v. NYP Holdings, Inc.,*
  816 F.3d 686 (11th Cir. 2016) ....................................................................................23

*Milkovich v. Lorain Journal Co.,*
  497 U.S. 1 (1990) ........................................................................................................34

v

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ..........................................................................23, 29

*O'Neil v. Peekskill Faculty Association*,
  507 N.Y.S.2d 173 (App. Div. 1986) ...................................................36

*Parekh v. CBS Corp.*,
  820 F. App'x 827 (11th Cir. 2020) .....................................................32

*Philadelphia Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986) ...........................................................................38

*Ratajack v. Brewster Fire Department, Inc.*,
  178 F. Supp. 3d 118 (S.D.N.Y. 2016) ................................................36

*Rosanova v. Playboy Enterprises, Inc.*,
  580 F.2d 859 (5th Cir. 1978) .............................................................24

*Squitieri v. Piedmont Airlines, Inc.*,
  2018 WL 934829 (W.D.N.C. Feb. 16, 2018) ......................................36

*Standing Committee on Discipline v. Yagman*,
  55 F.3d 1430 (9th Cir. 1995) .............................................................36

*Tannerite Sports, LLC v. NBC Universal News Group*,
  864 F.3d 236 (2d Cir. 2017) ..............................................................39

*Three Amigos SJL Restaurant, Inc. v. CBS*,
  28 N.Y.3d 82 (2016) ...........................................................................32

*Trump v. CNN*,
  2025 WL 3213203 (11th Cir. Nov. 18, 2025) ..............................36, 41

*Trump v. CNN*,
  684 F. Supp. 3d 1269 (S.D. Fla. 2023) ..............................................40

*Turner v. Wells*,
  879 F.3d 1254 (11th Cir. 2018) ...................................................23, 24

*Williams v. Kanemaru*,
  2013 WL 4458887 (Haw. Ct. App. 2013) ...........................................37

## Other Authorities

Robert D. Sack, *Sack on Defamation* ....................................24, 36, 41

Defendant Southern Poverty Law Center, Inc. ("SPLC") respectfully submits this Memorandum of Law in support of its motion to dismiss the Second Amended Complaint ("SAC") in this action pursuant to Federal Rule of Civil Procedure 12(b)(6) and states as follows:

## PRELIMINARY STATEMENT

This is Plaintiff Gavin McInnes's third attempt to state a viable defamation claim against SPLC over a series of articles that SPLC published about the Proud Boys. Following this Court's dismissal of McInnes's First Amended Complaint ("FAC"), *see* Oct. 16, 2025 Op. & Order (Dkt. 57) (the "Opinion & Order"), McInnes's Second Amended Complaint now identifies ten specific statements in those articles upon which it attempts to premise claims set out in Counts I through X. But while the SAC largely avoids the "cardinal sins of shotgun pleading" that this Court identified in dismissing the FAC, *id.* at 40, the SAC's factual allegations are no more sufficient when addressed to specific statements than they were when the Court considered them generally. McInnes wholly fails to satisfy the test set out by the Opinion & Order, namely that to plead a viable claim for defamation he must present "allegations that satisfy *all three* of the First Amendment requirements": that each challenged statement (1) was an assertion of fact capable of being proven or disproven, rather than a nonactionable expression of opinion; (2) was false; and (3) was published with knowledge of its falsity or despite a high degree of awareness of its probable falsity, *i.e.*, with "actual malice" fault. *Id.* at 39-42. The Second Amended Complaint does not satisfy each of those elements for *any* of the ten challenged statements, either regarding the issue previously reached by the Court—the sufficiency of the factual allegations of "actual malice" fault—or, for many statements, the other elements, as discussed further below. Following this third attempt to state a claim, dismissal should be granted with prejudice.[1]

---

[1] The original Complaint failed to allege facts establishing that this Court had jurisdiction. *See* Sept. 13, 2021 Op. & Order (Dkt. 46). In its more recent Opinion & Order, the Court held that the First Amended

## BACKGROUND AND PROCEDURAL HISTORY[2]

Although the Court is familiar with the factual background of this action, the following summary relates to the ten challenged statements and their defenses as a matter of law, including the context for interpreting the meaning of such statements and the plausibility of damages.

### A.    PLAINTIFF GAVIN MCINNES

Quoting a 2018 profile in *The New York Times*, the SAC acknowledges that McInnes has long been "a controversial figure in the news media." SAC ¶ 24. A founder of media and advertising businesses, a filmmaker and author, and a talk show host on internet websites, *id.* ¶¶ 24-26 (pp. 5-6),[3] McInnes is known for what the SAC characterizes as his "iconoclastic" and "'offensive'" style, *id.* ¶ 26 (p. 6)—in particular, his long history of provocative statements on race, gender, religion, and culture. For example:

---

Complaint failed to state a claim for tortious interference, false light, or violation of New York labor law, and failed to plausibly allege—as a public-figure defamation plaintiff must—that SPLC published any challenged statement with the constitutionally required level of "actual malice" fault. *See generally* Opinion & Order. The Court dismissed the non-defamation tort claims with prejudice and allowed McInnes a third try to plead a viable defamation claim.

[2] The SAC refers to and quotes extensively from multiple news reports, including the SPLC publications upon which McInnes bases his claims. "As a result, the full text of these referenced and quoted articles . . . is properly considered on a motion to dismiss." Opinion & Order at 4-5. This memorandum also references other news reporting about McInnes and the Proud Boys. SPLC relies on these reports not for the truth of the information they contain, but because their existence provides the necessary context for evaluating the challenged statements and for assessing whether McInnes could plausibly plead that SPLC published them with the requisite actual malice. Federal courts properly take judicial notice of such press reports, videos, speeches, and other publicly available materials on a motion to dismiss in defamation cases such as this one where the broader context in which a given statement was disseminated is an important element of the legal analysis. *See, e.g.*, *Lil' Joe Wein Music, Inc. v. Jackson*, 245 F. App'x 873, 879 (11th Cir. 2007) (taking judicial notice of widespread distribution of a film based on newspaper articles); *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (taking judicial notice of prior news articles in considering motion to dismiss defamation claims).

[3] Because paragraph numbering in the SAC restarts twice at paragraph 25—on page 7 (after paragraph 31) and on page 11 (after paragraph 49)—this Memorandum cites to paragraph and page numbers for paragraphs 25-49.

- In 2002, when a *New York Press* reporter asked McInnes what he thought about the residents of New York's Williamsburg neighborhood, he responded, "Well, at least they're not f***ing n***ers or Puerto Ricans.  At least they're white."[4]

- In 2003, McInnes told *The New York Times*: "I love being white and I think it's something to be very proud of . . . .  I don't want our culture diluted.  We need to close the borders now and let everyone assimilate to a Western, white, English-speaking way of life."[5]

- In a 2013 article written for *Taki's Magazine*, McInnes proclaimed that, "through trial and error, I learned that women want to be downright abused" by men.[6]

- Also in 2013, in a different article he wrote for *Taki's Magazine*, McInnes referred to Asian-Americans as "slopes" and "riceballs."[7]

- In a 2014 article published on the website *Thought Catalog*, McInnes wrote: "We're all transphobic. . . .  We see there are no old trannies.  They die of drug overdoses and suicide way before they're 40 and nobody notices because nobody knows them.  They are mentally ill gays who need help, and that doesn't include being maimed by physicians."[8]

- In 2017, in an on-camera interview with NBC News, McInnes stated "I'm not a fan of Islam.  I think it's fair to call me Islamophobic."[9]

---

[4] *Vice Rising: Corporate Media Woos Magazine World's Punks*, N.Y. Press, Oct. 8, 2002 (updated Feb. 16, 2015) (Holliday Decl. ¶ 21) (asterisks substituted for actual words used).

[5] Vanessa Grigoriadis, *The Edge of Hip: Vice, the Brand*, N.Y. Times, Sept. 28, 2003 (Holliday Decl. ¶ 22).

[6] Gavin McInnes, *Everything I Learned in College Was A Lie*, Taki's Magazine, July 19, 2013 ("When I got an email that said, 'Thank you for raping me last night,' I realized everything I learned in college was a lie.") (Holliday Decl. ¶ 23).

[7] Gavin McInnes, *OK, Let's NOT Kill Everyone in China*, Taki's Magazine, Nov. 15, 2013 ("I recently made the mistake of doing a humorous piece about 'Asian privilege,' which was nothing more than an article about white privilege with the word 'white' replaced with 'Asian.'  Virtually no **slopes** got the joke and my phone almost overheated with angry emails, re-Tweets, Facebook posts, and texts. (How did those tenacious **riceballs** get my number?)" (emphases added)) (Holliday Decl. ¶ 24).

[8] The article was removed shortly after publication because it espoused "hateful or abusive content."  In its place, *Thought Catalog* now provides a link to "criticism gathered from across the web" about McInnes's article.  *See* Holliday Decl. ¶ 25.

[9] *The America First Fraternity Pledges Trump*, NBC News Left Field, Nov. 1, 2017 at 3:17 (Holliday Decl. ¶ 26).

3

These comments were not outliers.  McInnes has authored dozens of articles—including for websites directed at white supremacists, such as VDARE[10] and American Renaissance[11]—with titles like "I'm Not A Racist, Sexist, or a Homophobe, You N***er Slut F***ot,"[12] "A Woman Should Vote with Her Husband,"[13] and "Transphobia Is Perfectly Natural."[14]  From at least 2014 through the end of 2018, when the final challenged statement identified in the Second Amended Complaint was published, McInnes hosted various internet talk shows that traffic in the same type of controversial rhetoric.  *See* SAC ¶ 25 (p. 6).  On his own program, for example, McInnes referred to U.S. Senator Cory Booker as "Sambo . . . shucking and jiving for the white man"; said that "a disproportionate number" of Muslims "are mentally damaged inbreds"; and asserted that "the reason [he is] sexist is because women are dumb."[15]  McInnes explained in a video posted to social media that he was "becoming anti-Semitic" after a trip to Israel,[16] and he posted a separate video entitled "10 Things I Hate About Jews" following the same trip.[17]

---

[10] Multiple news reports identify VDARE—named for Virginia Dare, the first English child born in the Americas, at the Roanoke settlement in 1587—as a white supremacist group.  *See, e.g.*, Sam Frizell, *GOP Shows White Supremacist's Tweet During Trump's Speech*, Time, July 22, 2016; *see generally* VDARE Wikipedia Page.  *See* Holliday Decl. ¶¶ 27-28.

[11] American Renaissance magazine is also commonly identified as a white supremacist publication in published reports.  *See, e.g.*, Emily Shugerman, *White supremacist sues Twitter for allegedly violating his right to free speech*, The Independent, Feb. 22, 2018; *see generally* American Renaissance (magazine) Wikipedia Page.  *See* Holliday Decl. ¶¶ 29-30.

[12] Gavin McInnes, *I'm Not a Racist Sexist, or a Homophobe, You N***er Slut Fa**ot*, Taki's Magazine, Aug. 12, 2011, (asterisks substituted for actual words used) (Holliday Decl. ¶ 31).

[13] Gavin McInnes, *A Woman Should Vote with Her Husband*, Taki's Magazine, Oct. 27, 2016 (Holliday Decl. ¶ 32).

[14] *See* note 8 *supra*.

[15] *See* Holliday Decl. ¶ 11 & Ex. 7.

[16] *See* Jonathan Goldsbie, *We Watched Gavin McInnes's Full Anti-Semitic Rant So You Don't Have To*, Canadaland, Mar. 14, 2017 (Holliday Decl. ¶ 33).

[17] The Forward & Daniel J. Solomon, *Vice Co-founder Lists the '10 Things He Hates the Most About Jews'*, Haaretz, March 18, 2017 (Holliday Decl. ¶ 34).

Beyond his own statements, press reports have documented McInnes's extensive interactions with individuals and groups known for bigotry. For example, one analysis noted McInnes's penchant for inviting prominent white nationalists to be guests on his shows, including Jared Taylor,[18] David Duke,[19] and Richard Spencer.[20] McInnes's writing appears in publications known for publishing white supremacists and so-called "race realists" such as VDARE, American Renaissance, and *Taki's Magazine*.[21]

For many years, McInnes has also maintained an active social media presence, including frequently sharing racist memes (virally transmitted cultural symbols or ideas), such as warnings of a "white genocide":[22]



---

[18] According to *The New York Times*, Taylor has "long [been] one of the country's most prominent white supremacists." Jonathan Mahler, *Donald Trump's Message Resonates with White Supremacists*, N.Y. Times, Feb. 29, 2016 (Holliday Decl. ¶ 35).

[19] David Duke is a former Grand Wizard of the Ku Klux Klan and an outspoken white supremacist. *See, e.g.*, Corky Siemaszko, *Who is David Duke, the White Supremacist Who Endorsed Donald Trump?*, NBC News, Feb. 29, 2016 (Holliday Decl. ¶ 36).

[20] *The Atlantic* magazine recently referred to Richard Spencer as "our generation's most prominent white supremacist." Graeme Wood, *His Kampf*, The Atlantic, June 2017 (Holliday Decl. ¶ 37). Regarding the appearance of these racists on McInnes's program, *see, e.g.*, Amanda Marcotte, *Gavin McInnes and the Proud Boys: 'Alt-right without the racism'?*, Salon, Oct. 17, 2018 ("As Jared Holt at Right Wing Watch has documented, McInnes frequently interviewed prominent white nationalists on his Compound show.") (Holliday Decl. ¶ 38).

[21] *See* notes 10-13 *supra.*

[22] *See* Holliday Decl. ¶ 6 & Ex. 3 (posting screenshot).

McInnes has also defended neo-Nazis accused—and eventually convicted—of beating two college students outside a New York bar, publicly identifying the victims and claiming they fabricated the incident.[23]  And he has appeared as a speaker at numerous public events, including at a nationwide "March Against Sharia."[24]

McInnes has proudly proclaimed his incitement of—and proclivity for—fighting and violence.  In February 2017, for example, McInnes told a cable news program that he "cannot recommend violence enough" as an "effective way to solve problems."[25]  In June 2018, he appeared in an online video in which he is depicted jabbing at a punching bag while offering opinions such as "what's wrong with hate?" and "what's wrong with fighting?  Fighting solves everything."[26]  And he once described the Proud Boys' ethos as: "We will kill you.  That's the Proud Boys in a nutshell."[27]  Indeed, according to McInnes, getting into a "major fight for the cause" is an official step towards becoming a full-fledged member of the Proud Boys.[28]

Moreover—and despite his occasional protestations that these many statements are merely ironic, rhetorical, or both—published reports indicate that McInnes is not afraid to practice what he preaches.  In January 2017, for example, it was widely reported that McInnes punched a

---

[23] *See* Max Jaeger & Tina Moore, *Vice co-founder shames victims of alleged neo-Nazi beatdown*, N.Y. Post, Feb. 27, 2017 (Holliday Decl. ¶ 39).

[24] *See* Kurtis Lee & Jenny Jarvie, *Anti-Sharia rallies around the U.S. denounce Islam while stoking concerns among Muslim groups*, Los Angeles Times, June 10, 2017 (Holliday Decl. ¶ 41).

[25] *See The Steve Maltzberg Show*, NewsmaxTV, Feb. 3, 2017 (Holliday Decl. ¶ 42).

[26] *See* Jane Coaston, *The Proud Boys, the bizarre far-right street fighters behind the violence in New York, Explained*, Vox.com, Oct. 15, 2018 (Holliday Decl. ¶ 43).

[27] James Purtill, *Labor calls on Govt to deny visa to Proud Boys founder Gavin McInnes*, Australian Broadcasting Corporation, Oct. 25, 2018 (Holliday Decl. ¶ 44).

[28] Kimberly M. Aquilina, *Gavin McInnes explains what a Proud Boy is and why porn and wanking are bad*, Metro, Feb. 9, 2017 (Holliday Decl. ¶ 45).

protestor on his way into a party celebrating Donald Trump's first election victory.[29]  On one

program, McInnes bragged that he had fought a man who "looked Hispanic."[30]

The SAC suggests that all of this is just an elaborate, years-long joke, describing McInnes

as a "comedian and political commentator."  SAC ¶ 25 (p.6).  In so doing, it quotes a 2018 profile

in *The New York Times* that describes McInnes as "offending liberals, women, 'beta male culture,'

and transgender people, writing in a voice inflected with a crass, contrarian bigotry that left him

just enough room to declare it all a joke."[31]  Other press reports have similarly noted McInnes's

attempts to avoid criticism by casting his statements as humor or irony—though many have

questioned that characterization.[32]  As *The New York Times* noted in another article discussing

McInnes, such "use of ironic, juvenile antics is something commonly seen on the fringes of the

right because it allows a veneer of deniability."[33]

In McInnes's case, however, the veneer has failed to shield him from the consequences of

his own statements and conduct.  After he published his "Transphobia" article in 2014, for

---

[29] *See, e.g.*, Andrew Marantz, *Trump Supporters at the Deploraball*, The New Yorker, Jan. 29, 2017 (Holliday Decl. ¶ 46).

[30] Jared Holt, *Gavin McInnes Brags About Fight Over Dog Poop With Man Who Looked 'Kind of Hispanic'*, Right Wing Watch, June 13, 2018 (Holliday Decl. ¶ 47).

[31] *See* SAC ¶ 26 (p. 6) (quoting Alan Feuer, *Proud Boys Founder: How He Went from Brooklyn Hipster to Far-Right Provocateur*, N.Y. Times, Oct. 16, 2018 (Holliday Decl. ¶ 19 & Ex. 15)).

[32] *See, e.g.*, Andy Campbell, *Gavin McInnes' Wife Threatens Neighbors Over 'Hate Has No Home Here' Signs*, HuffPost, Jan. 8, 2019 (noting that, in an effort to win over his neighbors, McInnes, "a gang leader famous for years of violent misogyny, was now trying to characterize himself as a misunderstood jokester."); Nicole Hemmer, *Tweedy Racists and "Ironic" Anti-Semites: the Alt-Right Fits a Historical Pattern*, Vox.com, Dec. 2, 2016 (opining in discussing McInnes that "[t]here is no functional difference between white supremacy and misogyny as acts of irony or acts of hatred."); Simon Houpt, *Everything Inside Gavin McInnes*, The Globe and Mail, Aug. 18, 2017 (updated Nov. 12, 2017) (noting that on McInnes' TV program, "irony and sincerity were dizzyingly fungible").  *See* Holliday Decl. ¶¶ 48-50.

[33] Alan Feuer & Jeremy W. Peters, *Fringe Groups Revel as Protests Turn Violent*, N.Y. Times, June 2, 2017 (Holliday Decl. ¶ 51).

example, McInnes was reportedly asked to leave the advertising agency he co-founded.[34]  Both McInnes and the Proud Boys were banned from Twitter (now known as X) on August 10, 2018—two days before a Washington, D.C. march held on the one-year anniversary of the Charlottesville, Virginia "Unite the Right" rally—for violating the company's "policy prohibiting violent extremist groups."[35]  On October 12, 2018 (and as discussed in more detail below), the Proud Boys were involved in a violent altercation in which several people were arrested after McInnes spoke at an event in New York City.  Approximately two weeks later, on October 30, 2018, McInnes and the Proud Boys were banned from Facebook and Instagram.[36]  Just over a week after that, online payment processor PayPal also banned McInnes and the Proud Boys, along with three left-wing "Antifa" groups.[37]  And on December 10, 2018, McInnes's videos were banned from YouTube as a result of "repeated copyright infringement offenses."[38]  *See* SAC ¶ 131.  Within the next month, other online platforms, including MailChimp and iTunes, followed suit.  *Id.* ¶¶ 141, 143.

### B.    THE PROUD BOYS

McInnes publicly announced the founding of the Proud Boys in September 2016, through an article he published in *Taki's Magazine*.[39]  According to that article, the "basic tenet of the

---

[34] Kristina Monllos, *Rooster CCO Gavin McInnes Asked to Take Leave of Absence*, Adweek, Aug. 15, 2014 (Holliday Decl. ¶ 52).

[35] Ryan Mac & Blake Montgomery, *Twitter Suspended Proud Boys' And Founder Gavin McInnes' Accounts Ahead Of The 'Unite The Right' Rally*, Buzzfeed News, Aug. 11, 2018 (quoting McInnes saying that Twitter ban "will have zero effect on my reach or on the Proud Boys") (Holliday Decl. ¶ 53).

[36] Sean Keane, *Facebook bans pages linked to far-right Proud Boys group after arrests*, CNET, Oct. 31, 2018 (Holliday Decl. ¶ 54).

[37] Aaron Mak, *PayPal Banned the Proud Boys and Three Antifa Groups*, Slate, Nov. 9, 2018 (Holliday Decl. ¶ 55).

[38] McInnes was reportedly allowed to return to YouTube several days later. *See* Jon Levine, *YouTube Reinstates Gavin McInnes Just Days After Ban*, The Wrap, Dec. 13, 2018 (Holliday Decl. ¶ 56).

[39] Gavin McInnes, *Introducing: The Proud Boys*, Taki's Magazine, Sept. 15, 2016 (Holliday Decl. ¶ 15 & Ex. 11).

group is that they are Western chauvinists who refuse to apologize for creating the modern world."[40]  Even at that early date, McInnes identified a dozen Proud Boys chapters worldwide, boasting at least 1,000 members.[41]  The founding article went on to describe the specifics of initiation into the Proud Boys, including a public declaration of allegiance, undergoing a physical beating, and getting a "Proud Boy" tattoo.[42]  In subsequent public statements, McInnes acknowledged the overlap between what he has described as "alt-light" groups such as the Proud Boys and what he has characterized as "alt-right" and white nationalist groups.[43]

Soon after McInnes unveiled the Proud Boys to the world, the group began making headlines for its members' involvement in often-violent, ideological street confrontations with other groups.  In April 2017, for example, CBS reported that the Proud Boys "sponsored [a] protest that descended into bloody violence at Berkeley's Civic Center Park" in California.[44]  Proud Boy Kyle Chapman was charged with a felony for wielding a leaded stick against counter-protestors at another Berkeley rally.[45]  In June 2017, *The New York Times* reported that the Proud Boys were visible (and violent) participants in a nationwide "Rally Against Sharia."[46]  In July 2017, the Proud Boys participated in a "ride through" of Islamberg, an Islamic community in Upstate New York.[47]

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *See* Rebel Media, *Gavin McInnes: What is the Alt-Right?*, YouTube.com (video in which McInnes explains that "both sides have in common Western chauvinism, they're not embarrassed by whiteness or whatever, [and] they don't believe diversity is the end-all and be-all") (Holliday Decl. ¶ 57).

[44] *Alt Right 'Proud Boys' Declare Victory in Berkeley Melee*, CBS News San Francisco, Apr. 15, 2017 (Holliday Decl. ¶ 58).

[45] Natalie Orenstein, *Kyle 'Based Stickman' Chapman charged with felony after Berkeley rally*, Berklyeside, Aug. 18, 2017 (Holliday Decl. ¶ 59).

[46] *See* note 33 *supra*.

[47] *See* Dean Obeidallah, *Trump-Supporting Bigots to Target Upstate New York Muslims*, The Daily Beast, July 14, 2017 (Holliday Decl. ¶ 61).

As later reported by *The New York Times*, a video of the event, produced for *Proud Boy* magazine, compared Muslims to a "virus" that "eat[s] and feed[s] off the host nation until it's dead."[48]

In August 2017, a Proud Boy named Jason Kessler was one of the principal organizers of the "Unite the Right" rally in Charlottesville, Virginia, that descended into violence and resulted in the death of a young woman named Heather Heyer. Prior to the rally, on June 21, 2017, the Proud Boys had posted, on their official website/online magazine, a purported "disavowal" by McInnes of the Charlottesville rally. That post, however, was taken down only three days later and replaced by an "official" statement that effectively retracted its predecessor, "wished [the Unite the Right organizers] nothing but the best," and "encouraged" interested Proud Boys chapters or individual members to attend the rally.[49] This second statement remained up through the date of the rally itself (August 12, 2017).[50] It was quietly removed thereafter and, by August

---

[48] Alan Feuer & Ali Winston, *Founder of Proud Boys Says He's Arranging Surrender of Men in Brawl*, N.Y. Times, Oct. 19, 2018 (Holliday Decl. ¶ 62).

[49] *Official Statement on the "Unite the Right" Rally*, Proud Boy Magazine, (accessed by searching Internet Archive for Proud Boys website as it existed on June 24, 2017) (Holliday Decl. ¶ 12 & Ex. 8). In relevant part, the new statement provided:

> "The general consensus among the group is while we enthusiastically support EVERYONE's right to free speech/peaceably assemble, that doesn't mean we have to attend every single event." (emphasis in original)

> "The organizers [of the Charlottesville Unite the Right event] are correct when they say we have to unite against our common enemy, the far left."

> "[I]f a chapter or an individual Proud Boy feels compelled to go, we **encourage** him to do so." (emphasis supplied)

> "[W]e wish them nothing but the best."

> "NOTE: An original version of this statement appeared earlier that included the ridiculous term 'disavow' and was meant to lampoon the elders. That is not who we are and that is not OK."

Judicial notice may properly be taken of such materials from the Internet Archive's Wayback Machine. *See, e.g.*, *Marten Transp., Ltd. v. PlattForm Advert., Inc.*, 184 F. Supp. 3d 1006, 1009-10 (D. Kan. 2016) (citing cases).

[50] *Official Statement*, *supra* n.49.

16, 2017, it had been replaced with McInnes's original statement.[51]  The rally and its aftermath dominated the national conversation for weeks, and Kessler's involvement—and membership in the Proud Boys—was widely reported by *The New York Times*, *Newsweek*, and numerous other news outlets.[52]  Other Proud Boys, including its chairman, also attended the rally.[53]

National press coverage of the Proud Boys and individual Proud Boys members intensified after the violence in Charlottesville, documenting members' increasingly violent rhetoric.  Much of that reporting focused on a series of planned demonstrations in the Pacific Northwest throughout the summer of 2017.  An organizer publicly announced an intention to bring guns to these events and to engage in "mutual combat" with counter-protestors, and stated that the Proud Boys would be on hand to provide "security."[54]  Not surprisingly, these rallies ultimately descended into violence.[55]  Then, in October 2018, after McInnes gave a speech to the Metropolitan Republican Club in New York City (at which, according to multiple news accounts, he brandished a Samurai

---

[51] *Id.*

[52] *See, e.g.*, Tom Porter, *Who are the Alt-right Leaders Addressing the White Nationalist Rally in Charlottesville?*, Newsweek, Aug. 12, 2017; Alan Feuer, *Proud Boys Founder: How He Went From Brooklyn Hipster to Far-Right Provocateur*, N.Y. Times, Oct. 16, 2018; *Explained: Who are the far-right Proud Boys?*, Al-Jazeera, July 18, 2018; Luke Barnes, *Proud Boys Founder Disavows Violence at Charlottesville But One of Its Members Organized the Event*, Think Progress, Aug. 24, 2017.  *See* Holliday Decl. ¶¶ 19, 63-65 & Ex. 15.

[53] Meg O'Connor, *Hate Goes Mainstream with the Miami Proud Boys*, Miami New Times, Dec. 10, 2018 (Holliday Decl. ¶ 66).

[54] *See, e.g.*, *Right-wing rally, counter-protesters face off in Portland*, PBS Newshour, Aug. 4, 2017 (quoting a Facebook post from event organizer Joey Gibson stating "We've always had guns at the rally . . . I cannot think of one rally when we didn't have guns with us . . .  Everywhere we go, we have guns"); Will Sommer, *Proud Boys, the Infamous Right-Wing Brawlers, Head to the Heart of Antifa Country*, The Daily Beast, July 19, 2018 ("[Rally organizer Joey] Gibson claims that the Portland Police Bureau told him the rally would be treated as 'mutual combat'—demonstrators facing off against one another, without police in the middle to separate them.").  *See* Holliday Decl. ¶¶ 67-68.

[55] *See, e.g.*, Katie Shepherd, *Portland Police Declare a Riot After Right-Wing Marchers Begin Beating Antifascists with Flag Poles*, Willamette Week, June 30, 2018 (updated July 1, 2018); Shane Dixon Kavanaugh, *Proud Boys, a fixture at Portland protests, labeled 'extremist group' by FBI*, The Oregonian, Nov. 19, 2018.  *See* Holliday Decl. ¶¶ 69-70.

sword to re-enact the assassination of Japanese leader Inejiro Asanuma in 1960),[56] Proud Boys members participated in a brawl outside the club's headquarters.[57] Parts of the altercation recorded and posted online documented the use of anti-gay slurs by Proud Boys.[58] The fight resulted in the arrest of nine Proud Boys, and ultimately in a decision by McInnes publicly to "disassociate" himself from the group—although not because he disagreed with either its actions or rhetoric. Rather, in a video posted online, McInnes explained that he did so on advice of counsel, in an effort to "alleviate [the members'] sentencing."[59] Eight Proud Boys arrested in connection with the incident have since pled guilty.[60]

Social media plays a prominent role in the Proud Boys' operations. It is, according to published reports, the primary means through which the group recruits new members.[61] Members regularly associate with or traffic in outright bigotry through social media or other internet platforms. For example, the hosts of a prominent anti-Semitic radio program, *The Daily Shoah*,[62] have discussed enthusiastically the prevalence of anti-Semitism among the Proud Boys'

---

[56] *See, e.g.*, Caroline Linton, *Video shows alleged assault of protestors after event featuring Proud Boys founder*, CBS News, Oct. 13, 2018 (Holliday Decl. ¶ 71); @FoxNews, Twitter (Oct. 12, 2018, 11:35 PM), https://x.com/FoxNews/status/1050953019708375041 ("Antifa attacks again — swords and vandalism at New York GOP office @FoxNewsNight"). McInnes now claims the sword was a toy. *See* SAC ¶ 253.

[57] *See, e.g.*, Shane Goldmacher, *Fight Breaks Out Near Republican Club After Visit by Gavin McInnes, Police Say*, N.Y. Times, Oct. 12, 2018; Tim Fitzsimons, *Proud Boys Guilty of a Hate Crime? Experts Say Probably Not*, NBC News, Oct. 17, 2018. *See* Holliday Decl. ¶¶ 72-73.

[58] *Id.*

[59] Jason Wilson, *Proud Boys founder Gavin McInnes quits 'extremist' far-right group*, The Guardian, Nov. 22, 2018, (quoting McInnes: "'I am told by my legal team and law enforcement that this gesture could help alleviate their sentencing.'"); *see also id.* ("'[A]t the very least this will show jurors they are not dealing with a gang and there is no head of operations.'") *See* Holliday Decl. ¶ 74.

[60] *See Far-right Proud Boys members sentenced over Manhattan brawl*, BBC, Mar. 2, 2019 (Holliday Decl. ¶ 75).

[61] Taylor Hatmaker, *Facebook is the recruiting tool of choice for far-right group the Proud Boys*, TechCrunch, Aug. 10, 2018 (Holliday Decl. ¶ 77).

[62] "Shoah" is a Hebrew word meaning "catastrophe." It is commonly used to refer to the Holocaust.

membership.[63]   Indeed, Proud Boys members have posted social media pictures of themselves with prominent Holocaust deniers, white nationalists, and known neo-Nazis.[64]   Media outlets have reported extensively on the Proud Boys' affiliations with neo-Nazi groups such as DIY Division, "a loose collective of violent neo-Nazis and fascists from Southern California that's organized and trains primarily to engage in fighting and violence at political rallies."[65]

The Proud Boys' profile has increased even more dramatically while this litigation has been pending.  According to the U.S. Department of Justice, "[t]he Proud Boys organization rose to a new level of national prominence in September 2020 when, during a nationally televised Presidential debate, candidate Donald Trump told the Proud Boys to 'stand back and stand by,' and that someone needed to do something about 'Antifa and the left.'"[66]   Following that event, "the Proud Boys began to view themselves as the foot soldiers of the right."[67]   Thus, after a political rally in November 2019, "Proud Boys engaged in violence on the streets of Washington, D.C.," and after another such rally in December 2019, "the Proud Boys viciously attacked a pedestrian (who they believed was associated with Antifa)."[68]   One month later, as the U.S. Attorney for the District of Columbia put it, "No organization put more boots on the ground at the Capitol on January 6, 2021 than the Proud Boys, and they were at the forefront of every major breach of the

---

[63] *See, e.g.*, *The Daily Shoah #159*, June 2, 2017, at 13:30-15:45 (approvingly discussing anti-Semitic statements by Proud Boys members) (Holliday Decl. ¶ 78).

[64] Holliday Decl. ¶ 6 & Ex. 3 at 14-36.

[65] Paul Bass, *Nationalists? Or Whitehoodwinkers?*, New Haven Independent, July 13, 2017 (Holliday Decl. ¶ 79).

[66] *See* Gov't's Opp. to Defs.' Mots. for J. of Acquittal & New Trial at 4, *United States v. Nordean*, No. 21-cr-175-TJK (D.D.C. July 21, 2023), ECF 883.

[67] *Id.* at 5-6.

[68] *Id.* at 7, 11.

Capitol's defenses, leading the on-the-ground efforts to storm the seat of government."[69]   The former national leader of the Proud Boys and several senior members were subsequently tried and convicted on multiple felony counts, including seditious conspiracy, for their actions in connection with the Capitol riot.[70]   President Trump commuted their sentences, however, shortly after taking office in January 2025.[71]

### C.    DEFENDANT THE SOUTHERN POVERTY LAW CENTER

Founded in 1971 in Montgomery, SPLC is a non-profit organization with a stated mission of working in partnership with communities to dismantle white supremacy, strengthen intersectional movements, and advance the human rights of all people.[72]   In furtherance of that purpose, SPLC endeavors to identify and monitor hate groups throughout the United States and expose their activities to the public.[73]

Beginning in April 2017, SPLC periodically reported on the activities of both the Proud Boys and its founder McInnes.  *See* SAC ¶¶ 159-60 (generally describing articles posted on SPLC's website).  SPLC created a publicly accessible "home page" for its research on the Proud Boys (the "SPLC Proud Boys Page"), which contains dozens of links to external sources of information, including both the group's own words posted on social media and other online

---

[69] *See Proud Boys Leader Sentenced to 22 Years in Prison for Seditious Conspiracy and Other Charges Related to U.S. Capitol Breach*, Dep't of Justice (Sept. 5, 2023), https://www.justice.gov/archives/opa/pr/proud-boys-leader-sentenced-22-years-prison-seditious-conspiracy-and-other-charges-related (Holliday Decl. ¶ 85).

[70] *See id.*

[71] *See A Proclamation by the President of the United States of America* (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021 (Holliday Decl. ¶ 86).

[72] *See, e.g.*, *About*, SPLC, Holliday Decl. ¶ 80.

[73] *Id.*; *see also* SAC ¶ 4; *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1250 (11th Cir. 2021) ("SPLC is an Alabama-based nonprofit organization that, among other things, publishes a 'Hate Map'—a list of entities the organization has characterized as hate groups—on its website.").

forums, and the voluminous mainstream news reporting about it.[74]  Through the SPLC Proud Boys Page and periodic articles describing the group's activities and public statements, SPLC has informed the public about the Proud Boys and sought to situate it within the taxonomy of hard right hate groups in the United States.

### D.    THE INITIAL COMPLAINT AND THE FIRST AMENDED COMPLAINT

McInnes filed his initial Complaint in this matter in February 2019, principally claiming that SPLC's description of the Proud Boys as a "hate group" injured his reputation, while also challenging more than thirty discrete statements within ten separate articles published on SPLC's website between April 2017 and October 2018.  This initial Complaint ran more than 300 paragraphs across 60 pages, including lengthy sections devoted to broad allegations about SPLC's activities and operations, and asserted claims for defamation, false light invasion of privacy, tortious interference, and aiding and abetting a violation of New York labor law.

After SPLC moved to dismiss the initial Complaint for failure to state a claim, Dkt. 17, the Court dismissed the Complaint without prejudice for lack of subject-matter jurisdiction, *see* Sept. 13, 2021 Op. & Order.  McInnes then filed an Amended Complaint, Dkt. 47, and SPLC moved again to dismiss for failure to state a claim, Dkt. 49.  The Court granted SPLC's motion to dismiss in October 2025.  *See generally* Opinion & Order.  As the Court explained, the New York labor law claim failed because that statute does not give rise to aider-and-abettor liability; the false light claim failed because New York law—which applies since New York is where McInnes allegedly suffered reputational injury—does not recognize invasion of privacy claims; and the tortious interference claim fails as duplicative of the defamation claim because both seek recovery for alleged reputational injury.  *Id.* at 16-28.  The Court dismissed those three claims with prejudice.

---

[74] *See* Holliday Decl. ¶ 11 & Ex. 7.

Turning to the defamation claim, the Court explained that to survive a motion to dismiss as a public-figure plaintiff, McInnes must plausibly allege publication with "actual malice" fault, which would require here "allegations sufficient to show that SPLC actually entertained serious doubts as to the veracity of [each challenged statement], or that SPLC was highly aware that [each challenged statement] was probably false." *Id.* at 32 (quoting *Coral Ridge*, 6 F.4th at 1252) (cleaned up). The Court concluded that McInnes failed to offer such allegations as to any of the challenged statements and granted SPLC's motion to dismiss. *Id.* at 41-42. That dismissal was without prejudice so that McInnes could have another chance to state a claim, but the Court cautioned that "[i]f McInnes decides to file an amended complaint, he is instructed to separate each allegedly defamatory statement into individual counts, clearly identifying each statement and providing allegations that satisfy *all three* of the First Amendment requirements described above, including the actual-malice requirement." *Id.* at 42.

E.    **THE SECOND AMENDED COMPLAINT**

Filed on October 29, 2025, the SAC is limited to defamation claims and no longer challenges SPLC's designation of the Proud Boys as a "hate group." The SAC instead attacks ten statements from six articles that SPLC published about the Proud Boys between August 2017 and October 2018. Those articles, each of which is attached to the Declaration of Shannon Holliday filed herewith, are summarized below, in chronological order.[75]

---

[75] In the SAC, the Articles are not presented in chronological order and are introduced with lettered paragraphs. For the Court's ease of reference, SPLC has re-ordered them chronologically and refers to them as Articles 1-6 in this Memorandum. Articles 1-6 also correspond with Exhibits 1-6 of the Holliday Declaration. In addition, this Memorandum is accompanied by an Addendum consisting of a chart that addresses each of the 10 challenged statements. For purposes of the Addendum, SPLC has presented the Articles in the order they appear in the SAC.

1.    **April 25, 2017: "New 'Fight Club' Ready for Street Violence"**
       **(Counts II, III, and IV)[76]**

This article ("Article 1") discusses the formation of a group called the Fraternal Order of Alt Knights, or "FOAK," which, according to its founder, Proud Boy Kyle Chapman, would act as the "tactical defensive arm" of the Proud Boys.  Based on Chapman's own description, the article offers the view that, while FOAK does not appear to have "any overt racist themes," it "sounds quite similar to a neo-Nazi 'fight club' called DIY Division."  The article also discusses public statements made by McInnes, including those "denigrat[ing] Muslims and refer[ing] to Asian-Americans as 'slopes' and 'riceballs'" on a right-wing website, as well as describing the Proud Boys as a "group that shows up at Trump rallies looking to rumble" and one that "others have described as the military arm of the Alt-Right."

Article 1 contains a number of primary sources and hyperlinks supporting the opinions it expresses.  For example, it quotes from a social media post by Chapman, in which he states that FOAK would be "partnering with Proud Boys," that it had the "full approval" of McInnes, and that its "emphasis would be on street activism, preparation, defense and confrontation."  The article also contains links to a previous SPLC article reporting on the violent Berkeley protests in April 2017, which in turn links to footage of the incident, as well as to news reporting (including quotes from Chapman, who participated in it) from the *Los Angeles Times* and *CBS San Francisco*, among others.  With respect to its reference to DIY Division, Article 1 links to an SPLC article regarding a similar protest a month earlier in which DIY Division participated, which includes links to and quotes from the *Los Angeles Times*, *Orange County Register*, and *OC Weekly*.

---

[76] Holliday Decl. ¶ 4 & Ex. 1.

McInnes alleges that Article 1 defamed him by stating that "others have described the Proud Boys as the military arm of the Alt-Right," SAC ¶ 184 (Count II); that the Proud Boys "show[] up at pro-Trump rallies looking to rumble," SAC ¶ 198 (Count III); and that McInnes "denigrated Muslims and called Asian Americans 'slopes' and 'riceballs,'" SAC ¶ 212 (Count IV).

### 2.   August 7, 2017: "Extremist's 'Unite the Right' Rally: A Possible Historic Alt-Right Showcase?" (Count I)[77]

SPLC published this article ("Article 2") in advance of the "Unite the Right" rally in Charlottesville, Virginia, and it examines several of the groups and personalities scheduled to attend the rally, including KKK members, self-avowed anti-Semites, and self-proclaimed white nationalists.  The 43-paragraph article contains only one sentence referencing the Proud Boys, and McInnes claims that one sentence defamed him by falsely stating that he "full-heartedly support[ed] the [Unite the Right] rally."  SAC ¶ 169 (Count I).

### 3.   August 10, 2017: "Do you want Bigots, Gavin? This is how you get Bigots" (Count V)[78]

This article ("Article 3"), published the day before the Unite the Right rally, examines the history of the Proud Boys and the group's connections to various white nationalist figures based on its analysis of shared platforms (such as *Taki's Magazine*, a favorite outlet for both McInnes and avowed white supremacists like Richard Spencer) and influences (such as Pat Buchanan's book *Death of the West*).  Article 3 goes on to examine how, despite the fact that McInnes is "adamant that his stable of 'Western chauvinists' aren't bigots," many individuals connected to the Proud Boys have gone on to become involved with overtly bigoted groups:

> Despite McInnes's protestations on social media and elsewhere, he's devised, perhaps inadvertently, the most fertile "in-real-life" recruiting

---

[77] Holliday Decl. ¶ 5 & Ex. 2.

[78] Holliday Decl. ¶ 6 & Ex. 3.

> ground for white nationalists and anti-Semites within today's organized far-right.
>
> And some of its leaders, like Mike "Enoch" Peinovich, have openly celebrated what amounts to a "western chauvinist" farm league from which they are happy to call up new followers.

The article acknowledges McInnes's efforts to expel or disavow some of the Proud Boys' most overtly bigoted members. But it ultimately opines that, despite McInnes's near-constant refrain that the Proud Boys do not accept and will not tolerate bigots, "the Proud Boys phenomenon is far more complex than" the "Nazi-or-not binary" that McInnes has tried to construct:

> [A]t least some Proud Boys appear to be following paths into hate groups after a gestation period in McInnes' group . . . The Proud Boys phenomenon is far more complex than McInnes wants to admit, and that appears to be benefiting—and delighting—the leaders of the Alt-Right.

Article 3 contains excerpts of and hyperlinks to material supporting its published opinions about the Proud Boys. It includes, for example, a screenshot of a tweet by McInnes in which he opines that abortion and immigration will lead to "white genocide"—a common white nationalist meme. Article 3 also contains links to McInnes's writing, including the article in *Taki's Magazine* in which he announced and described the Proud Boys. It further contains lengthy excerpts (as well as links to broadcasts) from the *Daily Shoah* podcast, in which the hosts applaud anti-Semitism within the ranks of the Proud Boys. The bulk of the article is devoted to explaining the increasing radicalization of three Proud Boys, using primary sources from these individuals' own social media accounts to illustrate their path from the Proud Boys to more extreme groups.

McInnes alleges that Article 3 defamed him by stating that he "devised the most fertile 'in-real-life' recruiting ground for white nationalists and anti-Semites within today's organized far-right." SAC ¶ 224 (Count V).

### 4. August 17, 2018: "Kessler Falls Flat, But the Radical Right Marches On" (Count VI)[79]

This article ("Article 4") contrasts two separate rallies held in August 2018—the Proud Boys and Patriot Prayer's August 4 rally in Portland, discussed above, and Jason Kessler's sparsely attended Washington, D.C. rally attempting to commemorate the one-year anniversary of Unite the Right. As is relevant to the SAC, the article states that:

> The Proud Boys (an SPLC-designated hate group started by Vice co-founder, original hipster and self-described Islamophobe Gavin McInnes) and Joey Gibson's Patriot Prayer, have found great success recruiting converts to their cause in the Pacific Northwest with an approach that focuses on the same old reactionary politics and fear, just with fewer vulgar racist overtures and more Americana. And another thing: they offer their right-wing converts a chance to duke it out in the street with people they disagree with.

Article 4 contains a hyperlink to the SPLC Proud Boys Page, which itself contains links to other articles that contain a wealth of primary sources and press reporting about both the Proud Boys' recruiting processes and the group's history with violence. Nevertheless, McInnes claims that Article 4 defamed him by stating that the Proud Boys "offer their right-wing converts a chance to duke it out in the street with people they disagree with." SAC ¶¶ 238-39 (Count VI).

### 5. October 13, 2018: "Far-right Skinheads Join Proud Boys in Assaulting Protestors in New York City Following Gavin McInnes Event" (Counts VII and VIII)[80]

This article ("Article 5") reports on the altercation involving the Proud Boys after McInnes's speech at the Metropolitan Republican Club in New York City. Article 5 focuses on several individuals associated with skinhead groups, including the so-called "211 Bootboys," who took part in the altercation on the side of the Proud Boys. The article goes on to document

---

[79] Holliday Decl. ¶ 7 & Ex. 4.

[80] Holliday Decl. ¶ 8 & Ex. 5.

connections between these men, the Proud Boys, and past violence, including noting that McInnes was photographed with one of the men at an anti-Muslim rally in 2017.

The report describes and contains hyperlinks to several videos of the incident, noting that "in one video, a far-right assailant in a group of at least 15 screams, 'Fa**ot!' as he kicks a person lying curled up on the pavement," and in another, a man "says of his beating victim": "That son of a bitch!  He was a fucking foreigner.'"  It also includes links to a sampling of the wealth of press reports about the incident, including *The New York Times*.  Article 5 also shows a photograph of McInnes posing with a member of 211 Bootboys who was present at the altercation.

McInnes claims that Article 5 defamed him by stating that he "brought a samurai sword to his event" because he claims to have been carrying "a toy sword," SAC ¶ 253 (Count VII); and by stating that McInnes "attended 'an anti-Muslim rally' in 2017" because he claims that event was instead a "March Against Sharia," SAC ¶ 265 (Count VIII).

> ### 6.   October 18, 2018: "Weekend Read: Violence and Hate, That's the Proud Boys in a Nutshell" (Counts IX and X)[81]

This article ("Article 6") recaps the Proud Boys' October 2018 altercation in New York City and provides an overview of the group's activities, including hyperlinks to many of the other articles cited in the SAC (which in turn contain links to video footage, social media content, and press articles from various sources about the group's history of violent incidents and connections to white nationalists).  McInnes claims that Article 6 defamed him by stating that the Proud Boys "simultaneously disavow the term 'white nationalism' and embrace its central tenets," SAC ¶ 278 (Count IX); and by quoting from a *New York Times* article about McInnes—the same article on which the SAC extensively relies—in which an anti-racism expert opines that the Proud Boys use "subterfuge and lies" to try to avoid being recognized as a hate group, SAC ¶ 293 (Count X).

---

[81] Holliday Decl. ¶ 9 & Ex. 6.

**ARGUMENT**

As this Court has noted, "'[t]o survive a Rule 12(b)(6) motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face.'"  Opinion & Order at 2 (quoting *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (internal marks omitted)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff." *Id.* (quoting *Michel*, 816 F.3d at 694).  "The court, however, need not accept as true 'conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts.'" *Id.* at 3 (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002)).  "'Conclusory allegations are those that express a factual inference without stating the underlying facts on which the inference is based.'" *Id.* (cleaned up) (quoting *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1268 (M.D. Ala. 2019)), *aff'd*, 6 F.4th 1247 (11th Cir. 2021)).

"As recognized by the Eleventh Circuit Court of Appeals, the 'application of the plausibility pleading standard makes particular sense when examining public figure defamation suits' such as this one, given that 'there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation.'" *Id.* at 4 (quoting *Michel*, 816 F.3d at 702).

**I.    THE SAC DOES NOT ALLEGE FACTS THAT, IF PROVEN, WOULD PLAUSIBLY ESTABLISH THAT SPLC PUBLISHED WITH ACTUAL MALICE**

In light of our "profound national commitment" to the "uninhibited, robust, and wide open" debate of controversial issues, those who have chosen to engage in public endeavors or participate

22

in public debate accept a greater risk of critical comment and scrutiny. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). To prevail in a defamation action, therefore, public figures must plead, and ultimately prove, by clear and convincing evidence, "actual malice"—a term of art that encompasses not personal spite or ill will, but rather whether the defendant actually "entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Turner v. Wells*, 879 F.3d 1254, 1273 (11th Cir. 2018) (cleaned up).

The actual malice standard is not an objective one; the beliefs or actions of a hypothetical reasonable person are irrelevant. *Michel*, 816 F.3d at 702-03 (citing *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968)). "Rather, [courts] ask whether the defendant . . . *actually* entertained serious doubts as to the veracity of the published account, or [*actually*] was highly aware that the account was probably false." *Id.* (emphasis added). The public figure plaintiff bears the ultimate burden to prove actual malice by clear and convincing evidence. This burden of proof must of necessity be taken into account when applying the plausibility pleading standard. *See id.* at 702.

McInnes is concededly a public figure, Opinion & Order at 29, and this Court has instructed that, to plead a viable defamation claim, he must therefore provide "sufficient allegations of actual malice," and he must do so for "each allegedly defamatory statement." *Id.* at 41-42.

The Second Amended Complaint fails to do so for *any* of the ten statements he challenges. It was extensively reported (as documented in great detail on, among other places, the SPLC Proud Boys Page) that both McInnes and the Proud Boys used incendiary racial and religious slurs; made anti-LGBTQ, anti-Asian, anti-Muslim, and anti-Semitic statements; disseminated threats of and paeans to violence; and published references to white supremacist conspiracy theories. *See supra* at 2-14. Both the SPLC Proud Boys Page and the articles themselves extensively document these statements and activities, though hyperlinks and other referenced sources, as the basis for SPLC's

conclusions.  All are properly before the Court on this motion.  *See, e.g.*, *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1319 (S.D. Fla. 2018) (considering records referenced by online report through hyperlink); *see also Adelson v. Harris*, 876 F.3d 413, 415 (2d Cir. 2017) (hyperlink was sufficient to incorporate linked material into publication at issue).  These cited and hyperlinked sources render implausible, as a matter of law, any allegation that SPLC published any of the challenged statements with actual malice, which is to say with knowledge of falsity or despite being "highly aware that the account was probably false."  *Turner*, 879 F.3d at 1273; *see also Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) ("It is the law in this Circuit that when the exhibits [to a complaint] contradict the general and conclusory allegations of the pleading, the exhibits govern." (citation omitted)).[82]

### A.     Count I

McInnes challenges SPLC's statement in Article 2 that he "full-heartedly support[ed]" the Unite the Right rally, SAC ¶ 168, and claims that SPLC published this statement with actual malice because "on June 20, 2017, [McInnes] published a statement on the Proud Boys website disavowing the Unite the Right rally," *id*. ¶ 171.  Yet Article 2 contains a hyperlink to this purported "disavowal" of the Charlottesville rally, and as explained above, McInnes's statement was removed shortly after it was posted.  At the time Article 2 actually was published, however, the same link led to a message on the Proud Boys website emphasizing that they "enthusiastically support EVERYONE's right to free speech/peaceably assemble," that "[t]he organizers [of the

---

[82] It is well settled that "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978) ("The subjective awareness of probable falsity required by [the Supreme Court] cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied."); Robert D. Sack, *Sack on Defamation* § 5:5.2[C] ("An author or publisher may rely on previously published accounts in reasonably reliable sources.").

Charlottesville Unite the Right rally] are correct when they say we have to unite against our common enemy, the far left," and that, "if a chapter or an individual Proud Boy feels compelled to go, we encourage him to do so." *See supra* note 49 & accompanying text. Given that this supportive message appeared on the Proud Boys website at the time Article 2 was posted, McInnes cannot plausibly allege that SPLC published the statement challenged in Count I with actual malice because the actual malice test "focuses on the defendant's state of mind *at the time of publication*." *See Hunt v. Liberty Lobby*, 720 F.2d 631, 647 (11th Cir. 1983) (emphasis added). The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count I.

### B.    Count II

McInnes challenges SPLC's statement in Article 1 that "others have described [the Proud Boys] as the military arm of the Alt-Right," SAC ¶ 184, and asserts that SPLC published this statement with actual malice solely because he denied it, and SPLC "was aware that [he] disavowed the Alt-Right and had described the Proud Boys as a social club, not a militant organization," *id.* ¶ 191. As this Court has already explained, however, a theory of actual-malice-by-bare-denial does not suffice to survive a motion to dismiss:

> McInnes's briefing returns to the same losing refrain: the Proud Boys says it is not a hate group; SPLC acknowledges that the Proud Boys says it is not a hate group and that the group contends that it has engaged in non-hateful activity; therefore, SPLC acted with actual malice in describing it as a hate group. Under this flawed formulation, any published statement denied by a public figure is, by virtue of that denial, published with actual malice. This type of syllogism should be squarely rejected. . . . To hold otherwise would empower public figures to silence opposing speech, not based on the veracity of the speech in the mind of the speaker but based solely on the subject's denial of its veracity.

Opinion & Order at 35-37 (citations omitted). The SAC puts forward the same failed syllogism: simply because McInnes denies that the Proud Boys are militant or linked to the Alt-Right, SPLC must have acted with actual malice when it reached a contrary conclusion. By relying again on

this faulty logic, McInnes "fail[s] to allege plausibly that SPLC at all doubted the veracity of its belief" in the statement it published, *id.* at 37, namely that "others have described [the Proud Boys] as the military arm of the Alt-Right." The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count II.

### C.    Count III

McInnes challenges another statement in Article 1, that the Proud Boys "show[] up at pro-Trump rallies looking to rumble," SAC ¶ 198, and asserts that SPLC published this statement with actual malice because SPLC "had no evidence that the Proud Boys attended rallies seeking to engage in violence," *id.* ¶ 205. Yet Article 1 expressly notes that part of the "initiation ritual" for becoming a member of the Proud Boys is "brawling with antifascists at public rallies," and Article 1 links to prior reporting on that topic,[83] which in turn linked to reporting where *McInnes himself states* that to become a member of the Proud Boys, an initiate must "get beat up [and] kick the crap out of an antifa."[84] Given SPLC's reliance on this prior reporting, *see supra* note 82, McInnes does not and cannot allege facts plausibly establishing, as a matter of law, that SPLC published this "looking to rumble" statement with knowledge that it was false. The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count III.

### D.    Count IV

McInnes challenges a third statement in Article 1, that he "denigrated Muslims and called Asian Americans 'slopes' and 'riceballs,'" SAC ¶ 212, and he asserts that SPLC published this

---

[83] *See* Will Sommer, *The fratty Proud Boys are the alt right's weirdest new phenomenon*, Right Richter (Feb. 5, 2017), https://medium.com/@willsommer/the-fratty-proud-boys-are-the-alt-rights-weirdest-new-phenomenon-7572b31e50f2 (Holliday Decl. ¶ 83).

[84] *See* Kimberly M. Aquilina, *Gavin McInnes explains what a Proud Boy is and why porn and wanking are bad*, Metro (Feb. 7, 2017), https://www.metro.us/gavin-mcinnes-explains-what-a-proud-boy-is-and-why-porn-and-wanking-are-bad/ (Holliday Decl. ¶ 45).

statement with actual malice because SPLC "had no evidence that plaintiff made these statements," *id.* ¶ 217.  To the contrary, McInnes used precisely those slurs in *Taki's Magazine* to describe Asian Americans.  *See* Holliday Decl. ¶ 24.  Likewise, McInnes stated in an interview with NBC in 2017 that he "think[s] it's fair to call me Islamophobic," and asserted that Muslims are "raping children regularly."  Holliday Decl., Ex. 7.  Given SPLC's express reliance on prior reporting on these points, *see supra* note 82, McInnes once again cannot plausibly allege, as a matter of law, that SPLC published this statement with actual malice.  The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count IV.

### E.    Count V

Turning to Article 3, McInnes challenges SPLC's statement that he "devised, perhaps inadvertently, the most fertile 'in-real-life' recruiting ground for white nationalists and anti-Semites within today's organized far-right," SAC ¶ 223, and asserts that SPLC published this statement with actual malice because it "was aware of the Proud Boys' bylaws which explicitly prohibit white supremacists and antisemites from membership," and because SPLC quoted sources who "admitted that their sentiments were contrary to those bylaws and Mr. McInnes's views both personal and as a leader of the Proud Boys," *id.* ¶ 232.  Just like in Count II, however, this theory of actual malice fails because McInnes is merely reciting *his own* belief that the Proud Boys do not attract and nurture white nationalists and anti-Semites, and the Proud Boys' *official* position rejecting such views.  These recitations amount to a mere denial of SPLC's views, which once again "fail[s] to allege plausibly that SPLC at all doubted the veracity of its belief" in the statement it published at the time of publication.  Opinion & Order at 37.  Moreover, it is simply not plausible to suggest that SPLC doubted the Proud Boys are a fertile recruiting ground for anti-Semites and

white nationalists given that, *inter alia*, the co-hosts of the anti-Semitic *Daily Shoah* podcast

expressed *the same perspective* in an April 2017 episode, which SPLC quoted in Article 3:

> **Caeralus Rex:** Let's be honest. Let's not bullshit. Gavin [McInnes] can say whatever he wants in a video about how, 'Oh, we don't admit Nazis in the Proud Boys,' or whatever. Dude, all the guys, all the Alt-Lite-Knight Proud F— or whatever that showed up to [Pikeville], if they were just hanging out at the bar with me and the guys from my pool party and they were pressed on the issue, **I guarantee you that like 90% of them would tell you something along the lines of, 'Hitler was right. Gas the Jews.'**
>
> **Dunstan**: I'm pretty sure we have some news for Gavin about his little organization. **If he disallowed all Nazis, he'd be left with nothing but a couple of Jews.**[85]

Because McInnes again has not plausibly alleged that SPLC published this challenged statement

with actual malice, the Court should grant dismissal with prejudice as to Count V.

## F.    Count VI

McInnes challenges SPLC's statement in Article 4 that the Proud Boys "offer their right-

wing converts a chance to duke it out in the street with people they disagree with," SAC ¶ 238,

and asserts that SPLC published this statement with actual malice because, he claims, SPLC "had

no evidence that the Proud Boys offers people a chance to engage in street violence," *id.* ¶ 245.

Just like the essentially identical "looking to rumble" statement challenged in Count III, however,

SPLC published this statement in the context of reporting that part of the "initiation ritual" for

becoming a member of the Proud Boys is "brawling with antifascists at public rallies," and that

McInnes himself has said that to become a member of the Proud Boys, an initiate must "get beat

up [and] kick the crap out of an antifa." *See supra* at notes 83-84 and accompanying text. McInnes

thus fails to allege any facts to suggest that SPLC doubted the veracity of this statement at the time

---

[85] *See The Daily Shoah #159*, June 2, 2017, at 13:30-15:45 (Holliday Decl. ¶ 78) (emphasis added).

of publication, either.  The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count VI.

### G.    Count VII

McInnes challenges SPLC's statement in Article 5 that he "brought a samurai sword" to the October 2018 event at the Metropolitan Republican Club in New York City, SAC ¶ 252, and asserts that SPLC published this statement with actual malice because it "had access to information showing that the sword was a toy, not a real samurai sword," *id.* ¶ 257.  For one, that allegation— even if credited—does nothing to suggest publication with actual malice: as the U.S. Supreme Court made clear in *New York Times v. Sullivan*, merely having *access* to information that could potentially contradict the challenged reporting does not amount to publication of that reporting with knowledge of its falsity or despite a high degree of awareness of its probable falsity.  *Sullivan*, 376 U.S. at 287 (deeming irrelevant to the actual malice test "evidence that the *Times* published the advertisement without checking its accuracy against [potentially contradictory] news stories in the *Times*' own files").  For another, in the very same article, SPLC provided links to prior reporting that, at the event in question, McInnes "reenacted the samurai sword assassination of Japanese socialist leader Inejiro Asanuma" and that McInnes left the event "carrying the samurai sword."[86]  For both of those reasons, McInnes has failed to allege that SPLC published this statement with actual malice, and the Court should dismiss with prejudice as to Count VII.

---

[86] *See* Julia Reinstein & Stephanie K. Baer, *Members Of A Far-Right Men's Group Violently Beat Up Protesters And Weren't Arrested. New York Police Won't Say Why*, BuzzFeed News (Oct. 15, 2018), https://www.buzzfeednews.com/article/juliareinstein/proud-boys-gavin-mcinnes-protest (Holliday Decl. ¶ 84).

### H.     Count VIII

Also in Article 5, McInnes challenges SPLC's statement that he attended "an anti-Muslim rally" in 2017, SAC ¶ 264, and he asserts that SPLC published this statement with actual malice because he claims it was not an "anti-Muslim" rally but rather an "anti-Sharia" rally, *id.* ¶ 271. Just as McInnes cannot manufacture actual malice from SPLC's characterization of the Proud Boys as a hate group through his own preference for calling it a "western chauvinist" group, McInnes cannot create actual malice in SPLC's characterization of a rally as "anti-Muslim" merely by describing it himself as "anti-Sharia."   Opinion & Order at 35-36.   In both cases, McInnes's personal views do not amount to plausible allegations that SPLC doubted the veracity of *its* views. The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count VIII.

### I.     Count IX

McInnes challenges SPLC's statement in Article 6 that the Proud Boys "simultaneously disavow the term 'white nationalism' and embrace its central tenets," SAC ¶ 278, and asserts that SPLC published this statement with actual malice because SPLC 'was aware of, or recklessly disregarded, the fact that the Proud Boys' bylaws explicitly prohibit white nationalism," *id.* ¶ 286. But that disconnect between the Proud Boys' stated principles and its actual practices is *precisely* the point that SPLC was making in Article 6: the Proud Boys *officially* reject white nationalism (including in organizational bylaws) while nevertheless adopting white nationalist positions in its day-to-day activities.   The mere existence of these "bylaws" thus does nothing to suggest that SPLC doubted the veracity of this statement at the time SPLC published it, and for that reason the Court should dismiss with prejudice as to Count IX.

J.      **Count X**

Finally, McInnes challenges SPLC's statement in Article 6 that the Proud Boys "utilize[] subterfuge and lies."  SAC ¶ 293.[87]  McInnes asserts that SPLC published this statement with actual malice because, he claims, SPLC "had no evidence that plaintiff or the Proud Boys engaged in subterfuge and lies."  *Id.* ¶ 304.  To the contrary, however, Article 6 provides readers with precisely that evidence: McInnes "denied that [the Proud Boys] has any connection to the racist 'alt-right,' even as its members marched in Charlottesville, Virginia, alongside Richard Spencer, the most prominent alt-right leader"; McInnes "denied that [the Proud Boys] seeks out violence, even as his thugs march alongside neo-Nazis and white supremacist hate groups"; and the Proud Boys "disavow the term 'white nationalism'" even as they "embrace its central tenets."[88]  McInnes thus fails again to plead any facts that would plausibly allege SPLC published this statement with knowledge of its falsity or despite a high degree of awareness of its probable falsity.  The Court should therefore grant SPLC's motion to dismiss with prejudice as to Count X.

\*      \*      \*

This Court gave McInnes the opportunity to re-plead his defamation claim, if he could support such claims with plausible factual allegations "that satisfy . . . the actual-malice requirement."  Opinion & Order at 42.  McInnes fails to offer such allegations as to *any* of the

---

[87] Although the SAC claims this article says McInnes himself "utilizes subterfuge and lies," SAC ¶ 293, this quote refers to the group generally, reading: "'*They've* utilized subterfuge and lies to keep that hate group tag from being applied to them,' Jenkins said. 'Every time their members are seen doing things they're not supposed to be doing, like showing up at Unite the Right, they claim that person left the Proud Boys.'"  Holliday Decl., Ex. 6 at 4-5 (emphasis added).  Where, as here, the article containing the challenged statement is properly before the Court and conflicts with the pleadings, it is the article itself that governs.  *See Crenshaw*, 556 F.3d at 1292 ("It is the law in this Circuit that when the exhibits [to a complaint] contradict the general and conclusory allegations of the pleading, the exhibits govern." (citation omitted)).

[88] Holliday Decl. ¶ 9 & Ex. 6.

statements discussed above. The time has therefore come for the defamation claims to be dismissed with prejudice.

## II. THE CHALLENGED STATEMENTS ARE PROPERLY DISMISSED ON SEPARATE AND INDEPENDENT GROUNDS AS WELL

### A. Various Challenged Statements Are Also Properly Dismissed as Not "Of and Concerning" McInnes

A defamation plaintiff bears the burden of pleading and proving that the alleged defamation is about the plaintiff specifically—or, as courts refer to the requirement, "of and concerning" him or her. *See Parekh v. CBS Corp.*, 820 F. App'x 827, 833 (11th Cir. 2020) ("a defamatory statement must be 'of and concerning' the plaintiff to be actionable"). Moreover, where, as here, the alleged defamation involves a matter of public concern, the First Amendment requires the plaintiff to demonstrate that he or she was "clearly identifiable" as the challenged statement's subject. *Algarin v. Town of Wallkill*, 421 F.3d 137, 139 (2d Cir. 2005) (citations omitted). "This burden is not a light one," *Three Amigos SJL Rest., Inc. v. CBS*, 28 N.Y.3d 82, 86 (2016), and "[t]he 'of and concerning' requirement stands as a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory," *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006). Whether a statement is "of and concerning" the plaintiff is a question of law that "should ordinarily be resolved at the pleading stage." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001).

This "of and concerning" requirement bars five of McInnes's claims: Counts II, III, VI, IX, and X. *See generally* Addendum. For example, McInnes claims he was defamed by a statement "that the Proud Boys are known as 'the military arm of the Alt-Right.'" SAC ¶ 184. He asserts this statement is defamatory "because the Proud Boys organization is not known that way; is not affiliated with the Alt-Right movement; and is not a military organization" but rather "is a social club." *Id.* ¶¶ 185-86. Regardless of McInnes's views of the Proud Boys, however, this statement

is simply not about McInnes *himself*. The same is true of the statements that the Proud Boys "show[] up at pro-Trump rallies looking to rumble," "offer their right-wing converts a chance to duke it out in the street with people they disagree with," "embrace [the] central tenets of white nationalism," and "utilize subterfuge and lies." *Id.* ¶¶ 198, 238, 278, 294.

These statements are not "of and concerning" McInnes in a literal sense—they address a *group*, the Proud Boys, and not an individual. No reasonable reader would think these statements about unnamed members of the Proud Boys are specifically referring to McInnes. *See Gilman v. Spitzer*, 902 F. Supp. 2d 389, 394 (S.D.N.Y. 2012) ("It is essential that the allegedly defamatory comment refer to the plaintiff." (citation and internal quotation marks omitted)), *aff'd* 538 F. App'x 45 (2d Cir. 2013).

As a matter of law, an allegedly false statement about an entity is not actionable by someone associated with that entity, even a prominent member, including where the article elsewhere mentions that individual. *See, e.g.*, *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) (statement that "only speaks about a group of which the plaintiff is a member" is not of and concerning that member); *Gilman*, 538 F. App'x at 47 (allegations of illegal activity by company and its "employees" were not "of and concerning" senior executive); *Fulani v. N.Y. Times Co.*, 260 A.D.2d 215, 216 (N.Y. App. Div. 1999) (statement defaming political group not "of and concerning" its coordinator); *1st Amend. Praetorian v. N.Y. Times Co.*, 2025 WL 949575, at *13 (S.D.N.Y. Mar. 28, 2025) ("[A]lthough Plaintiff is mentioned in parts of the articles, that does not mean that all of the statements concern Plaintiff; this is even true when the plaintiff is described as a part of this larger group or an example of a member of the group."). As the D.C. Circuit has similarly emphasized:

> [D]efamation is personal; . . . Allegations of defamation by an organization
> and its members are not interchangeable. Statements which refer to

> individual members of an organization do not implicate the organization.
> By the same reasoning, statements which refer to an organization do not
> implicate its members.

*Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1089 (D.C. Cir. 2007) (quoting *Provisional Gov't of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) (cited in *Fulani*, 260 A.D.2d at 216)). Accordingly, in *Jankovic*, the court rejected the contention that "the namesake of a corporation can be defamed when false misdeeds are attributed to his company," even if they "reflect[] poorly upon" him. *Id.* Such statements simply are not "[of and] concerning" that person *unless* he is alleged to be "solely" responsible for the entity's conduct. *Id.* There is no such allegation in the SAC, nor could there be. Indeed, it affirmatively alleges the contrary—*i.e.,* that, as of November 2018, McInnes had "severed his connections with the Proud Boys." SAC ¶ 32 (p. 8). These five claims are simply not "of and concerning" McInnes as a matter of law, and Counts II, III, VI, IX, and X of the SAC must be dismissed for this independent reason as well.

### B.    Nine of the Ten Challenged Statements are Non-Actionable Opinion

Because the First Amendment allows only provably *false* statements to be potentially actionable as defamation, subjective characterizations cannot give rise to a valid claim as a matter of law. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (a statement about a matter of public concern "must be provable as false before there can be liability under state defamation law, at least in situations like the present, where a media defendant is involved"). New York law goes even further in protecting such speech: "[U]nlike the Federal Constitution, the New York Constitution provides for absolute protection of opinions." *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 178 (2d Cir. 2000). Under New York law, protected opinion can take either of two forms: (1) "a statement of opinion which is accompanied by a recitation of the facts upon which it is based"; and (2) "an opinion not accompanied by such a factual recitation so long as it does not imply that it is based upon undisclosed facts." *Coleman v. Grand*, 158 F.4th 132, 139 (2d Cir.

2025) (quoting *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014)).

New York courts weigh three factors in determining whether a statement qualifies as opinion: (1) whether it is "capable of being proven true or false"; (2) whether it "has a precise meaning which is readily understood"; and (3) "whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Boeheim*, 22 N.E.3d at 1005. While "[d]istinguishing between assertions of fact and nonactionable expressions of opinion has often proved a difficult task," *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995), that is not the case here.

Nine of McInnes's ten claims in the SAC arise from statements that are not provably false or otherwise constitute non-actionable opinion: Counts I to VI and VIII to X. Many of these statements consist of non-actionable descriptors that, "[s]imilar to the terms 'fascism,' 'radical right,' [] 'political Marxist,' [and] 'hate group'" are so "debatable, loose and varying," as to be "insusceptible to proof of truth or falsity." *Coral Ridge*, 406 F. Supp. 3d at 1277 (cleaned up); *see also* Opinion & Order at 29 n.9. Specifically, this group includes the challenged statements "that the Proud Boys are known as 'the military arm of the Alt-Right,'" are "the most fertile 'in-real-life' recruiting ground for white supremacists and anti-Semites," have "right-wing converts," "embrace [the] central tenets of white nationalism," and that McInnes "attended 'an anti-Muslim rally'" and is an "extremist." SAC ¶¶ 184-85, 223, 238, 264, 278, 293.[89]

---

[89] These challenged statements actually read: "Now described as a 'neo-masculine reactionary,' McInnes calls his Proud Boys a 'pro-West fraternal organization. [¶] Others describe it as the military arm of the Alt-Right," Holliday Decl. Ex. 1 at 3, and ""Despite McInnes's protestations on social media and elsewhere, he's devised, perhaps inadvertently, the most fertile 'in real life' recruiting ground for white nationalists and anti-Semites within today's organized far-right." *Id.* at 4.

These terms belong to "the realm of political debate," not defamation law. *Coral Ridge*, 406 F. Supp. 3d at 1277; *see also, e.g.*, *Buckley v. Littell*, 539 F.2d 882, 893-95 (2d Cir. 1976) (description of plaintiff as "fascist" is "loose" and "ambiguous" and cannot be regarded as statement of fact because of "tremendous imprecision" of the term); *Trump v. CNN*, 2025 WL 3213203, at *2 (11th Cir. Nov. 18, 2025) (use of the term "Big Lie" to describe President Trump's claims about the 2020 election was "ambiguous" and "not readily capable of being proven true or false"); *Cummings v. City of New York*, 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24, 2020) ("Courts in New York have consistently held that terms like 'racist' constitute nonactionable opinion."); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (statement "that Plaintiff was a racist or a future threat to others . . . is nonactionable opinion"); *O'Neil v. Peekskill Faculty Ass'n*, 507 N.Y.S.2d 173, 180 (App. Div. 1986) (holding that "characterizations of plaintiff's alleged statement as a 'reprehensible racial slur' and as an expression of 'bigotry'" were "classic examples of pure opinions"); *Covino v. Hagemann*, 627 N.Y.S.2d 894, 896-97 (Sup. Ct. 1995) (noting that "[a]ccusations of racism and prejudice" have routinely been held non-actionable).[90]

---

[90] This principle is widely recognized and frequently applied. *See, e.g.*, *Sack on Defamation* § 2:4.7 at 2-47-48 & n.193; *Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 2009 WL 10704261, at *39 (N.D. Ala. Feb. 23, 2009) (holding statement that plaintiff "was a 'racist' and a 'radical'" non-actionable and collecting cases); *Florio v. Gallaudet Univ.*, 119 F.4th 67, 77 (D.C. Cir. 2024) (describing individuals "as the 'face of systemic racism' and 'anti-Semitic' are likewise not actionable"); *L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1131 (7th Cir. 2022) (holding "hypocrite," "chauvinist," and "racist" were not actionable); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020) ("Whether [plaintiff] speaks for the 'hard right' is 'incapable of defamatory meaning.'"); *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (calling a judge "anti-Semitic" was a non-actionable opinion); *Squitieri v. Piedmont Airlines, Inc.*, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false.") (collecting cases); *Forte v. Jones*, 2013 WL 1164929, at *6 (E.D. Cal. Mar. 20, 2013) ("[T]he allegation that a person is a 'racist' . . . is not actionable because the term 'racist' has no factually-verifiable meaning."); *Martin v. Brock*, 2007 WL 2122184, at *3 (N.D. Ill. July 19, 2007) ("[U]nder Illinois law, statements of opinion that someone is racist 'fit comfortably within the immunity for name-calling' unless they imply the existence of undisclosed, defamatory facts." (citation omitted)); *Cousins v. Goodier*, 2022 WL 3365104, at *2 (Del. Aug. 16, 2022)

McInnes also challenges statements containing other "loose, figurative language" that amounts to non-actionable rhetorical hyperbole. *Horsley v. Feldt*, 304 F.3d 1125, 1132-33 (11th Cir. 2002) (internal quotation marks omitted); *see also Ganske v. Mensch*, 480 F. Supp. 3d 542, 553 (S.D.N.Y. 2020) (statements constituting "fiery rhetoric," "rhetorical hyperbole," and "imaginative expression" are "typically understood as a statement of opinion"). This category includes the statements that the Proud Boys "show[] up at pro-Trump rallies looking to rumble," and that the group provides members "a chance to duke it out in the street with people they disagree with." SAC ¶¶ 198, 223.

McInnes's claims also fail where they challenge statements of opinion based on fully disclosed facts. For example, McInnes challenges the statement that he "full-heartedly supports the [Unite the Right] rally," SAC ¶ 168, yet SPLC disclosed the facts on which the opinion was based. These facts were drawn from the Proud Boys' own website and made available to the reader through a hyperlink at the word "supports." McInnes similarly takes issue with statements that the Proud Boys offer recruits a chance to "duke it out in the streets," are "looking to rumble," and are "known as 'the military arm of the Alt-Right.'" *Id.* ¶¶ 184, 198, 238. These statements, however, are all contained within articles that base such assessments on disclosed facts, from the founding of a "tactical defense arm" of the Proud Boys with an emphasis on "defense and confrontation," to discussions and links to news reports about prior street violence involving Proud Boys. *See* Holliday Decl. Ex. 1; *see also id*. Exs. 5-6. Similarly, the statement that McInnes "denigrated Muslims and called Asian Americans 'slopes' and 'riceballs,'" SAC ¶ 212, is a conclusion drawn from numerous quoted and linked statements by McInnes, including that he self-identified as an

---

(statement that plaintiff filed lawsuit with "shockingly racist statements . . . about protecting his white, Christian heritage" were not actionable); *Williams v. Kanemaru*, 2013 WL 4458887, at *2 (Haw. Ct. App. 2013) (accusation of racism based on disclosed facts not actionable for defamation).

"Islamophobe," called Islam a "rape culture," and called Asians "slopes" and "riceballs" in an article that he wrote in *Taki's Magazine*. *See* Holliday Decl. Ex. 1 at 2.

Because the articles "narrate[], in great detail, facts" underlying their assertions, "reasonable readers could only have understood" the challenged statements as SPLC's "characterization of the facts set forth in the" articles. *Coleman*, 158 F.4th at 140; *see also Farrakhan v. Anti-Defamation League*, 2025 WL 24066, at **2-3 (2d Cir. Jan. 3, 2025) (holding "statements that label plaintiffs in various ways as 'anti-Semitic'" were non-actionable opinion where they "were either accompanied by disclosures of [plaintiff's] actual statements or were based on [plaintiff's] statements that were widely reported by the media"); *Cooper v. Franklin Templeton Invs.*, 2023 WL 3882977, at *4 (2d Cir. June 8, 2023) ("To the extent that Defendants' statements are read as accusing Plaintiff of being a racist, the reasonable reader would have understood this to be an expression of opinion based on the widely circulated video of Plaintiff[.]"). "The fact that Plaintiff may disagree with the sources' characterizations of h[im] or wish that the articles painted h[im] in a different light, does not alter this conclusion." *Cummings*, 2020 WL 882335, at *21. These statements thus constitute non-actionable opinions based on disclosed facts, and the Court should dismiss with prejudice as to Counts I-VI and VIII-X accordingly.

## C.    Even if They Were Deemed Statements or Implications of Fact, Numerous Challenged Statements Are Substantially True

In cases like this one that involve speech about matters of public concern, a defamation plaintiff has the burden of establishing substantial falsity. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986). "New York defamation law does not require that the statements be dead-on accurate." *Bauer v. Baud*, 2023 WL 2307413, at *6 (S.D.N.Y. Mar. 1, 2023) (citation omitted). To the contrary, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Mag., Inc.*, 501 U.S.

496, 517 (1991) (citation omitted); *see also Tannerite Sports, LLC v. NBC Universal News Grp.*, 864 F.3d 236, 243 (2d Cir. 2017) ("'Substantial truth' is the standard by which New York law . . . determines an allegedly defamatory statement to be true or false."). A statement is substantially true if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 242. Moreover, because "falsity—or lack of substantial truth— is an element of a New York defamation claim, it follows that a *plaintiff must plead facts demonstrating falsity* to prevail on a motion to dismiss the complaint in federal court." *Id.* at 247 (emphasis added).

While McInnes denies an SPLC statement that he was "a contributor for the racist site VDARE where he denigrated Muslims and called Asian Americans 'slopes' and 'riceballs,'" in Count IV, *see* SAC ¶ 213 and Article 1, his quibble appears to be with the *attribution* to a VDARE publication. An article under McInnes's byline published in *Taki's Magazine* used precisely these slurs to describe Asian Americans. *See* Holliday Decl. ¶ 24. McInnes likewise contests in Count IV the statement that he "denigrated Muslims," but as SPLC's article notes, McInnes has said in interviews that Muslims are "raping children regularly" and that "it's fair to call me Islamophobic." Holliday Decl., Ex. 7. These challenged statements are thus at the least *substantially* true, and under New York law the Court should dismiss Count IV on that additional and independent basis.

### D. Certain of the Challenged Statements Are Not, as a Matter of Law, Reasonably Subject to a Defamatory Meaning

Under New York law, "it is for the court to decide whether . . . the offending words pleaded in a libel action are susceptible of a libelous meaning." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986). In so doing, challenged statements must be read in the context of the entire publication in which they are contained and without straining to give the publication either an

innocent or a defamatory construction. *James v. Gannett Co.*, 353 N.E.2d 834, 838 (N.Y. 1976).

A statement is defamatory only if it would "expose[] an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or . . . induce[] an evil opinion of one in the minds of right-thinking persons, and deprive[] one of confidence and friendly intercourse in society.'" *Celle*, 209 F.3d at 177.  If a statement is "not reasonably susceptible" of such a defamatory meaning, it is not actionable as a matter of law and "cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985).

Several of McInnes's claims challenge statements that are not defamatory as a matter of law.  For example, McInnes challenges the statement that he "brought a samurai sword" to a speaking engagement. SAC ¶ 252.  But the article's assertion that McInnes used a sword as a prop at a speaking event—whether or not it was a toy, as he alleges—would not expose him to public hatred or shame. The article contains no assertion or suggestion that McInnes either used or intended to use it to hurt or threaten anyone.  Similarly, in the year 2025, it can hardly be claimed that being described as "right-wing," even if that description were capable of being proven false, is defamatory.  *Id.* ¶ 241.

Moreover, several of the challenged statements cannot reasonably be construed to convey the defamatory meaning the SAC ascribes to them.  For example, McInnes contends that the statement that the Proud Boys "show[] up at pro-Trump rallies looking to rumble," implies that he "founded the Proud Boys as a paramilitary organization, terrorist group or other kind of violent group."  *Id.* ¶¶ 198, 201.  The article in which the quoted language appears, however, nowhere asserts or implies that the Proud Boys are a "terrorist group" or the like.  *See, e.g.*, *Trump v. CNN*, 684 F. Supp. 3d 1269, 1275 (S.D. Fla. 2023) (declining to "to build inference upon inference in

order to find defamatory meaning in a statement" (quoting *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272, 1288 (5th Cir. 1981), *abrogated on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87 (1989)), *aff'd*, 2025 WL 3213203 (11th Cir. Nov. 18, 2025).  Nor has McInnes made the requisite "rigorous showing that" SPLC "intended or endorsed that inference." *Lindell v. Mail Media Inc.*, 575 F. Supp. 3d 479, 488 (S.D.N.Y. 2021) (citing *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28 (N.Y. App. Div. 2014)).

 In these circumstances, McInnes has simply mischaracterized what the Articles say to allege a defamatory meaning where none exists.  His claims therefore fail and must be dismissed.

### E.    The Challenged Statements Cannot, as a Matter of Law, Cause McInnes Additional Harm in Light of Unchallenged Statements

Finally, the "incremental harm" doctrine, applicable under New York law, provides that "when unchallenged or non-actionable parts of a publication are damaging, an additional statement, even if maliciously false, might be non-actionable because it causes no appreciable additional harm."  *Behar*, 238 F.3d at 176; *see also Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 387 (S.D.N.Y. 1998) ("This doctrine measures the difference between the harm caused by non-actionable statements when compared with the harm caused by purportedly actionable statements and dismisses the latter when the difference is incremental.").  In other words, "if a communication contains enough true or unchallenged derogatory material about the plaintiff so that additional defamatory statements of questionable accuracy do not add materially to the overall defamatory impact of the statement, the publication is not actionable." *Sack on Defamation* § 2:4.18.

Similarly, under the "subsidiary meaning" doctrine, if a court determines that the statements primarily challenged in a publication are not actionable, then other challenged statements that "merely impl[y] the same view" must also be dismissed, even if they are both

provably false and defamatory. *Church of Scientology Int'l v. Time Warner, Inc.*, 932 F. Supp. 589, 595 (S.D.N.Y. 1996), *aff'd sub nom.*, *Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001); *see also id.* at 594 ("[W]here a maliciously false statement implies the same ultimate conclusion as that of the remainder of the publication [which is non-actionable,] a plaintiff cannot 'base his defamation action solely on inaccuracies contained within statements subsidiary to these larger views'" (quoting *Herbert v. Lando*, 781 F.2d 298, 311 (2d Cir. 1986))).  This is true whether the primary statements are non-actionable as a matter of law (*e.g.*, they are opinion), because they are concededly true, or simply because they have not been challenged.  *Id.* at 595.  In *Church of Scientology*, for example, the court dismissed such subsidiary claims after determining that a publication's primary contention—*i.e.*, that the challenged article had falsely alleged "that Scientology's purpose is making money by means legitimate and illegitimate"—was non-actionable.  *Id.*  The court so held even though it concluded that one of the challenged statements otherwise presented a fact issue as to both defamation and actual malice.  *Id.*  Because that specific statement "merely implie[d] the same view which [the court had] held to be nonactionable," claims based on it were properly subject to dismissal.  *Id.*

Here, to the extent that the Court dismisses most, but not all, of McInnes's claims, any remaining statement would injure McInnes's reputation in no more than an incremental or subsidiary manner.  As a result, under New York law, the claims based on those remaining statements must be dismissed as well because, by definition, their publication cannot be said to have caused him any "appreciable *additional* harm."  *Behar*, 238 F.3d at 176 (emphasis added).

This conclusion is buttressed by the innumerable statements that McInnes does *not* challenge.  These statements include, first and foremost, the voluminous primary source materials directly cited or linked to in the articles themselves—*i.e.*, the Proud Boys' and McInnes's own

statements and conduct.  To take the most obvious example, the SAC does not challenge a single specific statement made on the SPLC Proud Boys Page, which, through hyperlinks and other citations, cogently and extensively lays out SPLC's case for why it considers the Proud Boys to be a hate group.  Indeed, on repleading, McInnes no longer challenges the designation of the Proud Boys as a hate group at all.  McInnes's failure to grapple with the SPLC Proud Boys Page alone demonstrates that the overarching thrust of SPLC's publications about him and the Proud Boys would be the same with or without the statements on which he bases his claims.

## CONCLUSION

For the foregoing reasons, SPLC respectfully requests that the Court dismiss the SAC in its entirety, with prejudice, and grant such other relief as it deems just and proper.

Dated:  December 3, 2025

Robert D. Segall [ASB-7354-E68R]
Shannon L. Holliday [ASB-5440-Y77S]
COPELAND, FRANCO, SCREWS
& GILL, P.A.
Post Office Box 347
Montgomery, AL  36101-0347
Telephone:  334-834-1180
Facsimile:  334-834-3172
Email:  segall@copelandfranco.com
Email:  holliday@copelandfranco.com

Respectfully submitted,

*/s/ Chad R. Bowman*
Chad R. Bowman (*pro hac vice*)
Maxwell S. Mishkin (*pro hac vice*)
Sasha Dudding (*pro hac vice*)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
Telephone:  202-661-2200
Facsimile:  202-661-2299
Email:  bowmanchad@ballardspahr.com
Email:  mishkinm@ballardspahr.com
Email:  duddings@ballardspahr.com

**Attorneys for Defendant
Southern Poverty Law Center, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of December, 2025, I caused a copy of the foregoing Motion to Dismiss the Second Amended Complaint and Memorandum of Law in Support Thereof, the accompanying Addendum, and the Declaration of Shannon L. Holliday and Exhibits thereto, to be filed using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Chad R. Bowman*
Chad R. Bowman
