IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| GAVIN McINNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:19cv98-MHT |
| | ) | (WO) |
| THE SOUTHERN POVERTY LAW CENTER, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Gavin McInnes filed this lawsuit against defendant Southern Poverty Law Center, Inc. (SPLC), alleging that SPLC defamed him in violation of New York law. As a result of court orders, McInnes amended his complaint twice. With his current complaint, he asserts that a number of SPLC's statements--specifically, ten statements in six articles--are defamatory. The court has jurisdiction under 28 U.S.C. § 1332 (diversity).

This lawsuit is now before the court on SPLC's motion, filed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss McInnes's current

complaint. In addressing the motion, the court has considered each of the ten statement separately. For reasons that follow, the motion will be granted as to all ten statements.

## I. MOTION-TO-DISMISS STANDARD

Earlier in this litigation, this court set forth the applicable standard to apply to SPLC's previous motion to dismiss McInnes's earlier complaint. *See McInnes v. Southern Poverty Law Center, Inc.*, 811 F.Supp.3d 1319 (M.D. Ala. 2025) (Thompson, J.). It does so again, here.

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). "The allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff." *Michel*, 816 F.3d at 694.

The court, however, need not accept as true "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d. 1182, 1188 (11th Cir. 2002). "Conclusory allegations are those that express 'a factual inference without stating the underlying facts on which the inference is based.'" *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 406 F. Supp. 3d 1258, 1268 (M.D. Ala. 2019) (Thompson, J.) (quoting *Conclusory*, Black's Law Dictionary (12th ed. 2024)), *aff'd,* 6 F.4th 1247 (11th Cir. 2021).

In considering a Rule 12(b)(6) motion, the court is generally limited to considering the operative complaint and its attachments. However, this limitation has exceptions. First, for example, "where the plaintiff refers to certain documents in the complaint and those

documents are central to the plaintiff's claim," then the court "may consider [those] documents part of the pleadings." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Here, the current complaint refers to and quotes from multiple articles, including SPLC publications upon which McInnes bases his claims. Moreover, and as a result, both sides have considered and relied upon, without objection, the full text of these referenced and quoted articles, as well as the links in these articles to other articles; and the court has, in turn and without objection, considered such in full in resolving the pending dismissal motion. Of course, the parties do differ on the legal conclusions that should be drawn from such consideration.

Second, Eleventh Circuit "Rule 12(b)(6) decisions have adopted the 'incorporation by reference' doctrine, ... under which a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached

document is: (1) central to the plaintiff's claim; and (2) undisputed. ... 'Undisputed' in this context means that the authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citations omitted). As to authenticity, "nothing ... mandates that a plaintiff stipulate that [the document] is authentic for the district court to properly consider it. All that is required is that its authenticity is not challenged." *Swinford v. Santos*, 121 F.4th 179, 187-188 (11th Cir. 2024). Here, SPLC has attached to its dismissal motion a number of documents. McInnes has not challenged the authenticity of any document, nor has he questioned whether each document is central to the relevant claim. In any event, the court has considered each document that has been submitted as an attachment to SPLC's dismissal motion and to which the incorporation-of-reference doctrine would arguably apply, and the court now finds that, for each document, it is central to the plaintiff's relevant claim. The court has, therefore, considered each document, to the

extent it is advanced as relevant to a particular claim, in resolving the pending dismissal motion. Of course, the parties do differ on the legal conclusions that should be drawn from a document.

## II. BACKGROUND

### A.

McInnes, a New York resident, is a self-described "humorist, businessman, political commentator and social critic whose work as an Internet 'television' personality" is "understood widely as satirical, meant for grownups and the 'rebellious.'" Current Compl. (Doc. 58) ¶ 1. He has worked in media spaces, having cofounded *Vice* magazine and an advertising agency called Rooster Worldwide, which he sold in 2014. From 2014 to 2018, he "focused entirely on talk show hosting." *Id.* ¶ 25. His persona and style are admittedly controversial. He states that an accurate description of his style is as follows: "offending liberals, women, 'beta male culture' and transgender people, writing in a

voice inflected with a crass, contrarian bigotry that left him just enough room to declare it all a joke." *Id.* ¶ 26. Nonetheless, McInnes, an immigrant himself, states that he "is an avowed and vocal opponent of discrimination based on race, religion or sexual preference, and of ideologies and movements espousing extremism, nationalism and white supremacy." *Id.* ¶ 2.

In 2016, McInnes founded the first official chapter of the Proud Boys in New York. In its beginnings, he described the group, which has since formed chapters across the country and globe, as "an ordinary men's club, like the Shriners or the Elks," which "serves as a sort of safe space" for "Western Chauvinists." *Id.* ¶ 27.

B.

In his initial complaint, McInnes asserted a number of claims previously described, in part, by the court as follows: He "alleg[ed] that SPLC defamed him, tortiously interfered with his business, and invaded his privacy by casting him in a false light. He also allege[d] SPLC

violated New York labor law by aiding and abetting his employer in its wrongful termination of his employment. At the heart of all four claims [was] McInnes's allegation that SPLC's designation of the Proud Boys ... as a 'hate group' [was] false and defamatory. Aside from the hate-group designation, he also allege[d] that, through dozens of statements that were published by SPLC in ten different articles, SPLC defamed him, such as by calling the Proud Boys a 'far-right group.'" *McInnes*, 811 F.Supp.3d at 1323.

Because McInnes failed to allege adequately the basis of the court's jurisdiction (which is diversity), the court allowed him to file an amended complaint that cured the jurisdictional defect. *See McInnes v. Southern Poverty Law Center, Inc.*, 2021 WL 4155785 (M.D. Ala. 2021) (Thompson, J.)

However, relying on Rule 12(b)(6), the court then dismissed his amended complaint. *See McInnes*, 811 F.Supp.3d 1320. The tortious-interference claim, the false-light-invasion-of-privacy claim, and the New York

labor law claim were all dismissed on the merits with prejudice. The defamation claim was dismissed on the merits without prejudice, that is, with leave to McInnes to file another amended complaint. This current complaint (which is 55 pages and has 307 numbered paragraphs and ten counts) is the subject of SPLC's renewed motion to dismiss, which is now before the court.

This time around, McInnes's complaint is more limited and focused, although still challenging a substantial number of statements.[1] While his current complaint does not include a challenge to SPLC's designation of the

---

1. McInnes's first amended complaint did not break up each of the dozens of allegedly defamatory statements into separate counts, and, thus, the court was unable to determine from the amended complaint whether *each statement individually* met the First Amendment requirements, described later in this opinion, for a defamation claim. This failure was, as this court stated the first time this case was dismissed, a cardinal sin of shotgun pleading, *see McInnes,* 811 F.Supp.3d at 1323 (citing *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015)). The current complaint now sets forth each challenged statement in a separate count.

Proud Boys as a 'hate group,' it does assert that ten separate statements by SPLC are defamatory.

The ten statements in the six articles are as follows:

1. "In an article by Bill Morlin dated August 7, 2017 published on defendant's website entitled 'Extremists' "Unite the Right" Rally: A Possible Historic Alt-Right Showcase?', defendant falsely stated that plaintiff 'full-heartedly supports the rally.'" Current Complaint (Doc.58) ¶ 168.

2. "In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled 'New "Fight Club" Ready for Street Violence,' defendant falsely stated that the Proud Boys are known as 'the military arm of the Alt-Right.'" *Id.* ¶ 184.

3. "In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled 'New "Fight Club" Ready for Street Violence,' defendant falsely stated that the Proud Boys 'shows up at pro-Trump rallies looking to rumble,' i.e., to get into violent confrontations." *Id.* ¶ 198.

4. "In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled 'New "Fight Club" Ready for Street Violence,' defendant falsely stated that plaintiff 'denigrated Muslims and called Asian Americans "slopes" and "riceballs".'" *Id.* ¶ 212.

5. "In an article by 'Hatewatch Staff' dated August 10, 2017, published on defendant's website entitled 'Do You Want Bigots, Gavin? Because This Is How You Get Bigots,' defendant falsely stated that plaintiff 'devised' what it falsely describes

as 'the most fertile "in-real-life" recruiting ground for white supremacists and anti-Semites [sic] within today's organized far-right.'" *Id.* ¶ 223.

6. "In an article published on defendant's website by Rachel Janik dated August 17, 2018, entitled 'Kessler falls flat in D.C., but the radical right marches on,' defendant falsely stated that the Proud Boys 'offer their right-wing converts a chance to duke it out in the street with people they disagree with.'" *Id.* ¶ 238.

7. "In an article by Rachel Janik dated October 13, 2018, on defendant's website entitled 'Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event,' defendant falsely stated that plaintiff 'brought a samurai sword to his event.'" *Id.* ¶ 252.

8. "In an article by Rachel Janik dated October 13, 2018 on defendant's website entitled 'Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event,' the title of which is also false and misleading, defendant falsely stated that Mr. McInnes attended 'an anti-Muslim rally' in 2017." *Id.* ¶ 264.

9. "In an article dated October 18, 2018, on defendant's website by 'the Editors' entitled 'Weekend Read: Violence and hate, that's the Proud Boys in a nutshell,' defendant falsely stated that the Proud Boys 'embrace [the] central tenets of white nationalism.'" *Id.* ¶ 278.

10. "In an article dated October 18, 2018, on defendant's website by 'the Editors' entitled 'Weekend Read: Violence and hate, that's the Proud Boys in a nutshell,' defendant falsely described

> plaintiff as an 'extremist' who 'utilizes subterfuge and lies.'" *Id.* ¶ 293.

McInnes alleges that, as a result of SPLC's ten statements, he has been damaged in various ways, including banned from social-media platforms; fired from his job and lost prospective job opportunities; had his reputation ruined; suffered a social boycott in his community; and ostracized by his neighbors.

## III. DISCUSSION

The SPLC argues that McInnes's challenges to the ten statements are deficient because he has, primarily, failed to show the required "actual malice" as to each statement.

### A.

#### 1.

Because "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern," *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46,

50 (1988), "[w]hen applying state defamation law to public figures, the First Amendment imposes additional limitations." *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1252 (11th Cir. 2021) (footnote omitted). McInnes acknowledges he is a "public figure." Plaintiff's Brief (Doc. 70) at 2. Therefore, the First Amendment requires that he demonstrate (1) that the challenged statements are "sufficiently factual to be susceptible of being proved true or false," *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990); (2) that the statements are false, *id.* at 16; and (3) that SPLC made the statements with "actual malice," *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964).

This case turns, primarily, on the third element: actual malice. The question posed by this element is whether the defendant made a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. Contrary to what it may sound like, actual malice has little to do with "evil intent or a motive arising from

spite or ill will." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). Rather, actual malice concerns itself with the speaker's "subjective beliefs about the truth of [its] own statements." *Dershowitz v. Cable News Network, Inc.*, 153 F.4th 1189, 1193 (11th Cir. 2025).

The test is, therefore, a subjective one. *See Coral Ridge*, 6 F.4th at 1252. The core of the inquiry is whether the speaker made a false statement with a 'high degree of awareness of probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (quoting *Garrison v. Louisiana*, 370 U.S. 64, 74 (1964)). The test does not ask what a "reasonably prudent man" would have said, but rather asks what the writer or speaker actually knew. *Id.* That means the plaintiff must put forth "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication." *Id.* "'Mere negligence' is not enough." *Dershowitz,* 153 F.4th at 1193 (quoting *Masson*, 501 U.S. at 510).

Moreover, "[s]peakers' feelings about their subjects are irrelevant--all that matters are the speakers' subjective beliefs about the truth of their own statements." *Dershowitz,* 153 F.4th at 1193; *see also id.* at 1194 ("Dershowitz's assessment of the CNN commentators' feelings about him may well be accurate--but it is also irrelevant. ... [T]he question is not whether they disliked Dershowitz, Trump, or both; it is whether they knew their statements were false.).

"[T]he mere existence of a false statement does not, on its own, demonstrate [a defendant's] knowledge of its falsity." *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 946 (11th Cir. 2017). Neither does a "departure from reasonable journalistic standards" suffice. *Michel* at 703. "[A] failure to investigate, standing on its own, does not indicate the presence of actual malice." *Id.* "Rather there must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth." *Id; see also McInnes,* 811 F.Supp.3d at 1333 ("McInnes's lone assertion that SPLC

never contacted him before publishing also fails to establish actual malice.”). And a plaintiff cannot simply fall back on nefarious motives to prove intent to avoid the truth--as discussed earlier, “the actual malice standard is not about whether the speaker had evil intent.” *Coral Ridge*, 6 F.4th at 1253 n.8.

Finally, and obviously, a challenged statement or word must not be viewed in isolation but rather in full context (here the context of the article at issue), for a statement or word may take on differing meanings depending upon the context in which the statement or word is used. *See, e.g., Greenbelt Co-op. Pub. Ass'n v. Bresler,* 398 U.S. 6, 14 (1970) (“It is simply impossible to believe that a reader who reached the word ‘blackmail’ in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal

offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable.")*.

2.

The court now considers these principles in the posture of this case. To avoid dismissal of his complaint, the plaintiff must "adequately plead that the statements were published with actual malice." *Michel*, 816 F.3d at 702. And the inference of such must be supported in the complaint by more than "conclusory" or "bare-bone allegations." *Coral Ridge*, 6 F.4th at 1251-53. Therefore, to plead actual malice, the plaintiff "must allege facts sufficient to give rise to a reasonable inference that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Michel*, 816 F.3d at 702 (quoting Sullivan, 376 U.S. at 280).

With regard to these requirements, the Eleventh Circuit has explained: "[A]pplication of the plausibility pleading standard makes particular sense when examining public figure defamation suits. In these cases, there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation. Indeed, the actual malice standard was designed to allow publishers the 'breathing space' needed to ensure robust reporting on public figures and events." *Michel*, 816 F.3d at 702 (quoting *Sullivan*, 376 U.S. at 271-72). The Circuit Court then continued: "Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all cases would constrict that breathing space in exactly the manner the actual malice standard was intended to prevent. The costs and efforts required to defend a lawsuit through that stage of litigation could chill free speech nearly as effectively as the absence of the actual malice standard altogether." *Id.* Thus, "a public figure bringing a defamation suit must

plausibly plead actual malice in accordance with the requirements set forth in *Iqbal* and *Twombly*." *Id.*

B.

This lawsuit challenges ten statements as being defamatory. The court, therefore, now turns to each of the ten statements described above and the corresponding count for each statement in McInnes's current complaint.

Count 1: First Statement

The heading for count 1 of McInnes's current complaint is: "*False Claim that Mr. McInnes 'Full-Heartedly Support[ed]' the Unite the Right Rally*." Current Compl. (Doc.58) at 38. McInnes then alleges: "In an article by Bill Morlin dated August 7, 2017 published on defendant's website entitled 'Extremists' "Unite the Right" Rally: A Possible Historic Alt-Right Showcase?', defendant falsely stated that plaintiff 'full-heartedly supports the rally.'" *Id.* ¶ 168.

McInnes's response to the article is that he "did not 'full-heartedly support the rally,'" *id.* ¶ 169, in Charlottesville, Virginia, and that, instead, "[s]pecifically, on June 20, 2017, [he] published a statement on the Proud Boys website disavowing the Unite the Right rally, stating: 'I get that it's about free speech and we want everyone--even white nationalists--to have that right but I think it's coming at a time when we need to distance ourselves from them. I'm not punching right. I'm just not coming to your rally-no offense.'" *Id.* ¶ 171.

However, the article and the evidentiary links cited in the it, all relied on by the parties, reflect the following: (1) Prior to the rally, on June 21, 2017, the Proud Boys did post on its website a purported "Disavowal" by McInnes of the Charlottesville rally. (2) However, that post was replaced about three days later with another statement that the Proud Boys "wished [the Unite the Right organizers] nothing but the best," and "encouraged" interested Proud Boys chapters or individual

members to attend the rally." (3) The second post remained up through the date of the rally itself, August 12, and was, in turn, around August 16, replaced with a post of McInnes's original statement.[2]

Because McInnes was using the website to reflect his views, it was reasonable that anyone following the Proud Boys website would assume that the second of the three statements, the one that appeared just before and during the rally--that the Proud Boys "wished [the Unite the Right organizers] nothing but the best," and "encouraged" interested Proud Boys chapters or individual members to attend the rally"--reflected McInnes's view, albeit a changed one, as well.[3]

---

2. McInnes contends that his statement was still posted on the date of the rally, but the link he relies on does not support this contention. The August 2017 link McInnes relies upon, in conjunction with all the other links relied upon by the parties, shows that his statement reappeared only after the rally.

3. Moreover, in his briefing, McInnes reinforces the above conclusion with the contention that the "statements about the organization reasonably [should be] understood to reflect on him personally" since he was "the founder and leader of the Proud Boys," and "had such a prominent role." Plaintiff's Brief (Doc. 70) at 17.

The allegations in count 1 are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue, when the statement is considered in the context of the entire article, and the links relied upon by both parties.

COUNT 2: Second Statement

The heading for count 2 of McInnes's current complaint is: "*False Claim that Proud Boys are the "Military Arm of the Alt-Right."* Current Compl. (Doc.58) at 40, McInnes then alleges: "In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled 'New "Fight Club" Ready for Street Violence,' defendant falsely stated that the Proud Boys are known as 'the military arm of the Alt-Right.'" *Id.* ¶ 184.

McInnes contends that the statement is false for several reasons, including the following: First, "the Proud Boys organization is not known that way; is not

---

Thus, he saw himself and the Proud Boys as, more or less, one and the same.

affiliated with the Alt-Right movement; and is not a military organization." *Id.* ¶ 185. Second, "[p]laintiff has explicitly disavowed the Alt-Right and has stated that the Proud Boys is a social club, not a militant organization." *Id.* ¶ 186. And, third, "[t]he plain inference of this false statement is that plaintiff himself founded the Proud Boys as a paramilitary organization, terrorist cell or other kind of violent group." *Id.* ¶ 187.

The article actually reads, in part: "Now described as a 'neo-masculine reactionary,' McInnes calls his Proud Boys a 'pro-West fraternal organization.' *Others describe it as the military arm of the Alt-Right.*" Holliday Decl. (Doc. 68), Ex. 1 at 3 (emphasis added). The article fully discloses the basis for the challenged statement, that is, how *others* describe the group: (1) Proud Boys member Kyle Chapman is reported to have created a militant "'tactical defense arm'" of the Proud Boys. *Id.* at 2. (2) Chapman is quoted as having said: "'We don't fear the fight. We are the fight.'" *Id.* (3)

The Proud Boys' initiation ritual included "brawling with antifascists at public rallies." *Id.* at 4. And (4), Chapman had articulated the purpose of the group as designed to "'defend our right wing brethren.'" *Id.*

It is evident from a full reading of the article that McInnes simply disagrees with what Chapman says about the Proud Boys. From Chapman's statements in the article, the author's view is not so off the mark as to reflect that there is no basis for it, and McInnes offers no basis for the author to know that Chapman was not telling it as he saw it. Indeed, the author acknowledges that McInnes was of a different view: "McInnes calls his Proud Boys a 'pro-West fraternal organization.'" Holliday Decl. (Doc. 68), Ex. 1 at 3. McInnes's mere disagreement with Chapman would not allow a factfinder to conclude that SPLC acted with actual malice when it published the article about what others thought.

COUNT 3: Third Statement

The heading for count 3 of McInnes's current complaint is: "*False Claim that the Proud Boys 'Shows Up at Pro-Trump Rallies Looking to Rumble.'*" Current Compl. (Doc.58) at 41. McInnes then alleges: "In an article by Bill Morlin dated April 25, 2017, published on 5\defendant's website entitled 'New "Fight Club" Ready for Street Violence,' defendant falsely stated that the Proud Boys 'shows up at pro-Trump rallies looking to rumble,' i.e., to get into violent confrontations." Current Complaint (Doc.58) ¶ 198.

McInnes's response to the article is that the statement is false for several reasons, including the following: (1) SPLC "had no evidence that the Proud Boys attended rallies seeking to engage in violence." *Id.* ¶ 205. (2) "[W]hile, under club policy, Proud Boys members may defend themselves if attacked, like all other citizens, they do not and may not proactively initiate physical confrontation." *Id.* ¶ 199. (3) "The Proud Boys does not attend rallies seeking to engage in violence and

it is against the policies of the Proud Boys to do so." *Id.* ¶ 200. (4) "The plain inference of this false statement is that plaintiff himself founded the Proud Boys as a paramilitary organization, terrorist group or other kind of violent group." *Id.* ¶ 201.

However, the article expressly notes that part of the "initiation ritual" for becoming a member of the Proud Boys is "brawling with antifascists at public rallies," and, in support of the comment, the article has a link to another article that relates the comment, and the other article also reports where McInnes himself allegedly said that, to become a member of the Proud Boys, "You must get beat up, kick the crap out of an antifa, and possibly get arrested." Holliday Decl. (Doc. 68-3), Ex. 1 at 5. Notably, in his reply to SPLC's dismissal motion, McInnes does not challenge the "brawling with antifascists at public rallies" reference, nor does he challenge the "get beat up" and "kick the crap out of an antifa" references. Instead, he asserts in his current complaint that the club had a policy

against "confrontations" and "violence." The allegation that the club had such a policy is not enough to support the conclusion that SPLC's publication of a statement about alleged actions contrary to that policy constituted actual malice.

In his reply brief, McInnes further offers the conclusory statement that "SPLC knew the Proud Boys do not attend rallies seeking to engage in violence and that it is against their policies to do so," Plaintiff's Brief (Doc. 70) at 13, but he doesn't say how SPLC was to have known this.[4]

---

4. In addition, in the context of the article, the phrase "looking to rumble" is "loose, figurative language that no reasonable person would believe presented facts." *Horsley*, 304 F.3d 1125, at 1132-1133, and, thus, is "exempt from liability" as "simply 'rhetorical hyperbole.'" *Id.* at 1132 (citation omitted); *see also id.* at 1131 ("The Supreme Court has long recognized 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.' ... Acknowledging that debate 'may well include vehement, caustic, and sometimes unpleasantly sharp attacks,' ... the Court nevertheless has decided that such attacks are constitutionally protected and those who make them are exempt from liability for defamation if the attacks are simply 'rhetorical hyperbole.' The constitutional protection provided rhetorical hyperbole 'reflects "the reality that exaggeration and non-literal

The allegations in the current complaint, with regard to count 3, are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue.

.

Count 4: Fourth Statement

The heading for count 4 of McInnes's current complaint is: "*False Claim that McInnes 'Denigrated Muslims and Called Asian Americans "Slopes" and "Riceballs."'*" Current Compl. (Doc.58) at 43. McInnes then alleges: "In an article by Bill Morlin dated April 25, 2017, published on defendant's website entitled 'New "Fight Club" Ready for Street Violence,' defendant falsely stated that plaintiff 'denigrated Muslims and called Asian Americans "slopes" and "riceballs."'" *Id.* ¶ 212.

McInnes's response to the article is that the author's statement is false because he "did not denigrate

---

commentary have become an integral part of social discourse.'") (cleaned up).

Muslims and did not call Asian Americans 'slopes' and 'riceballs.'" *Id.* ¶ 213.

The actual sentence in the article reads: "McInnes ... more recently has been ... a contributor for the racist site VDARE where he denigrated Muslims and called Asian Americans 'slopes' and 'riceballs.'" Holliday Decl. (Doc. 68-5), Ex. 3 at 3. SPLC states that McInnes called Asians "slopes" and "riceballs" in an article he wrote in Taki's Magazine. *See* Holliday Decl. (Doc. 68-2), Ex. 2, ¶ 24. The article, with a byline showing McInnes as the author, states in part:

> "Asians are so good with computers that if you make them mad on the Internet you had better be prepared for a tsunami of terabytes in retaliation. I recently made the mistake of doing a humorous piece about 'Asian privilege,' which was nothing more than an article about white privilege with the word 'white' replaced with 'Asian.' Virtually no *slopes* got the joke and my phone almost overheated with angry emails, re-Tweets, Facebook posts, and texts. (How did those tenacious *riceballs* get my number?) I even won an award for 'Hipster Racism.' I didn't apologize and eventually they went away. That's the way it works with the Perpetually Offended. They feed off apologies. They're vindicated by them. The more apologies you give them, the more they demand. And Asians are particularly demanding."

*Id.*[5]

Notably, in his brief in reply to the dismissal motion, *see* Plaintiff's Brief (Doc. 70), McInnes does not say he did not write the Taki's Magazine article or that the article is fraudulent or does not exist; nor, importantly, does he provide a basis to conclude that SPLC should have known not to rely on the Taki's Magazine article. Puzzlingly, in his brief, he just ignores the existence of the article in the record.

The allegations in the current complaint, with regard to count 4, are insufficient to reflect that SPLC acted with "actual malice" in making the statement that McInnes called Asians "slopes" and "riceballs."

As to the "denigrate Muslims" statement, it is, first, simply the author's opinion, not a fact. Second,

---

5. Earlier in this opinion, the court discussed "the 'incorporation by reference' doctrine, ... under which a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment" in certain circumstances. *Horsley,* 304 F.3d at 1134.

it is one supported by comments from an article whose authenticity McInnes does not challenge and which has statements (often with supporting links) McInnes, in his reply brief to the dismissal motion, does not deny making: self-identifying as an "Islamophobe"; calling Islam a "rape culture"; saying that "Muslims have a problem with inbreeding" and that a "disproportionate number" of Muslims are "mentally damaged inbreds"; and saying that "Muslims are stupid. And the only thing they really respect is violence and being tough." Holliday Decl. (Doc. 68-9), Ex. 7. Whether these comments denigrate Muslims is a matter of opinion.

The allegations in the current complaint, with regard to count 4, are insufficient to reflect that SPLC acted with "actual malice" as to the "denigrate Muslims" statement.

Count 5: Fifth Statement

The heading for count 5 of McInnes's current complaint is: "*False Claim that McInnes Devised the "Most*

*Fertile 'In-Real-Life' Recruiting Ground for White Supremacists and Anti-Semites."* Current Compl. (Doc. 58) ¶ 44. McInnes then alleges that "In an article by 'Hatewatch Staff' dated August 10, 2017, published on defendant's website entitled 'Do You Want Bigots, Gavin? Because This Is How You Get Bigots,' defendant falsely stated that plaintiff 'devised' what it falsely describes as 'the most fertile 'in-real-life' recruiting ground for white supremacists and anti-Semites [sic] within today's organized far-right.'" *Id.* ¶ 223.

McInnes's response to the article includes the following: "The statement is false because plaintiff did not devise any recruiting ground for white supremacists and anti-Semites, much less the 'most fertile' one, assuming that a 'recruiting ground' can even be 'fertile.'" *Id.* ¶ 224. To support this allegation, McInnes further alleges:

(1) "The Proud Boys explicitly prohibits white supremacists and anti-Semites from membership, as stated in its bylaws." *Id.* ¶ 225.

(2) "The article quoted ... does not set forth facts to support the accusation that the Proud Boys is 'the most fertile' recruiting ground for white supremacists and antisemites, but, rather, imputes to the organization the bigoted rhetoric of a handful of members or former members." *Id.* ¶ 226.

(3) "Indeed, while the article itself admits that such comments 'notably complicate the 'either-Nazi-or-not' binary that McInnes uses to define his own organization's boundaries--'either-Proud Boy-or-not'--that is, his claim, while leader of the Proud Boys, that neo-Nazis were not welcome in the organization, the title of the article, far from alluding to any complications, simplistically and misleadingly tars Mr. McInnes with the brush of members or former members who admitted that their comments were inconsistent with plaintiff's stated positions." *Id.* ¶ 227.

(4) "Defendant knew the statement, as well as its framing in a manner meant to associate it with plaintiff,

was false or acted with reckless disregard for its truth or falsity because defendant was aware of the Proud Boys' bylaws which explicitly prohibit white supremacists and antisemites from membership, and because the sources defendant quoted explicitly admitted that their sentiments were contrary to those bylaws and Mr. McInnes's views both personal and as a leader of the Proud Boys." *Id.* ¶ 232.

In determining the adequacy of McInnes's allegations in Count 5, the court, of course, begins with the article itself. The paragraph in the article reads: "Despite McInnes's protestations on social media and elsewhere, he's devised, perhaps inadvertently, the most fertile 'in real life' recruiting ground for white nationalists and anti-Semites within today's organized far-right." Holliday Decl. (Doc. 68-5), Ex. 3 at 5.

The alleged facts on which above paragraph is based are disclosed in the article. The article recounts purported case studies involving different persons associated with the Proud Boys and allegedly follows at

least two of them from an initial association with the Proud Boys to their becoming allegedly involved with the "alt-right." *Id.* at 15-40. The article then also acknowledges that "it's true that the Proud Boys have expelled fascists from their events." *Id.* at 37. The article then gives, as an example, the following: "Just last month, William Scott Planer--a Golden State Skinhead who has since been arrested for allegedly attacking a protester at a white supremacist rally last July and on charges related to his alleged involvement in the vandalizing of a synagogue with anti-Semitic materials--took part in a Free Speech rally hosted by the Proud Boys-Colorado chapter. Planer was wearing a shirt-printed in Proud Boys colors--that carried the slogan, "Proud to be a Fascist," and a Totenkopf. Members of the Proud Boys publicly disavowed Planer on the spot." *Id.* at 37-38. The article then opines: "Playing gatekeeper is an impossible task for McInnes--particularly when Proud Boys events can't seem to stop attracting individuals that they claim to despise

or who can't abide by their own proclamations and avowals." *Id.* at 37.

The article, therefore, lays out, on one hand, the allegations that support the author's view that McInnes not only disavows bigoted views, he acts to expel those from the group who hold such; and that, on the other hand, the group still attracts persons with those views.

McInnes does not challenge the article's assertion that the Proud Boys has had members who hold the views described in the article. He does not challenge the article's stories of persons associated with group. He, instead, attempts to write off the views and comments of those members as "the bigoted rhetoric of a handful of members or former members." *Id.* ¶ 226. He complains that SPLC quoted sources who "admitted that their sentiments were contrary to [the Proud Boys'] bylaws and Mr. McInnes's views both personal and as a leader of the Proud Boys." *Id.* ¶ 232. But the fact that these views and comments were contrary to his views and inconsistent with the Proud Boys' bylaws does not mean that these

former members did not have the views asserted in the article.[6]

Count 5 essentially reflects a dispute over what conclusions to draw from the underlying factual allegations in the article. The allegations in the current complaint, with regard to count 5, are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue. The complaint

---

6. The article also gives this broadcast exchange in support of the disjunct between what McInnes's believes or states and what is allegedly occurring within the Proud Boys:

> "Caeralus Rex: Let's be honest. Let's not bullshit. Gavin [McInnes] can say whatever he wants in a video about how, 'Oh, we don't admit Nazis in the Proud Boys,' or whatever. Dude, all the guys, all the Alt-Lite-Knight Proud F— or whatever that showed up to [Pikeville], if they were just hanging out at the bar with me and the guys from my pool party and they were pressed on the issue, I guarantee you that like 90 % of them would tell you something along the lines of, 'Hitler was right. Gas the Jews.'
>
> "Dunstan: I'm pretty sure we have some news for Gavin about his little organization. If he disallowed all Nazis, he'd be left with nothing but a couple of Jews."

Holliday Decl. (Doc. 68-5), Ex. 3 at 7-8.

fails to provide specific, nonconclusory allegations that SPLC made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280.

Count 6: Sixth Statement

The heading for count 6 of McInnes's current complaint is: "*False Claim that Proud Boys 'Offer Their Right-Wing Converts a Chance to Duke It Out in the Street.'*" Current Compl. (Doc. 58) at 46. McInnes then alleges that "In an article published on defendant's website by Rachel Janik dated August 17, 2018, entitled 'Kessler falls flat in D.C., but the radical right marches on,' defendant falsely stated that the Proud Boys 'offer their right-wing converts a chance to duke it out in the street with people they disagree with.'" *Id.* ¶ 238.

McInnes's response to the article includes the following:

(1) "This statement is false because the Proud Boys does not offer anyone 'a chance to duke it out in the street with people they disagree with.' The Proud Boys does not promote or encourage violence and certainly does not 'offer' members the chance, nor does it approve of or permit members, to initiate violence against people who merely 'disagree with' them." *Id.* ¶ 239.

(2) "This plain implication of this statement is that plaintiff founded an organization that attracted and kept members by offering them the opportunity to engage in violence with persons with whom they disagree, a statement for which defendant could not and did not have any factual basis." *Id.* ¶ 240.

However, a similar article challenged in count 3 of the current complaint expressly notes the following: (1) Proud Boys affiliate Kyle Chapman is reported to have created a militant "tactical defense arm" of the Proud Boys. Holliday Decl. (Doc. 68-3), Ex. 1 at 3. (2) Chapman is quoted as having said: "We don't fear the fight. We are the fight." *Id.* (3) The Proud Boys'

initiation ritual included "brawling with antifascists at public rallies." *Id.* at 5. And (4), Chapman had articulated the purpose of the group as designed to "defend our right wing brethren." *Id.* And Chapman describes his relationship with the Proud Boys as follows: "'I'm proud to announce that my newly created Fraternal Order of Alt-Knights will be partnering with Proud Boys,' Chapman said, with the 'full-approval' of its founder, Gavin McInnes." *Id.* at 3. He then went on to describe his group "as a 'fraternal organization,' a Proud Boys affiliate chapter, 'with its own bylaws, constitution, rituals and vetting processes.'" *Id.* at 4. And, in the article challenged in count 6, it is stated, with a supporting link, that, in March 2017, "Chapman became a star for beating a man over the head with the stick." *Id.*[7]

---

7. McInnes also asserts that the article1s use of the term "convert," in the phrase "right wing converts," "exacerbates the defamatory nature of the overall statement [at issue] because it implies that plaintiff founded and 1ed an organization that 'converted' or programmed individuals to change their political views as well as their attitude toward, tolerance of and

Count 6 essentially reflects a dispute over what conclusions to draw from the underlying factual allegations in the articles challenged in counts 3 and 6. The allegations in the current complaint, with regard to count 6, when read in conjunction with those in related count 3, are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue. The complaint fails to provide specific, nonconclusory allegations that SPLC made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280.[8]

---

appetite for violence," Current Compl. (Doc. 58) ¶ 241; and the article "misleadingly suggests, by the use of the word 'convert,' that members of the Proud Boys are programmed, weak-minded or mentally defective." *Id.* ¶ 245. There is nothing in the article to support these assertions.

8. In addition, in the context of the article, the phrase "chance to duke it out" is "loose, figurative language that no reasonable person would believe presented facts," *Horsley*, 304 F.3d at 1132-1133 (cleaned up), and, thus, is "exempt from liability" as "simply 'rhetorical hyperbole.'" *Id.* at 1132 (citation omitted); *see also supra* note 4.

**Count 7: Seventh Statement**

**The heading for count 7 of McInnes's current complaint is: "*False Claim that Mr. McInnes 'Brought a Samurai Sword' to a Public Event.*" Current Compl. (Doc. 58) at 47. McInnes then alleges: "In an article by Rachel Janik dated October 13, 2018, on defendant's website entitled 'Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event,' defendant falsely stated that plaintiff 'brought a samurai sword to his event.'" *Id.* ¶ 252.**

**McInnes's response to the article includes the following:**

**(1) "This statement is false because plaintiff did not bring a samurai sword to his event. Consistent with his persona as a humorist, plaintiff appeared with a toy sword made of plastic, which was also broken." *Id.* ¶ 253.**

**(2) "Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant had access to information showing that the sword was a toy, not a real samurai sword." *Id.* ¶ 257.**

However, as the U.S. Supreme Court made clear in *New York Times v. Sullivan*, merely having access to information that could potentially contradict the challenged reporting does not amount to publication of that reporting with knowledge of its falsity or despite a high degree of awareness of its probable falsity. 376 U.S. at 287 (deeming irrelevant to the actual malice test "evidence that the Times published the advertisement without checking its accuracy against [potentially contradictory] news stories in the Times' own files"). In any event, McInnes does not indicate what reliable source the author could have accessed, at the time, to reveal the sword was a toy, and not real. The allegation that SPLC "had access to information showing that the sword was a toy, not a real samurai sword" is merely conclusory.

As to the article itself, the full paragraph stated: "The assaults came after Proud Boys founder Gavin McInnes wrapped up remarks at the Metropolitan Republican Club located on the Upper East Side in New York. McInnes

brought a samurai sword to his event after promising on his Instagram page to reenact the assassination of Japanese Socialist Inejiro Asanuma by teenage ultranationalist Otoya Yamaguchi. He called the killing, which was caught on national television and shocked the nation, an 'inspiring moment.'" Holliday Decl. (Doc. 68-7), Ex. 5 at 4. The article then, in turn, provided a link to a supporting article that said essentially the same thing. Neither the article in count 7, nor the underlying linked article, mentioned that the sword McInnes used for the reenactment was not real, but a toy. The articles just didn't mention whether the sword was real. (In any event, there is no allegation that McInnes intended to use the sword for any purpose other than as a prop for the reenactment.)

The allegations in the current complaint, with regard to count 7, are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue. The complaint fails to provide specific, nonconclusory allegations that SPLC made the statement "with knowledge

that it was false or with reckless disregard of whether it was fal.se or not." *New York Times*, 376 U.S. at 280.

Count 8: Eighth Statement

The heading for count 8 of McInnes's current complaint is: "*False Claim. that Mr. McInnes Attended 11an Anti-Muslim Rally.*" Current Compl. (Doc. 58) at 49. McInnes then alleges: "In an article by Rachel Janik dated October 13, 2018, on defendant's website entitled 'Far-right skinheads join Proud Boys in assaulting protesters in New York City following Gavin McInnes event,' defendant falsely stated that Mr. McInnes attended 'an anti-Muslim rally' in 2017." *Id.* ¶ 264.

McInnes's response to the article includes the following:

(1) "This statement is false because plaintiff did not attend an anti-Muslim rally. Plaintiff attended a March Against Sharia rally." *Id.* ¶ 265.

**(2) "The rally was meant to express opposition to implementation of Islamic religious law in secular society, not to Islam or its adherents."** ***Id.*** **¶ 266.**

**"Sharia" is defined by one legal source as, "The body of Islamic religious law applicable to police, banking, business, contracts, and social issues," Black's Law Dictionary (12th ed. 2024); and "Islamic law" is, in turn, defined as, "The system of religious and ethical rules that regulate the lives of Muslims, comprising ordinances regarding worship and ritual, political rules, and legal rules."** ***Id.***

**Here, with above definitions in mind, the court emphasizes that McInnes does not indicate how SPLC should have known that the rally was limited in purpose in the way he asserts. He does not indicate how the rally was made public in general, nor whether the publicity, if any, was limited as he asserts. All he gives are his own personal views about the purpose of the rally. He offers no basis for the conclusion, other than his own, that**

SPLC should have shared his view of the purpose of the rally.[9]

The allegations in the current complaint, with regard to count 8, are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue. The complaint fails to provide specific, nonconclusory allegations that SPLC made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 316 U.S. at 280.

COUNT 9: Ninth Statement

The heading for count 9 of McInnes's current complaint is: "*False Claim that the Proud Boys Embrace the Central Tenets of White Nationalism.*" Current Compl. (Doc. 58) at 50. McInnes then alleges: "In an article dated October 18, 2018, on defendant's website by 'the

9. Also, whether a person who is "anti-Sharia" could or could not also be viewed as an "anti-Muslim"--that is, that an anti-Sharia viewpoint may be rooted in an anti-Muslim bias--could be a matter of opinion.

Editors' entitled 'Weekend Read: Violence and hate, that's the Proud Boys in a nutshell,' defendant falsely stated that the Proud Boys 'embrace [the] central tenets of white nationalism.'" *Id.* ¶ 278.

McInnes's response to the article includes the following: "This statement is false because the Proud Boys did not, and not [sic], embrace the central tenets of white nationalism." *Id.* ¶ 279. He then explains: "The Proud Boys explicitly prohibit white nationalism in their bylaws and include members of all races." *Id.* ¶ 281. And, in support of his contention of "actual malice," McInnes states: "Defendant knew the statement was false or acted with reckless disregard for its truth or falsity because defendant was aware of or recklessly disregarded the fact that the Proud Boys' by laws explicitly prohibit white nationalism." *Id.* ¶ 286.

However, the point of the article's writer, right or wrong, is that there is a dichotomy between what the Proud Boys avow and what they do or assert themselves. The full paragraph, containing the challenge statement,

is as follows: "Groups like the Proud Boys represent a new face of the radical right. They relish street fighting, *simultaneously disavow* the term 'white nationalism' and embrace its central tenets and they insist on calling their agenda simply one of 'anti-political correctness'--a wild understatement that signals how far we seemed to have wandered in this political moment, from the facts." Holliday Decl. (Doc. 68-8), Ex. 6 at 4.

Thus, the writer of the article expressly acknowledges that the group "disavows" the term "white nationalism," as does McInnes when he states that, "The Proud Boys explicitly prohibit white nationalism in their bylaws." The writer then simply goes further and says that an individual person can "disavow" one thing and then act, or say something, to the contrary. McInnes does show how someone could not have a similar opinion about the Proud Boys.[10]

---

10. Moreover, the writer's drawing of dichotomies is further expressed in the paragraphs leading up to the paragraph at issue--in particular, with

The allegations in the current complaint, with regard to count 9, are insufficient to reflect that SPLC acted with "actual malice" in making the statement at issue. The complaint fails to provide specific, nonconclusory allegations that SPLC made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280.

COUNT 10: Tenth Statement

---

regard to McInnes. An earlier paragraph states: "McInnes has denied that his group has any connection to the racist 'alt-right,' even as its members marched in Charlottesville, Virginia, alongside Richard Spencer, the most prominent alt-right leader." Holliday Decl. (Doc. 68-8), Ex. 6 at 3. And another, earlier paragraph states: "He's denied that the group is any different from other fraternal orders, like the Shriners or the Elks. But the Proud Boys calls its members 'Western chauvinists,' and they initiate prospective members by beating them up while requiring them to name five breakfast cereals." *Id.* And another paragraph states: "McInnes has also denied that the hate group seeks out violence, even as his thugs march alongside neo-Nazis and white supremacist hate groups. 'We don't start fights, but we will finish them,' he wrote last year." Id. at 4.

Finally, the heading to count 10 of McInnes's current complaint is: "*False Claim that Mr. McInnes 'Utilizes Subterfuge and Lies.'*" Current Compl. (Doc. 58) at 52. McInnes then alleges: "In an article dated October 18, 2018, on defendant's website by 'the Editors' entitled 'Weekend Read: Violence and hate, that's the Proud Boys in a nutshell,' defendant falsely described plaintiff as an 'extremist' who 'utilizes subterfuge and lies.'" *Id.* ¶ 293.

McInnes's response to the article includes the following: "[P]laintiff is not an extremist and does not utilize subterfuge and lies. Plaintiff is a humorist and commentator who expresses his views openly and honestly." *Id.* ¶ 294.

However, as noted earlier in this opinion, so as to give context, the court begins with the paragraph containing the statement: "'They've utilized subterfuge and lies to keep that hate group tag from being applied to them,' Jenkins said. 'Every time their members are seen doing things they're not supposed to be doing, like

showing up at Unite the Right, they claim that person left the Proud Boys.'" Holliday Decl. (Doc. 68-8), Ex. 6 at 5-6. The article reflects that the person stating this opinion was Daryle Lamont Jenkins of One People Group.

It is clear from the statement that Jenkins opined, first, that *he* believed the Proud Boys "utilized subterfuge and lies to keep that hate group tag from being applied to them," and, second, that *he* based *his* opinion on *his* belief or observation that, "Every time their members are seen doing things they're not supposed to be doing, like showing up at Unite the Right, they claim that person left the Proud Boys." This understanding is important because it appears that McInnes assigns the "subterfuge and lies" comment to the *author* of the article, and then accuses the *author* of basing that comment on other statements in the article by McInnes where he is supposed to have said one thing and then said something to deceptively avoid taking responsibility for a later event or result that was

contradictory to what he first said. He appears to be saying that the author of the article has accused him, that is, McInnes, of engaging in "subterfuge and lies."

In count 10, in paragraph 295, McInnes says that the "article, in fact, builds its "subterfuge and lies" claims on a series of misstatements of its own." Then, in the paragraphs that followed, McInnes alleges that, with the words "subterfuge and lies," the author of the article was accusing him of lying in his three "denials" as they are referenced in ¶¶ 296, 297, & 299 of the current complaint and appeared as follows in the article, Holliday Decl. (Doc. 68-8), Ex. 6 at 3:

(1) "McInnes has denied that his group has any connection to the racist 'alt-right,' even as its members marched in Charlottesville, Virginia, alongside Richard Spencer, the most prominent alt-right leader."

(2) "He's denied that the group is any different from other fraternal orders, like the Shriners or the Elks. But the Proud Boys calls its members 'Western chauvinists,' and they initiate prospective members by

beating them up while requiring them to name five breakfast cereals.”

(3) “McInnes has also denied that the hate group seeks out violence, even as his thugs march alongside neo-Nazis and white supremacist hate groups. ‘We don't start fights, but we will finish them,’ he wrote last year.”

The article makes clear, however, that the words "subterfuge and lies" were uttered by Jenkins and were based on only Jenkins's opinion about the Proud Boys: "Every time their members are seen doing things they’re not supposed to be doing, like showing up at Unite the Right, they claim that person left the Proud Boys." There is nothing in the article to indicate that Jenkins was even aware of, let alone relied on, the above three “denials” by McInnes. There is nothing to indicate that Jenkins leveled his "subterfuge and lies" comment at McInnes based on McInnes’s three denials.

Nevertheless, there is the fact that the author does repeat Jenkins's “subterfuge and lies” criticism in the

article. However, in leveling his criticism, Jenkins uses the nondescript terms "they" and "their." It is not clear whether he is directing his criticism at the Proud Boys in general or to just some of them, and, if the latter, which ones. He does not say that McInnes is the object of his criticism. Also, Jenkins is not clear as to what conduct is the basis for his "subterfuge and lies" criticism. It may have included something that McInnes did or said or it may have included something that only some other group members did or said. The bottom line is that the allegations in count 10 are insufficient to indicate that the author should have known that Jenkins's criticism was directed at McInnes and was based on McInnes's conduct, and further made the criticism with knowledge that it was false or with reckless disregard of whether it was false.[11]

---

11. Moreover, there is nothing in count 10's allegations to suggest that McInnes believed that, while Jenkins's comments were based on his own beliefs and observations, the author must still have intended for the criticism to apply to McInnes, for McInnes does not even mention Jenkins in count 10 or otherwise connect Jenkins and his comments to McInnes. The allegations in count

As to the word "extremist," McInnes challenges it as defamatory in the body of count 10 ("defendant falsely described plaintiff as an '*extremist*' who 'utilizes subterfuge and lies,'" Current Compl. (Doc. 58) ¶ 293) (emphasis added), but does not challenge it as defamatory in the heading ("*False Claim that Mr. McInnes 'Utilizes Subterfuge and Lies,'" id.* at 52). Also, in his brief where he discusses count 10, McInnes mentions only "subterfuge and lies" and does not mention "extremist" as the basis for his defamation claim. Plaintiff's Brief (Doc. 70) at 14 ("Count X (utilizing 'subterfuge and lies'): Mr. McInnes alleges SPLC had no evidence he engaged in subterfuge and lies, suggesting reckless disregard for the truth."). But most importantly, in the paragraph where McInnes accuses SPLC of actual malice (that is, that SPLC "knew the statement was false or acted with reckless disregard of its truth or falsity," Current Compl. (Doc. 58) ¶ 304), he refers to only

10 simply suggest that the author alone was the source of the criticism.

**article's use of the words "subterfuge and lies." As a result, McInnes fails to allege that SPLC use the word extremist with "actual malice."[12]**

**Therefore, the allegations in the current complaint, with regard to count 10, are insufficient to reflect that SPLC acted with "actual malice" in using the words at issue. The complaint fails to provide specific, nonconclusory allegations that SPLC used the words "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New York Times*, 376 U.S. at 280.**

## IV. CONCLUSION

---

**12. In addition, in the context of the article, the words "extremist," "subterfuge," and "lies" were "loose, figurative words that no reasonable person would believe presented facts," *Horsley*, 304 F.3d at 1132-1133 (cleaned up), and, thus, is "exempt from liability" as "simply 'rhetorical hyperbole.'" *Id.* at 1132 (citation omitted); *see also supra* note 4.**

For the foregoing reasons, the court will grant SPLC's motion to dismiss, in this case will be dismissed. An appropriate final judgment will be entered.

DONE, this the 16th day of November, 2026.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE